No. 25-_____

# United States Court of Appeals for the Eighth Circuit

*IN RE* EXXON MOBIL CORP.,

*Defendant–Petitioner,*

Petition for Writ of Mandamus to the United States District Court for the
Western District of Missouri, (Hon. Stephen R. Bough)
No. 4:24-cv-00803-SRB

## PETITIONER'S APPENDIX

William F. Ford
Richard N. Bien
LATHROP GPM LLP
2345 Grand Boulevard
Suite 2200
Kansas City, MO 64108
(816) 292-2000

Zachary D. Tripp
WEIL, GOTSHAL & MANGES LLP
2001 M Street NW, Suite 600
Washington, DC 20036
(202) 682-7000
Zack.Tripp@weil.com

David J. Lender
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
(212) 310-8000

*Counsel for Exxon Mobil Corp.*

# TABLE OF CONTENTS

Page(s)

Exhibit 1, Order Denying Motion to Transfer
(Jan. 21, 2025), Dkt. 49 ............................................... App. 1–App. 3

Exhibit 2, Order Denying Motion to Reconsider
(Feb. 10, 2025), Dkt. 92 ............................................... App. 4–App. 6

Exhibit 3, Complaint, No. 2:24-cv-02547 (D. Kan.)
(Nov. 27, 2024), Dkt. 1 ............................................... App. 7–App. 53

Exhibit 4, Docket, No. 2:24-cv-02547 (D. Kan.) ............ App. 54–App. 58

Exhibit 5, Complaint, No. 4:24-cv-00803 (W.D. Mo.)
(Dec. 16, 2024), Dkt. 1 ........................................... App. 59–App. 151

Exhibit 6, Docket, No. 4:24-cv-00803 (W.D. Mo.) ....... App. 152–App. 175

Exhibit 7, Exxon Mobil Corp.'s Suggestions in Support of Motion to
Transfer
(Dec. 22, 2024), Dkt. 4 ......................................... App. 176–App. 188

Exhibit 8, Plaintiffs' Notice in Response to Motion to Transfer
(Jan. 17, 2025), Dkt. 47 ....................................... App. 189–App. 193

Exhibit 9, First Amended Complaint
(Jan. 17, 2025), Dkt. 48 ....................................... App. 194–App. 292

Exhibit 10, Exxon Mobil Corp.'s Motion to Reconsider
(Jan. 22, 2025), Dkt. 55 ....................................... App. 293–App. 303

Exhibit 11, Plaintiffs' Suggestions in Opposition to Motion to
Reconsider
(Feb. 2, 2025), Dkt. 82 ......................................... App. 304–App. 315

Exhibit 12, Exxon Mobil Corp.'s Reply Suggestions in Support of Motion
to Reconsider
(Feb. 10, 2025), Dkt. 90 ....................................... App. 316–App. 325

Exhibit 13, Kansas's Suggestions in Support of Motion for Limited
     Intervention
       (Feb. 4, 2025), Dkt. 81 .......................................... App. 326–App. 344

# Exhibit 1

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\*** Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.

**U.S. District Court**

**Western District of Missouri**

**Notice of Electronic Filing**

The following transaction was entered on 1/21/2025 at 6:45 PM CST and filed on 1/21/2025

| | |
|---|---|
| **Case Name:** | Rodriguez et al v. Exxon Mobil Corporation et al |
| **Case Number:** | 4:24-cv-00803-SRB |
| **Filer:** | |
| **Document Number:** | 49(No document attached) |

**Docket Text:**
Before the Court is Defendant Exxon Mobil Corporation's Motion to Transfer Venue (Doc. #[3]) and Motion to Stay Proceedings (Doc. #[5]). Upon review, as Plaintiff has voluntarily dismissed his parallel lawsuit in the District of Kansas, the motions are DENIED AS MOOT. Signed on 1/21/2025 by District Judge Stephen R. Bough. This is a TEXT ONLY ENTRY. No document is attached. (Peters, Tracey)

**4:24-cv-00803-SRB Notice has been electronically mailed to:**

Rex A Sharp   rsharp@midwest-law.com, rex-sharp-6631@ecf.pacerpro.com, roberta-ranes-1070@ecf.pacerpro.com, rranes@midwest-law.com

William F. Ford   bill.ford@Lathropgpm.com, kellie.bennett@lathropgpm.com

Richard N Bien   richard.bien@lathropgpm.com, amy.smith@lathropgpm.com

Kara Trouslot Stubbs   stubbs@bscr-law.com, kheath@bscr-law.com, mcarrillo@bscr-law.com

Robert M. Thompson   rmthompson@bclplaw.com, ECF_KC@bryancave.com, maforge@bryancave.com

Thomas P. Schult   tschult@berkowitzoliver.com, dfigge@berkowitzoliver.com, slibel@berkowitzoliver.com

Karrie J. Clinkinbeard   kclinkinbeard@atllp.com, KCLitDocket@atllp.com, ecf@atllp.com, lervin@atllp.com

William G. Wright   gwright@midwest-law.com, cary-baumann-7624@ecf.pacerpro.com, cbaumann@midwest-law.com, greg-wright-6619@ecf.pacerpro.com, mari-gribble-9999@ecf.pacerpro.com, roberta-ranes-1072@ecf.pacerpro.com, rranes@midwest-law.com, stetuan@midwest-law.com, summer-tetuan-0813@ecf.pacerpro.com

Robert J Hoffman   rjhoffman@bclplaw.com, bob-hoffman-5484@ecf.pacerpro.com, ecf_kc@bclplaw.com

Booker T Shaw   bshaw@thompsoncoburn.com, kwalker@thompsoncoburn.com

Sarah Bradshaw   sbradshaw@midwest-law.com, cary-baumann-7624@ecf.pacerpro.com, cbaumann@midwest-law.com, roberta-ranes-1072@ecf.pacerpro.com, rranes@midwest-law.com, sarah-bradshaw-4986@ecf.pacerpro.com, stetuan@midwest-law.com, summer-tetuan-0813@ecf.pacerpro.com

Brian Nye   bnye@atllp.com, brian-nye-4897@ecf.pacerpro.com, ecf@atllp.com, kclitdocket@atllp.com

Grant A. Harse   grant.harse@lathropgpm.com

David J Lender   david.lender@weil.com, david-lender-8619@ecf.pacerpro.com, mco.ecf@weil.com

Lauren Tallent   ltallent@berkowitzoliver.com, sgoulden@berkowitzoliver.com

Grace E. Martinez   grace.martinez@bclplaw.com, ECF_KC@bclplaw.com, grace-colato-martinez-5201@ecf.pacerpro.com

Brody Sabor   brody.sabor@lathropgpm.com

Rachel P. Raphael    rachel.raphael@morganlewis.com

Emma Halling    emma.halling@lathropgpm.com

Hammons P. Hepner    hhepner@midwest-law.com

Courtney Kroeger    ckroeger@berkowitzoliver.com

David L. Schrader    david.schrader@morganlewis.com

Willam T. McEnroe    william.mcenroe@morganlewis.com

**4:24-cv-00803-SRB It is the filer's responsibility for noticing the following parties by other means:**

# Exhibit 2

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**

***NOTE TO PUBLIC ACCESS USERS*** Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.

**U.S. District Court**

**Western District of Missouri**

**Notice of Electronic Filing**

The following transaction was entered on 2/10/2025 at 6:16 PM CST and filed on 2/10/2025

| | |
|---|---|
| **Case Name:** | Rodriguez et al v. Exxon Mobil Corporation et al |
| **Case Number:** | 4:24-cv-00803-SRB |
| **Filer:** | |
| **Document Number:** | 92(No document attached) |

**Docket Text:**
Before the Court is Defendant Exxon Mobil Corporation's Motion for Reconsideration. (Doc. #[55].) To support a motion for reconsideration for an interlocutory order, a moving party must demonstrate "(1) that it did not have a fair opportunity to argue the matter previously, and (2) that granting the motion is necessary to correct a significant error." *Provisur Techs., Inc. v. Weber, Inc.*, No. 19-CV-06021-SRB, 2022 WL 22883433, at *1 (W.D. Mo. Aug. 18, 2022) (internal citations omitted). However, the Court "has an interest in judicial economy and ensuring respect for the finality of its decisions, values that would be undermined if it were to routinely reconsider its interlocutory orders." *Disc. Tobacco Warehouse, Inc. v. Briggs Tobacco & Specialty Co.*, No. 3:09-CV-05078-DGK, 2010 WL 3522476, at *1 (W.D. Mo. Sept. 2, 2010). Therefore, a "district court has wide discretion over whether to grant a motion for reconsideration of a prior order[.]" *SPV-LS, LLC v. Transamerica Life Ins. Co.*, 912 F.3d 1106, 1111 (8th Cir. 2019). Upon review, the motion has been duly considered and is DENIED. Signed on 2/10/2025 by District Judge Stephen R. Bough. This is a TEXT ONLY ENTRY. No document is attached. (Peters, Tracey)

**4:24-cv-00803-SRB Notice has been electronically mailed to:**

Rex A Sharp      rsharp@midwest-law.com, rex-sharp-6631@ecf.pacerpro.com, roberta-ranes-1070@ecf.pacerpro.com, rranes@midwest-law.com

William F. Ford      bill.ford@Lathropgpm.com, kellie.bennett@lathropgpm.com

Richard N Bien      richard.bien@lathropgpm.com, amy.smith@lathropgpm.com

Kara Trouslot Stubbs      stubbs@bscr-law.com, kheath@bscr-law.com, mcarrillo@bscr-law.com

Robert M. Thompson      rmthompson@bclplaw.com, ECF_KC@bryancave.com, maforge@bryancave.com

Thomas P. Schult      tschult@berkowitzoliver.com, dfigge@berkowitzoliver.com, slibel@berkowitzoliver.com

Jeffrey Daniel Morris      jmorris@berkowitzoliver.com, agleason@berkowitzoliver.com, emiller@Berkowitzoliver.com, lparmenter@berkowitzoliver.com

Tristan L. Duncan      tlduncan@shb.com, canders@shb.com, kade@shb.com, tristan-duncan-2710@ecf.pacerpro.com

Karrie J. Clinkinbeard      kclinkinbeard@atllp.com, KCLitDocket@atllp.com, ecf@atllp.com, lervin@atllp.com

William G. Wright      gwright@midwest-law.com, cary-baumann-7624@ecf.pacerpro.com, cbaumann@midwest-law.com, greg-wright-6619@ecf.pacerpro.com, mari-gribble-9999@ecf.pacerpro.com, roberta-ranes-1072@ecf.pacerpro.com, rranes@midwest-law.com, stetuan@midwest-law.com, summer-tetuan-0813@ecf.pacerpro.com

Robert J Hoffman      rjhoffman@bclplaw.com, bob-hoffman-5484@ecf.pacerpro.com, ecf_kc@bclplaw.com

Isaac Diel      Idiel@midwest-law.com

Booker T Shaw      bshaw@thompsoncoburn.com, kwalker@thompsoncoburn.com

Richard C. Godfrey      richardgodfrey@quinnemanuel.com

Sarah Bradshaw    sbradshaw@midwest-law.com, cary-baumann-7624@ecf.pacerpro.com, cbaumann@midwest-law.com, roberta-ranes-1072@ecf.pacerpro.com, rranes@midwest-law.com, sarah-bradshaw-4986@ecf.pacerpro.com, stetuan@midwest-law.com, summer-tetuan-0813@ecf.pacerpro.com

Brian Nye    bnye@atllp.com, brian-nye-4897@ecf.pacerpro.com, ecf@atllp.com, kclitdocket@atllp.com

Grant A. Harse    grant.harse@lathropgpm.com

Zachary Joseph Parker    zparker@sidley.com, efilingnotice@sidley.com, zachary--parker--8129@ecf.pacerpro.com

David J Lender    david.lender@weil.com, david-lender-8619@ecf.pacerpro.com, mco.ecf@weil.com

Lauren Tallent    ltallent@berkowitzoliver.com, sgoulden@berkowitzoliver.com

Grace E. Martinez    grace.martinez@bclplaw.com, ECF_KC@bclplaw.com, grace-colato-martinez-5201@ecf.pacerpro.com

Brody Sabor    brody.sabor@lathropgpm.com

Theodore Joseph Boutrous, Jr    tboutrous@gibsondunn.com

Christopher Dean Dusseault    cdusseault@gibsondunn.com

Adam Thomas Steinhilber    Adam.Steinhilber@ag.ks.gov, adam-steinhilber-5179@ecf.pacerpro.com

Rachel P. Raphael    rachel.raphael@morganlewis.com, jess.sheehan@morganlewis.com

Emma Halling    emma.halling@lathropgpm.com

Hammons P. Hepner    hhepner@midwest-law.com

Courtney Kroeger    ckroeger@berkowitzoliver.com

David L. Schrader    david.schrader@morganlewis.com

Willam T. McEnroe    william.mcenroe@morganlewis.com

David Lloyd Anderson    dlanderson@sidley.com

Sheila Ag Armbrust    sarmbrust@sidley.com

David A. Goldenberg    dgoldenberg@sidley.com

Bradley Hamburger    bhamburger@gibsondunn.com

Perlette Michele Jura    pjura@gibsondunn.com

Joshua D. Dick    jdick@gibsondunn.com

Gregory DuBoff    gduboff@mcguirewoods.com

Daniel Brandon Rogers    drogers@shb.com

Nicholas C Smith    nicholas.smith@ag.ks.gov, ConsumerParalegal@ag.ks.gov

Jonathan N Adair    jonathan.adair@kirkland.com, Kenymanagingclerk@kirkland.com, meghan.guzaitis@kirkland.com

Nader R Boulos    nboulos@kirkland.com

Daniel E Laytin    daniel.laytin@kirkland.com

Melanie Sue Jack    melanie.jack@ag.ks.gov

R. Allan Pixton    allanpixton@quinnemanuel.com

**4:24-cv-00803-SRB It is the filer's responsibility for noticing the following parties by other means:**

# Exhibit 3

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT COURT OF KANSAS**

| | |
|---|---|
| FORD COUNTY, KANSAS, individually and on behalf of all others similarly situated, | |
| Plaintiffs, | |
| vs. | Case No. _____ |
| EXXON MOBIL CORPORATION, CHEVRON USA INC., CHEVRON PHILLIPS CHEMICAL CORPORATION, DUPONT de NEMOURS INC., CELANESE CORPORATION, DOW INC., DOW CHEMICAL COMPANY, DUPONT CORPORATION, EASTMAN CHEMICAL COMPANY, LYONDELLBASELL INDUSTRIES, and AMERICAN CHEMISTRY COUNCIL | JURY TRIAL DEMANDED |
| Defendants. | |

## <u>CLASS ACTION COMPLAINT</u>

Plaintiff Ford County, Kansas files this Class Action Complaint, individually and on behalf of all others similarly situated, against the named Defendants, seeking relief to remedy the harms caused by Defendants' negligent and/or intentional representations regarding the recyclability of plastics, which led to the production and purchase of more plastics than otherwise would have occurred. These representations have led to higher plastic prices than otherwise would have occurred in a competitive market and massive sanitation problems for county and city governments and their landfills. Plaintiffs' allegations are based on personal knowledge as to Plaintiffs' own conduct and investigation of counsel based on publicly available information as to all other allegations.

## I.    __INTRODUCTION__

1.    This case is about Defendants' profit-driven decision to promote the idea to the American consumer that plastics were recyclable and better for the environment, when in reality they had information that only a tiny fraction of plastics are ever recycled.

2.    Defendants' false representations regarding the recyclability of plastics led to increased production of plastic products, increased demand for plastics products, increased prices for plastic products and corresponding issues with the remediation of plastic waste, all of which have harmed the citizens of Kansas.

3.    Through this Class Action Complaint, Plaintiff, individually and on behalf of the Class (defined below), seeks abatement to remove and properly dispose of Defendants' plastic products, and an injunction to enforce that Defendants will no longer advertise their plastic products as recyclable.

4.    Plastic pollution is one of the most serious environmental crises facing the world today. Between 1950 and 2015, over 90% of plastics were landfilled, incinerated, or leaked into the environment.[1] Plastic waste is ubiquitous—from our rivers, lakes, and oceans to roadways and coastlines. It is in "the air we breathe, the food we eat, and the water we drink."[2] One study estimates that humans ingest up to five grams or the equivalent of one credit card worth of plastic per week.[3] Some of the largest oil and gas companies are among the 20 petrochemical companies

---

[1] Roland Guyer, et al., Production, *Use, and Fate of All Plastics Ever Made*, 3 SCIENCE ADVANCES 2-3 (2017), https://www.science.org/doi/10.1126/sciadv.1700782.
[2] WWF, NO PLASTIC IN NATURE: ASSESSING PLASTIC INGESTION FROM NATURE TO PEOPLE 6-7 (2019), https://wwfeu.awsassets.panda.org/downloads/plastic_ingestion_web_spreads.pdf
[3] Kala Senathirajah, et al., *Estimation of the Mass Microplastics Ingested – A Pivotal First Step Towards Human Health Risk Assessment,* 404 JOURNAL OF HAZARDOUS MATERIALS 11 (2021), https://www.sciencedirect.com/science/article/abs/pii/S0304389420319944.

App. 9

responsible for more than half of all single-use plastics generated globally.[4] ExxonMobil, for example, is the world's top producer of single-use plastic polymers.[5]

5.    Underpinning this plastic waste crisis is a decades-long campaign of fraud and deception about the recyclability of plastics.

6.    Despite their long-standing knowledge that recycling plastic is neither technically nor economically viable, petrochemical companies—independently and through their industry trade associations and front groups—have engaged in fraudulent marketing and public education campaigns designed to mislead the public about the viability of plastic recycling as a solution to plastic waste. These efforts have effectively protected and expanded plastic markets, while stalling legislative or regulatory action that would meaningfully address plastic waste and pollution. Fossil fuel and other petrochemical companies have used the false promise of plastic recycling to exponentially increase virgin plastic production over the last six decades, creating and perpetuating the global plastic waste crisis and imposing significant costs on communities that are left to pay for the consequences.

7.    The plastics industry—which includes petrochemical companies, their trade associations, and the front groups that represent their interests—should be held accountable for their campaign of deception much like the producers of tobacco, opioids, and toxic chemicals that engaged in similar schemes.

## II.    JURISDICTION AND VENUE

8.    This Court has proper jurisdiction over this matter in that Defendants have

---

[4] *See* Minderoo Foundation, THE PLASTIC WASTE MAKERS INDEX: REVEALING THE SOURCE OF THE SINGLE-USE PLASTICS CRISIS 12, 14 (2021), https://cdn.minderoo.org/content/uploads/2021/05/27094234/20211105-Plastic-Waste-Makers-Index.pdf; Minderoo Foundation, THE PLASTIC WASTE MAKERS INDEX 2023 18, 57 (2023), https://cdn.minderoo.org/content/uploads/2023/02/04205527/Plastic-Waste-Makers-Index-2023.pdf.
[5] Minderoo Foundation, THE PLASTIC WASTE MAKERS INDEX 2023, *supra* note 4, at 57.

**App. 10**

transacted and conducted business within the State of Kansas and in this judicial district.

9.        This Court has diversity jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action where the amount in controversy exceeds the sum or value of $5 million, exclusive of interest and costs, there are more than 100 members in the proposed class, and Plaintiff, is an entity located in a state different from Defendants.

10.       This Court also has personal jurisdiction over all Defendants, and Venue in this District is proper, under the combination of 28 U.S.C. § 1391(b), (c), and (d).

11.       Venue is proper in this Court, because a substantial part of the events or omissions giving rise to the claims at issue occurred in this district, Plaintiff resides in this district and Defendants' property at issue (plastics) are located in this district.

### III.    PARTIES

12.       Plaintiff County of Ford, Kansas ("Plaintiff") is a duly organized county located in Kansas, which purchased plastic products in the State of Kansas, and operated a landfill in the State of Kansas. County attorneys in Kansas have standing to sue to abate public nuisances on behalf of their respective counties pursuant to Kan. Stat. Ann. § 60-908.

13.       Defendant Exxon Mobil Corporation is the world's largest plastic producing company in revenue and market capitalization. It is headquartered in Spring, Texas. Exxon Mobil is the successor company to John D. Rockefeller's Standard Oil Company and was created by merging two oil giants (Exxon and Mobil). It dominates the American oil and gas industry and is the world's largest producer of polyolefins, additives, raw materials, compounds and other related polymers and resins. Exxon Mobil Corporation can be served at 22777 Springwoods Village Parkway, Spring, TX 77389-1425.

14.       Defendant Chevron USA, Inc. is another oil and gas company created by the breakup of Standard Oil Company. It is headquartered in San Ramon, California and is the largest

App. 11

polyethylene manufacturer in North America. It can be served at 6001 Bollinger Canyon Road, San Ramos, CA 94583.

15.    Defendant Eastman Chemical Company is a global specialty chemicals company that produces a wide range of fibers, chemicals and advanced materials. It is a significant supplier of coatings, adhesives, specialty plastic products and a major supplier of cellulose acetate fibers and copolyesters. It is headquartered in Kingsport, Tennessee. It may be served at 200 S. Wilcox Dr., Kingsport, TN 37660.

16.    Defendant Celanese Corporation focuses mainly on specialty chemicals and is a leading producer of acetic acid. It is also the world's largest vinyl acetate monomer (VAM) producer. It is headquartered in Irving, Texas. It can be served at 222 W. Los Colinas Blvd., Suite 900N, Irving, TX 75039.

17.    Defendant Chevron Phillips Chemical Corporation is a joint venture between Chevron USA Inc. and Phillips 66 Company. It is headquartered in The Woodlands, Texas and is one of the top suppliers of polyethylene in the world today. It can be served at 10001 Six Pines Dr., The Woodlands, TX 77380.

18.    Defendant Dow Chemical Company is headquartered at 2211 H. H. Dow Way Midland, Michigan. As of 2021, Dow Chemical was among the three largest chemical producers in the world. Dow Chemical produces commodity chemicals like polyethylene. Basic plastics make up 26% of Dow Chemical sales. It is an operating subsidiary of Dow Inc. It can be served at 2211 H.H. Dow Way Midland, MI 48674.

19.    Defendant Dow Inc. is one of the world's leading material science companies. The company has six worldwide business units. It was incorporated in Delaware in 2018 to serve as a

holding company for the Dow Chemical Company. It is headquartered in Midland Michigan and can be served at 2211 H.H. Dow Way, Midland, MI 48674.

20.     Defendant Dupont de Nemours Inc. is an American multinational company headquartered in Wilmington, Delaware. It is a leading plastics manufacturer with revenue of over $12 billion dollars in 2023. It can be served at 974 Centre Rd. Bldg. 730, Wilmington, DE 19805.

21.     Defendant LyondellBasell Industries is a multinational company. It is the largest licensor of polyethylene and polypropylene in the world. Its worldwide headquarters is located in Houston, Texas. It can be served at 1221 McKinney St., 300, Houston, TX 77010.

22.     Defendant The American Chemistry Council, known as the Manufacturing Chemists' Association at its founding in 1872, then as the Chemical Manufacturers Association from 1978 to 2000, is an industry trade association for American chemical companies. It is based in Washington D.C. The mission of the American Chemistry Council is to promote the interests of the chemical industry. The trade group represents U.S. chemical companies as well as the plastics and chlorine industries, formerly known as the American Plastics Council. It can be served at 700 Second St. NE Washington D.C. 20002. Throughout its operations the Council has included the following Defendant members: Exxon Mobil, Chevron Phillips, Dow, Dupont, Eastman Chemical Company, Celanese Corporation and LyondellBasell.

## IV.     FACTUAL ALLEGATIONS

### A.     Background of the Plastic Product Industry

23.     The plastic products at issue in this case can be separated into certain categories based upon their chemical composition and end use.

24.     Polyethylene Terephthalate (PET) is used most commonly in water and soft drink bottles, fruit juice containers, domes or covers for prepared meals, cookie/biscuit trays, condiment bottles, cream/nut butter containers and cooking oil bottles.

25.    Polyethylene (PE) is used in milk and water jugs.

26.    Polypropylene (PP) is used in hard containers such as pill bottles as well as microwave dishes, yogurt and ice cream containers and chip bags.

27.    Polystyrene (PS) is used for water station cups and plastic cutlery.

28.    Polycarbonate (PC) is used in longer lasting reusable containers including refillable water bottles, nursing bottles or lab bottles.

29.    High Density Polyethylene (HDPE) is used in milk bottles, freezer bags, ice cream containers, pouches and sachets.

30.    Low Density Polyethylene (LDPE) is used in squeeze bottles, cling wrap, shrink wrap pouches and sachets.

31.    Plastics are part of a sector known as "petrochemicals," or products made from fossil fuels such as oil and gas. More than 99% of plastics are produced from fossil fuels.[6]

**B.    Most plastics cannot be recycled, causing the plastic waste and pollution crisis.**

32.    There are "thousands of different types of plastic, each with its own chemical composition and characteristics."[7] The vast majority of these plastics cannot be "recycled"— meaning they cannot be collected, processed, and remanufactured into new products.[8]

---

[6] Center for International Environmental Law (CIEL), FUELING PLASTICS: FOSSILS, PLASTICS, AND PETROCHEMICAL, FEEDSTOCKS 1 (2017), https://www.ciel.org/wp-content/uploads/2017/09/Fueling-Plastics-Fossils-Plastics-Petrochemical-Feedstocks.pdf.

[7] Professor Plastics, *Types of Plastic: How Many Kinds of Plastics are There?*, Plastics Make it Possible (Jan. 18, 2012), *available at* https://web.archive.org/web/20220611222514/https://www.plasticsmakeitpossible.com/about-plastics/types-of-plastics/professor-plastics-how-many-types-of-plastics-are-there/ (archived June 11, 2022).

[8] U.S. EPA, The U.S. Recycling System, https://www.epa.gov/circulareconomy/us-recycling-system ("In the United States, recycling is the process of collecting and processing materials (that would otherwise be thrown away as trash) and remanufacturing them into new products.").

33.    As of 2021, the U.S. recycling rate for plastic is estimated to be only 5-6%.[9] Despite decades of industry promises, plastic recycling has failed to become a reality due to long-known technical and economic limitations.[10]

34.    Certain types of plastics have no end markets (i.e., businesses that buy and use recyclable materials to make new products), and therefore are *impossible* to recycle. To date, viable markets only exist for polyethylene terephthalate (PET) and high-density polyethylene (HDPE) plastic bottles and jugs.[11] These are known as plastics #1 and #2, respectively, under the industry's Resin Identification Codes (RICs).[12]

| Resin Identification Number | Resin | Resin Identification Code –Option A | Resin Identification Code –Option B |
|---|---|---|---|
| 1 | Poly(ethylene terephthalate) | 1 PETE | 01 PET |
| 2 | High density polyethylene | 2 HDPE | 02 PE-HD |
| 3 | Poly(vinyl chloride) | 3 V | 03 PVC |
| 4 | Low density polyethylene | 4 LDPE | 04 PE-LD |
| 5 | Polypropylene | 5 PP | 05 PP |
| 6 | Polystyrene | 6 PS | 06 PS |
| 7 | Other resins | 7 OTHER | 07 O |

https://web.archive.org/web/20160126213345/http://www.plasticsindustry.org/AboutPlastics/content.cfm?ItemNumber=823&navItemNumber=1125

[9] Beyond Plastics & The Last Beach Cleanup, The Real Truth About the U.S. Plastics Recycling Rate 3 (2022), https://static1.squarespace.com/static/5eda91260bbb7e7a4bf528d8/t/62b2238152acae761414d698/1655841666913/The-Real-Truth-about-the-USPlastic-Recycling-Rate-2021-Facts-and-Figures-_5-4-22.pdf.
[10] The plastic recycling rate in the U.S. has never exceeded the 2014 peak of 9.5%, and even that figure includes a significant amount of exported plastic waste that was dumped or burned rather than recycled. *Id*.; John Hocevar, Circular Claims Fall Flat: Comprehensive U.S. Survey of Plastics Recyclability 7 (2020), https://www.greenpeace.org/usa/wp-content/uploads/2020/02/Greenpeace-Report-Circular-Claims-Fall-Flat.pdf.
[11] John Hocevar, *supra* note 10, at 7.
[12] Brad Kelechava, Resin Identification Codes (RICs), as Specified by ASTM D7611, American National Standards Institute (Feb. 21, 2019), https://blog.ansi.org/2019/02/resin-identification-codes-rics-astm-d7611/.

**App. 15**

35.     After conducting a 10-year review on plastic recycling, in 1991, the U.S. Environmental Protection Agency (EPA) concluded that "it appears that at the present only two types could be considered for making into high quality objects, PET and HDPE," specifically those sourced from bottles.[13]

36.     This remains true more than 30 years later.[14] While a minority of municipal recycling programs across the country may collect plastics with RICs #3-7, they do not actually recycle them.[15] Instead, such plastics are incinerated or sent to landfills.

37.     The thousands of different plastics and the variation among them further limit recyclability. When recycling plastic waste, a facility must sort and separate thousands of pieces of plastic by type to maintain a high degree of purity in the recycled material.[16]

38.     For this reason, some types of plastic may be technically recyclable but are not recycled in practice. For example, many single-use plastics are made of different types of plastic polymers as well as other materials, such as paper, metals, or adhesives.[17] It is impractical—if not impossible—to separate these different components for recycling.[18]

---

[13] U.S. EPA, Ten Year Review of Plastics Recycling 22 (1991), https://semspub.epa.gov/work/03/17184.pdf.

[14] John Hocevar, *supra* note 10, at 4 ("Only some PET #1 and HDPE #2 plastic bottles and jugs can be legitimately labeled as recyclable in the U.S. today"); *see also* Greenpeace, Circular Claims Fall Flat Again: 2022 Update 27-29 (2022), https://www.greenpeace.org/usa/wp-content/uploads/2022/10/GPUS_FinalReport_2022.pdf (estimating that the existing domestic capacity for recycling/reprocessing PET waste is 20.9% and HDPE is 10.3%, while the capacity to recycle other plastics ranges from "negligible" to less than 5%).

[15] John Hocevar, *supra* note 10 at 4, 7-9; Greenpeace, *supra* note 14, at 3-4. For example, the City of Knoxville, Tennessee, states on its website that its recycling facility will collect plastics #3-7, but it does not recycle them because "there is no 'end-market' buyer." City of Knoxville, Recycling, https://www.knoxvilletn.gov/cms/One.aspx?portalId=109562&pageId=200229.

[16] Judith Enck & Jan Dell, Plastic Recycling Doesn't Work and Will Never Work, The Atlantic (May 30, 2022), https://www.theatlantic.com/ideas/archive/2022/05/single-use-plastic-chemical-recycling-disposal/661141/.

[17] *See* Jefferson Hopewell et al., Plastics Recycling: Challenges and Opportunities, 364 Philos Trans. R. Soc. Lond. B Biol. Sci. 2115, 2118 (2009), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2873020/.

[18] *Id.*

39.     Even products made of a single type of plastic often cannot be recycled together, because they include different chemical additives or colorants.[19] For example, PET is widely accepted by municipal recycling programs, yet PET bottles cannot be recycled with PET clamshells and other thermoforms, which are made from a PET material with different chemical properties.[20] Similarly, green PET bottles cannot be recycled with clear PET bottles.[21]

40.     The quality of plastic degrades as it is recycled, limiting both the use of recycled plastic and its continued recyclability. The fossil fuel-derived chemicals that form the basis of plastic are vulnerable to heat and other processes used in recycling.[22] As the chemicals degrade, they lose their quality and integrity, making recycled resins unsuitable for many manufacturers.[23]

41.     The reality is that plastics can only be recycled – or more accurately "downcycled" – once, rarely twice.[24]

42.     Recycling most plastics was technologically infeasible, as the plastics industry knew, and subsequent scientific research would confirm. "When recycled, some of the plastic can be remade into similar products; however, most is typically downcycled into a product of lower quality and is unable to displaced products made from virgin plastics [citation omitted]."[25] Even PET, the most easily-recycled type of plastic, quickly degrades through the recycling process.

---

[19] Judith Enck & Jan Dell, *supra* note 16.

[20] *Id.*

[21] *Id.*; *see also* Becky Sullivan, *Sprite Ditches its Iconic green bottle—but Environmentalists Say it's Not Enough*, NPR ( July 28, 2022), https://www.npr.org/2022/07/28/1114242535/sprite-green-bottles-recycle.

[22] *See* Huiying Jin et al., *The effect of extensive mechanical recycling on the properties of low density polyethylene*, 97 POLYMER DEGRADATION AND STABILITY 2263 (2012), https://www.sciencedirect.com/science/article/abs/pii/S0141391012003114 ("[P]roperties of mechanically recycled polymers do not remain the same because of degradation from heat, mechanical stress, oxidation and ultraviolet radiation during reprocessing and lifetime").

[23] *See* Sarah DeWeerdt, *Why It's So Hard to Recycle Plastic*, SCIENTIFIC AMERICAN (Dec. 13, 2022), https://www.scientificamerican.com/article/why-its-so-hard-to-recycle-plastic/.

[24] *See* Roland Geyer et al., *supra* note 1, at 2-3.

[25] Moran et al., San Francisco Estuary Institute, A Synthesis of Microplastic Sources and Pathways to Urban Runoff (Oct. 2021) page 76.

App. 17

43.     The *toxicity* of plastic and its chemical additives limits the recyclability of plastic. Many plastics commonly contain toxic additives such as stabilizers, plasticizers, coatings, catalysts, and flame retardants.[26]

44.     Managed plastic waste contributes to plastic pollution of the environment. As plastic waste degrades in landfills, microplastics are released into the surrounding environment, including contamination of soil, groundwater, and surface water by air and by leachate.[27]

45.     Plastic waste may be further contaminated through curbside collection of containers for pesticides, cleaning solvents, and other household items.[28]

46.     As plastics degrade through use and the recycling process, they begin to leach these toxic substances.[29] For this reason, a vast majority of plastic products cannot be recycled into food-grade packaging, food-contact surfaces, or other high-contact products.[30]

**C.     Defendants knew that their promotion and production of plastic products for a throw-away lifestyle created a solid-waste crisis without a solution.**

**i.     1950s: The plastics industry touted plastics' supposedly disposability.**

47.     Beginning in the 1950s, the petrochemical companies that produced plastic resins identified a way to ensure a steady, growing demand for plastic: disposability. If plastic products were used only once, then they would need to be purchased—and thus produced—again and again.

48.     At the Society of the Plastics Industry's (SPI) 1956 national conference, participants were told that "developments should be aimed at low cost, big volume, practicability,

---

[26] *See* John N. Hahladakis et al., *An overview of chemical additives present in plastics: Migration, release, fate and environmental impact during their use, disposal and recycling*, 344 J. of Hazardous Materials 179, 184-168 (Feb. 15, 2018), https://www.sciencedirect.com/science/article/pii/S03043894173076 3X.
[27] Leachate is a solution or product obtained by leaching, especially from landfills or other sources.
[28] Greenpeace, Forever Toxic: The Science on Health Threats from Plastic Recycling 4 (2023), https://www.greenpeace.org/usa/wp-content/uploads/2023/05/GreenpeaceUSA_ForeverToxic_ENG.pdf.
[29] *Id.*
[30] *See* Environment & Climate Change Canada, ASSESSING THE STATE OF FOOD GRADE RECYCLED RESIN IN CANADA AND THE UNITED STATES, 4, 34 (2021), https://www.plasticsmarkets.org/jsfcontent/ECCC_Food_Grade_Report_Oct_2021_jsf_1.pdf.

**App. 18**

and *expendability*."[31] In short, the producers' aim should be for their products to end up "in the garbage wagon."[32]

49.    The shift to disposables began almost immediately—even for products that had previously been sold to customers on the basis that they could be repurposed.[33] Plastic dry cleaning bags were advertised as durable and reusable throughout the 1950s,[34] but the industry quickly changed tack in 1959 after around 80 children suffocated on plastic dry cleaner bags, leading to immense public backlash against the industry and some of the earliest calls for plastic bans.[35]

50.    SPI launched a nationwide public relations campaign, claiming that the bags were meant to be disposable, essentially shifting the blame to the children's parents—and it worked.[36]

51.    This campaign served as a mechanism to insulate the industry from public and regulatory backlash while simultaneously introducing consumers to the idea of disposable plastics. An SPI pamphlet from 1959 **(Figure 1)** explained that customers should "never keep a plastic bag after it has served its intended usefulness. Destroy it: Tear it up … or tie it in a knot … and throw it away."[37] To do otherwise "is the worst mistake a mother could make."[38]

---

[31] *Plastics in Disposables and Expendables*, 34 MODERN PLASTICS 93 (Apr. 1957) (emphasis in original).
[32] *Id.*
[33] Jeffrey L. Meikle, AMERICAN PLASTIC: A CULTURAL HISTORY 266-67 (Rutgers University Press 1995), https://www.google.com/books/edition/American_Plastic/u_1ePU4GEGAC?hl=en&gbpv=0 (chronicling the shift to disposables). The industry's earlier campaigns promoting plastic as durable have also been chronicled. *See id.* at 186-88; Susan Freinkel, Plastic: A TOXIC LOVE STORY 145 (2011).
[34] *See This Bag Spells Business*, 50 DUPONT MAGAZINE 24, 25 (Feb/Mar. 1956), https://digital.hagley.org/1956_50_01 (quoting the general manager of a Providence, Rhode Island dry cleaning company who explained that the film bags combined "maximum transparency as well as the necessary durability." That durability, the article went on to say, allowed consumers to find additional uses for the bags even after they had received their laundered clothes, stating, "Bags of 'Alathon' are reusable, too, as housewives have discovered").
[35] Susan Freinkel, *supra* note 38, at 142-43.
[36] Jeffrey L. Meikle, *supra* note 38, at 249-58; *see also* Hiram McCann, *Hazards in Film Misuse Must Be Taught Parents*, 36 MODERN PLASTICS 262 (June 1959) (explaining that the bags were "made and costed to be disposable" and lamenting that items ranging from cars to cleaning fluids "kill children every day," but in those cases "[a]dults are blamed–mainly parents. And rightly so").
[37] Society of the Plastics Industry (SPI), PLASTIC FILM: CORRECT USE AND MIS-USE 2 (1959).
[38] *Id.* at 3.

App. 19



## Figure 1

The Society of the Plastics Industry encouraged consumers to dispose of plastic dry-cleaning bags. SPI, 1959.

52.     The plastics industry's successful navigation of this crisis—and the corresponding threat of plastic bans—provided a model for the future, both in the way the industry would respond to backlash and the way it would insist on disposability by offering customers no alternative.[39] Yet even as consumers resisted the shift to single-use plastics, which they found jarring after being told since the 1930s that plastics were too valuable to be thrown away, the plastics industry expanded into new markets—including single-use packaging—at an unprecedented pace.

53.     In 1960, packaging represented just 10% of total plastic production but amounted to 25% by the end of the decade.[40] By that point, disposable plastics had become the norm for everything from detergent bottles to plastic milk jugs, and plastic rings for canned beverage six-packs.[41]

54.     In 1963, Lloyd Stouffer, editor of the trade journal Modern Plastics, congratulated the industry on "filling the trash cans, the rubbish dumps and the incinerators" with single-use

---

[39] Jeffrey L. Meikle, *supra* note 38, at 249-58.
[40] *Id.* at 266.
[41] *Id.* at 265-66.

App. 20

plastics.[42] "The happy day has arrived," Stouffer opined, "when nobody any longer considers the plastics package too good to throw away."[43]

> ## ii. Late 1960s into 1970s: Landfills and burning were the plastic industry's "solution" to the growing pollution problem.

55.     The industry's success in "selling" disposability and introducing single-use plastics had predictable consequences. By the end of the decade and into the early 1970s, plastics were identified as a key part of the developing solid waste crisis.

56.     Modern Plastics warned companies that the industry needed to figure out a solution to the pushback they were experiencing before "well-meaning but misinformed authorities step in with homemade remedies and regulations."[44]

57.     Again, facing immense public backlash and a genuine threat of regulation,[45] the plastics industry responded with two "solutions." The first, in response to concerns about litter, was landfilling.

58.     Throughout the 1970s, SPI officials argued that plastics were an ideal material for landfilling since "they don't biodegrade," they "just sit there."[46] But the industry favored waste-

---

[42] *See* Rebecca Altman, *American Beauties: How Plastic Bags Came to Rule Our Lives, And Why We Can't Quit them*, Topic (2018), *available at* https://web.archive.org/web/20191113102708/https://www.topic.com/american-beauties (archived Nov. 13, 2019) (quoting Lloyd Stouffer, *Plastics Packaging: Today and Tomorrow,* SPI Annual Plastics Conference (Nov. 19-21, 1963)).

[43] *Id.*

[44] Jeffrey L. Meikle, *supra* note 38, at 265 (quoting Joel Frados, *There's Something in the Air*, 4 MODERN PLASTICS 89 (Oct. 1966)).

[45] *See* Jerome Heckman, General Counsel, SPI, Presentation at the Meeting of the SPI Plastics Waste Management Committee: Solid Waste and Litter: Legislative Status and Outlook—1972 (Mar. 1, 1972), *available at* https://cdn.toxicdocs.org/8R/8Rq8Namx13mzoge1jEG7N0pzm/8Rq8Namx13mzoge1jEG7N0pzm.pdf (claiming that, at the time of the presentation in 1972, there were over "a thousand regulatory proposals . . . at various governmental levels which could adversely affect the interests of the plastics industry"); Lester E. Blaschke, *Analysis of the Resource Recovery Act of 1970 and Its Effect on Implementation of Solid Waste Management Programs*, 34 J. ENVTL. HEALTH 89, 89 (1971), https://www.jstor.org/stable/44545882 (describing the passage of the Resource Recovery Act in 1970, as an EPA official, represented "a significant shift in emphasis from 'disposal' to 'recycling and recovery of materials and energy'").

[46] Radio Interview with Ralph Harding, President of the Society of the Plastics Industry, in Atlanta, Georgia (n.d.).

to-energy (WtE) incineration. Support for WtE was reinforced by individual companies and trade associations representing the industry throughout the decade.[47]

### iii. 1980s: After receiving backlash from the earlier "solutions," the plastics industry encouraged recycling of plastics.

59.     These so-called solutions provided little reprieve for the plastics industry. Neither landfilling nor incineration sufficiently assuaged public concerns or regulatory pressure, and the industry again found itself facing proposed bans on single-use plastics in the mid-1980s. This time, it adopted a solution that it knew was popular among consumers and policymakers alike: recycling.

60.     SPI established the Plastics Recycling Foundation (PRF), bringing together petrochemical companies and bottlers **(Figure 2)**, and PRF immediately began a campaign to demonstrate the industry's supposed commitment to mechanical recycling.[48]

---

[47] Jeffrey L. Meikle, *supra* note 38, at 272; *see also*, *e.g.,* Internal Memorandum from Avron B. Magram, Hatco Chemical Division, W.R. Grace Company on PVC/Ecology (May 11, 1971), available at https://cdn.toxicdocs.org/pe/peX25LzXyN4nbMM8dO6D1Za66/peX25LzXyN4nbMM8dO6D1Za66.pdf (discussing relevant research and updates regarding PVC incineration from January 1970 to May 1971).

[48] *See* Leo H. Carney, *The Environment*, N.Y. TIMES (Sept. 15, 1985) https://www.nytimes.com/1985/09/15/nyregion/the-environment.html; *see also* Judie Neilson, Oregon Dep't of Fish & Wildlife *The Oregon Experience, in* NOAA, PROCEEDINGS OF THE WORKSHOP ON THE FATE AND IMPACT OF MARINE DEBRIS 154, 158 (Richard S. Shomura & Howard O. Yoshida eds., 1985), https://repository.library.noaa.gov/view/noaa/5680 (noting that "the Society for the Plastics Industry has allocated $5 million to establish a Plastic Recycling Foundation and Institute to aggressively pursue methods to make it economically feasible to recycle plastic in large quantities").



**Figure 2**

Exxon Chemical, a member of the Society of the Plastics Industry, acknowledged its support for organizations like the Plastics Recycling Foundation and the Council for Solid Waste Solutions in its Environmental Compendium. *Exxon, 1990 (emphasis added).*

61.     But industry support did little to change the basic problem: plastics were notoriously difficult to recycle, as the industry had known for years. Doubts about the viability of municipal solid waste recycling in general went back decades.

62.     As the American Chemical Society explained in 1969, "it is always possible that scientists and engineers will learn to recycle or dispose of wastes at a profit, but that does not seem likely to happen soon on a broad basis."[49]

---

[49] ACS Committee on Chemistry & Public Affairs, *Cleaning Our Environment–The Chemical Basis for Action*, in C&E NEWS, at 58, 60 (Sept. 8, 1969), available at https://cdn.toxicdocs.org/6b/6bLOmw81KLQJwzb0RQ9mEadx6/6bLOmw81KLQJwzb0RQ9mEadx6.pdf.

63.     Plastics presented the greatest challenge of any material in the municipal waste stream. Crucially, the term "plastics" refers to a set of related synthetic polymers, not a single material.

64.     Different types of plastic cannot be recycled together, even when separating out those that cannot be recycled at all (including thermoset polymers like polyurethanes and vulcanized rubber). For example, a PET bottle cannot be recycled with an HDPE bottle, however similar they appear. Further complicating matters, many plastic products are made by incorporating various additives, as well as mixing different polymers to take advantage of their distinct qualities.

65.     As explained by researchers in 1969, "[t]he very success of package makers in marrying dissimilar materials has made packaging materials virtually unrecoverable after use."[50] As a result, the economics of plastic recycling were—and still are— "virtually hopeless," as one industry insider put it in 1969.[51]

66.     Still, the greatest obstacle to plastic recycling was that no market existed for the final product. Recycled plastic was more expensive and of lower quality than virgin resins. This was, in part, intrinsic to the material. Even under ideal conditions, plastics experienced "a degradation of resin properties and performance . . . during the initial fabrication, through aging, and in any reclamation process," as explained in a 1973 report commissioned by SPI.[52]

---

[50] Arsen J. Darnay & William E. Franklin, *The Changing Dimensions of Packaging Wastes*, FIRST NATIONAL CONFERENCE ON PACKAGING WASTES at 11, 16, https://nepis.epa.gov/Exe/ZyPURL.cgi?Dockey=2000Q54D.TXT; *see also* Thomas B. Becnel, *supra* note 54, at 85 (stating that "it is ironic that the very molecular structure that has made [plastic] so popular creates certain disposal problems").
[51] Eric B. Outwater, Packaging – U.S.A., in Proceedings: First National Conference on Packaging Wastes 1, 7 (1971).
[52] R.L. Glauz, et al., THE PLASTICS INDUSTRY IN THE YEAR 2000 41 (1973), Box 12, Jack Milgrom Papers, Special Collections Research Center, Syracuse University Libraries.

67.    SPI, at its annual meeting, reported that it deployed a female employee to women's groups in the Midwest to explain the benefits of plastics. The plastics industry's efforts were specifically directed to making plastics more appealing, encouraging a "throw away" culture, and focusing on anti-litter laws to shift the plastic waste and pollution crisis to consumers.

68.    As a direct result of these limitations, few manufacturers had any interest in purchasing recycled resins.[53]

69.    According to the SPI report, "[r]ecycling of plastics from [municipal sources of plastic waste] poses the greatest challenge," because "there are no effective marketing mechanisms for trade in contaminated, mixed plastics."[54] The report was definitive: "When plastics leave fabrication points, they are almost never recovered. There is no recovery from obsolete products."[55]

### iv.    Mid-1980 to 1990s: The plastics industry came under further scrutiny to either "recycle or be banned."

70.    Prior to 1980, the plastics industry consistently reached the same conclusion when it explored the possibility of recycling plastic from the municipal waste stream: mechanical recycling was technically and economically infeasible.

71.    Defendants have known about the limitations of plastics recycling for decades. In 1986, an industry trade association acknowledged that the situation was virtually the same as it had been decades prior.

72.    The Vinyl Institute (VI), a spin-off organization of SPI, explained in a report that "purity and quality demands set for many applications preclude the use of recycled material."[56] As

---

[53] *Id.*
[54] *Id.*
[55] *Id.*
[56] Vinyl Institute, SOLID WASTE FACT SHEET—DRAFT 5 (July 18, 1986), *available at* https://climateintegrity.org/uploads/deception/1989_Vinyl_Institute_-_Fact_Sheet.pdf.

the organization's founding director, Roy Gottesman, explained to attendees of an industry conference in 1989 **(Figure 3)**, "Recycling cannot go on indefinitely, and does not solve the solid waste problem."[57]



## Figure 3

The executive director of the Vinyl Institute shared "key considerations to be made when considering recycling" with other members of the plastics industry. *Gottesman, 1989 (emphasis added).*

73.    Ultimately, the VI report **(Figure 4)** concluded, "recycling cannot be considered a permanent solid waste solution, as it merely prolongs the time until an item is disposed of. At that point, recycled products also become MSW [municipal solid waste] components."[58]

---

[57] Dr. Roy T. Gottesman, Executive Director, Vinyl Institute, Presentation at the Institute for International Research Conference on Achieving Market Expansion Through Plastics Recycling, *An Overview of Options for Disposal of Vinyl Plastics in Municipal Solid Waste* 1 (Sept. 26, 1989), Box No. 5, Jack Milgrom Papers, Special Collections Research Center, Syracuse University Libraries.
[58] *Id.* at 2 (emphasis in original).

App. 26

## Figure 4

A draft "Solid Waste Fact Sheet," created by the Vinyl Institute,
was stark in its assessment of the viability of recycling
to address plastic waste issues. *VI. 1986 (emphasis added).*

74.     At the Vinyl Institute meeting that same year, members discussed a recent study on the economics of recycling. "This study indicates that based on our economic system, on the cost of fuel and transportation, on the economic benefit of downstream markets, on the low cost of plastic feedstocks, and the even lower cost of off grade-off spec plastic feedstocks, recycling is not and will never be commercially viable unless it is significantly subsidized by a government entity."

75.     What led the industry to change its position in the 1980s was not a massive technological breakthrough or an answer to the economic roadblocks to plastic recycling. Rather, the plastics industry began to lie about the viability of recycling as a direct result of the backlash they faced from the public.

76.     As SPI officials discussed in a 1984 memo on the threat of a recycling bill **(Figure 5)**, although they were able to shape the bill "to reflect the . . . commitment of our industry to move forward" on recycling, "there is no question that the State of New Jersey must see substantial short-term progress in the recycling of plastic containers or else punitive legislation . . . will attack the problem head-on."[59]

---

[59] Letter from Roger Bernstein, Society of the Plastics Industry, to the New Jersey Task Force State Government Affairs Committee, New Jersey's Mandatory Recycling Bill 2 (Dec. 20, 1984), available at https://www.toxicdocs.org/d/rpQVOR8obVNLbN5R69K0EJ5pJ?lightbox=1. As an SPI employee put it in a



## Figure 5

The Society of the Plastics Industry articulating the industry's support for recycling in the face of potential "punitive legislation" that would attack the plastic waste problem "head-on." Bernstein, 1991 (emphasis added).

77. The industry felt the threat of legislative action acutely throughout the 1980s and 1990s.

78. Looking back at the early days of this regulatory uptick, a representative from Occidental Chemical testified to Congress in 1992 that there was a "rush to demonstrate environmental purity. . . . The call was to recycle or be banned."[60]

79. Consumer demands that plastics be recycled or banned, presented the plastics industry with a serious problem. The industry knew that mechanical recycling was not a viable solution—yet renewed concerns about plastic waste and its impact on the environment meant they

---

different memo, "the NJ Recycling office regards plastics as a problem not shared by competitive materials." Memorandum from John C. Malloy, Director of Packaging Services, SPI, to Plastic Bottle Institute (Oct. 12, 1984).

[60] Plastics Recycling: Problems and Possibilities: Hearing Before the Subcomm. on Env't & Emp. of the H. Comm. on Small Bus., 102nd Cong. 121 (1992) (testimony of William F. Carroll, Jr., Ph.D., Director of Commercial Development, Occidental Chemical Corp.). The Occidental representative went on to explain the challenge of the situation given the poor state of plastic recycling infrastructure and development: "The plastics industry was made to feel the pressure acutely. Programs for each plastic, and in many cases each grade of plastic, had to be devised and technically proven. Bottles had to be sorted, cleaned, purified and made into pellets for processors." *Id.*

needed the public to *believe* recycling could address their concerns, and the industry was invested in its success.

80.    The industry took a familiar approach, leaning on its trade associations just as it had in the face of previous crises.[61] SPI's Public Affairs Council (PAC), originally created after SPI successfully defeated a recycling bill in New York City in 1971,[62] served as a model in particular. Initially established as the Plastics Waste Management Fund, PAC brought together 12 petrochemical companies "to fight off restrictive legislation everywhere," in the words of SPI President Ralph Harding, Jr.[63]

81.    Similar trade associations and front groups proliferated during the 1980s and early 1990s. In addition to the Plastics Recycling Foundation and Vinyl Institute, the petrochemical companies, with support from SPI, created a variety of organizations in this brief span,[64] including: the Plastic Bottle Institute (PBI) in the early 1980s; the Center for Plastics Recycling Research (CPRR) at Rutgers University in 1985; the Council on Packaging in the Environment (COPE) in 1986; and the Council for Solid Waste Solutions (CSWS) in 1988 **(Figure 6)**, which became known as the Partnership for Plastics Progress (P3) in 1992 before quickly being reorganized as the American Plastics Council (APC).[65]

---

[61] *See, e.g.*, Jerome Heckman, *supra* note 50 (addressing the plastics industry as SPI's general counsel amid fighting proposed taxes on plastic containers and other regulation on plastics in 1972).
[62] *Id.*
[63] Jeffrey L. Meikle, *supra* note 38, at 272-73 (quoting a talk given by Ralph Harding, Jr. entitled "Challenges Facing the Plastics Industry" on December 8, 1971).
[64] These organizations were not necessarily contained within a single umbrella organization. For example, SPI and the Chemical Manufacturers Association both had official roles in the Partnership for Plastics Progress. The board of directors, "made up of the highest level of industry executives," and "function[ed] as a business council under the auspices of the" CMA, while SPI was responsible for "staffing and implementing Partnership programs." Partnership for Plastics Progress, *Introducing the Partnership for Plastics Progress* (Jan. 1992).
[65] Internal notes at APC indicate that the name was changed after it was poorly received by consumers: "The connect betw[ee]n P3 & SPI was clutter—no good[.] Consumers don't like." Bailey Condrey, APC, *Staff Mtg 8/24/92*, *in* STAFF MEETINGS 53 (1992). These issues had been anticipated a year prior, when internal discussions about organization names concluded: "P3 great internally, but bad externally," and the group would "[n]eed consumer-friendly name." Bailey Condrey, APC, *Outreach TF 8/23/91*, *in* NOTES 6 (1991). The Task Force praised another unused acronym because it was "[m]ore publically [sic] focused" and "[n]o conspiracy implied." *Id.* at 7.



**Figure 6**

The executive board members of the Council for Solid Waste Solutions, including many of the world's largest fossil fuel and petrochemical companies, were listed on the cover of the organization's industry newsletter, *Handlers News. CSWS, 1991* (emphasis added).

82.    The Council for Solid Waste Solutions (the Council) formed in 1988 was in furtherance of their campaign to convince the public that recycling was the answer to the plastics waste and pollution crisis.[66]

83.    After Exxon, Mobil, and others in the industry formed the Council, they pushed the plastics recycling message with increased coordination and seriousness. In 1989, Mobil misleadingly promised the public that it was "venturing into recycling mainly out of a sense of environmental concern. 'We are responsible for that segment of the waste stream, so we're going to see that it's disposed of consistent with' the federal [EPA's] recommendations."

84.    At the time that Mobil made these statements, the national plastics recycling rate was between just one and two percent. *See* **Figure 7**: National Recycling and Composting Rates from 1960 to 2018.[67]

---

[66] Council for Solid Waste Solutions, *The Urgent Need to Recycle* (July 17, 1989) *Time*.
[67] U.S. Environmental Protection Agency, *National Overview: Facts and Figures on Materials, Wastes, and Recycling* https://www.epa.gov/facts-and-figures-about-materials-waste-and-recycling/national-overview-facts-and-figures-materials#Trends1960-Today.

App. 30

**Figure 7**



### Recycling Tonnages, 1960–2018

**Recycling and composting as a percentage of generation**

|                          | 1960 | 1970 | 1980 | 1990 | 2000 | 2005 | 2010 | 2015 | 2017 | 2018 |
|--------------------------|------|------|------|------|------|------|------|------|------|------|
| **Paper and Paperboard** | 17%  | 15%  | 21%  | 28%  | 43%  | 50%  | 63%  | 67%  | 66%  | 68%  |
| **Glass**                | 2%   | 1%   | 5%   | 20%  | 23%  | 21%  | 27%  | 28%  | 25%  | 25%  |
| **Plastics**             | Neg. | Neg. | <1%  | 2%   | 6%   | 6%   | 8%   | 9%   | 9%   | 9%   |
| **Yard Trimmings**       | Neg. | Neg. | Neg. | 12%  | 52%  | 62%  | 58%  | 61%  | 69%  | 63%  |
| **Lead-acid Batteries**  | Neg. | 76%  | 70%  | 97%  | 93%  | 96%  | 99%  | 99%  | 99%  | 99%  |

"Neg." means less than 5,000 tons or 0.05 percent.

85.     Other trade associations, such as the National Association for PET Container Resources (NAPCOR) and the Flexible Packaging Association (FPA), were established or took on new importance over the same time period.

24

86.    All these groups had the same directive: defend the plastics industry from restrictive legislation by selling recycling as a viable solution to plastic waste. **(Figure 8).**



**Figure 8**

Meeting notes from January 2, 1994 indicate that the American Plastics Council intended to take an aggressive approach in responding to public outcry about plastic waste. *Condrey, 1994 (emphasis added).*

87.    The largest resin producers, including Exxon, Mobil, DuPont, and Dow, invested tens of millions of dollars into various aspects of plastic recycling, including public relations efforts to shape consumer perception of recycling.[68]

88.    One of the first and most important steps in this campaign to make consumers believe in plastic recycling was the implementation of a labeling system known as Resin Identification Codes, or RICs. First introduced in 1988 by SPI, in an attempt to stave off regulation, the "Voluntary Plastic Container Coding System," as it was originally known, grouped plastics by resin type and labeled them with a number surrounded by a triangle of "chasing arrows," the widely recognized symbol for recycling.[69] The "chasing arrows" symbol, a logo showing three arrows each folded in the middle and arranged in a triangle was invented in 1970 by a student who won a contest held by a box manufacturer to promote recycling of paper.[70]

89.    SPI modified and adopted the chasing arrow symbol for plastic containers, including a number in the middle of the three arrows ranging from 1 to 7, that would correspond to the type of resin the item was made from.

---

[68] Susan Freinkel, *supra* note 39, at 162-63.
[69] *Id*. at 177-78.
[70] Che, *His Recycling Symbol Is Everywhere. The E.P.A. Says It Shouldn't Be.*, N.Y. Times (Aug. 3, 2023) https://www.nytimes.com/2023/08/07/climate/chasing-arrows-recycling-symbol-epa.html.

90.    The chasing arrows symbol is now strongly associated with recycling, and consumers usually assume that the symbol identifies items that can be recycled.[71] Even though, it is universally understood as the recycling symbol, the symbol is unnecessary and misleading.

91.    Indeed, in practice, the symbol led consumers to believe that all labeled plastic items were recyclable. In truth, however, the plastic resin identification codes confused consumers, who believed that any item containing the chasing arrows symbol was recyclable. When in fact, most plastic resins were not able to be recycled because there were no recycling facilities that were capable of recycling most resin numbers. Two surveys in different states showed that between 53 and 74 percent of consumers believed the presence of the symbol on a product meant it could be recycled where they live.

92.    The recyclers themselves were clear that they did not need, and in some cases actively opposed, SPI's RIC system. **(Figure 9)**.



**Figure 9**

*The Connecticut Department of Environmental Conservation discouraged the state governement from adopting Society of the Plastics Industry's resin identification code system because it was uncessesary and likely to confuse consumers. DEC, 1990 (emphasis added).*

93.    Despite these concerns, the plastics industry continued to push for the adoption of the codes, with other trade associations like APC joining SPI in the fight to codify the system

---

[71] *Id.*

through state legislation with a clear purpose: "to prevent bans."[72] The industry encouraged the adoption of the codes not in spite of the confusion the RIC system would cause, but because of it. As APC officials noted in a 1992 meeting, the chasing arrows were a "consumer tested mark" and "most identified."[73] The RIC system conveyed that plastics are recyclable and, by the mid-1990s, 39 states had adopted legislation requiring the symbols.[74]

94.    Industry trade associations also sought to influence consumer views on plastic recycling through other means. The industry heavily publicized repeated "commitments" to recycling, only to quietly ignore them when they were not achieved.[75]

95.    The plastics industry set these goals knowing they were unlikely to meet them, according to a representative of DuPont. "It is no secret that the quantitative goals industry originally set for itself for economically recycling plastic containers extracted from municipal waste streams were extremely ambitious," James Lohr told attendees at a 1992 recycling conference.[76]

96.    Unfortunately for the industry, Lohr explained, "[t]he goals have proven to be an even greater 'stretch' than originally anticipated."[77]

97.    APC internally acknowledged that their publicized goal to recycle 25% of post-consumer plastic bottles and containers by 1995 would be difficult to reach years before.

---

[72] Bailey Condrey, *Staff Mtg 8/24/92, in* STAFF MEETINGS, *supra* note 70, at 54.

[73] Bailey Condrey, *Monday Mar 23 Staff Mtg., in* STAFF MEETINGS, *supra* note 70, at 11.

[74] *See* Richard Lindsay Stover, et al., Ecology Center, Report of the Berkeley Plastics Task Force 9 (Apr. 8, 1996), https://ecologycenter.org/plastics/ptf/; Steve Toloken, *FTC Cracks Down on Resin Code Placement*, PLASTICS NEWS (May 4, 1998), https://www.plasticsnews.com/article/19980504/NEWS/305049986/ftc-cracks-down-on-resin-code-placement.

[75] *See, e.g.,* Tom Ford & Roger King, *APC Retreats from Goal To Recycle 25%*, PLASTICS NEWS (Mar. 25, 1996), https://www.plasticsnews.com/article/19960325/NEWS/303259995/apc-retreats-from-goal-to-recycle-25 (SPI and the Council for Solid Waste Solutions announced in 1991 a goal to recycled 25% of post-consumer bottles and containers by 1995, but abandoned the goal in 1995).

[76] James E. Lohr, *supra* note 77, at 4.

[77] *Id*.

98.    In 1992, staffers at APC noted that "[a]dvocacy doomed to failure unless signif[icant] resources allocated to recy[cling],"[78] and acknowledged that the goal "will be difficult to reach" since the "value of the product is lower than cost to prod[uce]."[79]

99.    By January 1994, APC staff again acknowledged that they were unlikely to meet the goal and began discussing how they hoped the failure would be viewed.[80] Still, they were careful to avoid emphasizing this in public. An Exxon employee warned APC staff **(Figure 10)** that they did not "want paper floating around saying we won't meet goal" since the issue was "HIGHLY SENSITIVE POLITICALLY."[81]



**Figure 10**

Irwin Levowitz of Exxon Chemical discouraged American Plastics Council staffers from being "too open" in their communications about the trade organization's recycling goal in a January 1994 meeting. *Condrey, 1994 (emphasis added).*

100.    In light of these failures, the industry developed new ways of measuring and presenting recycling rates.

101.    Internal APC meeting notes from May 1995, for example, indicate that the organization was "moving from reporting plas[tic] pkg #s [*sic*] to bottles only,"[82] making it appear

---

[78] Bailey Condrey, *Staff Mtg 4/13/92, in* STAFF MEETINGS, *supra* note 70, at 13.
[79] Bailey Condrey, *Staff Mtg 8/24/92, in* STAFF MEETINGS, *supra* note 70, at 53.
[80] Bailey Condrey, *ART Meeting – Houston 1/26/94, in* NOTES, at 24 (1994).
[81] *Id*. at 25 (emphasis in original).
[82] Bailey Condrey, *Staff Mtg 5/8/95, in* STAFF & COMMUNICATIONS MTGS. 111 (1994-1996).

that rates had increased more than they actually had. This "roll out of new recy[cling] rates" was appealing because it "helps us justify the new methodology."[83]

102.    Industry advertisements, whether sponsored by individual petrochemical companies or front groups, normalized the idea that plastics could be recycled among consumers and policymakers. But most advertisements simply repeated the same lies about the viability of plastic recycling. According to a NAPCOR ad placed in *Ladies' Home Journal* in 1991 **(Figure 11)**, "a bottle can come back as a bottle, over and over again."[84]



**Figure 11**

In 1991, The National Association for Plastic Container Recovery ran a seemingly innocuous advertisement in *Ladies' Home Journal*, deceptively telling readers that "PET plastic can now be recycled repeatedly." *NAPCOR, 1991.*

---

[83] Bailey Condrey, *May 5, 1995 Red Mtg., Tech Review Prog.*, *in* STAFF & COMMUNICATIONS MTGS., *supra* note 70, at 107. An alternative system of measurement and a new phrase, "Recovered for Recycling," had been developed by NAPCOR in partnership with the accounting firm Ernst & Young. *See generally* R.W. Beck, 1995 NATIONAL POST-CONSUMER PLASTICS RECYCLING RATE STUDY (Sept. 1996), Box No. 12, Jack Milgrom Papers, Special Collections Research Center, Syracuse University Libraries.
[84] National Association for Plastic Container Recovery, *A Bottle That Can Come Back for New Year's Eve is a Cause for Thanksgiving*, LADIES HOME JOURNAL 92 (Dec. 1991).

103.    CSWS advertised its materials demonstrating how people could set up plastic recycling programs in their communities and left little room for doubt: "The proven systems are in place. The talk is over. Plastics recycling is here."[85] And COPE (then known as the Council on Plastic and Packaging in the Environment) told *Chicago Tribune* readers that they should "Recycle Plastic to Save Landfill Space" to celebrate Earth Day in 1992.[86]

104.    Perhaps most egregiously, plastics industry trade associations representing the petrochemical companies developed "sponsored educational materials" for use in schools.[87]

105.    For example, a 1994 educational guide distributed by the California Department of Conservation Division of Recycling promoted materials created by trade associations and petrochemical companies, including free curriculum materials on plastic recycling from Dow,[88] an APC guide to setting up a school recycling program,[89] and a Foodservice Packaging Institute (FPI) video entitled "Foodservice Disposables: Should I Feel Guilty?" discussing "the growing controversy over reusable versus disposables."[90] APC produced another video, "Working Together for a Healthier Planet," that featured a narrator making blatantly false statements, including the claim that "most plastics can be melted and reused over and over again."[91]

---

[85] Council for Solid Waste Solutions, *Plastics Recycling Has Taken Off*, STATE LEGISLATURES 35 (Apr. 1991); *see also* Council for Solid Waste Solutions, *Innovations in Recycling: Plastics Industry Offers Step by Step Recycling Program Set Up*, STATE LEGISLATURES a2, special insert at 13 (June 1991).

[86] Council for Solid Waste Solutions & National Association for Plastic Container Recovery, *Together, We're Working to Improve Products for Our Environment*, CHICAGO TRIBUNE Z21 (Apr. 5, 1992).

[87] *Molding Young Minds: Firms Spend Big to Get Views into Public Schools*, PLASTICS NEWS (Oct. 30, 1995), https://www.plasticsnews.com/article/19951030/NEWS/310309999/molding-young-minds-firms-spend-big-to-get-views-into-public-schools.

[88] Cal. Dep't of Conservation, Div. of Recycling, EDUCATION & RECYCLING: EDUCATOR'S WASTE MANAGEMENT RESOURCE & ACTIVITY GUIDE 1994 124, 127 (1994).

[89] *Id.* at 131; *see also* National Energy Information Center (NEIC), ENERGY EDUCATION RESOURCES 8 (Mar. 1997) (describing another APC education campaign as "a unique hands-on kit, designed to help middle level science classes explore the world of plastics").

[90] Cal. Dep't of Conservation, *supra* note 93, at 133; *IAMFES Audio Visual Library*, DAIRY, FOOD, & ENVIRONMENTAL SANITATION 195 (Mar. 1993) (describing the educational material as a video that "examines such issues as litter, solid waste, recycling, composting and protection of the earth's ozone layer" and "makes for an excellent discussion opener on . . . the environmental trade-offs (convenience, sanitation and family health) that source reduction necessarily entails").

[91] Working Together for a Healthier Planet, at 8:31 (American Plastics Council 1992).

106.    When public backlash prompted threats of legislative and regulatory action, the plastics industry recognized that the appearance of action was its best defense. The industry announced direct investments in recycling initiatives, taking the form of research efforts, pilot programs, and company-owned recycling facilities.

107.    Whatever form they took, they shared a common purpose: to prevent bans on single-use plastics. Although heavily publicized in their initial phases, investments in these projects rarely lasted. The projects were either never built, or the facilities were shut down quietly when the threat of regulation passed.

108.    Short-term industry investment could not overcome the economic obstacles to plastic recycling. "The basic issue is economics," the director of environmental solutions at B.F. Goodrich explained to an industry panel in 1992. "[F]or commodity plastics, including PVC, the costs of recycling or recovery either overlap or are greater than the selling price for these materials. This is the essence of the problem and the basic reason why recycling is not growing at faster rates."[92]

109.    Ideally, a representative of Eastman Chemical told attendees of an industry conference in 1994, consumers could put their plastic containers into recycling bins and "be assured that they would be separated into pure streams and would all be sold for viable reuse applications."[93] But "[w]hile someday this may be a reality," he explained, "it is more likely that we will wake up and realize that we are not going to recycle our way out of the solid waste issue."[94]

---

[92] F.E. Krause, Director Environmental Solutions, Geon Vinyl Division, BF Goodrich Co., Presentation to The Vinyl Industry Tripartite Meeting, *PVC Recycling—An Overview* 1 (Sept. 3-4, 1992), *available at* https://www.toxicdocs.org/d/91wxG1YnjQ8KjOnZ3jE9wLxg7?lightbox=1.

[93] Noel Malone, Manager Plastics Solid Waste Management, Eastman Chemical Company, Presentation at Bev-Pak America's '94 Program, *Automated Sortation of Plastic Containers* 1-2 (1994), Box No. 5, Jack Milgrom Papers, Special Collections Research Center, Syracuse University Libraries.

[94] *Id*. At 2.

110.    The petrochemical companies continued to be primarily invested in expanding production, and that meant more virgin resins. Between 1990 and 1996, for every pound of plastic packaging that was recycled, an average of four pounds of virgin plastic was produced.

111.    As another employee at Occidental, James R. Clark, explained at a 1992 conference, "the economics of virgin production"— meaning the widespread availability of cheap, virgin resins—"have put downward pressure on recycled resin value in the marketplace."[95] He told attendees that while "[v]irgin resin meets" the criteria of converters—including characteristics like consistent color, low contamination, and processability—"current recycled materials fail in many of these categories."[96]

112.    In 1995, even as APC officials continued their campaign to convince the public that recycling was viable, staffer Bailey Condrey noted internally **(Figure 12)** that "virgin supplies will go up sharply in near future [and] kick the shit out of PCR (Post-Consumer Recycled material) prices."[97]



**Figure 12**

Notes from a November 1995 American Plastics Council staff meeting reveal clear knowledge that recycled plastic was not economically competitive with virgin material. *Condrey, 1994-1996 (emphasis added).*

---

[95] James R. Clark, Product Manager Recycling, Occidental Chemical Company, Presenting at ETEX '92: Turn Waste into Profits, *Plastics Recycling Strategy* 1 (Apr. 6-7, 1992), Box No. OS2, Jack Milgrom Papers, Special Collections Research Center, Syracuse University Libraries.
[96] *Id*. at 3.
[97] Bailey Condrey, *Staff Mtg 11/6/95*, *in* STAFF & COMMUNICATIONS MTGS. 111, 182 (1994-1996).

113.    "Recycling is not always the best option as it does not always effect [*sic*] greatest environmental gain," explained the European Vinyls Corporation in 1993. "In many instances where mechanical recycling is possible, the energy and other resources consumed outweigh the environmental gain."[98] (**Figure 13**).



The popularity of recycling increasingly sees different materials being sorted and separated out of the waste stream. Eco-impact studies in the Netherlands and Germany have demonstrated that there is a limit (18 per cent maximum in the Netherlands) to the amount of household plastics waste which can be mechanically recycled with environmental gain. This means that the majority of the remaining waste must be treated by other techniques.

**Figure 13**

A report from the Association of Plastics Manufacturers in Europe acknowledged that recycling could not adequately address plastic waste. *APME, 1996 (emphasis added).*

114.    The plastics industry's failure to overcome the technical and economic obstacles to mechanical recycling may have suggested the need for additional research and investment, either a doubling-down on the mission of the "strike force" or exploration of additional options in the fight against plastic waste. But, in reality, the opposite happened.

115.    The Center for Plastics Recycling Research shuttered its doors in 1996, as did several of the plastic recycling facilities owned by various petrochemical corporations, including Union Carbide.[99]

---

[98] Rolf Buhl, European Vinyls Corp., UPDATE OF THE PVC RELATED ENVIRONMENTAL DEVELOPMENTS IN EUROPE AS PER JANUARY 1993 25 (Jan. 25, 1993), *available at* https://www.toxicdocs.org/d/O19KKZqrv3EGM5451dXYGmbr1?lightbox=1.
[99] *See* Dianne Dumanoski, *Key Events of 1996*, PLASTICS NEWS (Apr 26, 2004), https://www.plasticsnews.com/article/20040423/NEWS/304239998/key-events-of-1996.

116.     NPRC fell well short of its 25% recycling commitment – it recycled under 2% as of 1995,[100] and was sold in 1999.[101]

117.     Recycling-oriented industry front groups also shifted to the background or, in the case of groups like COPE, ceased operations.[102]

118.     All of these changes reflected a broader shift away from the highly visible campaign for recycling that defined the period between 1985 and 1995.

> **v.     Mid-1990s to 2010s: The plastics industry successfully curbed pressure to create more recyclable plastics, yet recycling continued to prove to be an ineffective method to combat plastic pollution and waste.**

119.     Recycling research and advocacy were no longer the priorities they once had been because, as far as the industry was concerned, the real problem had been addressed. The public had been successfully convinced that plastics could be recycled, and the actual viability of recycling mattered far less to the industry than perception.

120.     By the mid-1990s, public outrage on plastic waste had begun to subside, and plastics fervor waned in state legislatures and city councils across the country.[103]

121.     With that decline in public pressure came a sense of security that the industry had not felt for some time. APC President Red Cavaney explained that "in the early 1990s the public

---

[100] Clare Goldsberry, *supra* note 133.

[101] Steve Toloken, *Thermoformer Elm Packaging Buys NPRC,* PLASTICS NEWS ( July 5, 1999), https://www.plasticsnews.com/article/19990705/NEWS/307059998/thermoformer-elm-packaging-buys-nprc.

[102] *See Recycling Structure is Worth Salvaging*, PLASTICS NEWS, (Dec. 9, 1996), https://www.plasticsnews.com/article/19961209/NEWS/312099976/recycling-structure-is-worth-salvaging. Further confirmation to industry insiders of the declining importance of recycling came in 1996 when Tom Rattray, the recycling expert who explained that petrochemical companies viewed recycling as competition, retired from his position as Procter & Gamble's associate director for environmental quality. The company decided not to fill his position. *Requiem for a Heavyweight*, PLASTICS NEWS (Sept. 16, 1996).

[103] *See* Roger King, *Big Reforms Not Likely by State Legislatures,* PLASTICS NEWS (Jan. 16, 1995). Internal documents indicate that by this time, industry fears of increased regulation and recycling mandates had largely shifted abroad. In a December 1995 meeting, APC staffers discussed the "European vs. American model" of packaging regulation, noting "more [and] more countries moving toward mandated recycling goals." Bailey Condrey, *Staff Mtg. 12/4/95, in* STAFF & COMMUNICATIONS MTGS., *supra* note 108, at 194.

focus was very much on targets, and they seemed the most easily explained way of showing that something was being done."[104]

122.     But while an APC spokesperson assured the public that the organization remained "very much committed to increased recycling," the situation was different in 1996 than it had been when they set recycled content goals that had not been reached.[105] "The idea of rates, dates, mandates . . . numerical goals, is all very artificial."[106] The plastics industry had "progressed beyond" these sorts of "targets," Cavaney explained.[107]

123.     This shift reflected the fact that the implementation of a sustainable plastic recycling infrastructure had never been as important to the industry as relieving public and regulatory pressure.

124.     As Exxon Chemical Vice President Irwin Levowitz succinctly explained in a January 1994 meeting with APC staff **(Figure 14)**, "We are committed to the activities, but not committed to the results."[108]



**Figure 14**

Notes from an American Plastics Council meeting in January 1994 quoted Irwin Levowitz of Exxon Chemical. *Condrey, 1994 (emphasis added)*.

---

[104] Tom Ford & Roger King, *supra* note 99.
[105] *Id.*
[106] *Id.*
[107] *Id.*
[108] Bailey Condrey, *Gov/Tech Mtg 1/21/94*, *in* NOTES, *supra* note 86, at 7-8.

125.    In essence, the plastics industry had won, and they knew it. As a *Plastics News* columnist told readers in March 1995, "[t]he plastics recycling war is over. We should declare victory and put the money into cancer research... [T]he level of plastics recycling is about 22 percent and won't increase greatly for each new dollar spent."[109]

126.    The results of the plastic recycling research and development sprint had been limited, but the public relations campaign accompanying it had been remarkably effective.

127.    Working in concert, petrochemical companies and their trade associations had convinced consumers that recycling presented a viable solution to the plastic waste crisis, and that was enough.

128.    Polling conducted for APC in 1997 showed that, while respondents who worked in the waste management field were rapidly losing confidence in recycling and shifting their priorities toward source reduction,[110] "recycling continues to be seen as the best use of a community's time and money for resource management by the media, government, and customers."[111]

129.    Members of the media in particular had embraced the industry's narrative on recycling, with a majority favoring plastic recycling over alternatives like reuse or source reduction.[112] Media respondents were also more likely to believe that plastic recycling was economically self-sufficient compared to other groups.[113]

---

[109] Roger King, *Don't Throw More Money at Recycling*, PLASTICS NEWS (Mar. 13, 1995), https://www.plas-ticsnews.com/article/19950313/OPINION02/303139979/don-t-throw-more-money-at-recycling.
[110] *See* Cambridge Reports, Research Int'l, RESOURCE MANAGEMENT OPTIONS, PLASTICS, AND THE PLASTICS INDUSTRY: VIEWS OF APC'S TARGET AUDIENCES 1 (May 1997).
[111] *Id*.
[112] *Id*.
[113] *Id*. at 2.

### vi.    Plastics production & waste increases.

130.    In 2000, the plastics recycling rate sat at only six percent and only increased three percentage points, to nine percent, by 2018. [114] According to plastic waste export data, the ostensible increase to nine percent was largely due to millions of pounds of plastic waste being exported each year to China and developing countries, supposedly for recycling but often for incineration or landfilling.[115] Today, the plastic waste exports have declined and the U.S. plastics recycling rate to a dismal five percent.[116]

131.    The steep increase in plastic production over the past 60 years, as depicted in **Figure 15**, created a dramatic increase in plastic waste: in the United States, plastic increased as a percent of municipal solid waste (by mass) from 0.4 percent in 1960 to 12.2 percent in 2018.[117] An estimated 44 million tons of plastic waste were generated in the United States in 2019.

---

[114] U.S. Environmental Protection Agency, *National Overview: Facts& Figures on Materials, Wastes, and Recycling, supra.*
[115] Beyond Plastics and the Last Beach Cleanup, The Real Truth about the U.S. Plastics Recycling Rate, *supra* note 9, at page 2.
[116] Nat. Renewable Energy Laboratory, *NREL Calculates Lost Value of Landfilled Plastic in the U.S.* (April 28, 2022) https://www.nrel.gov/news/press/2022/nrel-calculates-lost-value-of-landfilled-plastic-in-us.html; *see also* Beyond Plastics and the Last Beach Cleanup, *supra* note 9.
[117] Com. on the U.S. Contributions to Global Ocean Plastic Waste, Nat. Academy Sciences, Engineering, and Medicine, Reckoning with the U.S. Role in Global Ocean Plastic Waste (2022) page 3. (Additionally, the generation of municipal solid waste in the United States has increased significantly over the past 60 years).

App. 44

**Figure 15 Plastics Production Chart and Prediction to 2060**[118]



132.    The excessive amount of plastic waste and pollution is one of the most serious environmental crises confronting Kansas and the planet today. According to the U.S. Environmental Protection Agency's (EPA) latest estimates, approximately 23 percent of global plastic waste was improperly disposed of, burned (creating harmful and toxic emissions), or leaked into the environment in 2019.

133.    Widespread production and promotion of single-use plastic has led to persistent plastic leakage into the environment[119] Around the world each year, an estimated 11 million tons of plastic waste become aquatic pollution and 18 million tons of plastic waste pollute land.

---

[118] *Global Plastic Production and Projections, 1950 to 2060,* Our World in Data
https://ourworldindata.org/grapher/global-plastic-production-projections.
[119] Organization for Economic Cooperation and Development (OECD), *Plastic Pollution is Growing Relentlessly as Waste Management and Recycling Fall Short, Says OECD* (Feb. 22, 2022)
https://www.oecd.org/en/about/news/press-releases/2022/02/plastic-pollution-is-growing-relentlessly-as-waste-management-and-recycling-fall-short.html.

Together, that is the equivalent of four garbage trucks of plastic waste polluted in the water or land *every minute.*[120]

134.    Single-use plastics – plastic packaging, bags, straws, and disposable plasticware and utensils – represent the largest plastics application, and account for one-third of all plastics consumed globally.[121] Single-use plastics comprise most of the plastic waste that escapes and/or is discharged into the environment.[122]

135.    Once plastic waste enters the environment as pollution, it is long-lived, cumulative, friable, and mobile, and can have substantial negative impacts on a wide range of freshwater, marine, and terrestrial species. Removing plastics from the environment becomes difficult and costly as plastics fragment into smaller and smaller pieces.

136.    Defendants produce the primary chemicals and polymers used to produce plastic and styrofoam products such as bottles, cups, plastics, utensils, take-out containers, and packaging designed for single-use that are sold throughout United States and Defendants consider the production of these polymers as the "core" of their chemicals and products portfolio and see 80 percent of its growth potential as "dependent on single-use plastics applications".

137.    Over the years, ExxonMobil and Defendants expanded their U.S. plastic production to 7.7 million tons per year in 2023. Plastic waste has also grown, for instance, from 8.9 percent of all managed trash in California in 1999 to almost 14 percent of all managed trash in California in 2021. Even when millions of tons of waste plastic were still being exported to China each year, plastics recycling never managed to reach 10%. Despite the stark failure of plastics recycling, the

---

[120] Lau et al., *Evaluating Scenarios Toward Zero Plastic Pollution* (2020) 269 Science 1455.
[121] Minderoo 2023, *supra* note 4, page 17.
[122] *Id.*

plastics, packaging, and products industries have waged a decades-long misinformation campaign to perpetuate the myth that plastic is recyclable.[123]

138.    "Plastic waste is not just an environmental issue. It's a waste management issue. It's also a land use issue because landfills are closing in many areas," Anelia Milbrandt, a senior research analyst at NREL said. "What do we do with all that waste?"[124]

139.    Tellingly, all polled groups—consumers, media members, government officials, and even waste management industry representatives—believed that plastic could be economically recycled at a much higher rate than it could be.[125]

## V.    TOLLING OF THE STATUTE OF LIMITATIONS

### A.    Discovery – Rule Tolling

140.    Within the period of any applicable statute of limitations, Plaintiffs could not have discovered through the exercise of reasonable diligence that Plastics are for the most part not recyclable.

141.    Plaintiffs did not discover, and did not know of facts that would have caused a reasonable person to suspect that Plastics were not for the most part recyclable.

142.    For these reasons, even if a statute of limitations did apply, the claims of Plaintiffs did not begin to run and have been tolled.

### B.    Fraudulent – Concealment Tolling

143.    All applicable statutes of limitations have also been tolled by Defendants fraudulent concealment throughout the period relevant to this action that Plastics were not for the most part recyclable.

---

[123] Beyond Plastics, The Real Truth about the U.S. Plastics Recycling Rate, *supra* note 9, at page 2. *See also* PBS Frontline, "Plastic Wars," March 31, 2020 https://www.pbs.org/wgbh/frontline/documentary/plastic-wars/
[124] Nat. Renewable Energy Laboratory, *NREL Calculates Lost Value of Landfilled Plastic in the U.S.* (April 28, 2022), https://www.nrel.gov/news/press/2022/nrel-calculates-lost-value-of-landfilled-plastic-in-us.html.
[125] *See id.*

144.    Instead of disclosing to consumers the fact that only 15% of all plastics can be recycled and less that 10% is recycled, Defendants continued to manufacture, market, distribute, and sell Plastics as recyclable and a better alternative to aluminum and glass.

## VI.    CLASS ACTION ALLEGATIONS

145.    Plaintiffs repeat and re-allege each and every allegation set forth above.

146.    Pursuant to Federal Rule 23(b)(3) and (2), Plaintiffs bring this suit on their own behalf and on behalf of a proposed national class of all other similarly situated persons ("Class Members" of the "Class") consisting of:

> All counties located within the State of Kansas which have incurred and will continue to incur sanitation costs for plastic waste clean-up and disposal from **January 1, 1989** until Defendants' conduct ceases or until class notice is given, whichever occurs first (the "Class").

Excluded from the Class are:

a.    The Defendants and their officers, directors, management, employees, subsidiaries or affiliates;

b.    The judges in this case and any members of their immediate families;

147.    Upon information and belief, the Class consists of over 100 counties throughout Kansas. Accordingly, it would be impracticable to join all Class Members before the Court.

148.    Under Rule 23(b)(3), there are numerous and substantial questions of law or fact common to all of the members of the Class and which predominate over any individual issues. Included within the common question of law or fact are:

a.    Whether Defendants' deceptive advertising regarding the recyclable nature of plastics, has substantially affected interstate and intrastate commerce;

b.    Whether Defendants' deceptive advertising regarding the recyclability of plastics has increased the cost of waste disposal;

c.    Whether Defendants negligently mispresented its product or pricing;

d.    Whether the Defendants' conduct was an unreasonable interference with the Kansas counties health and welfare; and

e.    The quantum of overcharges paid by the Class in the aggregate.

149.    The claims of the Plaintiffs are typical of the claims of Class Members, in that they share the above-referenced facts and legal claims or questions with Class Members, there is a sufficient relationship between the damage to Plaintiffs and Defendants' conduct affecting Class Members, and Plaintiffs have no interests adverse to the interests other Class Members.

150.    Plaintiffs will fairly and adequately protect the interests of Class Members and have retained counsel experienced and competent in the prosecution of complex class actions including complex questions that arise in consumer protection litigation.

151.    A class action is superior to other methods for the fair and efficient adjudication of this controversy, since individual joinder of all Class Members is impracticable and no other group method of adjudication of all claims asserted herein is more efficient and manageable for at least the following reasons:

a.    The liability claims presented in this case predominate over any questions of law or fact, if any exists at all, affecting any individual member of the Class;

b.    Absent a Class, the Class Members will continue to suffer damage and Defendants' unlawful conduct will continue without remedy while Defendants profit from and enjoy their ill-gotten gains;

c.    Given the size of individual Class Members' claims, few, if any, Class Members could afford to or would seek legal redress individually for the wrongs Defendants committed against them, and absent Class Members have no substantial interest in individually controlling the prosecution of individual actions;

d.    When the liability of Defendants has been adjudicated, claims of all Class Members can be administered efficiently and/or determined uniformly by the Court; and

e.    This action presents no difficulty that would impede its management by the

Court as a class action, which is the best available means by which Plaintiff and members of the Class can seek redress for the harm caused to them by Defendant.

152.    Because Plaintiffs seek relief for the entire Class, the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual member of the Class, which would establish incompatible standards of conduct for Defendant.

153.    Further, bringing individual claims would overburden the Courts and be an inefficient method of resolving the dispute, which is the center of this litigation. Adjudications with respect to individual members of the Class would, as a practical matter, be dispositive of the interest of other members of the Class who are not parties to the adjudication and may impair or impede their ability to protect their interests. As a consequence, class treatment is a superior method for adjudication of the issues in this case.

## VII.    CLAIMS FOR RELIEF

### COUNT I
### PUBLIC NUISANCE

154.    Plaintiffs repeat and re-allege each and every allegation set forth above.

155.    Defendants created, exacerbated, and maintained a public nuisance by increasing plastic waste which proximately caused injury to Plaintiffs.

156.    A public nuisance is an unreasonable interference with a right common to the general public. Defendants conduct has created, contributed to, and maintained an ongoing, significant, unlawful, and unreasonable interference with rights common to the general public, including the public health, welfare, safety, peace, comfort, and convenience of Plaintiffs' communities. *See* Restatement (Second) of Torts § 821B.

157.    Defendants have created, contributed to, and maintained a public nuisance by

deceptively advertising and marketing that plastics were recyclable when in reality less than 10% of Plastics are recycled. This deceptive advertising caused various agencies not to ban Plastics, artificially increased the demand for Plastics and increased the amount of Plastics waste that counties across Kansas have had to dispose of. This conduct has unreasonably interfered with the public health, welfare, and safety in Plaintiffs' communities. Plaintiffs have a common right to be free from such conduct and to be free from conduct that creates a disturbance and reasonable apprehension of danger to person and property.

158.    The interference is unreasonable because Defendants nuisance-creating conduct:

    a.    Involves a significant interference with the public health, the public safety, the public peace, the public comfort, and/or the public convenience;

    b.    Was and is proscribed by state laws and regulations at all relevant times; and/or

    c.    Is of a continuing nature and, as Defendants know, has had and continues to have a significant effect upon rights common to the general public, including the public health, the public safety, the public peace, the public comfort, and/or the public convenience.

159.    The significant interference with rights common to the general public is described in detail throughout this Complaint.

160.    Defendants are liable for creating, contributing to, and maintaining the public nuisance because their intentional, knowing, reckless, and unreasonable and/or unlawful conduct was a substantial factor in producing the public nuisance and harm to Plaintiffs.

161.    Defendants had control over its conduct in Plaintiffs' communities and that conduct has had an adverse effect on rights common to the general public. Defendants have controlled the dissemination of information regarding the recyclability of Plastics to consumers for years.

162.    It was reasonably foreseeable that Defendant's actions and omissions would result in the public nuisance and harm to Plaintiffs described herein.

163.    The externalized risks associated with Defendants nuisance-creating conduct as described herein greatly exceed the internalized benefits.

164.    The nuisance created by Defendants conduct is abatable.

165.    As a direct and proximate result of Defendants' tortious conduct and the public nuisance created by Defendant, Plaintiffs have been damaged.

## DEMAND FOR JURY TRIAL

Plaintiffs respectfully demand a jury trial.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs respectfully request the following relief:

a.    Determine that this action may be maintained as a class action pursuant to Fed. R. Civ. P. 23(a) and (b)(3); direct that reasonable notice of this action, as provided by Fed. R. Civ. P.  23(c)(2) be given to the Class; and declare that Plaintiffs are the representatives of the Class;

b.    Require Defendants to pay for sending notice to the certified class of all consumers, as required by relevant states' law;

c.    Appoint Plaintiffs as Class Representatives and Plaintiffs' counsel as Class Counsel;

d.    Issue an injunction to enjoin Defendants from engaging in the deceptive, unfair, unconscionable, and unlawful business practices alleged in this Class Action Complaint;

e.    Find that Defendants have caused a public nuisance by their conduct which has injured the Plaintiffs;

f.    Provide abatement/clean up of this public nuisance at the court's direction;

g.    Award compensatory damages to Plaintiffs and the proposed Class in an amount to be established at trial;

h.    Award treble damages as permitted by law;

i.    Award pre- and post-judgment interest;

j.    Award punitive damages based on Defendants' reprehensible and deliberate conduct;

k.    Award reasonable attorneys' fees and costs; and,

l.    For all such other and further relief as may be just and proper.


Dated: November 27, 2024.                    Respectfully submitted,

                                            */s/ Rex A. Sharp*
                                            Rex A. Sharp, KS #12350
                                            Isaac L. Diel, KS #14376
                                            W. Greg Wright, KS #18352
                                            Hammons P. Hepner, KS #29138
                                            Brandon C. Landt , KS #28867
                                            SHARP LAW, LLP
                                            4820 W. 75th Street
                                            Prairie Village, KS  66208
                                            (913) 901-0505
                                            (913) 261-7564 Fax
                                            rsharp@midwest-law.com
                                            idiel@midwest-law.com
                                            gwright@midwest-law.com
                                            hhepner@midwest-law.com
                                            blandt@midwest-law.com

                                            --and--

                                            Dave Rebein, KS #10476
                                            REBEIN BROTHERS, PA
                                            1715 Central Ave.
                                            Dodge City, KS 67801
                                            Tel: (620) 227-08126

                                            --and--

                                            Glenn I. Kerbs, KS #09754
                                            Samantha F. Sweley, KS #26833
                                            KERBS LAW OFFICE, LLC
                                            1715 Central Ave.
                                            Dodge City, KS 67801
                                            Tel: (620) 255-0238
                                            gkerbs@kerbslaw.com
                                            ssweley@kerbslaw.com

                                            *Attorneys for Plaintiff*
                                            *and the Proposed Class*

# Exhibit 4

**Query    Reports    Utilities    Help    Log Out**

<span style="color:red">CLOSED</span>

# U.S. District Court
## DISTRICT OF KANSAS (Kansas City)
## CIVIL DOCKET FOR CASE #: 2:24-cv-02547-KHV-GEB

| | |
|---|---|
| Ford County, Kansas v. Exxon Mobil Corporation et al | Date Filed: 11/27/2024 |
| Assigned to: District Judge Kathryn H. Vratil | Date Terminated: 01/17/2025 |
| Referred to: Magistrate Judge Gwynne E. Birzer | Jury Demand: Plaintiff |
| Demand: $5,000,000 | Nature of Suit: 360 P.I.: Other |
| Cause: 28:1332 Diversity-Property Damage | Jurisdiction: Diversity |

### Plaintiff

**Ford County, Kansas**
*individually and on behalf of all others
similarly situated*

represented by **Brandon Christopher Landt**
Sharp Law, LLP
4820 W. 75th Street
Prairie Village, KS 66208
972-998-8825
Fax: 913-901-0419
Email: blandt@midwest-law.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**David J. Rebein**
Rebein Brothers PA
810 Frontview
PO Box 1147
Dodge City, KS 67801
620-227-8126
Fax: 620-227-8451
Email: david@rbr3.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Glenn I. Kerbs , I**
Kerbs Law Office
PO Box 1473
Dodge City, KS 67801
620-225-0238
Fax: 620-225-0318
Email: gkerbs@kerbslaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Hammons P. Hepner**
Sharp Law, LLP
4820 W. 75th Street
Prairie Village, KS 66208
913-901-0505

**App. 55**

Email: hhepner@midwest-law.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Isaac L. Diel**
Sharp Law, LLP
4820 W. 75th Street
Prairie Village, KS 66208
913-661-9931
Fax: 913-901-0419
Email: idiel@midwest-law.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Samantha Sweley**
Law Office of Amber M. Brehm
PO Box 156
Dodge City, KS 67801
620-227-3190
Email: samanthasweley@arsico.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**W. Greg Wright**
Sharp Law, LLP
4820 W. 75th Street
Prairie Village, KS 66208
913-901-0505
Email: gwright@midwest-law.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Rex A. Sharp**
Sharp Law, LLP
4820 W. 75th Street
Prairie Village, KS 66208
913-901-0505
Fax: 913-901-0419
Email: rsharp@midwest-law.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Exxon Mobil Corporation**

**Defendant**

**Chevron USA, Inc.**

**Defendant**

**Chevron Phillips Chemical Corporation**

**Defendant**

**App. 56**

**DuPont de Nemours, Inc.**

**Defendant**

**Celanese Corporation**

**Defendant**

**Dow, Inc.**

**Defendant**

**Dow Chemical Company, Inc.**

**Defendant**

**DuPont Corporation**

**Defendant**

**Eastman Chemical Company**

**Defendant**

**LyondellBasell Industries**

**Defendant**

**American Chemistry Council**

| Date Filed | # | Docket Text |
|---|---|---|
| 11/27/2024 | 1 | COMPLAINT with trial location of Kansas City ( Filing fee $405, Internet Payment Receipt Number AKSDC-6528874.), filed by Ford County, Kansas. (Sharp, Rex) (Entered: 11/27/2024) |
| 11/27/2024 | 2 | CIVIL COVER SHEET by Plaintiff Ford County, Kansas. (Sharp, Rex) (Entered: 11/27/2024) |
| 11/27/2024 | 3 | DESIGNATION OF PLACE OF TRIAL filed by Plaintiff Ford County, Kansas - trial to be held in Kansas City. (Sharp, Rex) (Entered: 11/27/2024) |
| 11/27/2024 |  | NOTICE OF JUDGE ASSIGNMENT: Case assigned to District Judge Kathryn H. Vratil and Magistrate Judge Gwynne E. Birzer for all proceedings. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.)<br><br>**NOTICE OF MAGISTRATE JUDGE AVAILABILITY: A United States magistrate judge is available to conduct all proceedings in this civil action if all parties voluntarily consent. Information & consent forms are available at https://www.uscourts.gov/file/459/download (jsh) (Entered: 11/27/2024)** |
| 01/17/2025 | 4 | NOTICE OF VOLUNTARY DISMISSAL by Ford County, Kansas *Pursuant to F.R.C.P. 41(a)(1)(A)(i)* (Sharp, Rex) (Entered: 01/17/2025) |
| 01/17/2025 |  | ***Civil Case Terminated. (mls)** (Entered: 01/21/2025) |

---

**PACER Service Center**

**Transaction Receipt**

02/22/2025 09:36:08

**App. 57**

| PACER Login: | biratusi | Client Code: | 44297.0114-7716 |
|---|---|---|---|
| Description: | Docket Report | Search Criteria: | 2:24-cv-02547-KHV-GEB |
| Billable Pages: | 3 | Cost: | 0.30 |

**App. 58**

# Exhibit 5

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF MISSOURI**

| | |
|---|---|
| BILLIE RODRIGUEZ, DANIEL ERWIN, MICHAEL B. ACKERMAN, and KYLE FOREMAN, individually and on behalf of all others similarly situated,<br><br>     Plaintiffs,<br><br>v.<br><br>EXXON MOBIL CORPORATION, CHEVRON USA INC., CHEVRON PHILLIPS CHEMICAL CORPORATION, DUPONT de NEMOURS, INC., DUPONT CORPORATION, CELANESE CORPORATION, DOW INC., DOW CHEMICAL COMPANY, EASTMAN CHEMICAL COMPANY, LYONDELLBASELL INDUSTRIES N.V., and AMERICAN CHEMISTRY COUNCIL,<br><br>     Defendants. | Case No. _____<br><br><br>JURY TRIAL DEMANDED |

## CLASS ACTION COMPLAINT

Plaintiffs Billie Rodriguez, Daniel Erwin, Michael B. Ackerman, and Kyle Foreman file this Class Action Complaint, individually and on behalf of all others similarly situated, against the named Defendants, seeking relief to remedy the harms caused by Defendants' coordinated negligent and/or fraudulent representations regarding the recyclability of plastics which led to the production and purchase of more plastics than otherwise would have occurred. These joint misrepresentations have led to higher plastic prices than otherwise would have occurred in a competitive market and massive sanitation problems for county and city governments and their landfills. Plaintiffs' allegations are based on personal knowledge as to Plaintiffs' own conduct and investigation of counsel based on publicly available information.

## I.     **INTRODUCTION**

1.     This case is about Defendants' profit-driven decision to promote the idea to the American consumer that plastics are recyclable and better for the environment, when in reality only a tiny fraction of plastics are ever recycled.

2.     Defendants' false representations regarding the recyclability of plastics led to increased production of plastic products, increased demand for plastics products, increased prices for plastic products and corresponding issues with the remediation of plastic waste, all of which have harmed the citizens of Missouri and other states.

3.     Through this Class Action Complaint, Plaintiffs, individually and on behalf of the Class (defined below), seeks an injunction to prohibit Defendants from advertising their plastic products as recyclable and damages for the increased cost of plastic products purchased by Plaintiffs during the class period. Plaintiffs also seek damages under state laws to remedy the high prices they paid because of Defendants' conduct.

4.     Plastic pollution is one of the most serious environmental crises facing the world today. Between 1950 and 2015, over 90% of plastics were landfilled, incinerated, or leaked into the environment.[1] Plastic waste is ubiquitous—from our rivers, lakes, and oceans to roadways and coastlines. It is in "the air we breathe, the food we eat, and the water we drink."[2] One study estimates that humans ingest up to five grams or the equivalent of one credit card worth of plastic per week.[3] Some of the largest plastics and gas companies are among the 20 petrochemical

---

[1] Roland Guyer, et al., Production, *Use, and Fate of All plastics Ever Made*, 3 SCIENCE ADVANCES 2-3 (2017), https://www.science.org/doi/10.1126/sciadv.1700782.
[2] WWF, NO PLASTIC IN NATURE: ASSESSING PLASTIC INGESTION FROM NATURE TO PEOPLE 6-7 (2019), https://wwfint.awassets.panda.org/downloads/plastic_ingest_web_spreads_1.pdf.
[3] Kala Senathirajah, et al., *Estimation of the Mass Microplastics Ingested – A Pivotal First Step Towards Human Health Risk Assessment,* 404 JOURNAL OF HAZARDOUS MATERIALS 11 (2021), https://www.sciencedirect.com/science/article/abs/pii/S0304389420319944.

companies responsible for more than half of all single-use plastics generated globally.[4] ExxonMobil, for example, is the world's top producer of single-use plastic polymers.[5]

5.     Underpinning this plastic waste crisis is a decades-long coordinated campaign of fraud and deception about the recyclability of plastics.

6.     Despite their longstanding knowledge that recycling plastic is neither technically nor economically viable, petrochemical companies—independently and through their industry trade associations and front groups—have engaged in fraudulent marketing and deceptive public education campaigns designed to mislead the public about the viability of plastic recycling as a solution to plastic waste. These calculated efforts have effectively protected and expanded plastic markets, while stalling legislative or regulatory action that would meaningfully address plastic waste and pollution. Fossil fuel and other petrochemical companies have used the false promise of plastic recycling to exponentially increase virgin plastic production over the last six decades, creating and perpetuating the global plastic waste crisis and imposing significant costs on communities that are left to pay for the consequences.

7.     The Plastic problems described throughout this Complaint amount to a national crisis affecting citizens (and children) in all 50 states. In turn, it requires a national, 50-state solution, to stamp out their nationwide scheme.

8.     This case seeks to hold these plastic producers and manufacturers accountable where government enforcement has not (at least not yet). Defendants should be required to repay the consumers they lied to and defrauded.

---

[4] *See* Minderoo Foundation, THE PLASTIC WASTE MAKERS INDEX: REVEALING THE SOURCE OF THE SINGLE-USE PLASTICS CRISIS 12, 14 (2021), https://cdn.minderoo.org/content/uploads/2021/05/27094234/20211105-Plastic-Waste-Makers-Index.pdf; Minderoo Foundation, THE PLASTIC WASTE MAKERS INDEX 2023 18, 57 (2023), https://cdn.minderoo.org/content/uploads/2023/02/04205527/Plastic-Waste-Makers-Index-2023.pdf.
[5] Minderoo Foundation, THE PLASTIC WASTE MAKERS INDEX 2023, *supra* note 4, at *57*.

9.      The plastics industry—which includes petrochemical companies, their trade asso-
ciations, and the front groups that represent their interests—should be held accountable for their
campaign of deception much like the producers of tobacco, opioids, and toxic chemicals, who
engaged in similar schemes.

## II.      JURISDICTION AND VENUE

10.      This Court has proper jurisdiction over this matter in that Defendants have
transacted and conducted business within the state of Missouri and in this judicial district.

11.      This Court has diversity jurisdiction over this action under 28 U.S.C. §§ 1331
and 1332(d) because this is a class action where the amount in controversy exceeds the sum or
value of $5 million, exclusive of interest and costs, there are more than 100 members in the
proposed class, and Plaintiffs are located in a state different from Defendants. This Court has
federal question jurisdiction under 28 U.S.C. §§ 1331 and 1337 because Plaintiffs assert
injunctive relief claims under federal antitrust laws aimed at remedying violations of the Sherman
Act. This Court has supplemental jurisdiction over Plaintiffs' pendent state-law claims pursuant
to 28 U.S.C. § 1367.

12.      This Court also has subject matter jurisdiction as a result of the Class Action
Fairness Act.

13.      Venue is proper in this Court, because a substantial part of the events or omissions
giving rise to the claims at issue occurred in this District, one Plaintiff resides in this District and
the Defendants' property at issue (plastics) are located in this District.

## III.      PARTIES

12.      Plaintiff Billie Rodriguez is a resident of the State of Missouri and purchased plastic
products in the states of Missouri and Kansas.

4

13.     Plaintiff Daniel Erwin is a resident of the State of Kansas and purchased plastic products in the states of Missouri and Kansas.

14.     Plaintiff Michael Ackerman is a resident of the State of California and purchased plastic products in the states of California and New York.

15.     Plaintiff Kyle Foreman is a resident of the State of Florida and purchased plastic products in the state of Florida.

16.     Defendant Exxon Mobil Corporation ("Exxon Mobil") is the world's largest plastic producing company in revenue and market capitalization. It is headquartered in Spring, Texas. Exxon Mobil is the successor company to John D. Rockefeller's Standard Plastics Company and was created by merging two plastics giants (Exxon and Mobil). It dominates the American plastics and gas industry and also is the world's largest producer of polyolefins, additives, raw materials, compounds and related polymers and resins. Exxon Mobil Corporation can be served at 22777 Springwoods Village Parkway, Spring, TX 77389-1425.

17.     Defendant Chevron USA, Inc. is another plastics and gas company created by the breakup of Standard Plastics Company. It is headquartered in San Ramon, California and is the largest polyethylene manufacturer in North America. It can be served at 6001 Bollinger Canyon Road, San Ramos, CA 94583.

18.     Defendant Chevron Phillips Chemical Corporation is a joint venture between Chevron USA Inc. and Phillips 66 Company. It is headquartered in The Woodlands, Texas, and is one of the top suppliers of polyethylene in the world today. It can be served at 10001 Six Pines Dr., The Woodlands, TX 77380.

19.     Defendant DuPont de Nemours, Inc.[6] is an American multinational company headquartered in Wilmington, Delaware. It is a leading plastics manufacturer with revenue of over $12 billion dollars in 2023. It can be served at 974 Centre Rd. Bldg. 730, Wilmington, DE 19805.

20.     Defendant Celanese Corporation focuses mainly on specialty chemicals and is a leading producer of acetic acid. It is also the world's largest vinyl acetate monomer (VAM) producer. It is headquartered in Irving, Texas. It can be served at 222 W. Los Colinas Blvd., Suite 900N, Irving, TX 75039.

21.     Defendant Dow Inc. is one of the world's leading material science companies. The company conducts its worldwide business through six business units. It was incorporated in Delaware in 2018 to serve as a holding company for the Dow Chemical Company. It is headquartered in Midland, Michigan, and can be served at 2211 H.H. Dow Way, Midland, MI 48674.

22.     Defendant Dow Chemical Company is headquartered at 2211 H. H. Dow Way Midland, Michigan. As of 2021, Dow Chemical was among the three largest chemical producers in the world. Dow Chemical produces commodity chemicals like polyethylene. Basic plastics make up 26% of Dow Chemical sales. It is an operating subsidiary of Dow Inc. It can be served at 2211 H.H. Dow Way Midland, MI 48674.

23.     Defendant Eastman Chemical Company is a global specialty chemicals company that produces a wide range of fibers, chemicals and advanced materials. It is a significant supplier of coatings, adhesives, specialty plastic products and a major supplier of cellulose acetate fibers and copolyesters. It is headquartered in Kingsport, Tennessee. It may be served at 200 S. Wilcox Dr., Kingsport, TN 37660.

---

[6] DuPont Corporation is used interchangeably when referencing to Defendant DuPont de Nemours, Inc.

24.     Defendant LyondellBasell Industries N.V. is a multinational company. It is the largest licensor of polyethylene and polypropylene in the world. Its United States headquarters is located in Houston, Texas. It can be served at 1221 McKinney St., Suite 300, Houston, TX 77010.

25.     Defendant The American Chemistry Council, known as the Manufacturing Chemists' Association at its founding in 1872, then as the Chemical Manufacturers Association from 1978 to 2000, is an industry trade association for American chemical companies. It is based in Washington, D.C. The mission of the American Chemistry Council is to promote the interests of the chemical industry. The trade group represents U.S. chemical companies as well as the plastics and chlorine industries, formerly known as the American plastics Council. It can be served at 700 Second St. NE Washington D.C. 20002. During its operations, the Council has included the following defendant members: Exxon Mobil, Chevron Phillips, Dow, Dupont, Eastman Chemical Company, Celanese Corporation, and LyondellBasell.

## IV.     FACTUAL ALLEGATIONS

### A.     Background of the Plastic Product Industry

26.     The plastic products at issue in this case can be separated into certain categories based on their chemical composition and end use.

27.     Polyethylene Terephthalate (PET) is used most commonly in water and soft drink bottles, fruit juice containers, domes or covers for prepared meals, cookie/biscuit trays, condiment bottles, cream/nut butter containers, and cooking plastics bottles.

28.     Polyethylene (PE) is used in milk and water jugs.

29.     Polypropylene (PP) is used in hard containers such as pill bottles as well as microwave dishes, yogurt and ice cream containers, and chip bags.

30.     Polystyrene (PS) is used for water station cups and plastic cutlery.

31.     Polycarbonate (PC) is used in longer lasting reusable containers including refillable water bottles, nursing bottles or lab bottles.

32.     High Density Polyethylene (HDPE) is used in milk bottles, freezer bags, ice cream containers, pouches and sachets.

33.     Low Density Polyethylene (LDPE) is used in squeeze bottles, cling wrap, shrink wrap pouches and sachets.

34.     Plastics are part of a sector known as "petrochemicals," or products made from fossil fuels such as plastics and gas. More than 99% of plastics are produced from fossil fuels.[7]

**B.      Most plastics cannot be recycled, causing the plastic waste and pollution crisis.**

35.     There are "thousands of different types of plastic, each with its own chemical composition and characteristics."[8] Almost all of these plastics cannot be "recycled"—meaning they cannot be collected, processed, and remanufactured into new products.[9]

36.     As of 2021, the U.S. recycling rate for plastic is estimated to be only 5-6%.[10] Despite decades of industry promises, plastic recycling has failed to become a reality due to long-known technical and economic limitations.[11]

---

[7] Center for International Environmental Law (CIEL), FUELING PLASTICS: FOSSILS, PLASTICS, AND PETROCHEMICAL, FEEDSTOCKS 1 (2017), https://www.ciel.org/wp-content/uploads/2017/09/Fueling-plastics-Fossils-plastics-Petrochemical-Feedstocks.pdf.

[8] Professor plastics, *Types of Plastic: How Many Kinds of plastics are There?*, plastics Make it Possible (Jan. 18, 2012), *available at* https://web.archive.org/web/20220611222514/https://www.plasticsmakeitpossible.com/about-plastics/types-of-plastics/professorplastics-how-many-types-of-plastics-are-there/ (archived June 11, 2022).

[9] U.S. EPA, The U.S. Recycling System, https://www.epa.gov/circulareconomy/us-recycling-system ("In the United States, recycling is the process of collecting and processing materials (that would otherwise be thrown away as trash) and remanufacturing them into new products.").

[10] Beyond plastics & The Last Beach Cleanup, The Real Truth About the U.S. plastics Recycling Rate 3 (2022), https://static1.squarespace.com/static/5eda91260bbb7e7a4bf528d8/t/62b2238152acae761414d698/1655841666913/The-Real-Truth-about-the-USPlastic-Recycling-Rate-2021-Facts-and-Figures-_5-4-22.pdf.

[11] The plastic recycling rate in the U.S. has never exceeded the 2014 peak of 9.5%, and even that figure includes a significant amount of exported plastic waste that was dumped or burned rather than recycled. Id.; John Hocevar, Circular Claims Fall Flat: Comprehensive U.S. Survey of plastics Recyclability 7 (2020), https://www.greenpeace.org/usa/wp-content/uploads/2020/02/Greenpeace-Report-Circular-Claims-Fall-Flat.pdf.

37.     Certain types of plastics have no end markets (i.e., businesses that buy and use recyclable materials to make new products), and therefore are *impossible* to recycle. To date, viable markets only exist for polyethylene terephthalate (PET) and high density polyethylene (HDPE) plastic bottles and jugs.[12] These are known as plastics #1 and #2, respectively, under the industry's Resin Identification Codes (RICs).[13]

| Resin Identification Number | Resin | Resin Identification Code –Option A | Resin Identification Code –Option B |
|---|---|---|---|
| 1 | Poly(ethylene terephthalate) | △ 1 PETE | △ 01 PET |
| 2 | High density polyethylene | △ 2 HDPE | △ 02 PE-HD |
| 3 | Poly(vinyl chloride) | △ 3 V | △ 03 PVC |
| 4 | Low density polyethylene | △ 4 LDPE | △ 04 PE-LD |
| 5 | Polypropylene | △ 5 PP | △ 05 PP |
| 6 | Polystyrene | △ 6 PS | △ 06 PS |
| 7 | Other resins | △ 7 OTHER | △ 07 O |

[14]

---

[12] John Hocevar, supra note 11, at 7.
[13] Brad Kelechava, Resin Identification Codes (RICs), as Specified by ASTM D7611, American National Standards Institute (Feb. 21, 2019), https://blog.ansi.org/2019/02/resin-identification-codes-rics-astm-d7611/.
[14] https://web.archive.org/web/20160126213345/http://www.plasticsindustry.org/Aboutplastics/content.cfm?Item-Number=823&navItemNumber=1125.

38.     After conducting a 10-year review on plastic recycling, in 1991, the U.S. Environmental Protection Agency (EPA) concluded that "it appears that at the present only two types could be considered for making into high quality objects, PET and HDPE," specifically those sourced from bottles.[15]

39.     This remains true more than 30 years later.[16] While a minority of municipal recycling programs across the country may collect plastics with RICs #3-7, they do not actually recycle them.[17] Instead, such plastics are incinerated or sent to landfills.

40.     The thousands of different plastics and the variation among them further limit recyclability. When recycling plastic waste, a facility must sort and separate thousands of pieces of plastic by type to maintain a high degree of purity in the recycled material.[18]

41.     For this reason, some types of plastic that are technically "recyclable" are not recycled in practice. For example, many single-use plastics are made of different types of plastic polymers as well as other materials, such as paper, metals, or adhesives.[19] It is impractical—if not impossible—to separate these different components for recycling.[20]

42.     Even products made of a single type of plastic often cannot be recycled together because they include different chemical additives or colorants.[21] For example, PET is widely

---

[15] U.S. EPA, Ten Year Review of plastics Recycling 22 (1991), https://semspub.epa.gov/work/03/17184.pdf.

[16] John Hocevar, supra note 10, at 4 ("Only some PET #1 and HDPE #2 plastic bottles and jugs can be legitimately labeled as recyclable in the U.S. today"); see also Greenpeace, Circular Claims Fall Flat Again: 2022 Update 27-29 (2022), https://www.greenpeace.org/usa/wp-content/uploads/2022/10/GPUS_FinalReport_2022.pdf (estimating that the existing domestic capacity for recycling/reprocessing PET waste is 20.9% and HDPE is 10.3%, while the capacity to recycle other plastics ranges from "negligible" to less than 5%).

[17] John Hocevar, supra note 10 at 4, 7-9; Greenpeace, supra note 15, at 3-4. For example, the City of Knoxville, Tennessee, states on its website that its recycling facility will collect plastics #3-7, but it does not recycle them because "there is no 'end-market' buyer." City of Knoxville, Recycling, https://www.knoxvilletn.gov/cms/One.aspx?portalId=109562&pageId=200229 (last visited Oct. 26, 2023).

[18] Judith Enck & Jan Dell, Plastic Recycling Doesn't Work and Will Never Work, The Atlantic (May 30, 2022), https://www.theatlantic.com/ideas/archive/2022/05/single-use-plastic-chemical-recycling-disposal/661141/.

[19] See Jefferson Hopewell et al., plastics Recycling: Challenges and Opportunities, 364 Philos. Trans. R. Soc. Lond. B Biol. Sci. 2115, 2118 (2009), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2873020/.

[20] Id.

[21] Judith Enck & Jan Dell, supra note 16.

accepted by municipal recycling programs, yet PET bottles cannot be recycled with PET clamshells and other thermoforms, which are made from a PET material with different chemical properties.[22] Similarly, green PET bottles cannot be recycled with clear PET bottles.[23]

43.    The quality of plastic degrades as it is recycled, limiting both the use of recycled plastic and its continued recyclability. The fossil fuel-derived chemicals that form the basis of plastic are vulnerable to heat and other processes used in recycling.[24] As the chemicals degrade, they lose their quality and integrity, making recycled resins unsuitable for many manufacturers.[25]

44.    But plastics can only be recycled – or more accurately "downcycled" – once, rarely twice.[26]

45.    Recycling most plastics is technologically infeasible, as the plastics industry has long known, and subsequent scientific research would confirm. "When recycled, some of the plastic can be remade into similar products; however, most is typically downcycled into a product of lower quality and is unable to displace products made from virgin plastics [citation omitted]."[27] Even PET, the most easily recycled type of plastic, quickly degrades through the recycling process.

---

[22] *Id.*

[23] Id.; *see also* Becky Sullivan, *Sprite Ditches its Iconic green bottle—but Environmentalists Say it's Not Enough*, NPR ( July 28, 2022), https://www.npr.org/2022/07/28/1114242535/sprite-green-bottles-recycle.

[24] *See* Huiying Jin et al., *The effect of extensive mechanical recycling on the properties of low density polyethylene*, 97 POLYMER DEGRADATION AND STABILITY 2263 (2012), https://www.sciencedirect.com/science/article/abs/pii/S0141391012003114 ("[P]roperties of mechanically recycled polymers do not remain the same because of degradation from heat, mechanical stress, oxidation and ultraviolet radiation during reprocessing and lifetime").

[25] *See* Sarah DeWeerdt, *Why It's So Hard to Recycle Plastic*, SCIENTIFIC AMERICAN (Dec. 13, 2022), https://www.scientificamerican.com/article/why-its-so-hard-to-recycle-plastic/.

[26] *See* Roland Geyer et al., *supra* note 1, at 2-3.

[27] Moran et al., San Francisco Estuary Institute, A Synthesis of Microplastic Sources and Pathways to Urban Runoff (Oct. 2021) page 76.

46.     The *toxicity* of plastic and its chemical additives limits the recyclability of plastic. Many plastics commonly contain toxic additives such as stabilizers, plasticizers, coatings, catalysts, and flame retardants.[28]

47.     Managed plastic waste contributes to plastic pollution of the environment. As plastic waste degrades in landfills, microplastics are released into the surrounding environment, including contamination of groundwater and surface water by air and by leachate.[29]

48.     Plastic waste may be further contaminated through curbside collection of containers for pesticides, cleaning solvents, and other household items.[30]

49.     As plastics degrade through use and the recycling process, they begin to leach these toxic substances.[31] For this reason, a vast majority of plastic products cannot be recycled into food-grade packaging, food-contact surfaces, or other high-contact products.[32]

**C.     Defendants knew that their promotion and production of plastic products for a throw-away lifestyle created a solid-waste crisis without a solution.**

**i.     1950s: The plastics industry touted plastics' supposed disposability.**

50.     Beginning in the 1950s, the petrochemical companies that produced plastic resins identified a way to ensure a steady, growing demand for plastic: disposability. If plastic products were used only once, then they would need to be purchased—and thus produced—again and again.

51.     At the Society of the Plastics Industry's ("SPI") 1956 national conference, participants were told that "developments should be aimed at low cost, big volume, practicability,

---

[28] *See* John N. Hahladakis et al., *An overview of chemical additives present in plastics: Migration, release, fate and environmental impact during their use, disposal and recycling*, 344 J. of Hazardous Materials 179, 184-168 (Feb. 15, 2018), https://www.sciencedirect.com/science/article/pii/S030438941730763X.

[29] Leachate is a solution or product obtained by leaching, especially from landfills or other sources.

[30] Greenpeace, Forever Toxic: The Science on Health Threats from Plastic Recycling 4 (2023), https://www.greenpeace.org/usa/wp-content/uploads/2023/05/GreenpeaceUSA_ForeverToxic_ENG.pdf.

[31] *Id.*

[32] *See* Environment & Climate Change Canada, Assessing the State of Food Grade Recycled Resin in Canada and the United States, 4, 34 (2021), https://www.plasticsmarkets.org/jsfcontent/ECCC_Food_Grade_Report_Oct_2021_jsf_1.pdf.

and *expendability*.[33] In short, the producers' aim should be for their products to end up "in the garbage wagon."[34]

52.     The shift to disposables began almost immediately—even for products that had previously been sold to customers because they could be repurposed.[35] Plastic dry cleaning bags were advertised as durable and reusable throughout the 1950s,[36] but the industry quickly changed tack in 1959 after around 80 children suffocated on plastic dry cleaner bags, leading to immense public backlash against the industry and some of the earliest calls for plastic bans.[37]

53.     SPI launched a nationwide public relations campaign, claiming that the bags were meant to be disposable, essentially shifting the blame to the children's parents—and it worked.[38]

54.     This campaign served as a mechanism to insulate the industry from public and regulatory backlash while simultaneously introducing consumers to the idea of disposable plastics. An SPI pamphlet from 1959 **(Figure 1)** explained that customers should "never keep a plastic bag after it has served its intended usefulness. Destroy it: Tear it up … or tie it in a knot … and throw it away."[39] To do otherwise "is the worst mistake a mother could make."[40]

---

[33] *plastics in Disposables and Expendables*, 34 MODERN PLASTICS 93 (Apr. 1957) (emphasis in original).
[34] *Id.*
[35] Jeffrey L. Meikle, AMERICAN PLASTIC: A CULTURAL HISTORY 266-67 (Rutgers University Press 1995), https://www.google.com/books/edition/American_Plastic/u_1ePU4GEGAC?hl=en&gbpv=0 (chronicling the shift to disposables). The industry's earlier campaigns promoting plastic as durable have also been chronicled. *See id.* at 186-88; Susan Freinkel, Plastic: A TOXIC LOVE STORY 145 (2011).
[36] *See This Bag Spells Business*, 50 DUPONT MAGAZINE 24, 25 (Feb/Mar. 1956), https://digital.hagley.org/1956_50_01 (quoting the general manager of a Providence, Rhode Island dry cleaning company who explained that the film bags combined "maximum transparency as well as the necessary durability." That durability, the article went on to say, allowed consumers to find additional uses for the bags even after they had received their laundered clothes, stating, "Bags of 'Alathon' are reusable, too, as housewives have discovered").
[37] Susan Freinkel, *supra* note 38, at 142-43.
[38] Jeffrey L. Meikle, *supra* note 38, at 249-58; *see also* Hiram McCann, *Hazards in Film Misuse Must Be Taught Parents*, 36 MODERN PLASTICS 262 (June 1959) (on file with CCI #1356.264) (explaining that the bags were "made and costed to be disposable" and lamenting that items ranging from cars to cleaning fluids "kill children every day," but in those cases "[a]dults are blamed–mainly parents. And rightly so").
[39] Society of the plastics Industry (SPI), PLASTIC FILM: CORRECT USE AND MIS-USE 2 (1959).
[40] *Id.* At 3.



**Figure 1**

The Society of the Plastics Industry encouraged consumers to dispose of plastic dry-cleaning bags. SPI, 1959.

55.     The plastics industry's successful navigation of this crisis—and the corresponding threat of plastic bans—provided a model for the future, both in the way the industry would respond to backlash and the way it would insist on disposability by offering customers no alternative.[41] Even as consumers resisted the shift to single-use plastics, which they found jarring after being told since the 1930s that plastics were too valuable to be thrown away, the plastics industry successfully expanded into new markets—especially single-use packaging—at an unprecedented pace.

56.     In 1960, packaging represented just 10% of total plastic production, but amounted to 25% by the end of the decade.[42] By that point, disposable plastics had become the norm for everything from detergent bottles to plastic milk jugs, and plastic rings for canned beverage six-packs.[43]

57.     In 1963, Lloyd Stouffer, editor of the trade journal *Modern Plastics,* congratulated the industry on "filling the trash cans, the rubbish dumps and the incinerators" with single-use

---

[41] Jeffrey L. Meikle, *supra* note 39, at 249-58.
[42] *Id.* At 266.
[43] *Id.* At 265-66.

plastics.[44] "The happy day has arrived," Stouffer opined, "when nobody any longer considers the plastics package too good to throw away."[45]

> ii.     **Late 1960s into 1970s: Landfills and burning were the plastic industry's "solution" to the growing pollution problem.**

58.     The industry's success in "selling" disposability and introducing single-use plastics had predictable consequences. By the end of the decade and into the early 1970s, plastics were identified as a key part of the developing solid waste crisis.

59.     *Modern Plastics* warned companies that the industry needed to figure out a solution to the pushback they were experiencing before "well-meaning but misinformed authorities step in with homemade remedies and regulations."[46]

60.     Again, facing immense public backlash and a genuine threat of regulation,[47] the plastics industry responded with two "solutions." The first, in response to concerns about litter, was landfilling. As the American Chemical Society explained in 1969, "it is always possible that scientists and engineers will learn to recycle or dispose of wastes at a profit, but that does not seem likely to happen soon on a broad basis."[48]

---

[44] See Rebecca Altman, *American Beauties: How Plastic Bags Came to Rule Our Lives, And Why We Can't Quit them*, Topic (2018), *available at* https://web.archive.org/web/20191113102708/https://www.topic.com/american-beauties (archived Nov. 13, 2019) (quoting Lloyd Stouffer, *plastics Packaging: Today and Tomorrow,* SPI Annual plastics Conference (Nov. 19-21, 1963)).

[45] *Id.*

[46] Jeffrey L. Meikle, *supra* note 39, at 265 (quoting Joel Frados, *There's Something in the Air*, 4 MODERN PLASTICS 89 (Oct. 1966)).

[47] See Jerome Heckman, General Counsel, SPI, Presentation at the Meeting of the SPI plastics Waste Management Committee: Solid Waste and Litter: Legislative Status and Outlook—1972 (Mar. 1, 1972), *available at* https://cdn.toxicdocs.org/8R/8Rq8Namx-13mzoge1jEG7N0pzm/8Rq8Namx13mzoge1jEG7N0pzm.pdf (claiming that, at the time of the presentation in 1972, there were over "a thousand regulatory proposals . . . at various governmental levels which could adversely affect the interests of the plastics industry"); Lester E. Blaschke, *Analysis of the Resource Recovery Act of 1970 and Its Effect on Implementation of Solid Waste Management Programs*, 34 J. ENVTL. HEALTH 89, 89 (1971), https://www.jstor.org/stable/44545882 (describing the passage of the Resource Recovery Act in 1970, as an EPA official, represented "a significant shift in emphasis from 'disposal' to 'recycling and recovery of materials and energy'").

[48] ACS Committee on Chemistry & Public Affairs, *Cleaning Our Environment–The Chemical Basis for Action*, in C&E NEWS, at 58, 60 (Sept. 8, 1969), available at https://cdn.toxicdocs.org/6b/6bLOmw81KLQJwzb0RQ9mEadx6/6bLOmw81KLQJwzb0RQ9mEadx6.pdf.

61.     Different types of plastic cannot be recycled together, even when separating out those that cannot be recycled at all (including thermoset polymers like polyurethanes and vulcanized rubber). For example, a PET bottle cannot be recycled with an HDPE bottle, however similar they appear. Further complicating matters, many plastic products are made by incorporating various additives, as well as mixing different polymers to take advantage of their distinct qualities.

62.     As explained by researchers in 1969, "[t]he very success of package makers in marrying dissimilar materials has made packaging materials virtually unrecoverable after use."[49] As a result, the economics of plastic recycling were—and still are— "virtually hopeless," as one industry insider put it in 1969.[50]

63.     Still, the greatest obstacle to plastic recycling was that no market existed for the final product. Recycled plastic was more expensive and of lower quality than virgin resins. This was, in part, intrinsic to the material. Even under ideal conditions, plastics experienced "a degradation of resin properties and performance . . . during the initial fabrication, through aging, and in any reclamation process," as explained in a 1973 report commissioned by SPI.[51]

64.     As a direct result of these limitations, few manufacturers had any interest in purchasing recycled resins.[52]

65.     According to the SPI report, "[r]ecycling of plastics from [municipal sources of plastic waste] poses the greatest challenge," because "there are no effective marketing mechanisms

---

[49] Arsen J. Darnay & William E. Franklin, *The Changing Dimensions of Packaging Wastes*, in FIRST NATIONAL CONFERENCE ON PACKAGING WASTES at 11, 16; https://nepis.epa.gov/Exe/ZyPURL.cgi?Dockey=2000Q54D.TXT; *see also* Thomas B. Becnel, *supra* note 54, at 85 (stating that "it is ironic that the very molecular structure that has made [plastic] so popular creates certain disposal problems").
[50] Eric B. Outwater, Packaging – U.S.A., in Proceedings: First National Conference on Packaging Wastes 1, 7 (1971).
[51] R.L. Glauz, et al., THE PLASTICS INDUSTRY IN THE YEAR 2000 41 (1973), Box 12, Jack Milgrom Papers, Special Collections Research Center, Syracuse University Libraries.
[52] *Id.*

for trade in contaminated, mixed plastics."[53] The report was definitive: "When plastics leave fabrication points, they are almost never recovered. There is no recovery from obsolete products."[54]

66.     Throughout the 1970s, SPI officials argued that plastics were an ideal material for landfilling since "they don't biodegrade," they "just sit there."[55] But the alternate "solution" proved to be the industry favored waste-to-energy (WtE) incineration. Support for WtE was reinforced by individual companies and trade associations representing the industry throughout the decade.[56]

67.     And by the 1980s, while the industry pushed the false narrative of recyclability of these plastics products, the same impediments identified in the 1960s and 1970s for why they couldn't be effectively recycled remained.

>     **iii.     1980s: After receiving backlash for their earlier "solutions," the plastics industry encouraged recycling of plastics.**

68.     By the 1980s, while the industry pushed the false narrative of recyclability of these plastics products, the same impediments identified in the 1960s and 1970s for why they couldn't be effectively recycled remained. Neither landfilling nor incineration sufficiently assuaged public concerns or regulatory pressure, and the industry again faced proposed bans on single-use plastics in the mid-1980s. This time, it adopted a solution that it knew was popular among consumers and policymakers alike: recycling.

---

[53] *Id.*
[54] *Id.*
[55] Radio Interview with Ralph Harding, President of the Society of the plastics Industry, in Atlanta, Georgia (n.d.).
[56] Jeffrey L. Meikle, *supra* note 38, at 272; *see also, e.g.,* Internal Memorandum from Avron B. Magram, Hatco Chemical Division, W.R. Grace Company on PVC/Ecology (May 11, 1971), available at https://cdn.toxicdocs.org/pe/peX25LzXyN4nbMM8dO6D1Za66/peX25LzXyN4nbMM8dO6D1Za66.pdf (discussing relevant research and updates regarding PVC incineration from January 1970 to May 1971).

69.     SPI established the Plastics Recycling Foundation (PRF), bringing together petrochemical companies and bottlers **(Figure 2)**, and PRF immediately began a campaign to demonstrate the industry's supposed commitment to mechanical recycling.[57]



## Figure 2

Exxon Chemical, a member of the Society of the Plastics Industry, acknowledged its support for organizations like the Plastics Recycling Foundation and the Council for Solid Waste Solutions in its Environmental Compendium. *Exxon, 1990 (emphasis added).*

70.     But industry support did little to change the basic problem: plastics were notoriously difficult to recycle, as the industry had known for years. Doubts about the viability of municipal solid waste recycling in general went back decades.

---

[57] *See* Leo H. Carney, *The Environment*, N.Y. TIMES (Sept. 15, 1985)
https://www.nytimes.com/1985/09/15/nyregion/the-environment.html; *see also* Judie Neilson, Oregon Dep't of Fish & Wildlife *The Oregon Experience, in* NOAA, PROCEEDINGS OF THE WORKSHOP ON THE FATE AND IMPACT OF MARINE DEBRIS 154, 158 (Richard S. Shomura & Howard O. Yoshida eds., 1985),
https://repository.library.noaa.gov/view/noaa/5680 (noting that "the Society for the plastics Industry has allocated $5 million to establish a Plastic Recycling Foundation and Institute to aggressively pursue methods to make it economically feasible to recycle plastic in large quantities").

71.     Prior to 1980, the plastics industry consistently reached the same conclusion when it explored the possibility of recycling plastic from the municipal waste stream: mechanical recycling was technically and economically infeasible.

72.     In 1986, an industry trade association acknowledged that the situation was virtually the same as it had been decades earlier.

73.     The Vinyl Institute (VI), a spin-off organization of SPI, explained in a report that "purity and quality demands set for many applications preclude the use of recycled material."[58] As the organization's founding director, Roy Gottesman, explained to attendees of an industry conference in 1989 **(Figure 3)**, "Recycling cannot go on indefinitely, and does not solve the solid waste problem."[59]



**Figure 3**

The executive director of the Vinyl Institute shared "key considerations to be made when considering recycling" with other members of the plastics industry. *Gottesman, 1989 (emphasis added).*

---

[58] Vinyl Institute, SOLID WASTE FACT SHEET—DRAFT 5 (July 18, 1986), *available at* https://climateintegrity.org/uploads/deception/1989_Vinyl_Institute_-_Fact_Sheet.pdf.
[59] Dr. Roy T. Gottesman, Executive Director, Vinyl Institute, Presentation at the Institute for International Research Conference on Achieving Market Expansion Through plastics Recycling, *An Overview of Options for Disposal of Vinyl plastics in Municipal Solid Waste* 1 (Sept. 26, 1989), Box No. 5, Jack Milgrom Papers, Special Collections Research Center, Syracuse University Libraries.

74.     Ultimately, the VI report **(Figure 4)** concluded, "recycling cannot be considered a <u>permanent</u> solid waste solution, as it merely prolongs the time until an item is disposed of."[60]



> Nevertheless, recycling cannot be considered a <u>permanent</u> solid waste solution, as it merely prolongs the time until an item is disposed of. At that point, recycled products also become MSW components.

## Figure 4

A draft "Solid Waste Fact Sheet," created by the Vinyl Institute, was stark in its assessment of the viability of recycling to address plastic waste issues. *VI. 1986 (emphasis added).*

75.     At the Vinyl Institute meeting that same year, members discussed a recent study on the economics of recycling. "This study indicates that based on our economic system, on the cost of fuel and transportation, on the economic benefit of downstream markets, on the low cost of plastic feedstocks, and the even lower cost of off grade-off spec plastic feedstocks, recycling is not and will never be commercially viable unless it is significantly subsidized by a government entity."

76.     What led the industry to change its position in the 1980s was not a massive technological breakthrough or an answer to the economic roadblocks to plastic recycling. Rather, the plastics industry began to lie about the viability of recycling as a direct result of the backlash they faced from the public.

77.     As SPI officials discussed in a 1984 memo on the threat of a recycling bill **(Figure 5)**, although they were able to shape the bill "to reflect the . . . commitment of our industry to move forward" on recycling, "there is no question that the State of New Jersey must see substantial short-

---

[60] *Id.* at 2 (emphasis in original).

**App. 79**

term progress in the recycling of plastic containers or else punitive legislation . . . will attack the

problem head-on."[61]



**Figure 5**

The Society of the Plastics Industry articulating the industry's
support for recycling in the face of potential "punitive legisla-
tion" that would attack the plastic waste problem "head-on."
*Bernstein, 1991 (emphasis added).*

78.     The industry felt the threat of legislative action acutely throughout the 1980s and

1990s.

> **iv.     Late 1980s to Mid-1990s: The plastics industry continued its
> recyclability campaign using trade groups to spread the message.**

79.     Looking back at the early days of this regulatory uptick, a representative from

Occidental Chemical testified to Congress in 1992 that there was a "rush to demonstrate

environmental purity. . . . The call was to recycle or be banned."[62]

---

[61] Letter from Roger Bernstein, Letter from Roger Bernstein, Society of the plastics Industry, to the New Jersey
Task Force State Government Affairs Committee, New Jersey's Mandatory Recycling Bill 2 (Dec. 20, 1984),
available at https://www.toxicdocs.org/d/rpQVOR8obVNLbN5R69K0EJ5pJ?lightbox=1. As an SPI employee put it
in a different memo, "the NJ Recycling office regards plastics as a problem not shared by competitive materials."
Memorandum from John C. Malloy, Director of Packaging Services, SPI, to Plastic Bottle Institute (Oct. 12, 1984).
[62] Plastics Recycling: Problems and Possibilities: Hearing Before the Subcomm. on Env't & Emp. of the H. Comm.
on Small Bus., 102nd Cong. 121 (1992) (testimony of William F. Carroll, Jr., Ph.D., Director of Commercial
Development, Occidental Chemical Corp.). The Occidental representative went on to explain the challenge of the
situation given the poor state of plastic recycling infrastructure and development: "The plastics industry was made to
feel the pressure acutely. Programs for each plastic, and in many cases each grade of plastic, had to be devised and
technically proven. Bottles had to be sorted, cleaned, purified and made into pellets for processors." *Id.*

80.     Consumer demands that plastics be recycled or banned presented the plastics industry with a severe problem. The industry knew that mechanical recycling was not a viable solution—yet renewed concerns about plastic waste and its impact on the environment meant they needed the public to *believe* recycling could address their concerns, and the industry was invested in its success.

81.     The industry took a familiar approach, leaning on its trade associations just as it had in the face of previous crises.[63] SPI's Public Affairs Council ("PAC"), created after SPI successfully defeated a recycling bill in New York City in 1971,[64] served as a model in particular. Initially established as the Plastics Waste Management Fund, PAC brought together 12 petrochemical companies "to fight off restrictive legislation everywhere," in the words of SPI President Ralph Harding, Jr.[65]

82.     Similar trade associations and front groups proliferated during the 1980s and early 1990s. Along with the Plastics Recycling Foundation and Vinyl Institute, the petrochemical companies, with support from SPI, created a variety of organizations in this brief span,[66] including: the Plastic Bottle Institute (PBI) in the early 1980s; the Center for Plastics Recycling Research (CPRR) at Rutgers University in 1985; the Council on Packaging in the Environment (COPE) in 1986; and the Council for Solid Waste Solutions (CSWS) in 1988 **(Figure 6)**, which became

---

[63] *See, e.g.*, Jerome Heckman, *supra* note 50 (addressing the plastics industry as SPI's general counsel amid fighting proposed taxes on plastic containers and other regulation on plastics in 1972).
[64] *Id.*
[65] Jeffrey L. Meikle, *supra* note 38, at 272-73 (quoting a talk given by Ralph Harding, Jr. entitled "Challenges Facing the plastics Industry" on December 8, 1971).
[66] These organizations were not necessarily contained within a single umbrella organization. For example, SPI and the Chemical Manufacturers Association both had official roles in the Partnership for plastics Progress. The board of directors, "made up of the highest level of industry executives," and "function[ed] as a business council under the auspices of the" CMA, while SPI was responsible for "staffing and implementing Partnership programs." Partnership for plastics Progress, *Introducing the Partnership for plastics Progress* (Jan. 1992).

known as the Partnership for Plastics Progress (P3) in 1992 before quickly being reorganized as

the American plastics Council (APC).[67]



**Figure 6**

The executive board members of the Council for Solid Waste Solutions, including many of the world's largest fossil fuel and petrochemical companies, were listed on the cover of the organization's industry newsletter, *Handlers News. CSWS, 1991* (emphasis added).

83.     The Council for Solid Waste Solutions (the Council) formed in 1988 in furtherance

of their campaign to convince the public that recycling was the answer to the plastics waste and

pollution crisis.[68]

84.     After Exxon, Mobil, and other major players in the industry formed the Council,

they pushed the plastics recycling message with increased coordination and seriousness.

85.     The Council spent millions of dollars on advertisements to herald recycling as the

solution to plastic waste in hopes to change public perception. For example, the Council took out

---

[67] Internal notes at APC indicate that the name was changed after it was poorly received by consumers: "The connect betw[ee]n P3 & SPI was clutter—no good[.] Consumers don't like." Bailey Condrey, APC, *Staff Mtg 8/24/92, in* STAFF MEETINGS 53 (1992). These issues had been anticipated a year prior, when internal discussions about organization names concluded: "P3 great internally, but bad externally," and the group would "[n]eed consumer-friendly name." Bailey Condrey, APC, *Outreach TF 8/23/91, in* NOTES 6 (1991). The Task Force praised another unused acronym because it was "[m]ore publically [sic] focused" and "[n]o conspiracy implied." *Id*. at 7.
[68] Council for Solid Waste Solutions, *The Urgent Need to Recycle* (July 17, 1989) *Time*.

a 12-page advertisement in the July 17, 1989 edition of *Time* magazine exclaiming, "The URGENT NEED to RECYCLE." Issued by the official-sounding organization, the "Council for Solid Waste Solutions," this advertisement pushed the Council's agenda and advertised for the Council and its members.

86.     In 1989, Mobil misleadingly promised the public that it was "venturing into recycling mainly out of a sense of environmental concern. 'We are responsible for that segment of the waste stream, so we're going to see that it's disposed of consistent with' the federal [EPA's] recommendations."

87.     At the time that Mobil made these statements, the national plastics recycling rate was between just one and two percent. *See* **Figure 7**: National Recycling and Composting Rates from 1960 to 2018.[69]

---

[69] U.S. Environmental Protection Agency, *National Overview: Facts and Figures on Materials, Wastes, and Recycling* https://www.epa.gov/facts-and-figures-about-materials-waste-and-recycling/national-overview-facts-and-figures-materials#Trends1960-Today.

Provided by CourtAlert                                    www.CourtAlert.com

**Figure 7**



Recycling Tonnages, 1960–2018

**Recycling and composting as a percentage of generation**

|                          | 1960 | 1970 | 1980 | 1990 | 2000 | 2005 | 2010 | 2015 | 2017 | 2018 |
|--------------------------|------|------|------|------|------|------|------|------|------|------|
| **Paper and Paperboard** | 17%  | 15%  | 21%  | 28%  | 43%  | 50%  | 63%  | 67%  | 66%  | 68%  |
| **Glass**                | 2%   | 1%   | 5%   | 20%  | 23%  | 21%  | 27%  | 28%  | 25%  | 25%  |
| **Plastics**             | Neg. | Neg. | <1%  | 2%   | 6%   | 6%   | 8%   | 9%   | 9%   | 9%   |
| **Yard Trimmings**       | Neg. | Neg. | Neg. | 12%  | 52%  | 62%  | 58%  | 61%  | 69%  | 63%  |
| **Lead-acid Batteries**  | Neg. | 76%  | 70%  | 97%  | 93%  | 96%  | 99%  | 99%  | 99%  | 99%  |

"Neg." means less than 5,000 tons or 0.05 percent.

88.     Other trade associations, such as the National Association for PET Container Resources (NAPCOR) and the Flexible Packaging Association (FPA), were established or took on new importance over the same time period.

89.     All of these groups had the same directive: defend the plastics industry from restrictive legislation; and worked in concert to push the same narrative: selling recycling as a viable solution to plastic waste. **(Figure 8)**.



## Figure 8

Meeting notes from January 2, 1994 indicate that the American Plastics Council intended to take an aggressive approach in responding to public outcry about plastic waste. *Condrey, 1994 (emphasis added).*

90.     The largest resin producers, including Exxon, Mobil, DuPont, and Dow, invested tens of millions of dollars into various aspects of plastic recycling, including public relations efforts to shape consumer perception of recycling.[70]

91.     One of the first and most important steps in this campaign to make consumers believe in plastic recycling was the industry-wide implementation of a labeling system known as Resin Identification Codes, or RICs. First introduced in 1988 by SPI, in an attempt to stave off regulation, the "Voluntary Plastic Container Coding System," as it was originally known, grouped plastics by resin type and labeled them with a number surrounded by a triangle of "chasing

---

[70] Susan Freinkel, *supra* note 39, at 162-63.

**App. 85**

arrows," the widely recognized symbol for recycling.[71] The "chasing arrows" symbol, a logo showing three arrows each folded in the middle and arranged in a triangle was invented in 1970 by a student who won a contest held by a box manufacturer to promote recycling of paper.[72]

92.     SPI modified and adopted the chasing arrow symbol for plastic containers, including a number in the middle of the three arrows ranging from 1 to 7, that would correspond to the type of resin the item was made from.

93.     The chasing arrows symbol is now strongly associated with recycling, and consumers usually assume that the symbol identifies items that can be recycled.[73] Even though it is universally understood as the recycling symbol the symbol is unnecessary and misleading.

94.     Indeed, in practice, the symbol led consumers to believe that all labeled plastic items were recyclable. And in turn, drove the demand for plastics by consumers. In truth, however, the plastic resin identification codes confused consumers, who believed that any item containing the chasing arrows symbol was recyclable. When in fact, most plastic resins could not be recycled because there were no recycling facilities that were capable of recycling most resin numbers. Two surveys in different states showed that between 53 and 74 percent of consumers believed the presence of the symbol on a product meant it could be recycled where they live. In fact, recyclers themselves were clear that they did not need, and in some cases actively opposed, SPI's RIC system. **(Figure 9)**.

---

[71] *Id*. at 177-78.
[72] Che, *His Recycling Symbol Is Everywhere. The E.P.A. Says It Shouldn't Be.*, N.Y. Times (Aug. 3, 2023)
https://www.nytimes.com/2023/08/07/climate/chasing-arrows-recycling-symbol-epa.html.
[73] *Id*.



### Figure 9

*The Connecticut Department of Environmental Conservation discouraged the state governement from adopting Society of the Plastics Industry's resin identification code system because it was uncessesary and likely to confuse consumers. DEC, 1990 (emphasis added).*

95.     Despite these concerns, the plastics industry continued to push for the adoption of the codes, with other trade associations like APC joining SPI in the fight to codify the system through state legislation with a clear purpose: "to prevent bans."[74] The industry encouraged the adoption of the codes not despite the confusion the RIC system would cause, but because of it. As APC officials noted in a 1992 meeting, the chasing arrows were a "consumer tested mark" and "most identified."[75] The RIC system conveyed that plastics are recyclable and, by the mid-1990s, 39 states had adopted legislation requiring the symbols.[76]

---

[74] Bailey Condrey, *Staff Mtg 8/24/92, in* STAFF MEETINGS, *supra* note 70, at 54.

[75] Bailey Condrey, *Monday Mar 23 Staff Mtg., in* STAFF MEETINGS, *supra* note 70, at 11.

[76] *See* Richard Lindsay Stover, et al., Ecology Center, Report of the Berkeley plastics Task Force 9 (Apr. 8, 1996), https://ecologycenter.org/plastics/ptf/; Steve Toloken, *FTC Cracks Down on Resin Code Placement*, PLASTICS NEWS (May 4, 1998), https://www.plasticsnews.com/article/19980504/NEWS/305049986/ftc-cracks-down-on-resin-code-placement.

96.     Industry trade associations also sought to influence consumer views on plastic recycling through other means. The industry heavily publicized repeated "commitments" to recycling, only to quietly ignore them when they were not achieved.[77]

97.     The plastics industry set these goals knowing they were unlikely to meet them, according to a representative of DuPont. "It is no secret that the quantitative goals industry originally set for itself for economically recycling plastic containers extracted from municipal waste streams were extremely ambitious," James Lohr told attendees at a 1992 recycling conference.[78]

98.     Unfortunately for the industry, Lohr explained, "[t]he goals have proven to be an even greater 'stretch' than originally anticipated."[79]

99.     APC internally acknowledged that their publicized goal to recycle 25% of post-consumer plastic bottles and containers by 1995 would be difficult to reach years before.

100.    In 1992, staffers at APC noted that "[a]dvocacy doomed to failure unless signif[icant] resources allocated to recy[cling],"[80] and acknowledged that the goal "will be difficult to reach" since the "value of the product is lower than cost to prod[uce]."[81]

101.    By January 1994, APC staff again acknowledged that they were unlikely to meet the goal and began discussing how they hoped the failure would be viewed.[82] Still, they were careful to avoid emphasizing this in public. An Exxon employee warned APC staff **(Figure 10)**

---

[77] *See, e.g.,* Tom Ford & Roger King, *APC Retreats from Goal To Recycle 25%*, PLASTICS NEWS (Mar. 25, 1996), https://www.plasticsnews.com/article/19960325/NEWS/303259995/apc-retreats-from-goal-to-recycle-25 (SPI and the Council for Solid Waste Solutions announced in 1991 a goal to recycled 25% of post-consumer bottles and containers by 1995, but abandoned the goal in 1995).
[78] James E. Lohr, *supra* note 77, at 4.
[79] *Id*.
[80] Bailey Condrey, *Staff Mtg 4/13/92, in* STAFF MEETINGS, *supra* note 70, at 13.
[81] Bailey Condrey, *Staff Mtg 8/24/92, in* STAFF MEETINGS, *supra* note 70, at 53.
[82] Bailey Condrey, *ART Meeting – Houston 1/26/94, in* NOTES, at 24 (1994).

29

that they did not "want paper floating around saying we won't meet goal" since the issue was "HIGHLY SENSITIVE POLITICALLY."[83]



**Figure 10**

Irwin Levowitz of Exxon Chemical discouraged American Plastics Council staffers from being "too open" in their communications about the trade organization's recycling goal in a January 1994 meeting. *Condrey, 1994 (emphasis added).*

102.    In light of these failures, the industry developed new ways of measuring and presenting recycling rates.

103.    Internal APC meeting notes from May 1995, for example, indicate that the organization was "moving from reporting plas[tic] pkg #s [*sic*] to bottles only,"[84] making it appear that rates had increased more than they actually had. This "roll out of new recy[cling] rates" was appealing because it "helps us justify the new methodology."[85]

104.    Industry advertisements, whether sponsored by individual petrochemical companies or front groups, normalized the idea that plastics could be recycled among consumers and policymakers. But most advertisements simply repeated the same lies about the viability of

---

[83] *Id*. at 25 (emphasis in original).
[84] Bailey Condrey, *Staff Mtg 5/8/95*, *in* STAFF & COMMUNICATIONS MTGS. 111 (1994-1996).
[85] Bailey Condrey, *May 5, 1995 Red Mtg., Tech Review Prog.*, *in* STAFF & COMMUNICATIONS MTGS., *supra* note 70, at 107. An alternative system of measurement and a new phrase, "Recovered for Recycling," had been developed by NAPCOR in partnership with the accounting firm Ernst & Young. *See generally* R.W. Beck, 1995 NATIONAL POST-CONSUMER PLASTICS RECYCLING RATE STUDY (Sept. 1996), Box No. 12, Jack Milgrom Papers, Special Collections Research Center, Syracuse University Libraries.

plastic recycling. According to a NAPCOR ad placed in *Ladies' Home Journal* in 1991 **(Figure 11)**, "a bottle can come back as a bottle, over and over again."[86]



**Figure 11**

105.    CSWS advertised its materials demonstrating how people could set up plastic recycling programs in their communities and left little room for doubt: "The proven systems are in place. The talk is over. Plastics recycling is here."[87] And COPE (then known as the Council on Plastic and Packaging in the Environment) told *Chicago Tribune* readers that they should "Recycle Plastic to Save Landfill Space" to celebrate Earth Day in 1992.[88]

---

[86] National Association for Plastic Container Recovery, *A Bottle That Can Come Back for New Year's Eve is a Cause for Thanksgiving*, LADIES HOME JOURNAL 92 (Dec. 1991).
[87] Council for Solid Waste Solutions, *plastics Recycling Has Taken Off*, STATE LEGISLATURES 35 (Apr. 1991); *see also* Council for Solid Waste Solutions, *Innovations in Recycling: plastics Industry Offers Step by Step Recycling Program Set Up*, STATE LEGISLATURES a2, special insert at 13 (June 1991).
[88] Council for Solid Waste Solutions & National Association for Plastic Container Recovery, *Together, We're Working to Improve Products for Our Environment*, CHICAGO TRIBUNE Z21 (Apr. 5, 1992).

106.     Perhaps most egregiously, plastics industry trade associations representing the petrochemical companies developed "sponsored educational materials" for use in schools.[89]

107.     For example, a 1994 educational guide distributed by the California Department of Conservation Division of Recycling promoted materials created by trade associations and petrochemical companies, including free curriculum materials on plastic recycling from Dow,[90] an APC guide to setting up a school recycling program,[91] and a Foodservice Packaging Institute (FPI) video entitled "Foodservice Disposables: Should I Feel Guilty?" discussing "the growing controversy over reusable versus disposables."[92] Another video, "Working Together for a Healthier Planet," was produced by APC in 1992—it featured a narrator making blatantly false statements, including the claim that "most plastics can be melted and reused over and over again."[93]

108.     When public backlash prompted threats of legislative and regulatory action, the plastics industry recognized that the appearance of action was its best defense. The industry announced direct investments in recycling initiatives, taking the form of research efforts, pilot programs, and company-owned recycling facilities.

109.     Whatever form they took, they shared a common purpose: to prevent bans on single-use plastics. Although heavily publicized in their initial phases, investments in these

[89] *Molding Young Minds: Firms Spend Big to Get Views into Public Schools*, PLASTICS NEWS (Oct. 30, 1995), https://www.plasticsnews.com/article/19951030/NEWS/310309999/molding-young-minds-firms-spend-big-to-get-views-into-public-schools.
[90] Cal. Dep't of Conservation, Div. of Recycling, EDUCATION & RECYCLING: EDUCATOR'S WASTE MANAGEMENT RESOURCE & ACTIVITY GUIDE 1994 124, 127 (1994).
[91] *Id.* at 131; *see also* National Energy Information Center (NEIC), ENERGY EDUCATION RESOURCES 8 (Mar. 1997) (describing another APC education campaign as "a unique hands-on kit, designed to help middle level science classes explore the world of plastics").
[92] Cal. Dep't of Conservation, *supra* note 93, at 133; *IAMFES Audio Visual Library*, DAIRY, FOOD, & ENVIRONMENTAL SANITATION 195 (Mar. 1993) (describing the educational material as a video that "examines such issues as litter, solid waste, recycling, composting and protection of the earth's ozone layer" and "makes for an excellent discussion opener on . . . the environmental trade-offs (convenience, sanitation and family health) that source reduction necessarily entails").
[93] Working Together for a Healthier Planet, at 8:31 (American plastics Council 1992).

"recycling" projects rarely lasted. The projects either never came to fruition, or the facilities were never built or shut down quietly when the threat of regulation passed.

110.    Short-term industry investment could not overcome the economic obstacles to plastic recycling. "The basic issue is economics," the director of environmental solutions at B.F. Goodrich explained to an industry panel in 1992. "[F]or commodity plastics, including PVC, the costs of recycling or recovery either overlap or are greater than the selling price for these materials. This is the essence of the problem and the basic reason why recycling is not growing at faster rates."[94]

111.    Ideally, a representative of Eastman Chemical told attendees of an industry conference in 1994 that consumers could put their plastic containers into recycling bins and "be assured that they would be separated into pure streams and would all be sold for viable reuse applications."[95] But "[w]hile someday this may be a reality," he explained, "it is more likely that we will wake up and realize that we are not going to recycle our way out of the solid waste issue."[96]

112.    The petrochemical companies continued to be primarily invested in expanding production, and that meant more virgin resins. Between 1990 and 1996, for every pound of plastic packaging that was recycled, an average of four pounds of virgin plastic was produced.

113.    Another employee at Occidental, James R. Clark, explained at a 1992 conference, "the economics of virgin production"— meaning the widespread availability of cheap, virgin

---

[94] F.E. Krause, Director Environmental Solutions, Geon Vinyl Division, BF Goodrich Co., Presentation to The Vinyl Industry Tripartite Meeting, *PVC Recycling—An Overview* 1 (Sept. 3-4, 1992), *available at* https://www.toxicdocs.org/d/91wxG1YnjQ8KjOnZ3jE9wLxg7?lightbox=1.
[95] Noel Malone, Manager plastics Solid Waste Management, Eastman Chemical Company, Presentation at Bev-Pak America's '94 Program, *Automated Sortation of Plastic Containers* 1-2 (1994), Box No. 5, Jack Milgrom Papers, Special Collections Research Center, Syracuse University Libraries.
[96] *Id*. At 2.

resins—"have put downward pressure on recycled resin value in the marketplace."[97] He told attendees that while "[v]irgin resin meets" the criteria of converters—including characteristics like consistent color, low contamination, and processability—"current recycled materials fail in many of these categories."[98]

114.    In 1995, even as APC officials continued their campaign to convince the public that recycling was viable, staffer Bailey Condrey noted internally **(Figure 12)** that "virgin supplies will go up sharply in near future [and] kick the shit out of PCR (Post-Consumer Recycled material) prices."[99]



**Figure 12**

Notes from a November 1995 American Plastics Council staff meeting reveal clear knowledge that recycled plastic was not economically competitive with virgin material. *Condrey, 1994-1996 (emphasis added).*

115.    "Recycling is not always the best option as it does not always effect [*sic*] greatest environmental gain," explained the European Vinyls Corporation in 1993. "In many instances where mechanical recycling is possible, the energy and other resources consumed outweigh the environmental gain."[100] Additional research highlighted these concerns. In 1996, the Association of Plastics Manufacturers in Europe discussed a study that found "there is a limit . . . to the amount

---

[97] James R. Clark, Product Manager Recycling, Occidental Chemical Company, Presenting at ETEX '92: Turn Waste into Profits, *plastics Recycling Strategy* 1 (Apr. 6-7, 1992), Box No. OS2, Jack Milgrom Papers, Special Collections Research Center, Syracuse University Libraries.

[98] *Id*. at 3.

[99] Bailey Condrey, *Staff Mtg 11/6/95*, *in* STAFF & COMMUNICATIONS MTGS. 111, 182 (1994-1996).

[100] Rolf Buhl, European Vinyls Corp., UPDATE OF THE PVC RELATED ENVIRONMENTAL DEVELOPMENTS IN EUROPE AS PER JANUARY 1993 25 (Jan. 25, 1993), *available at* https://www.toxicdocs.org/d/O19KKZqrv3EGM5451dXYGmbr1?lightbox=1.

of household plastics waste which can be mechanically recycled with environmental gains."
(**Figure 13**).[101]



**Figure 13**

A report from the Association of Plastics Manufacturers in
Europe acknowledged that recycling could not adequately
address plastic waste. *APME, 1996 (emphasis added).*

116.    The plastics industry's failure to overcome the technical and economic obstacles to

mechanical recycling may have suggested the need for additional research and investment, either

a doubling-down on the mission of the "strike force" or exploration of other options in the fight

against plastic waste. But, in reality, the opposite happened.

117.    The Center for plastics Recycling Research shuttered its doors in 1996, as did

several of the plastic recycling facilities owned by various petrochemical corporations, including

Union Carbide.[102]

118.    NPRC fell well short of its 25% recycling commitment – it recycled under 2% as

of 1995,[103] and was sold in 1999.[104]

---

[101] Ass'n of Plastic Mfrs. in Europe (APME), *Summary Report: Separated Mixed Plastics Waste as a Fuel Source* 2
(1996).
[102] *See* Dianne Dumanoski, *Key Events of 1996*, PLASTICS NEWS (Apr 26, 2004),
 https://www.plasticsnews.com/article/20040423/NEWS/304239998/key-events-of-1996.
[103] Clare Goldsberry, *supra* note 133.
[104] Steve Toloken, *Thermoformer Elm Packaging Buys NPRC,* PLASTICS NEWS ( July 5, 1999),
https://www.plasticsnews.com/article/19990705/NEWS/307059998/thermoformer-elm-packaging-buys-nprc.

119. Recycling-oriented industry front groups also shifted to the background or, in the case of groups like COPE, ceased operations.[105]

120. All of these changes reflected a broader shift away from the highly visible campaign for recycling that defined the period between 1985 and 1995.

> **v. Mid-1990s to 2010s: The plastics industry successfully curbed pressure to create more recyclable plastics, yet recycling continued to prove to be an ineffective method to combat plastic pollution and waste.**

121. Recycling research and advocacy were no longer the priorities they once had been because, as far as the industry was concerned, the real problem had been addressed. The public had been successfully convinced that plastics could be recycled, and the actual viability of recycling mattered far less to the industry than perception.

122. By the mid-1990s, public outrage on plastic waste had begun to subside, and plastics fervor waned in state legislatures and city councils across the country.[106]

123. With that decline in public pressure came a sense of security that the industry had not felt for some time. APC President Red Cavaney explained that "in the early 1990s the public focus was very much on targets, and they seemed the most easily explained way of showing that something was being done."[107]

124. But while an APC spokesperson assured the public that the organization remained "very much committed to increased recycling," the situation was different in 1996 than it had been

---

[105] *See Recycling Structure is Worth Salvaging*, PLASTICS NEWS, (Dec. 9, 1996), https://www.plasticsnews.com/article/19961209/NEWS/312099976/recycling-structure-is-worth-salvaging. Further confirmation to industry insiders of the declining importance of recycling came in 1996 when Tom Rattray, the recycling expert who explained that petrochemical companies viewed recycling as competition, retired from his position as Procter & Gamble's associate director for environmental quality. The company decided not to fill his position. *Requiem for a Heavyweight*, PLASTICS NEWS (Sept. 16, 1996).

[106] *S See* Roger King, *Big Reforms Not Likely by State Legislatures*, PLASTICS NEWS (Jan. 16, 1995). Internal documents indicate that by this time, industry fears of increased regulation and recycling mandates had largely shifted abroad. In a December 1995 meeting, APC staffers discussed the "European vs. American model" of packaging regulation, noting "more [and] more countries moving toward mandated recycling goals." Bailey Condrey, *Staff Mtg. 12/4/95, in* STAFF & COMMUNICATIONS MTGS., *supra* note 108, at 194.

[107] Tom Ford & Roger King, *supra* note 99.

when they set recycled content goals that had not been reached.[108] "The idea of rates, dates, mandates … numerical goals, is all very artificial."[109] The plastics industry had "progressed beyond" these sorts of "targets," Cavaney explained.[110]

125.    This shift reflected the fact that the implementation of a sustainable plastic recycling infrastructure had never been as important to the industry as relieving public and regulatory pressure.

126.    As Exxon Chemical Vice President Irwin Levowitz succinctly explained in a January 1994 meeting with APC staff **(Figure 14)**, "We are committed to the activities, but not committed to the results."[111]



**Figure 14**
Notes from an American Plastics Council meeting in January 1994 quoted Irwin Levowitz of Exxon Chemical. *Condrey, 1994 (emphasis added).*

127.    In essence, the plastics industry had won, and they knew it. As a *Plastics News* columnist told readers in March 1995, "[t]he plastics recycling war is over. We should declare victory and put the money into cancer research. . . . [T]he level of plastics recycling is about 22 percent and won't increase greatly for each new dollar spent."[112]

---

[108] *Id*.
[109] *Id*.
[110] *Id*.
[111] Bailey Condrey, *Gov/Tech Mtg 1/21/94*, *in* NOTES, *supra* note 86, at 7-8.
[112] Roger King, *Don't Throw More Money at Recycling*, PLASTICS NEWS (Mar. 13, 1995), https://www.plasticsnews.com/article/19950313/OPINION02/303139979/don-t-throw-more-money-at-recycling.

128.    The results of the plastic recycling research and development sprint had been limited, but the public relations campaign accompanying it had been remarkably effective.

129.    Working in concert, petrochemical companies and their trade associations successfully convinced consumers that recycling presented a viable solution to the plastic waste crisis, and that was enough.

130.    Polling conducted for APC in 1997 showed that, while respondents who worked in the waste management field were rapidly losing confidence in recycling and shifting their priorities toward source reduction,[113] "recycling continues to be seen as the best use of a community's time and money for resource management by the media, government, and customers."[114]

131.    Members of the media in particular embraced the industry's narrative on recycling, with a majority favoring plastic recycling over alternatives like reuse or source reduction.[115] Media respondents were also more likely to believe that plastic recycling was economically self-sufficient compared to other groups.[116]

132.    In 2000, the plastics recycling rate sat at only six percent and only increased three percentage points, to nine percent, by 2018.[117] According to plastic waste export data, the ostensible increase to nine percent was largely due to millions of pounds of plastic waste being exported each year to China and developing countries, supposedly for recycling but often for

---

[113] *See* Cambridge Reports, Research Int'l, RESOURCE MANAGEMENT OPTIONS, PLASTICS, AND THE PLASTICS INDUSTRY: VIEWS OF APC'S TARGET AUDIENCES 1 (May 1997).
[114] *Id*.
[115] *Id*.
[116] *Id*. at 2.
[117] U.S. Environmental Protection Agency, *National Overview: Facts & Figures on Materials, Wastes, and Recycling, supra*.

incineration or landfilling.[118] Today, the plastic waste exports have declined and the U.S. plastics recycling rate is a dismal five percent.[119]

133.    The steep increase in plastic production over the past 60 years, as depicted in **Figure 15**, created a dramatic increase in plastic waste: in the United States, plastic increased as a percent of municipal solid waste (by mass) from 0.4 percent in 1960 to 12.2 percent in 2018.[120] An estimated 44 million tons of plastic waste were generated in the United States in 2019.

**Figure 15 plastics Production Chart and Prediction to 2060**[121]



134.    The excessive amount of plastic waste and pollution is one of the most serious environmental crises confronting Missouri and the planet today. According to the U.S.

---

[118] Beyond plastics and the Last Beach Cleanup, The Real Truth about the U.S. plastics Recycling Rate, *supra* note 9, at page 2.
[119] Nat. Renewable Energy Laboratory, *NREL Calculates Lost Value of Landfilled Plastic in the U.S.* (April 28, 2022) https://www.nrel.gov/news/press/2022/nrel-calculates-lost-value-of-landfilled-plastic-in-us.html; *see also* Beyond plastics and the Last Beach Cleanup, *supra* note 9.
[120] Com. on the U.S. Contributions to Global Ocean Plastic Waste, Nat. Academy Sciences, Engineering, and Medicine, Reckoning with the U.S. Role in Global Ocean Plastic Waste (2022) page 3. (Additionally, the generation of municipal solid waste in the United States has increased significantly over the past 60 years).
[121] *Global Plastic Production and Projections, 1950 to 2060,* Our World in Data https://ourworldindata.org/grapher/global-plastic-production-projections.

**App. 98**

Environmental Protection Agency's (EPA) latest estimates, approximately 23 percent of global plastic waste was improperly disposed of, burned (creating harmful and toxic emissions), or leaked into the environment in 2019.

135. Widespread production and promotion of single-use plastic has led to persistent plastic leakage into the environment[122] Around the world each year, an estimated 11 million tons of plastic waste become aquatic pollution, and 18 million tons of plastic waste pollute land. Together, that is the equivalent of four garbage trucks of new plastic waste polluting water or land *every minute.*[123]

136. Single-use plastics – plastic packaging, bags, straws, and disposable plasticware and utensils – represent the largest plastics application, and account for one-third of all plastics consumed globally.[124] Single-use plastics comprise most of the plastic waste that escapes and/or is discharged into the environment.[125]

137. Once plastic waste enters the environment as pollution, it is long-lived, cumulative, friable, and mobile, and can have substantial negative effects on a wide range of freshwater, marine, and terrestrial species. Removing plastics from the environment becomes difficult and costly as plastics fragment into smaller and smaller pieces.

138. Defendants produce the primary chemicals and polymers used to produce plastic and styrofoam products such as bottles, cups, plastics, utensils, take-out containers, and packaging designed for single-use that are sold throughout United States, and Defendants consider the

---

[122] Organization for Economic Cooperation and Development (OECD), *Plastic Pollution is Growing Relentlessly as Waste Management and Recycling Fall Short, Says OECD* (Feb. 22, 2022) https://www.oecd.org/en/about/news/press-releases/2022/02/plastic-pollution-is-growing-relentlessly-as-waste-management-and-recycling-fall-short.html.
[123] Lau et al., *Evaluating Scenarios Toward Zero Plastic Pollution* (2020) 269 Science 1455.
[124] Minderoo 2023, *supra* note 4, page 17.
[125] *Id.*

production of these polymers as the "core" of their chemicals and products portfolio and see 80 percent of its growth potential as "dependent on single-use plastics applications."

139.     Over the years, Exxon Mobil and the other Defendants expanded their U.S. plastic production to 7.7 million tons per year in 2023. Plastic waste has also grown, for instance, from 8.9 percent of all managed trash in California in 1999 to almost 14 percent of all managed trash in California in 2021. Even when millions of tons of waste plastic were still being exported to China each year, plastics recycling never managed to reach 10%. Despite the stark failure of plastics recycling, the plastics, packaging, and products industries have waged a decades-long misinformation campaign to perpetuate the myth that plastic is recyclable.[126]

140.     "Plastic waste is not just an environmental issue. It's a waste management issue. It's also a land use issue because landfills are closing in many areas," Anelia Milbrandt, a senior research analyst at National Renewable Energy Laboratory (NREL) said. "What do we do with all that waste?"[127]

141.     Tellingly, all polled groups—consumers, media members, government officials, and even waste management industry representatives—believed that plastic could be economically recycled at a much higher rate than it could be.[128]

### vi.     Today: The plastics industry's aggressive misinformation campaign continues to deceive consumers.

142.     In 2019, NAPCOR and its membership of companies that manufacture and distribute PET containers conceived a scheme to attempt to combat a rising "tide of anti-plastic sentiment." To address this issue, NAPCOR hired a public relations firm to address these concerns

---

[126] Beyond plastics, The Real Truth about the U.S. plastics Recycling Rate, *supra* note 9, at page 2. *See also* PBS Frontline, "Plastic Wars," March 31, 2020 https://www.pbs.org/wgbh/frontline/documentary/plastic-wars/
[127] Nat. Renewable Energy Laboratory, *NREL Calculates Lost Value of Landfilled Plastic in the U.S.* (April 28, 2022), https://www.nrel.gov/news/press/2022/nrel-calculates-lost-value-of-landfilled-plastic-in-us.html.
[128] *See id.*

and the "voices calling for safe, environmentally conscious packaging alternatives." The public relations firm then created the "Positively PET" slogan for its campaign. NAPCOR's public relations firm hired specifically to address this rising tide advised NAPCOR that it should "not be the overall handle for the account" to ensure that "consumers don't feel like they are being preached to."

143.    Instead of NAPCOR promoting the Positively PET campaign, internal documents reveal that NACPRO hired social media influencers to promote "PET plastics messaging." These social media influencers were paid to post Positively PET posts containing the claim that a PET bottle is 100% recyclable and can be made with 100% recyclable content. But that claim doesn't match NAPCOR's own recycling data for PET Bottle Collection Rates, 2001 – 2022 (**Figure 16**).[129]

**Figure 16: PET Bottle Collection Rates, 2001-2022**



---

[129] *NAPCOR's 2022 PET Recycling Report Demonstrates Bottle-to-Bottle Circulatrity Continues on the Rise* (Dec. 13, 2023), available at: https://napcor.com/news/2022-pet-recycling-report/.

144.    The fraudulent campaign continued into 2024, when NAPCOR entered the debate on the 2024 Paris Olympics ban on single-use water bottles and cups. NAPCOR communications director, Lindsay Nichols, described this strategy on inserting industry-favoring messaging into trending conversations as the opportunity to "newsjack." And to ensure a successful hijack of news and trending topics with NAPCOR's misleading recycling messaging, NAPCOR encouraged all posts to include common hashtags such as #Olympics, #Paris2024, and #TeamUSA.

145.    Similarly, Defendants and associated plastics industry trade group continue their mislead advertising campaign. For example, the previously-discussed Society of Plastics Industry (SPI) changed its name in 2016 to the Plastics Industry Association. Even as recently as 2023, Exxon Mobil played an active role in the Plastics Industry Association's governance, where an Exxon Mobil Senior Sustainability Advisor was Vice Chair of the Plastics Industry Association's Recycling Committee.

146.    The Plastics Industry Association, with Exxon Mobil at the helm, seemingly continues to play an integral role in pushing the messaging that plastics are recyclable, as indicated by its website[130] and companion site, recyclingisreal.com.

147.    Defendants, working in conjunction with these trade groups, have successfully worked for over 60 years to drive the demand for single-use plastics by misleading and defrauding the American public with the unfounded notion that plastics are recyclable.

## V.     TOLLING OF THE STATUTE OF LIMITATIONS

### A.     Discovery-Rule Tolling

148.    Within the period of any applicable statute of limitations, Plaintiffs could not have discovered through the exercise of reasonable diligence that most plastics are not recyclable.

---

[130] https://www.plasticsindustry.org/sustainability

149.     Plaintiffs did not discover, and did not know of, facts that would have caused a reasonable person to suspect that most plastics were not recyclable.

**B.    Fraudulent – Concealment Tolling**

150.     All applicable statutes of limitations have also been tolled by Defendants' fraudulent concealment throughout the period relevant to this action that most plastics were not recyclable.

151.     Rather than disclosing to consumers the fact that only 15% of all plastics can be recycled, Defendants continued to manufacture, market, distribute, and sell plastics as recyclable and a better alternative to aluminum and glass.

## VI.    <u>CLASS ACTION ALLEGATIONS</u>

152.     Plaintiffs repeat and re-allege every allegation above as if set forth in full herein.

153.     **Nationwide Class:** Pursuant to Federal Rule 23(b)(3), Plaintiffs bring this suit on their own behalf and on behalf of a proposed national class of all other similarly situated persons ("Nationwide Class") consisting of:

> All persons or entities in the United States and its territories who indirectly purchased plastics for end use from January 1, 1990 until Defendants' conduct ceases or class notice is given, whichever occurs first.

Excluded from the Class are:

a.     The Defendants and their officers, directors, management, employees, subsidiaries or affiliates;

a.     The judges in this case and any members of their immediate families;

b.     All persons who are presently in bankruptcy proceedings or who obtained a bankruptcy discharge in the last three years; and

c.     All persons who are currently incarcerated.

154.    **State Law Class:** Pursuant to Federal Rule 23(b)(3), Plaintiffs bring this suit on

their own behalf and on behalf of a proposed national class of all other similarly situated persons

("State Law Class") consisting of:

> All persons or entities in the Indirect Purchaser states[131] who indirectly
> purchased plastics for end use from January 1, 1990 until Defendants'
> conduct ceases or class notice is given, whichever occurs first.

Excluded from the Class are:

    a.    The Defendants and their officers, directors, management, employees,
        subsidiaries or affiliates;

    b.    The judges in this case and any members of their immediate families;

    c.    All persons who are presently in bankruptcy proceedings or who obtained a
        bankruptcy discharge in the last three years; and

    d.    All persons who are currently incarcerated.

155.    Upon information and belief, the Class consists of millions of purchasers residing

throughout the United States. Numerosity is therefore satisfied and it would be impracticable to

join all Class Members before the Court.

156.    Under Rule 23(b)(3), there are numerous and substantial questions of law or fact

common to all of the Class Members and which predominate over any individual issues. Included

within the common question of law or fact are:

    a.    Whether Defendants' combined deceptive advertising regarding the recyclable
        nature of plastics, has substantially affected interstate and intrastate commerce;

    b.    Whether Defendants engaged in an agreement, combination or conspiracy to
        artificially increase the demand for plastics to protect their profits;

    c.    The duration of this conspiracy or combination;

---

[131] The Indirect Purchaser States include Arizona, Arkansas, California, Colorado, Connecticut, District of Columbia,
Florida, Hawaii, Illinois, Iowa, Kansas, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi,
Missouri, Montana, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota,
Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin.

    d.       Whether the alleged conspiracy violated state antitrust and consumer protection laws;

    e.       Whether the conduct of Defendants caused injury to the class;

    f.       The quantum of overcharges paid by the Class in the aggregate;

    g.       Whether Defendants negligently mispresented its product or pricing;

    h.       Whether Defendants formed an enterprise (the "Plastics Market Manipulation Enterprise") within the meaning of RICO; and

    i.       Whether Defendants were unjustly enriched by selling plastics at an inflated price.

157.    The claims of Plaintiffs are typical of the claims of Class Members, in that they share the facts above and legal claims or questions with Class Members, there is a sufficient relationship between the damage to Plaintiffs and Defendants' conduct affecting Class Members, and Plaintiffs have no interests adverse to the interests other Class Members.

158.    Plaintiffs will fairly and adequately protect the interests of Class Members and have retained counsel experienced and competent in the prosecution of complex class actions including complex questions that arise in consumer protection litigation.

159.    A class action is superior to other methods for the fair and efficient adjudication of this controversy, since individual joinder of all Class Members is impracticable and no other group method of adjudication of all claims asserted herein is more efficient and manageable for at least the following reasons:

    a.       The liability claims presented in this case predominates over any questions of law or fact, if any exists at all, affecting any individual member of the Class;

    b.       Absent a Class, the Class Members will continue to suffer damage and Defendants' unlawful conduct will continue without remedy while Defendants profit from and enjoy their ill-gotten gains;

    c.       Given the size of individual Class Members' claims, few, if any, Class Members could afford to or would seek legal redress individually for the wrongs Defendants committed against them, and absent Class Members

have no substantial interest in individually controlling the prosecution of individual actions;

d.      When the liability of Defendants has been adjudicated, claims of all Class Members can be administered efficiently and/or determined uniformly by the Court; and

e.      This action presents no difficulty that would impede its management by the Court as a class action, which is the best available means by which Plaintiff and Class Members can seek redress for the harm caused to them by Defendant.

160.    Because Plaintiffs seek relief for the entire Class, the prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual member of the Class, which would establish incompatible standards of conduct for Defendant.

161.    Further, bringing individual claims would overburden the Courts and be an inefficient method of resolving the dispute, which is the center of this litigation. Adjudications with respect to individual Class Members would, as a practical matter, be dispositive of the interest of other Class Members who are not parties to the adjudication and may impair or impede their ability to protect their interests. As a consequence, class treatment is a superior method for adjudication of the issues in this case.

### VII.    <u>ANTITRUST INJURY</u>

162.    Plaintiffs repeat and re-allege every allegation above as if set forth in full herein.

163.    Defendants' anticompetitive conduct had the following effects, among others:

a.      the demand for plastics was artificially increased;

b.      price competition has been restrained or eliminated with respect to plastic;

c.      purchasers of plastics have been deprived of free and open competition; and

d.      purchasers of plastics, including Plaintiffs, paid artificially inflated prices.

164.    The purpose of Defendants' conduct was to artificially increase the demand for plastics to protect their profits. As a direct and foreseeable result, Plaintiffs and the Classes paid supracompetitive prices for plastics during the Class Periods.

165.    Through the alleged violations of antitrust laws, Plaintiffs and the Classes have sustained injury to their business or property, purchasing more plastics than if they had known of the true recyclability rates of plastics and paying higher prices for plastics than they would have paid in the absence of Defendants' illegal conduct, and have suffered damages as a result.

166.    Plaintiffs paid higher prices for plastics that would have in the absence of Defendants' conduct.

167.    This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

## VIII.   RELEVANT MARKET

168.    The relevant product market for this action is plastics products for end use consumption and the relevant geographic market is the United States and its territories.

## IX.    CLAIMS FOR RELIEF

## A.    VIOLATIONS OF THE SHERMAN ACT

### COUNT 1
### VIOLATION OF 15 U.S.C. § 1
**(On Behalf of the Nationwide Class for Injunctive Relief)**

169.    Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

170.    From at least January 1, 1990, and continuing through the present, the exact dates being unknown to Plaintiffs, Defendants and their co-conspirators entered into a continuing agreement, understanding, and conspiracy in restraint of trade artificially to artificially increase the demand for plastics in the United States, including by restraining their respective production volumes, in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

171.     In formulating and carrying out the alleged agreement, understanding, and conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including, but not limited to, the acts, practices, and course of conduct set forth above, and to artificially increase the demand for plastics to protect their profits.

172.     The combination and conspiracy alleged herein has had the following effects, among others:

     a.    The demand for plastics was artificially increased;

     b.    Price competition in the sale of plastics has been restrained, suppressed, and/or eliminated in the United States; and

     c.    Those who purchased plastics indirectly from Defendants and their co-conspirators for their personal use have been deprived of the benefits of free and open competition and paid artificially high prices for plastics.

173.     Plaintiffs and Class Members have been injured and will continue to be injured in their businesses and property by paying more for plastics purchased indirectly from Defendants and their co-conspirators for their personal use than they would have paid and will pay in the absence of the combination and conspiracy.

174.     Plaintiffs and Class Members are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein.

175.     Plaintiffs and the Nationwide Class, pursuant to Fed. R. Civ. P. 57 and 28 U.S.C. § 2201(a), seek a declaratory judgment that Defendants' conduct in seeking to prevent competition as described violates §§ 1 and 2 of the Sherman Act (15 U.S.C. §§ 1 and 2).

**B.     VIOLATION OF STATE CONSUMER PROTECTION LAWS**

176.     Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

177.     As alleged throughout this Class Action Complaint, Exxon Mobil Corporation, Chevron USA, Inc., Chevron Philips Chemical Corporation, Celanese Corporation, Dow Inc.,

49

Dow Chemical Company, Dupont de Nemours, Inc., Dupont Corporation, Eastman Chemical Company, LyondellBasell Industries N.V., and American Chemical Counsel engaged in unfair methods of competition; unfair or deceptive acts or practices; and/or unconscionable acts or practices in violation of the following state consumer protection laws by taking the following actions, including but not limited to:

      a.      making fraudulent, deceptive, and material misrepresentations about the recyclability of plastics sold in the United States;

      b.      not disclosing that less than 10% of plastic products are recycled;

      c.      exploiting the perceived recyclability of plastics to artificially increased demand and therefore prices of plastic.

178.    As a result of Defendants' practices, Plaintiffs and the class members have suffered damages and are entitled to recover those damages and costs, including reasonable attorneys' fees.

179.    Plaintiffs and the Class are also entitled to an injunction to stop Defendants continued deceptive and unconscionable practices of advertising and selling plastics as recyclable.

180.    By engaging in the conduct set forth throughout this Class Action Complaint, Defendants have engaged in unfair competition and unfair or deceptive acts or practices or unconscionable practices in violation of the following state consumer protection statutes:

**COUNT 2**
**VIOLATIONS OF THE ARKANSAS DECEPTIVE TRADE PRACTICES ACT**
**(Ark. Code Ann. § 4-88-101, *et seq.*)**
**(On Behalf of the State Law Class)**

181.    Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

182.    Through the conduct alleged herein, Defendants have violated Arkansas Code § 4-88-101 *et seq.*

183.    Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of trade or commerce in the plastics market, a substantial part of which occurred within Arkansas.

184.    Defendants' unlawful conduct substantially affected Arkansas' trade and commerce.

185.    Defendants concealed, suppressed, and omitted to disclose material facts to members of the Arkansas Class concerning Defendants' unlawful activities and artificially inflated prices for plastics. They concealed, suppressed, and omitted facts would have been important to members of the Arkansas Class as they related to the cost of products they purchased.

186.    Defendants misrepresented the real cause of price increases and/or the absence of price reductions in plastics by making public statements that were not in accord with the facts.

187.    Defendants' statements and conduct related to the price of their products were deceptive as they had the tendency or capacity to mislead members of State Law Class to believe that they were purchasing at prices established by a free and fair market.

188.    The aforementioned conduct by Defendants constituted "unconscionable" and "deceptive" acts or practices in violation of Arkansas Code Annotated § 4-88-107(a)(10).

189.    As a direct and proximate result of Defendants' unlawful conduct, members of the State Law Class have been injured in their business or property and are threatened with further injury in that they paid and will pay supra-competitive prices for plastics due to Defendants' unlawful conduct.

190.    Accordingly, members of the State Law Class seek all relief available under the Arkansas Deceptive Trade Practices Act.

## COUNT 3
## VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION LAW
### (Cal. Bus. & Prof. Code § 17200, *et seq.*)
### (On Behalf of the State Law Class)

191.    Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

192.    Plaintiffs bring this Count on behalf of all Class Members who are or have been residents of California at any relevant time ("California Class Members") against Exxon Mobil Corporation, Chevron USA, Inc., Chevron Philips Chemical Corporation, Celanese Corporation, Dow Inc., Dow Chemical Company, Dupont de Nemours, Inc., Dupont Corporation, Eastman Chemical Company, LyondellBasell Industries N.V., and American Chemical Council.

193.    California Business and Professions Code § 17200 prohibits any "unlawful, unfair, or fraudulent business act or practices."

194.    As alleged throughout this Class Action Complaint, Defendants engaged in unfair, deceptive, and/or unlawful practices in violation of California's Unfair Competition law by, at a minimum: (a) making material misrepresentations about the recyclability of plastics; and (b) causing confusion or misunderstanding regarding the recyclability of plastics.

195.    As indicated by the below statements of California and federal policy, Defendants' grossly excessive and unfair plastics pricing violates public policy and is, as such, unlawful under California Business and Professions Code § 17200.

196.    Defendants' unfair, unlawful and/or deceptive activity alleged herein caused Plaintiffs and the California Class Members to purchase plastics at inflated prices. Accordingly, Plaintiffs and the California Class Members have suffered injury in fact including lost money or property as a result of Defendants' misrepresentations and omissions.

197.    Plaintiffs request that this Court enter such orders or judgments as may be necessary to enjoin Defendants from continuing their unfair, unlawful, and/or deceptive practices and to

restore to Plaintiffs and Class Members any money Defendants acquired by unfair competition, including restitution and/or restitutionary disgorgement, as provided in Cal. Bus. & Prof. Code § 17203 and Cal. Bus. & Prof. Code § 3345; and for such other relief set forth below.

### COUNT 4
### VIOLATION OF THE DISTRICT OF COLUMBIA CONSUMER PROTECTION PROCEDURES (6 Del. Code § 2513, *et seq.*)
### (On Behalf of the State Law Class)

198.     Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

199.     Plaintiffs and Class Members purchased plastics for personal, family, or household purposes.

200.     Through the conduct alleged herein, Defendants have violated D.C. CODE § 28-3901, *et seq*.

201.     Defendants are "merchants" within the meaning of D.C. CODE § 28- 3901(a)(3).

202.     Defendants' conduct was an unfair method of competition, and an unfair or deceptive act or practice within the conduct of commerce within the District of Columbia. Defendants' unlawful conduct substantially affected the District of Columbia's trade and commerce.

203.     As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and Class Members have been injured in their business or property and are threatened with further injury.

204.     Because of the foregoing, Plaintiffs and Class Members are entitled to seek all forms of relief, including treble damages or $1,500 per violation (whichever is greater) plus punitive damages, reasonable attorney's fees and costs under D.C. CODE § 28-3901, *et seq*.

**COUNT 5**
**VIOLATIONS OF FLORIDA'S UNFAIR & DECEPTIVE TRADE PRACTICES ACT**
**(Fla. Stat. § 501.201, *et seq.*)**
**(On Behalf of the State Law Class)**

205.     Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

206.     The Florida Deceptive & Unfair Trade Practices Act, Fla. Stat. § 501.201, et seq. (the "FDUTPA"), generally prohibits "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce," including practices in restraint of trade. FLA. STAT. § 501.204(1).

207.     The primary policy of the FDUTPA is "[t]o protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." FLA. STAT. § 501.202(2).

208.     A claim for damages under the FDUTPA has three elements: (1) a prohibited practice; (2) causation; and (3) actual damages.

209.     Under Florida law, indirect purchasers have standing to maintain an action under the FDUTPA based on the facts alleged in this complaint. See FLA. STAT. § 501.211(1) ("anyone aggrieved by a violation of this [statute] may bring an action . . .").

210.     Plaintiffs and Class Members purchased plastics within the State of Florida during the Class Period. But for Defendants' conduct set forth, the price of plastics would have been lower, in an amount to be determined at trial.

211.     Defendants' unlawful conduct substantially affected Florida's trade and commerce.

212.     As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and the Class Members have been injured in their business or property because of overcharges for plastics and are threatened with further injury.

213.    Because of the foregoing, Plaintiffs and the Class Members are entitled to seek all forms of relief, including injunctive relief pursuant to Fla. Stat. § 501.208 and declaratory judgment, actual damages, reasonable attorneys' fees and costs pursuant to FLA. STAT. § 501.211.

## COUNT 6
## VIOLATION OF THE MASSACHUSETTS CONSUMER PROTECTION ACT,
### (Mass. Gen. Laws Ch. 93a, § 1, *et seq.*)
### (On Behalf of the State Law Class)

214.    Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

215.    Through the conduct alleged herein, including the violation of federal antitrust laws, Defendants have violated the Massachusetts Consumer Protection Act, MASS. GEN. LAWS ch. 93A § 2, et seq.

216.    Plaintiffs and Class Members purchased plastics within the Commonwealth of Massachusetts during the Class Period. But for Defendants' conduct set forth, the price paid would have been lower, in an amount to be determined at trial.

217.    Defendants' conduct was an unfair method of competition, and an unfair or deceptive act or practice within the conduct of commerce within the Commonwealth of Massachusetts.

218.    Defendants' unlawful conduct substantially affected Massachusetts' trade and commerce.

219.    Plaintiffs and Class Members purchased plastics, primarily for personal, family, or household purposes.

220.    As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and Class Members have been injured in their business or property and are threatened with further injury.

221.     Because of the foregoing, Plaintiffs and Class Members are entitled to seek all forms of relief, including up to treble damages and reasonable attorney's fees and costs under Massachusetts General Laws ch. 93A § 9.

222.     The demand letter requirement of Section 9 of Massachusetts General Laws Annotated Chapter 93A does not apply as to Defendants because, upon information and belief, Defendants have not identified a place of business or assets within Massachusetts.

### COUNT 7
### VIOLATION OF THE MISSOURI MERCHANDISING PRACTICES (ACT, MO. ANN. STAT. § 407-010, *ET SEQ.*)
**(On Behalf of the State Law Class)**

205.     Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

206.     Chapter 407 of the Missouri Merchandising Practices Act (the "MMPA") governs unlawful business practices, including antitrust violations such as restraints of trade and monopolization. Mo. Rev. Stat. § 407.020 prohibits "the act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce…," as further interpreted by the Missouri Code of State Regulations, 15 CSR 60-7.010, *et seq.*, 15 CSR 60-8.010, *et seq.*, and 15 CSR 60-9.010, *et seq.*, and Mo. Rev. Stat. § 407.025, which provides for the relief sought in this count.

207.     The Defendants concealed, suppressed, and omitted to disclose material facts to Plaintiffs and members of the Damages Class concerning its unlawful activities and artificially inflated prices for plastics. It concealed, suppressed, and omitted facts that would have been important to Plaintiffs and members of the State Law Class as they related to the cost of plastics they purchased.

208.    The Defendants misrepresented the real cause of price increases and/or the absence of price reductions in plastics by making public statements that were not in accord with the facts.

209.    The Defendants' statements and conduct related to the price of plastics were deceptive as they had the tendency or capacity to mislead Plaintiffs and members of the State Law Class to believe that they were purchasing plastics at prices established by a free and fair market.

210.    Plaintiffs and Class Members purchased plastics for end use within the State of Missouri during the Class Period. But for Defendants' conduct set forth, the price of plastics would have been lower, in an amount to be determined at trial.

211.    Under Missouri law, indirect purchasers have standing to maintain an action under the MMPA based on the facts alleged in this Complaint. *Gibbons v. J. Nuckolls, Inc.*, 216 S.W.3d 667, 669 (Mo. 2007).

212.    Plaintiffs and Class Members were injured with respect to purchases of plastics in Missouri and are entitled to all forms of relief, including actual damages or liquidated damages in an amount which bears a reasonable relation to the actual damages which have been sustained, as well as reasonable attorneys' fees, costs, and injunctive relief.

<u>**COUNT 8**</u>
<u>**VIOLATION OF THE MONTANA UNFAIR TRADE PRACTICES AND CONSUMER**</u>
<u>**PROTECT ION ACT OF 1970,**</u>
<u>**(Mont. Code § 30-14-103, *et seq.* and § 30-14-201, *et seq.*)**</u>
**(On Behalf of the State Law Class)**

213.    Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

214.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Montana Unfair Trade Practices and Consumer Protection Act of 1970, MONT. CODE, §§ 30-14-103, *et seq*., and 30-14-201, *et seq.*

215.    Defendants' unlawful conduct had the following effects: (1) the demand for plastics was artificially increased throughout Montana; (2) Plaintiffs and Class Members were deprived of

free and open competition; and (3) Plaintiffs and Class Members paid supracompetitive, artificially inflated prices for plastics.

216.    Plaintiffs and Class Members purchased plastics, primarily for personal, family, or household purposes.

217.    During the Class Period, Defendants' illegal conduct substantially affected Montana commerce and consumers.

218.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and Class Members have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of MONT. CODE, §§ 30 14-103, *et seq*., and 30-14-201, *et seq*., and, accordingly, Plaintiffs and Class Members seek all relief available under that statute.

<u>**COUNT 9**</u>
<u>**VIOLATION OF THE NEBRASKA CONSUMER PROTECTION ACT**</u>
<u>**(Neb. Rev. Stat. § 59-1602, *et seq.*)**</u>
**(On Behalf of the State Law Class)**

219.    Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

220.    Through the conduct alleged herein, Defendants have violated NEB. REV. STAT. § 59-1602, *et seq*.

221.    Under Nebraska law, indirect purchasers have standing to maintain an action under the Nebraska Consumer Protection Act based on the facts alleged in this Complaint. *See* NEB. REV. STAT. § 59-1609. Defendants' conduct had a direct or indirect impact upon Plaintiffs' and Class Members's ability to protect themselves.

222.    Defendants' unlawful conduct substantially affected Nebraska's trade and commerce.

223.     As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and the Class Members have been injured in their business or property and are threatened with further injury.

224.     Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of Nebraska.

225.     Because of the foregoing, Plaintiffs and Class Members seek all relief available under the statute, Neb. Rev. Stat. § 59-1601, *et seq*.

**COUNT 10**
**VIOLATIONS OF THE NEVADA DECEPTIVE TRADE PRACTICES ACT**
**(Nev. Rev. Stat. § 598.0903, *et seq*.)**
**(On Behalf of the State Law Class)**

226.     Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

227.     Through the conduct alleged herein, Defendants have violated Nev. Rev. Stat. § 598.0903, *et seq*.

228.     Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of Nevada.

229.     Defendants' conduct amounted to a fraudulent act or practice committed by a supplier in connection with a consumer transaction.

230.     Defendants' unlawful conduct substantially affected Nevada's trade and commerce.

231.     Defendants' conduct was willful.

232.     As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and Class Members have been injured in their business or property and are threatened with further injury.

233.     Because of the foregoing, Plaintiffs and Class Members is entitled to seek all forms of relief, including damages, reasonable attorneys' fees and costs, and a civil penalty of up to $5,000 per violation under NEV. REV. STAT. § 598.0993.

**COUNT 11**
**VIOLATIONS OF NEW HAMPSHIRE CONSUMER PROTECTION ACT**
**(N.H. Rev. Stat. Ann. § 358-a:1, *et seq.*)**
**(On Behalf of the State Law Class)**

234.     Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

235.     Through the conduct alleged herein, Defendants have violated N.H. REV. STAT. tit. XXXI, § 358-A:1, *et seq*.

236.     Under New Hampshire law, indirect purchasers have standing to maintain an action under the New Hampshire Consumer Protection Act based on the facts alleged in this Complaint. *See LaChance v. U.S. Smokeless Tobacco Co.*, 156 N.H. 88, 92-100 (2007).

237.     Defendants' conduct was unfair or deceptive within the conduct of commerce within the State of New Hampshire.

238.     Defendants' conduct was willful and knowing.

239.     Defendants' conduct had a direct or indirect impact upon Plaintiffs' and Class Members's ability to protect themselves.

240.     Defendants' unlawful conduct substantially affected New Hampshire's trade and commerce.

241.     As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and the Class Members have been injured in their business or property and are threatened with further injury.

242.     Because of the foregoing, Plaintiffs and the Class Members are entitled to seek all forms of relief available under New Hampshire Revised Statutes §§ 358-A:10 and 358-A:10-a.

**COUNT 12**
**VIOLATIONS OF THE NEW MEXICO UNFAIR TRADE PRACTICES ACT**
**(N.M. Stat. Ann. §§ 57-12-1, *et seq.*)**
**(On Behalf of the State Law Class)**

243.    Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

244.    Through the conduct alleged herein, Defendants have violated N.M. STAT. § 57-12-3, *et seq.*

245.    Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of New Mexico.

246.    Defendants' unlawful conduct substantially affected New Mexico's trade and commerce.

247.    Defendants' conduct constituted "unconscionable trade practices" in that such conduct, inter alia, resulted in a gross disparity between the value received by Plaintiffs and Class Members and the price paid by them for Defendants' oil as set forth in N.M. STAT. § 57- 12-2E.

248.    Defendants' conduct was willful.

249.    As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and the Class Members have been injured in their business or property and are threatened with further injury.

250.    Because of the foregoing, Plaintiffs and Class Members are entitled to seek all forms of relief, including actual damages or up to $300 per violation, whichever is greater, plus reasonable attorney's fees under N.M. STAT. § 57-12-10.

**COUNT 13**
**VIOLATIONS OF THE NORTH CAROLINA UNFAIR AND DECEPTIVE TRADE PRACTICES ACT**
**(N.C. Gen. Stat. §§ 75-1.1, *et seq.*)**
**(On Behalf of the State Law Class)**

251.    Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

252.    Through the conduct alleged herein, Defendants have violated N.C. Gen. Stat. § 75-1.1, *et seq.* Under North Carolina law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. *See Hyde v. Abbott Labs., Inc.*, 123 N.C. App. 572, 584 (1996).

253.    Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of North Carolina.

254.    Defendants' trade practices are and have been immoral, unethical, unscrupulous, and substantially injurious to consumers.

255.    Defendants' unlawful conduct substantially affected North Carolina's trade and commerce.

256.    Defendants' conduct constitutes consumer-oriented deceptive acts or practices within the meaning of North Carolina law, which resulted in consumer injury and broad adverse impact on the public at large and harmed the public interest of North Carolina consumers in an honest marketplace in which economic activity is conducted in a competitive manner.

257.    As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and Class Members have been injured in their business or property and are threatened with further injury.

258.    Because of the foregoing, Plaintiffs and the Class Members are entitled to seek all forms of relief, including treble damages under N.C. GEN. STAT. § 75-16.

**COUNT 14**
**VIOLATIONS OF THE RHODE ISLAND DECEPTIVE TRADE PRACTICES ACT**
**(R. I. Gen. Laws § 6-13-1.1, *et seq.*)**
**(On Behalf of the State Law Class)**

259.    Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

260.    Through the conduct alleged herein, Defendants have violated R.I. GEN. LAWS § 6-13.1-1, *et seq.*

261.    Defendants engaged in an unfair or deceptive act or practice with the intent to injure competitors and consumers through supra-competitive profits.

262.    Defendants' conduct was unfair or deceptive within the conduct of commerce within the State of Rhode Island.

263.    Defendants' conduct amounted to an unfair or deceptive act or practice committed by a supplier in connection with a consumer transaction.

264.    Defendants' unlawful conduct substantially affected Rhode Island's trade and commerce.

265.    Defendants' conduct was willful.

266.    Plaintiffs and Class Members purchased goods plastics, primarily for personal, family, or household purposes.

267.    As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and Class Members have been injured in their business or property and are threatened with further injury.

268.    Because of the foregoing, Plaintiffs and Class Members are entitled to seek all forms of relief, including actual damages or $200 per violation, whichever is greater, and injunctive relief and punitive damages under R.I. GEN. LAWS § 6-13.1-5.2.

### COUNT 15
### VIOLATIONS OF THE SOUTH CAROLINA UNFAIR TRADE PRACTICES ACT
### (S.C. Code Ann. § 39-5-10, *et seq.*)
### (On Behalf of the State Law Class)

269.    Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

270.     Through the conduct alleged herein, Defendants have violated S.C. CODE ANN. §
39-5-10, *et seq.*

271.     Defendants' conduct was unfair or deceptive within the conduct of commerce
within the State of South Carolina. Defendants' conduct had a direct or indirect impact upon
Plaintiffs' and Class Members's ability to protect themselves.

272.     Defendants' unlawful conduct substantially affected South Carolina trade and
commerce.

273.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and
members of the Damages Class have been injured in their business and property and are threatened
with further injury.

274.     The Defendants have engaged in unfair competition or unfair or deceptive acts or
practices in violation of S.C. Code Ann. §§ 39-5-10, *et seq.*, and, accordingly, Plaintiffs and the
members of the State Law Class seek all relief available under that statute.

**COUNT 16**
**VIOLATIONS OF VERMONT CONSUMER PROTECTION ACT**
**(Vt. Stat. Ann. Tit. 9, § 2451 *et seq.*)**
**(On Behalf of the State Law Class)**

275.     Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

276.     Through the conduct alleged herein, Defendants have violated VT. STAT. ANN.
tit. 9, § 2451, *et seq.*

277.     Title 9 of the Vermont Statutes generally governs commerce and trade in Vermont.
Chapter 63 thereof governs consumer protection and prohibits, among other things, unfair methods
competition, unfair and deceptive acts and practices, and antitrust violations such as restraints of
trade and monopolization. *See* VT. STAT ANN. tit. 9, § 2453(a).

64

278. Plaintiffs and Class Members purchased plastics within the State of Vermont during the Class Period. But for Defendants' conduct set forth, the price of plastics would have been lower, in an amount to be determined at trial.

279. Under Vermont law, indirect purchasers have standing under the antitrust provisions of the Vermont Statutes to maintain an action based on the facts alleged in this complaint. VT. STAT. ANN. TIT. 9, § 2465(b); *see* also *Elkins v. Microsoft Corp.*, 174 Vt. 328, 341 (2002).

280. Defendants competed unfairly by restraining trade as set forth, in violation of VT. STAT. tit. 9, § 2453, *et seq.*

281. Defendants' violations of Vermont law were flagrant.

282. Defendants' conduct caused or was intended to cause unfair methods of competition within the State of Vermont.

283. Defendants' unlawful conduct substantially affected Vermont's trade and commerce.

284. As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and the Class Members have been injured in their business or property and are threatened with further injury.

285. Plaintiffs and Class Members were injured with respect to purchases of plastics in Vermont and are entitled to all forms of relief, including actual damages, treble damages, and reasonable attorneys' fees.

## C. <u>VIOLATIONS OF THE STATE ANTITRUST LAWS</u>

286. Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

287. During the Class Period, Defendants and their co-conspirators entered and engaged in a contract, combination, or conspiracy to artificially increase the demand for plastics to protect

their profits, the production of plastics in various states to unreasonably restrain trade and commerce and harm consumers in violation of the various state antitrust and consumer protection laws set forth below.

288.    In formulating and effectuating this conspiracy, Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including: agreeing to artificially increase the demand for plastics, which injured Plaintiffs and Class Members; exchange of competitively sensitive information between and among Defendants; and participating in meetings conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

289.    Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to artificially increase the demand for plastics to protect their profits. As a direct and proximate result of Defendants' conduct, Plaintiffs and Class Members were deprived of free and open competition and paid more to purchase plastics than they otherwise would have absent Defendants' unlawful conduct. This injury is of the type that the antitrust and consumer protection laws of the below states were designed to prevent and flows from what makes Defendants' conduct unlawful.

290.    Defendants have also profited significantly from the conspiracy. Defendants' profits derived from their anticompetitive conduct and come at the expense of and to the detriment of Plaintiffs and Class Members.

291.    Accordingly, Plaintiffs and the members of the State Law Class in each of the following jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by each jurisdiction's law, injunction (where applicable), and costs of suit, including reasonable attorneys' fees, as allowed by the following state laws.

292.     Defendants' anticompetitive acts described above were knowing and willful and constitute violations of the following state antitrust and consumer protection statutes.

293.     In the Counts that follow, a reference to the "Class" is a reference to the State Law Class unless otherwise specified.

**COUNT 17**
**VIOLATION OF ARIZONA'S UNIFORM STATE ANTITRUST ACT,**
**(ARIZ. REV. STAT. § 44-401, *ET SEQ.*)**
**(On Behalf of the State Law Class)**

294.     Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

295.     Through the conduct alleged herein, Defendants have violated ARIZONA REV. STAT. § 44-1401, *et seq*.

296.     Under Arizona law, indirect purchasers have standing to maintain an action under the Antitrust Act based on the facts alleged in this Complaint. *Bunker's Glass Co. v. Pilkington PLC*, 206 Ariz. 9, 11-20 (2003).

297.     Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of the plastics market, a substantial part occurred within Arizona.

298.     Defendants' violations of Arizona law were flagrant.

299.     Defendants' unlawful conduct substantially affected Arizona's trade and commerce (plastics).

300.     As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and Class Members have been injured in their business or property and are threatened with further injury.

301.     Because of the foregoing, Plaintiffs and Class Members are entitled to seek all forms of relief available under Arizona Revised Statutes Section 44-1401, *et seq*.

302.     In conjunction with the filing of this Complaint, Plaintiffs have served a copy of this Complaint on the Arizona Attorney General in accordance with ARIZ. REV. STAT. ANN. § 44-1415(A). Plaintiffs will file proof of such service with the Court.

## COUNT 18
## VIOLATION OF CALIFORNIA'S CARTWRIGHT ACT,
### (CAL. BUS. & PROF. CODE § 16700 *ET SEQ.*)
### (On Behalf of the State Law Class)

303.     Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

304.     The California Business & Professions Code generally governs conduct of corporate entities. The Cartwright Act, CAL. BUS. & PROF. CODE §§ 16700-16770, governs antitrust violations in California.

305.     Under the Cartwright Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. CAL. BUS. & PROF. CODE § 16750(a).

306.     A trust in California is any combination of capital, skills or acts by two or more persons intended for various purposes, including, but not limited to, creating or carrying out restrictions in trade or commerce, limiting or reducing the production or increasing the price of any commodity, or preventing competition in the market for a commodity. CAL. BUS. & PROF. CODE § 16720. Every trust in California is unlawful except as provided by the Code. *Id*. § 16726.

307.     Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of the plastics market, a substantial part of which occurred within California.

308.     Defendants enacted a combination of capital, skill or acts for the purpose of creating and carrying out restrictions in trade or commerce, in violation of CAL. BUS. & PROF. CODE § 16700, *et seq*.

309.    Plaintiffs and Class Members purchased plastics within the State of California during the Class Period. But for Defendant's conduct set forth, the price of plastics would have been lower, in an amount to be determined at trial.

310.    Plaintiffs and Class Members were with respect to purchases of plastics in California and are entitled to all forms of relief, including recovery of treble damages, interest, and injunctive relief, plus reasonable attorneys' fees and costs.

**COUNT 19**
**VIOLATION OF THE COLORADO ANTITRUST ACT,**
**(COLO. REV. STAT. ANN. § 6-4-101, *ET SEQ.*)**
**(On Behalf of the State Law Class)**

311.    Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

312.    Plaintiffs and Class Members purchased Defendants' plastics within Colorado during the Class Period. But for Defendants' conduct set forth, the price of Defendants' plastic would have been lower, in an amount to be determined at trial.

313.    The Colorado State Antitrust Act of 2023 specifically allows a private act of recovery for "[a]ny person injured, either directly or indirectly" from violations Colorado antitrust law for actual damages. *See* C.R.S. § 6-4-115 (emphasis added).

314.    Defendants contracted, combined or conspired to act in restraint of trade within Colorado in violation of C.R.S. § 6-4-101, *et seq*.

315.    Plaintiffs and Class Members were injured with respect to purchases of plastics in Colorado and are entitled to all forms of relief, including actual damages, treble damages, as well as interest and reasonable attorneys' fees and costs. C.R.S. § 6-4-115.

**COUNT 20**
**VIOLATION OF THE CONNECTICUT ANTITRUST ACT,**
**(CONN. GEN. STAT. ANN § 35-24, *ET SEQ.*)**
**(On Behalf of the State Law Class)**

316.    Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

317.    Plaintiffs and Class Members purchased Defendants' plastics within Connecticut during the Class Period. But for Defendants' conduct set forth, the price of Defendants' plastics would have been lower, in an amount to be determined at trial.

318.    The Connecticut Antitrust specifically allows a private act of recovery for indirect purchasers by prohibiting a defendant from "assert[ing] a defense that the defendant did not deal directly with the person on whose behalf the action is brought." *See* C.G.S.A. § 35-46a.

319.    Defendants contracted, combined, or conspired to act in restraint of trade within Connecticut in violation C.G.S.A. § 35-24, *et seq*. Defendants' conducts and conspiracies restrained, suppressed, and eliminated the price competitive for plastics; artificially increased the demand for plastics, while depriving Plaintiffs and Class Members of free and open competition. These acts resulted in Plaintiffs and Class Members paying supracompetitive, artificially inflated prices for plastics.

320.    Plaintiffs and Class Members were injured with respect to purchases of plastics in Connecticut and are entitled to all forms of relief, including actual damages, treble damages, as well as interest and reasonable attorneys' fees and costs.

## COUNT 21
### VIOLATION OF DISTRICT OF COLUMBIA ANTITRUST ACT,
### (D.C. CODE § 28-4501, *ET SEQ.*)
### (On Behalf of the State Law Class)

321.    Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

322.    Plaintiffs and Class Members purchased Defendants' plastics within the District of Columbia during the Class Period. But for Defendants' conduct set forth, the price of Defendants' plastics would have been lower, in an amount to be determined at trial.

323.    Under District of Columbia law, indirect purchasers have standing to maintain an action under the antitrust provisions of the D.C. Code because "[a]ny indirect purchaser in the

chain of manufacture, production or distribution of goods or services . . . shall be deemed to be injured within the meaning of this chapter." D.C. CODE § 28-4509(a).

324.    Defendants contracted, combined or conspired to act in restraint of trade within the District of Columbia in violation of D.C. CODE § 28-4501, *et seq*.

325.    Plaintiffs and Class Members were injured with respect to purchases of plastics in the District of Columbia and are entitled to all forms of relief, including actual damages, treble damages, as well as interest and reasonable attorneys' fees and costs.

**COUNT 22**
**VIOLATION OF HAWAII ANTITRUST ACT,**
**(HAW. REV. STAT. ANN § 480-1, *ET SEQ.*)**
**(On Behalf of the State Law Class)**

326.    Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

327.    Plaintiffs and Class Members purchased plastics within Hawaii during the Class Period. But for Defendants' conduct set forth, the price of plastics would have been lower, in an amount to be determined at trial.

328.    The Hawaii Antitrust Act specifically allows a private act of recovery for indirect purchasers. *See* HRS § 480-13.3.

329.    Defendants contracted, combined, or conspired to act in restraint of trade within Connecticut in violation of H.S.R. § 480-1, *et seq*.

330.    Plaintiffs and Class Members were injured with respect to purchases of plastics in Hawaii and are entitled to all forms of relief, including actual damages, as well as interest and reasonable attorneys' fees and costs.

**COUNT 23**
**VIOLATION OF ILLINOIS ANTITRUST ACT,**
**(740 ILL. COMP. STAT. ANN. 10/3(1), *ET SEQ.*)**
**(On Behalf of the State Law Class)**

331.    Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

332.    Plaintiffs and Class Members purchased Defendants' plastics within the State of Illinois during the Class Period. But for Defendants' conduct set forth, the price of Defendants' plastics would have been lower, in an amount to be determined at trial.

333.    Under the Illinois Antitrust Act, indirect purchasers have standing to maintain an action for damages based on the facts alleged in this complaint. 740 ILL. COMP. STAT. ANN.10/7(2).

334.    Defendants entered into contracts or engaged in a combination or conspiracy to artificially increase the demand for plastics sold within the State of Illinois.

335.    Plaintiffs and Class Members were injured with respect to purchases of plastics in Illinois and are entitled to all forms of relief, including actual damages, treble damages, and reasonable attorneys' fees and costs.

**COUNT 24**
**VIOLATION OF IOWA COMPETITION LAW,**
**(IOWA CODE § 553.1, *ET SEQ.*)**
**(On Behalf of the State Law Class)**

336.    Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

337.    Under Iowa law, indirect purchasers have standing to maintain an action under the Iowa Competition Law based on the facts alleged in this Complaint. *Comes v. Microsoft Corp.*, 646 N.W.2d 440, 449-51 (Iowa 2002).

338.    Plaintiffs and Class Members purchased Defendants' plastics within the State of Iowa during the Class Period. But for Defendants' conduct set forth, the price of Defendants' plastics would have been lower, in an amount to be determined at trial.

339.    Defendants contracted, combined or conspired to restrain trade in the plastics market, in violation of Iowa Code § 553.1, *et seq*.

340.     Plaintiffs and Class Members were injured with respect to purchases of plastics in Iowa, and are entitled to all forms of relief, including actual damages, exemplary damages for willful conduct, reasonable attorneys' fees and costs, and injunctive relief.

**COUNT 25**
**VIOLATION OF KANSAS RESTRAINT OF TRADE ACT,**
**(KAN. STAT. ANN. § 50-101, *ET SEQ.*)**
**(On Behalf of the State Law Class)**

341.     Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

342.     The Kansas Restraint of Trade Act aims to prohibit practices which, among other things, "tend to prevent full and free competition in the importation, transportation or sale of articles imported into this state . . . ." Kan. Stat. Ann. § 50-112.

343.     Plaintiffs and Class Members purchased plastics within the State of Kansas during the Class Period.

344.     But for Defendants' conduct set forth, the price of plastics would have been lower, in an amount to be determined at trial.

345.     Under the Kansas Restraint of Trade Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. KAN. STAT. ANN. § 50-161(b).

346.     Plaintiffs and Class Members were injured with respect to purchases of plastics in Kansas and are entitled to all forms of relief, including actual damages, reasonable attorneys' fees and costs, and injunctive relief.

**COUNT 26**
**VIOLATION OF MAINE'S ANTITRUST STATUTE,**
**(ME. REV. STAT. ANN. TIT. 10 § 1101, *ET SEQ.*)**
**(On Behalf of the State Law Class)**

347.     Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

348. Plaintiffs and Class Members purchased plastics within the State of Maine during the Class Period. But for Defendants' conduct set forth, the price of plastics would have been lower, in an amount to be determined at trial.

349. Under Maine law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. ME. REV. STAT. ANN. tit. 10, § 1104(1).

350. Plaintiffs and Class Members were injured with respect to purchases of plastics in Maine and are entitled to all forms of relief, including actual damages, treble damages, and reasonable attorneys' and experts' fees and costs.

**COUNT 27**
**VIOLATION OF MARYLAND'S ANTITRUST STATUTE,**
**(MD. CODE ANN. § 11-201, *ET SEQ.*)**
**(On Behalf of the State Law Class)**

351. Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

352. The purpose of Maryland's antitrust statute is "to complement the body of federal law governing restraints of trade, unfair competition, and unfair, deceptive, and fraudulent acts or practices." MD. CODE ANN. § 11-202(a)(1).

353. Under Maryland law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. MD. CODE. ANN. § 11-209(b)(2)(i).

354. Under Maryland's antitrust statute, a plaintiff who establishes a violation is entitled to recover three times the amount of actual damages resulting from the violation, along with costs and reasonably attorneys' fees. MD. CODE ANN. § 209(b)(4).

355. Plaintiffs and Class Members were injured with respect to purchases of plastics in Maryland and are entitled to all forms of relief, including actual damages, treble damages, and reasonable attorneys' and experts' fees and costs.

**COUNT 28**
**VIOLATION OF THE MICHIGAN ANTITRUST REFORM ACT,**
**(MICH. COMP. LAWS § 445.771, *ET SEQ.*)**
**(On Behalf of the State Law Class)**

356.    Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

357.    The Michigan Antitrust Reform Act aims "to prohibit contracts, combinations, and conspiracies in restraint of trade or commerce . . . [and] to provide remedies, fines, and penalties for violations of this act." Mich. Act 274 of 1984 (MICH. COMP. LAWS § 445.771, *et seq*.).

358.    Plaintiffs and Class Members purchased Defendants' plastics within the State of Michigan during the Class Period. But for Defendants' conduct set forth, the price of plastics would have been lower, in an amount to be determined at trial.

359.    Under the Michigan Antitrust Reform Act, indirect purchasers have standing to maintain an action based on the facts alleged in this complaint. MICH. COMP. LAWS § 445.778(2).

360.    Plaintiffs and Class Members were injured with respect to purchases of plastics in Michigan and are entitled to all forms of relief, including actual damages, treble damages for flagrant violations, interest, costs, reasonable attorneys' fees, and injunctive or other appropriate equitable relief.

**COUNT 29**
**VIOLATION OF THE MINNESOTA ANTITRUST LAW,**
**(MINN. STAT. §§ 325D.49 *ET SEQ.* & 325D.57 *ET SEQ.*)**
**(On Behalf of the State Law Class)**

361.    Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

362.    The Minnesota Antitrust Law of 1971 prohibits "any contract, combination or conspiracy when any part thereof was created, formed, or entered into in [Minnesota]; and any contract, combination or conspiracy, wherever created, formed or entered into . . . whenever any of the forgoing affects the trade or commerce of [Minnesota]." MINN. STAT. § 325D.54.

75

363.     Plaintiffs and Class Members purchased Defendants' plastics the State of Minnesota during the Class Period. But for Defendants' conduct set forth, the price of plastics would have been lower, in an amount to be determined at trial.

364.     Under the Minnesota Antitrust Act of 1971, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. MINN. STAT. § 325D.57.

365.     Plaintiffs and Class Members were injured with respect to purchases of plastics in Minnesota and are entitled to all forms of relief, including actual damages, treble damages, costs and disbursements, reasonable attorneys' fees, and injunctive relief necessary to prevent and restrain violations hereof.

366.     In conjunction with the filing of this Complaint, Plaintiffs have served a copy of this Complaint on the Minnesota Attorney General in accordance with MINN. STAT. § 325D.63.

**COUNT 30**
**VIOLATION OF THE MISSISSIPPI ANTITRUST STATUTE,**
**Miss. Code Ann. § 75-21-1, _et seq._**
**(On Behalf of the State Law Class)**

367.     Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

368.     Title 75 of the Mississippi Code regulates trade, commerce, and investments. Chapter 21 thereof generally prohibits trusts and combines in restraint or hindrance of trade, with the aim that "trusts and combines may be suppressed, and the benefits arising from competition in business [are] preserved" to Mississippians. MISS. CODE ANN. § 75-21-39.

369.     "A trust or combine is a combination, contract, understanding or agreement, express or implied . . . when inimical to the public welfare" and with the effect of, among other things, restraining trade, increasing the price or output of a commodity, or hindering competition in the production or sale of a commodity. MISS. CODE ANN. § 75-21-1.

370. Plaintiffs and Class Members purchased plastics within the State of Mississippi during the Class Period. But for Defendants' conduct set forth, the price of plastics would have been lower, in an amount to be determined at trial.

371. Under Mississippi law, indirect purchasers have standing to maintain an action under the antitrust provisions of the Mississippi Code based on the facts alleged in this Complaint. MISS. CODE ANN. § 75-21-9.

372. Plaintiffs and Class Members were injured with respect to purchases of plastics in Mississippi and are entitled to all forms of relief, including actual damages and a penalty of $500 per instance of injury.

**COUNT 31**
**<u>VIOLATION OF THE NEBRASKA JUNKIN ACT,</u>**
**(NEB. REV. STAT. § 59-801, *ET SEQ.*)**
**(On Behalf of the State Law Class)**

205. Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

206. Chapter 59 of the Nebraska Revised Statutes generally governs business and trade practices. Sections 801 through 831 thereof, known as the Junkin Act, prohibit antitrust violations such as restraints of trade and monopolization.

207. Plaintiffs and Class Members purchased plastics within the State of Nebraska during the Class Period. But for Defendants' conduct set forth, the price of plastics would have been lower, in an amount to be determined at trial.

208. Under Nebraska law, indirect purchasers have standing to maintain an action under the Junkin Act based on the facts alleged in this Complaint. NEB. REV. STAT. § 59-821.

209. Plaintiffs and Class Members were injured with respect to purchases of plastics in Nebraska and are entitled to all forms of relief, including actual damages or liquidated damages in

an amount which bears a reasonable relation to the actual damages which have been sustained, as well as reasonable attorneys' fees, costs, and injunctive relief.

## COUNT 32
### VIOLATION OF THE NEVADA UNFAIR TRADE PRACTICES ACT,
### (NEV. REV. STAT. § 598A.010, *ET SEQ.*)
### (On Behalf of the State Law Class)

210.    Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

211.    The Nevada Unfair Trade Practices Act ("NUTPA") states that "free, open and competitive production and sale of commodities and services is necessary to the economic well-being of the citizens of the State of Nevada." NEV. REV. STAT. ANN. § 598A.030(1).

212.    The policy of NUTPA is to "[p]rohibit acts in restraint of trade or commerce," "[p]reserve and protect the free, open and competitive market," and "[p]enalize all persons engaged in [] anticompetitive practices." NEV. REV. STAT. ANN. § 598A.030(2). Such acts include, among other things, price fixing, division of markets, allocation of customers, and monopolization of trade. *See* NEV. REV. STAT. § 598A.060.

213.    Plaintiffs and Class Members purchased plastics within the State of Nevada during the Class Period. But for Defendants' conduct set forth, the price of plastics would have been lower, in an amount to be determined at trial.

214.    Under Nevada law, indirect purchasers have standing to maintain an action under NUTPA based on the facts alleged in this Complaint. NEV. REV. STAT. ANN. § 598A.210(2).

215.    Plaintiffs and Class Members were injured with respect to purchases of plastics in Nevada in that at least thousands of sales of plastics took place in Nevada, purchased by Nevada consumers at supra-competitive prices caused by Defendants' conduct.

216.    Accordingly, Plaintiffs and Class Members are entitled to all forms of relief, including actual damages, treble damages, reasonable attorneys' fees, costs, and injunctive relief.

217.    In accordance with the requirements of § 598A.210(3), Plaintiffs mailed notice of this action to the Nevada Attorney General.

**COUNT 33**
**VIOLATION OF NEW HAMPSHIRE'S ANTITRUST STATUTE,**
**(N.H. REV. STAT. ANN. TIT. XXXI, § 356:1, *ET SEQ.*)**
**(On Behalf of the State Law Class)**

218.    Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

219.    Title XXXI of the New Hampshire Statutes generally governs trade and commerce.

220.    Chapter 356 thereof governs combinations and monopolies and prohibits restraints of trade. *See* N.H. REV. STAT. ANN. tit. XXXI, §§ 356:2, 3.

221.    Plaintiffs and Class Members purchased Defendants' plastics within the State of New Hampshire during the Class Period. But for Defendants' conduct set forth, the price of Defendants' plastics would have been lower, in an amount to be determined at trial.

222.    Under New Hampshire law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. N.H. REV. STAT. ANN. § 356:11(II). Defendants established, maintained or attempted to, constituting a contract, combination or conspiracy in restraint of trade in violation of in violation of N.H. REV. STAT. ANN. § 356:1, *et seq*.

223.    Plaintiffs and Class Members were injured with respect to purchases of Defendants' plastics in New Hampshire and are entitled to all forms of relief, including actual damages sustained, treble damages for willful or flagrant violations, reasonable attorneys' fees, costs, and injunctive relief.

**COUNT 34**
**VIOLATION OF THE NEW MEXICO ANTITRUST ACT,**
**(N.M. STAT. ANN. § 57-1-1, *ET SEQ.*)**
**(On Behalf of the State Law Class)**

224.    Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

**App. 138**

225.    The New Mexico Antitrust Act aims to "prohibit[] restraints of trade and monopolistic practices." N.M. STAT. ANN. § 57-1-15.

226.    Plaintiffs and Class Members purchased plastics within the State of New Mexico during the Class Period. But for Defendants' conduct set forth, the price of plastics would have been lower, in an amount to be determined at trial.

227.    Under New Mexico law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. *See* N.M. STAT. ANN. § 57-1-3(A).

228.    Plaintiffs and Class Members were injured with respect to purchases of plastics in New Mexico and are entitled to all forms of relief, including actual damages, treble damages, reasonable attorneys' fees, costs, and injunctive relief.

**COUNT 35**
**VIOLATION OF SECTION 340 OF THE NEW YORK GENERAL BUSINESS LAW,**
**(N.Y. GEN. BUS. LAW § 340, *ET SEQ.*)**
**(On Behalf of the State Law Class)**

229.    Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

230.    Section 340 of Article 22 of the New York General Business Law prohibits monopolies and contracts or agreements in restraint of trade, with the policy of encouraging competition or the free exercise of any activity in the conduct of any business, trade or commerce in New York. *See* N.Y. GEN. BUS. LAW § 340(1).

231.    Plaintiffs and Class Members purchased plastics within the State of New York during the Class Period. But for Defendants' conduct set forth, the price of plastics would have been lower, in an amount to be determined at trial.

232.    Under New York law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. *See* N.Y. GEN. BUS. LAW § 340(6).

233.    Plaintiffs and Class Members were injured with respect to purchases of plastics in New York and are entitled to all forms of relief, including actual damages, treble damages, costs not exceeding $10,000, and reasonable attorneys' fees and all relief available under N.Y. GEN. BUS. LAW §349, *et seq*.

234.    Pursuant to New York General Business Law § 340(5), counsel for Plaintiffs has sent letters by certified mail, return receipt requested, to the Attorney General of New York, informing the Attorney General of the existence of this Class Action Complaint, identifying the relevant state antitrust provisions, and enclosing a copy of the original complaints filed by plaintiffs.

### COUNT 36
### <u>VIOLATION OF THE NORTH CAROLINA GENERAL STATUTES, (N.C. GEN. STAT. § 75-1, *ET SEQ.*)</u>
### (On Behalf of the State Law Class)

235.    Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

236.    Chapter 75 of the North Carolina Statutes generally governs unlawful business practices, including antitrust violations such as restraints of trade and monopolization.

237.    Under North Carolina law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. *See Hyde v. Abbott Labs., Inc.*, 123 N.C. App. 572, 584 (1996).

238.    Defendants' unlawful conduct substantially affected North Carolina's trade and commerce.

239.    As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and the Class Members have been injured in their business or property and are threatened with further injury.

240.     Because of the foregoing, Plaintiffs and Class Members are entitled to seek all forms of relief available, including treble damages, under N.C. GEN. STAT. § 75-1, *et seq*.

## COUNT 37
## VIOLATION OF THE NORTH DAKOTA UNIFORM STATE ANTITRUST ACT, N.D.
### (CENT. CODE § 51-08.1-01, *ET SEQ.*)
### (On Behalf of the State Law Class)

241.     Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

242.     The North Dakota Uniform State Antitrust Act generally prohibits restraints on or monopolization of trade. *See* N.D. CENT. CODE § 51-08.1-01, *et seq*.

243.     Plaintiffs and Class Members purchased plastics within the State of North Dakota during the Class Period. But for Defendants' conduct set forth, the price of plastics would have been lower, in an amount to be determined at trial.

244.     Under the North Dakota Uniform State Antitrust Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. N.D. CENT. CODE § 51- 08.1-08.

245.     Defendants' violations of North Dakota law were flagrant.

246.     Defendants' unlawful conduct substantially affected North Dakota's trade and commerce.

247.     As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and Class Members were injured with respect to purchases in North Dakota and are threatened with further injury, and are entitled to all forms of relief, including actual damages, treble damages for flagrant violations, costs, reasonable attorneys' fees, and injunctive or other equitable relief available under N.D. CENT. CODE § 51-08.1-01, *et seq*.

**COUNT 38**
**VIOLATION OF THE OREGON ANTITRUST LAW,**
**(OR. REV. STAT. § 646.705, *ET SEQ.*)**
**(On Behalf of the State Law Class)**

248.    Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

249.    Chapter 646 of the Oregon Revised Statutes generally governs business and trade practices within Oregon. Sections 705 through 880 thereof govern antitrust violations, with the policy to "encourage free and open competition in the interest of the general welfare and economy of the state." OR. REV. STAT. § 646.715(1).

250.    Plaintiffs and Class Members purchased plastics within the State of Oregon during the Class Period. But for Defendants' conduct set forth, the price of plastics would have been lower, in an amount to be determined at trial.

251.    Under Oregon law, indirect purchasers have standing under the antitrust provisions of the Oregon Revised Statutes to maintain an action based on the facts alleged in this Complaint. OR. REV. STAT. § 646.780(1)(a).

252.    Plaintiffs and Class Members were injured with respect to purchases of plastics within the intrastate commerce of Oregon, or alternatively to interstate commerce involving actual or threatened injury to persons located in Oregon, and are entitled to all forms of relief, including actual damages, treble damages, reasonable attorneys' fees, expert witness fees and investigative costs, and injunctive relief.

**COUNT 39**
**VIOLATION OF THE RHODE ISLAND ANTITRUST ACT,**
**(6 R.I. GEN. LAWS § 6-36-1, *ET SEQ.*)**
**(On Behalf of the State Law Class)**

253.    Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

254.    The Rhode Island Antitrust Act aims "[t]o promote the unhampered growth of commerce and industry throughout [Rhode Island] by prohibiting unreasonable restraints of trade

and monopolistic practices" that hamper, prevent or decrease competition. 6 R.I. GEN. LAWS § 6-36-2(a)(2).

255.     Plaintiffs and Class Members purchased plastics within the State of Rhode Island during the Class Period. But for Defendants' conduct set forth, the price of plastics would have been lower, in an amount to be determined at trial.

256.     Under the Rhode Island Antitrust Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. R.I. GEN. LAWS § 6-36-11(a).

257.     Plaintiffs and Class Members were injured with respect to purchases of plastics in Rhode Island and are entitled to all forms of relief, including actual damages, treble damages, reasonable costs, reasonable attorneys' fees, and injunctive relief.

258.     In conjunction with the filing of this Complaint, Plaintiffs have mailed a copy of this Complaint to the Rhode Island Attorney General in accordance with R.I. GEN. LAWS § 6-36-21. Plaintiffs will file proof of such service with the Court.

**COUNT 40**
**VIOLATION OF THE SOUTH DAKOTA ANTITRUST STATUTE,**
**(S.D. CODIFIED LAWS § 37-1-3.1, *ET SEQ.*)**
**(On Behalf of the State Law Class)**

259.     Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

260.     Chapter 37-1 of the South Dakota Codified Laws prohibits restraint of trade, monopolies, and discriminatory trade practices. S.D. CODIFIED LAWS §§ 37-1-3.1, 3.2.

261.     Plaintiffs and Class Members purchased plastics within the State of South Dakota during the Class Period. But for Defendants' conduct set forth, the price of plastics would have been lower, in an amount to be determined at trial.

262.     Under South Dakota law, indirect purchasers have standing under the antitrust provisions of the South Dakota Codified Laws to maintain an action based on the facts alleged in this Complaint. *See* S.D. CODIFIED LAWS § 37-1-33.

263.     Plaintiffs and Class Members were injured with respect to purchases of plastics in South Dakota and are entitled to all forms of relief, including actual damages, treble damages, taxable costs, reasonable attorneys' fees, and injunctive or other equitable relief.

**COUNT 41**
**VIOLATION OF THE TENNESSEE TRADE PRACTICES ACT,**
**(TENN. CODE § 47-25-101, *ET SEQ.*)**
**(On Behalf of the State Law Class)**

264.     Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

265.     The Tennessee Trade Practices Act generally governs commerce and trade in Tennessee, and it prohibits, among other things, all arrangements, contracts, agreements, or combinations between persons or corporations made with a view to lessen, or which tend to lessen, full and free competition in goods in Tennessee. All such arrangements, contracts, agreements, or combinations between persons or corporations designed, or which tend, to increase the prices of any such goods, are against public policy, unlawful, and void. *See* TENN. CODE, § 47-25-101.

266.     Under Tennessee law, indirect purchasers have standing under the Tennessee Trade Practice Acts to maintain an action based on the facts alleged in this Complaint. *See Freeman Indus., LLC v. Eastman Chem. Co.*, 172 S.W.3d 512, 520 (Tenn. 2005).

267.     Defendants competed unfairly and colluded by meeting to restrain output, artificially increase demand, divide markets, and otherwise restrain trade as set forth, in violation of Tenn. Code, § 47-25-101, *et seq.*

268.     Defendants' conduct violated the Tennessee Trade Practice Act because it was an arrangement, contract, agreement, or combination to lessen full and free competition in goods in

Tennessee, and because it tended to increase the prices of goods in Tennessee. Specifically, Defendant's combination or conspiracy had the following effects: (1) price competition for plastics was restrained, suppressed, and eliminated throughout Tennessee; (2) artificially increase the demand for plastics throughout Tennessee; (3) Plaintiffs and Class Members were deprived of free and open competition; and (4) Plaintiffs and Class Members paid supracompetitive, artificially inflated prices for plastics.

269.     During the Class Period, Defendants' illegal conduct had a substantial effect on Tennessee commerce as plastics refined from Defendants plastics was sold in Tennessee.

270.     Plaintiffs and Class Members purchased plastics within the State of Tennessee during the Class Period. But for Defendants' conduct set forth, the price of plastics would have been lower, in an amount to be determined at trial.

271.     Plaintiffs and Class Members were injured with respect to purchases of plastics in Tennessee and are entitled to all forms of relief available under the law, including return of the unlawful overcharges that they paid on their purchases, damages, equitable relief, and reasonable attorneys' fees.

### COUNT 42
### VIOLATION OF THE UTAH ANTITRUST ACT,
(UTAH CODE ANN. § 76-10-3101, *ET SEQ.*)
### (On Behalf of the State Law Class)

272.     Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

273.     The Utah Antitrust Act aims to "encourage free and open competition in the interest of the general welfare and economy of this state by prohibiting monopolistic and unfair trade practices, combinations and conspiracies in restraint of trade or commerce." UTAH CODE ANN. § 76-10-3102.

274.     Plaintiffs and Class Members purchased plastics within the State of Utah during the Class Period. But for Defendants' conduct set forth, the price of plastics would have been lower, in an amount to be determined at trial.

275.     Under the Utah Antitrust Act, indirect purchasers who are either Utah residents or Utah citizens have standing to maintain an action based on the facts alleged in this Complaint. UTAH CODE ANN. § 76-10-3109(1)(a).

276.     Plaintiffs and Class Members were injured with respect to purchases of plastics in Utah and are entitled to all forms of relief, including actual damages, treble damages, costs of suit, reasonable attorneys' fees, and injunctive relief.

277.     In conjunction with the filing of this Complaint, Plaintiffs have served a copy of this Complaint on the Utah Attorney General in accordance with UTAH CODE ANN. § 76-10-3109(9).

## COUNT 43
## VIOLATION OF THE WEST VIRGINIA ANTITRUST ACT,
### (W. VA. CODE § 47-18-1, *ET SEQ.*)
### (On Behalf of the State Law Class)

278.     Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

279.     The violations of law set forth above also constitute violations of Section 47-18-1 of the West Virginia Code.

280.     During the Class Period, Defendants engaged in anticompetitive conduct alleged above, including a continuing contract, combination or conspiracy in unreasonable restraint of trade and commerce within the intrastate commerce of West Virginia, in violation of W. VA. CODE §§ 47-18-3; 47-18-4.

281.     Plaintiffs and Class Members purchased Defendants' plastics within the State of West Virginia during the Class Period. But for Defendant's conduct set forth, the price of Defendants' plastics would have been lower, in an amount to be determined at trial.

282.     Under West Virginia law, indirect purchasers have standing to maintain an action under the West Virginia Antitrust Act based on the facts alleged in this Complaint. W. VA. CODE St. R. 142-9-2 ("Any person who is injured directly or indirectly by reason of a violation of the West Virginia Antitrust Act, W. Va. Code § 47-18-1, *et seq*., may bring an action for damages under W. Va. Code § 47-18-9.").

283.     Defendants' anticompetitive acts described above were knowing, willful and constitute violations or flagrant violations of the West Virginia Antitrust Act.

284.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and Class Members have been injured in their business and property in that they paid more for plastics than they otherwise would have paid absent Defendants' unlawful conduct.

285.     As a result of Defendants' violation of Section 47-18-3 of the West Virginia Antitrust Act, Plaintiffs and Class Members seek treble damages and their cost of suit, including reasonable attorneys' fees, pursuant to Section 47-18-9 of the West Virginia Code.

**COUNT 44**
**VIOLATION OF THE WISCONSIN ANTITRUST ACT,**
**(WIS. STAT. § 133.01, *ET SEQ.*)**
**(On Behalf of the State Law Class)**

286.     Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

287.     Chapter 133 of the Wisconsin Statutes governs trust and monopolies, with the intent "to safeguard the public against the creation or perpetuation of monopolies and to foster and encourage competition by prohibiting unfair and discriminatory business practices which destroy or hamper competition." WIS. STAT. § 133.01.

288.     Plaintiffs and Class Members purchased plastics within the State of Wisconsin during the Class Period. But for Defendants' conduct set forth, the price of plastics would have been lower, in an amount to be determined at trial.

289.     Under Wisconsin law, indirect purchasers have standing under the antitrust provisions of the Wisconsin Statutes to maintain an action based on the facts alleged in this Complaint. *See* WIS. STAT. § 133.18(1)(a).

290.     Defendants contracted, combined or conspired in restraint of trade or commerce of plastics, with the intention of injuring or destroying competition, in violation of WIS. STAT. § 133.01, *et seq*.

291.     Plaintiffs and Class Members were injured with respect to purchases of Defendants' plastics in Wisconsin in that the actions alleged herein substantially affected the people of Wisconsin, with at least thousands of consumers in Wisconsin paying substantially higher prices for plastics in Wisconsin.

292.     Accordingly, Plaintiffs and Class Members are entitled to all forms of relief, including actual damages, treble damages, costs and reasonable attorneys' fees, and injunctive relief.

**COUNT 45**
**UNJUST ENRICHMENT**
**(on behalf of the Nationwide Class for Damages, or**
**Alternatively, on Behalf of the State Law Class)**

293.     Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

294.     Through their conduct, Defendants caused damages to Plaintiffs and to Class Members.

295.     By misleading the American public into thinking that plastics are completely, or near completely recyclable, Defendants artificially increased the demand for their plastics. This

deception not only allowed Defendants to avoid plastic bans, but the artificially inflated demand allowed them to increase the prices of their plastics. By purchasing plastics at an inflated price in the United States, which Defendants forced them to do, Plaintiffs and the Class Members conferred a benefit on Defendants in the form of the inflated and unconscionable price of the product.

296.    Defendants appreciated the benefit because, were consumers not to purchase plastics, Defendants would have no sales and make no money off Plastic sales in the aforementioned states.

297.    Defendants were directly involved in, the deceptive advertising of plastics, setting the price for plastics, making material misstatements, and directing the sale and distribution of plastics nationwide in the United States.

298.    Plaintiffs and Class Members have conferred upon Defendants an economic benefit, in the nature of profits resulting from unlawful overcharges and the artificial increase in the demand of plastics to the economic detriment of Plaintiffs and the Class. Defendants' acceptance and retention of the benefit is inequitable and unjust because the benefit was obtained by Defendants unconscionable sales, and unlawful acts.

299.    Equity cannot in good conscience permit Defendants to be economically enriched for its unjust actions at Plaintiffs and Class Members' expense and in violation of state law, and therefore restitution or disgorgement or both of such economic enrichment is required. It would be futile for Plaintiffs and the Class to seek a remedy from any party with whom they had privity of contract. Defendants have paid no consideration to anyone for any benefits received indirectly from Plaintiffs and the Class.

300.    Plaintiffs and the members of the Damages Class are entitled to the amount of the Defendants' ill-gotten gains resulting from its unlawful, unjust, and inequitable conduct. Plaintiffs

and the members of the Damages Class are entitled to the establishment of a constructive trust consisting of all ill-gotten gains from which Plaintiffs and the members of the Damages Class may make claims on a pro rata basis.

## **DEMAND FOR JURY TRIAL**

Plaintiffs respectfully demand a jury trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request the following relief:

a.   Determine that this action may be maintained as a class action pursuant to Fed. R. Civ. P. 23(a) and (b)(3); direct that reasonable notice of this action, as provided by Fed. R. Civ. P. 23(c)(2) be given to the Class; and declare that Plaintiffs are the representatives of the Class;

b.   Require Defendants to pay for sending notice to the certified class of all consumers, as required by relevant states' law;

c.   Appoint Plaintiffs as Class Representatives and Plaintiffs' counsel as Class Counsel;

d.   Issue an injunction to enjoin Defendants from engaging in the deceptive, unfair, unconscionable, and unlawful business practices alleged in this Class Action Complaint;

e.   Issue an injunction to enjoin Defendants from engaging in anticompetitive conduct in the plastics market;

f.   Award compensatory damages to Plaintiffs and the proposed Class in an amount to be established at trial;

g.   Award treble damages as permitted by law;

h.   Award pre- and post-judgment interest;

i.   Award reasonable attorneys' fees and costs; and,

j.   For all such other and further relief as may be just and proper.

**App. 150**

Dated: December 16, 2024.                    Respectfully submitted,

                                             */s/ Rex A. Sharp*
                                             Rex A. Sharp, MO #51205
                                             Isaac L. Diel, MO #39503
                                             W. Greg Wright, MO #49545
                                             Sarah T. Bradshaw, MO #66276
                                             Hammons P. Hepner, MO #77258
                                             Brandon C. Landt, *to be admitted*
                                             pro hac vice
                                             SHARP LAW, LLP
                                             4820 W. 75th Street
                                             Prairie Village, KS 66208
                                             (913) 901-0505
                                             (913) 261-7564 Fax
                                             rsharp@midwest-law.com
                                             idiel@midwest-law.com
                                             gwright@midwest-law.com
                                             sbradshaw@midwest-law.com
                                             hhepner@midwest-law.com
                                             blandt@midwest-law.com

# Exhibit 6

**Query**    **Reports**    **Utilities**    **Help**    **Log Out**

MAPN,PHV

# U.S. District Court
## Western District of Missouri (Kansas City)
## CIVIL DOCKET FOR CASE #: 4:24-cv-00803-SRB

Rodriguez et al v. Exxon Mobil Corporation et al          Date Filed: 12/16/2024
Assigned to: District Judge Stephen R. Bough          Jury Demand: Plaintiff
Demand: $5,000,000                                    Nature of Suit: 410 Anti-Trust
Cause: 28:1337 Sherman-Clayton Act                    Jurisdiction: Federal Question

**Plaintiff**

**Billie Rodriguez**                    represented by    **Rex A Sharp**
                                                        Sharp Law, LLP
                                                        4820 W. 75th Street
                                                        Prairie Village, KS 66208
                                                        913-901-0505
                                                        Fax: 913-901-0419
                                                        Email: rsharp@midwest-law.com
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Hammons P. Hepner**
                                                        Sharp Law, LLP
                                                        4820 W. 75th Street
                                                        Prairie Village, KS 66208
                                                        913-901-0505
                                                        Email: hhepner@midwest-law.com
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Isaac Diel**
                                                        Sharp McQueen
                                                        6900 College Blvd.
                                                        Suite 285
                                                        Overland Park, KS 66211
                                                        (913) 661-9931
                                                        Fax: (913) 661-9935
                                                        Email: Idiel@midwest-law.com
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Sarah Bradshaw**
                                                        SharpLaw, LLP
                                                        4820 W. 75th Street
                                                        Prairie Village, KS 66208
                                                        913-901-0419
                                                        Email: sbradshaw@midwest-law.com
                                                        *ATTORNEY TO BE NOTICED*

                                                        **William G. Wright**

**App. 153**

Sharp Law LLP
4820 W. 75th Street
Prairie Village, KS 66208
913-901-0505
Email: gwright@midwest-law.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Daniel Erwin**                      represented by   **Rex A Sharp**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Hammons P. Hepner**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Isaac Diel**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sarah Bradshaw**
(See above for address)
*ATTORNEY TO BE NOTICED*

**William G. Wright**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Michael Ackerman**                  represented by   **Rex A Sharp**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Hammons P. Hepner**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Isaac Diel**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sarah Bradshaw**
(See above for address)
*ATTORNEY TO BE NOTICED*

**William G. Wright**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Kyle Foreman**                      represented by   **Rex A Sharp**
(See above for address)

**App. 154**

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Hammons P. Hepner**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Isaac Diel**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sarah Bradshaw**
(See above for address)
*ATTORNEY TO BE NOTICED*

**William G. Wright**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Emily Thorpe**                          represented by  **Isaac Diel**
                                                         (See above for address)
                                                         *ATTORNEY TO BE NOTICED*

                                                         **Rex A Sharp**
                                                         (See above for address)
                                                         *ATTORNEY TO BE NOTICED*

**Plaintiff**

**The Board of Commissioners of The**     represented by  **Isaac Diel**
**County of Ford**                                       (See above for address)
                                                         *ATTORNEY TO BE NOTICED*

                                                         **Rex A Sharp**
                                                         (See above for address)
                                                         *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Jennifer Tritt**                        represented by  **Isaac Diel**
                                                         (See above for address)
                                                         *ATTORNEY TO BE NOTICED*

                                                         **Rex A Sharp**
                                                         (See above for address)
                                                         *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Drew Scruggs**                          represented by  **Isaac Diel**
                                                         (See above for address)
                                                         *ATTORNEY TO BE NOTICED*

                                                         **Rex A Sharp**

**App. 155**

(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Mary Jane McQueeny**                    represented by    **Isaac Diel**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Rex A Sharp**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Exxon Mobil Corporation**               represented by    **Richard N Bien**
Lathrop GPM LLP
2345 Grand Avenue
Suite 2200
Kansas City, MO 64108-2618
816-292-2000
Fax: 816-292-2001
Email: richard.bien@lathropgpm.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Brody Sabor**
Lathrop GPM LLP
2345 Grand Avenue
Suite 2200
Kansas City, MO 64108-2618
816-460-5858
Email: brody.sabor@lathropgpm.com
*ATTORNEY TO BE NOTICED*

**David J Lender**
Weil, Gotshal & Manges - New York
767 Fifth Avenue
New York, NY 10153
212-310-8153
Email: david.lender@weil.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Emma Halling**
Lathrop Gpm
2345 Grand Blvd
Suite 2200
Kansas City, MO 64108
816-460-5622
Email: emma.halling@lathropgpm.com
*ATTORNEY TO BE NOTICED*

**App. 156**

**Grant A. Harse**
Lathrop GPM LLP
2345 Grand Avenue
Suite 2200
Kansas City, MO 64108-2618
816-460-5750
Fax: 816-292-2001
Email: grant.harse@lathropgpm.com
*ATTORNEY TO BE NOTICED*

**William F. Ford**
Lathrop GPM LLP
2345 Grand Avenue
Suite 2200
Kansas City, MO 64108-2618
816-460-5668
Email: bill.ford@Lathropgpm.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Chevron U.S.A., Inc.,**                    represented by  **Courtney Kroeger**
Berkowitz Oliver LLP
2600 Grand Blvd.
Suite 1200
Kansas City, MO 64108
816-561-7007
Email: ckroeger@berkowitzoliver.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jeffrey Daniel Morris**
Berkowitz Oliver LLP-KCMO
2600 Grand Boulevard
Suite 1200
Kansas City, MO 64108
(816) 561-7007
Fax: (816) 561-1888
Email: jmorris@berkowitzoliver.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Lauren Tallent**
Berkowitz Oliver LLP-KCMO
2600 Grand Boulevard
Suite 1200
Kansas City, MO 64108
816-561-7007
Email: ltallent@berkowitzoliver.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Thomas P. Schult**
Berkowitz Oliver LLP-KCMO
2600 Grand Boulevard

**App. 157**

Suite 1200
Kansas City, MO 64108
(816) 561-7007
Fax: (816) 561-1888
Email: tschult@berkowitzoliver.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Bradley Hamburger**
Bradley Hamburger
333 South Grand Avenue
Los Angeles, CA 90071
213-229-7658
Email: bhamburger@gibsondunn.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Christopher Dean Dusseault**
Gibson, Dunn & Crutcher LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
213-229-7855
Fax: 213-229-6855
Email: cdusseault@gibsondunn.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joshua D. Dick**
Gibson, Dunn & Crutcher LLP
One Embarcadero Center
Suite 2600
San Francisco, CA 94111-3715
415-393-8331
Email: jdick@gibsondunn.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Perlette Michele Jura**
Gibson, Dunn & Crutcher LLP
333 S. Grand Avenue
Suite 5300
Los Angeles, CA 90071
213-229-7121
Fax: 213-229-6121
Email: pjura@gibsondunn.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Theodore Joseph Boutrous , Jr**
Gibson, Dunn & Crutcher LLP
333 South Grand Avenue
Los Angeles, CA 90071
213-229-7804
Fax: 213-229-6804

**App. 158**

Email: tboutrous@gibsondunn.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Chevron Phillips Chemical Corporation**          represented by   **Tristan L. Duncan**
Shook, Hardy & Bacon, LLP-KCMO
2555 Grand Boulevard
Kansas City, MO 64108-2613
(816) 474-6550
Fax: (816) 421-5547
Email: tlduncan@shb.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Daniel Brandon Rogers**
Shook, Hardy & Bacon L. L. P.
201 South Biscayne Boulevard
Suite 3200
Miami, FL 33131
305-960-6968
Fax: 305-358-7470
Email: drogers@shb.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Dupont de Nemours, Inc.**          represented by   **Kara Trouslot Stubbs**
Baker, Sterchi, Cowden & Rice, LLC -
KCMO
2400 Pershing Road
Suite 500
Kansas City, MO 64108-2504
(816)471-2121
Fax: (816)472-0288
Email: stubbs@bscr-law.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**David L. Schrader**
Morgan, Lewis & Bockius LLP
300 South Grand Ave.
22nd Floor
Los Angeles, CA 90071
213-612-2500
Email: david.schrader@morganlewis.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Drew Cleary Jordan**
1111 Pennsylvania Avenue, NW
Washington, DC 20004
202-739-5962
Email: drew.jordan@morganlewis.com

**App. 159**

*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Rachel P. Raphael**
Morgan, Lewis & Bockius, LLP - DC
1111 Pennsylvania Avenue, NW
Washington, DC 20004
202-739-3000
Fax: 202-739-3001
Email: rachel.raphael@morganlewis.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Willam T. McEnroe**
Morgan, Lewis & Bockius LLP
222 Market St.
Philadelphia, PA 19103
215-963-5000
Email: william.mcenroe@morganlewis.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Dupont Corporation**

**Defendant**

**Celanese Corporation**                    represented by **Booker T Shaw**
Thompson Coburn LLP - StL
One US Bank Plaza
St. Louis, MO 63101
314-552-6087
Fax: 314-552-7000
Email: bshaw@thompsoncoburn.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**R. Allan Pixton**
Quinn Emanuel Urquhart & Sullivan, LLP
191 N. Wacker Drive
Suite 2700
Chicago, IL 60606
312-705-7400
Email: allanpixton@quinnemanuel.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Richard C. Godfrey**
Quinn Emanuel Urquhart & Sullivan, LLP
191 N. Wacker Drive
Suite 2700
Chicago, IL 60606
312-705-7463
Fax: 312-705-7401

**App. 160**

Email: richardgodfrey@quinnemanuel.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Dow, Inc.**                              represented by **Grace E. Martinez**
Bryan Cave Leighton Paisner LLP
1200 Main Street
Suite 3800
Kansas City, MO 64105
816-374-3277
Fax: 816-855-3277
Email: grace.martinez@bclplaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert J Hoffman**
Bryan Cave Leighton Paisner LLP
1200 Main Street
Suite 3500
Kansas City, MO 64105
816-374-3229
Fax: (816) 374-3300
Email: rjhoffman@bclplaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert M. Thompson**
Bryan Cave, LLP
1200 Main Street
Suite 3800
Kansas City, MO 64105
(816) 374-3249
Fax: (816) 855-3249
Email: rmthompson@bclplaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Daniel E Laytin**
Kirkland & Ellis LLP
333 West Wolf Point Plaza
Chicago, IL 60654
312-862-2198
Fax: 312-862-2200
Email: daniel.laytin@kirkland.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jonathan N Adair**
Kirkland & Ellis
333 West Wolf Point Plaza
Chicago, IL 60654
312-862-2000
Email: jonathan.adair@kirkland.com

**App. 161**

*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Nader R Boulos**
Kirkland & Ellis LLP
333 Wolf Point Plaza
Chicago, IL 60654
312-862-2000
Email: nboulos@kirkland.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Dow Chemical Company**                    represented by    **Grace E. Martinez**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert J Hoffman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert M. Thompson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Daniel E Laytin**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jonathan N Adair**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Nader R Boulos**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Eastman Chemical Company**                    represented by    **Brian Nye**
Armstrong Teasdale LLP-KCMO
2345 Grand Boulevard
Suite 1500
Kansas City, MO 64108
816-472-3125
Fax: 816-329-5416
Email: bnye@atllp.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**App. 162**

**Karrie J. Clinkinbeard**
Armstrong Teasdale LLP-KCMO
2345 Grand Boulevard
Suite 1500
Kansas City, MO 64108
(816) 221-3420
Fax: (816) 221-0786
Email: kclinkinbeard@atllp.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Gregory DuBoff**
McGuireWoods LLP
Gateway Plaza
800 East Canal Street
Richmond, VA 23219
804-775-1154
Fax: 804-698-2054
Email: gduboff@mcguirewoods.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Lyondellbasell Industries, N.V.**          represented by   **G. Edgar James**
James Sobba, LLC
4435 Main Street
Suite 910
Kansas City, MO 64112
816-623-0544
Fax: 816-623-0508
Email: ejames@jamessobba.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**James M. Humphrey**
James Sobba, LLC
4435 Main Street
Suite 910
Kansas City, MO 64112
816-631-0669
Email: jhumphrey@jamessobba.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**American Chemistry Council**          represented by   **Zachary Joseph Parker**
Sidley Austin LLP - Chicago
1 South Dearborn Street
Chicago, IL 60603
312-853-9957
Email: zparker@sidley.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**App. 163**

**David Lloyd Anderson**
Sidley Austin LLP
555 California Street, Suite 2000
San Francisco, CA 94104
415-772-1200
Fax: 415-772-7400
Email: dlanderson@sidley.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**David A. Goldenberg**
555 California St
San Francisco, CA 94104
415-772-1200
Email: dgoldenberg@sidley.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sheila Ag Armbrust**
Sidley Austin LLP
555 California Avenue
Suite 2000
San Francisco, CA 94104
415-772-7430
Fax: 415-772-7400
Email: sarmbrust@sidley.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Defendant**

**State of Kansas Attorney General**
*State of Kansas, ex rel. Kris W. Kobach,*
*Attorney General*

represented by **Adam Thomas Steinhilber**
Office of the Kansas Attorney General
120 SW 10th Ave
2nd Floor
Topeka, KS 66612
785-296-2215
Email: Adam.Steinhilber@ag.ks.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Nicholas C Smith**
Office of Attorney General
120 SW 10th Ave., 2nd Floor
Topeka, KS 66612
785-296-4350
Email: nicholas.smith@ag.ks.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Melanie Sue Jack**
Kansas Attorney General's Office
120 S.W. 10th Avenue
2nd Floor
Topeka, KS 66612-1597

**App. 164**

785-368-8242
Fax: 785-291-3699
Email: melanie.jack@ag.ks.gov
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 12/16/2024 | 1 | COMPLAINT *Class Action* against All Defendants filed by Rex A Sharp on behalf of All Plaintiffs. Filing fee $405, receipt number AMOWDC-9342699. Service due by 3/17/2025 unless otherwise directed by the court. (Attachments: # 1 Civil Cover Sheet) (Sharp, Rex) (Entered: 12/16/2024) |
| 12/16/2024 | 2 | **NOTICE OF INCLUSION FOR MEDIATION AND ASSESSMENT PROGRAM (MAP). REVIEW NOTICE AND MAP GENERAL ORDER CAREFULLY FOR IMPORTANT CHANGES, DEADLINES AND REQUIREMENTS.**<br><br>**Notice of MAP assignment to outside neutral category I.** (Attachments: # 1 MAP General Order)(Woods, Gloria) (Entered: 12/16/2024) |
| 12/18/2024 | | SUMMONS ISSUED as to American Chemistry Council, Celanese Corporation, Chevron Phillips Chemical Corporation, Chevron U.S.A., Inc.,, Dow Chemical Company, Dow, Inc., Dupont de Nemours, Inc., Eastman Chemical Company, Exxon Mobil Corporation, Lyondellbasell Industries, N.V.. (Woods, Gloria) (Entered: 12/18/2024) |
| 12/18/2024 | | SUMMONS ISSUED as to Dupont Corporation. (Woods, Gloria) (Entered: 12/18/2024) |
| 12/22/2024 | 3 | MOTION to reassign/transfer case */Motion to Transfer Venue* filed by Richard N Bien on behalf of Exxon Mobil Corporation. Suggestions in opposition/response due by 1/6/2025 unless otherwise directed by the court. (Attorney Richard N Bien added to party Exxon Mobil Corporation(pty:dft))(Bien, Richard) (Entered: 12/22/2024) |
| 12/22/2024 | 4 | SUGGESTIONS in support re 3 MOTION to reassign/transfer case */Motion to Transfer Venue* filed by Richard N Bien on behalf of Defendant Exxon Mobil Corporation. (Attachments: # 1 Exhibit 1 - Class Action Complaint)(Related document(s) 3 ) (Bien, Richard) (Attachment 1 replaced on 12/23/2024) (Berner, Crystal. Modified on 12/23/2024 with document provided by counsel. NEF regenerated. (Berner, Crystal) (Entered: 12/22/2024) |
| 12/22/2024 | 5 | MOTION to stay */Motion to Stay Proceedings and Suggestions in Support* filed by Richard N Bien on behalf of Exxon Mobil Corporation. Suggestions in opposition/response due by 1/6/2025 unless otherwise directed by the court. (Bien, Richard) (Entered: 12/22/2024) |
| 12/22/2024 | 6 | DISCLOSURE OF CORPORATE INTERESTS */ Certificate of Interest* filed by Richard N Bien on behalf of Defendant Exxon Mobil Corporation.(Bien, Richard) (Entered: 12/22/2024) |
| 12/23/2024 | 7 | NOTICE of appearance by William F. Ford on behalf of Exxon Mobil Corporation (Attorney William F. Ford added to party Exxon Mobil Corporation(pty:dft))(Ford, William) (Entered: 12/23/2024) |
| 12/23/2024 | 8 | NOTICE of appearance by Grant A. Harse on behalf of Exxon Mobil Corporation (Attorney Grant A. Harse added to party Exxon Mobil Corporation(pty:dft))(Harse, Grant) (Entered: 12/23/2024) |
| 12/23/2024 | 9 | NOTICE of appearance by Emma Halling on behalf of Exxon Mobil Corporation (Attorney Emma Halling added to party Exxon Mobil Corporation(pty:dft))(Halling, |

**App. 165**

| | | |
|---|---|---|
| | | Emma) (Entered: 12/23/2024) |
| 12/23/2024 | 10 | NOTICE of appearance by Brody Sabor on behalf of Exxon Mobil Corporation (Attorney Brody Sabor added to party Exxon Mobil Corporation(pty:dft))(Sabor, Brody) (Entered: 12/23/2024) |
| 01/01/2025 | 11 | Consent MOTION for extension of time to file response/reply as to 3 MOTION to reassign/transfer case *Motion to Transfer Venue*, 5 MOTION to stay *Motion to Stay Proceedings and Suggestions in Support* filed by Rex A Sharp on behalf of All Plaintiffs. Suggestions in opposition/response due by 1/15/2025 unless otherwise directed by the court. (Related document(s) 3 , 5 ) (Sharp, Rex) (Entered: 01/01/2025) |
| 01/02/2025 | 12 | Before the Court is Plaintiffs Billie Rodriguez, Daniel Erwin, Michael B. Ackerman, and Kyle Foreman's (collectively "Plaintiffs") Consent Motion for Extension of Time. (Doc. # 11 .) For good cause shown, the motion is GRANTED. Plaintiffs may oppose Defendant Exxon Mobil Corporation's Motion to Transfer and Motion to Stay on or before January 17, 2025. Signed on 1/2/25 by District Judge Stephen R. Bough. This is a TEXT ONLY ENTRY. No document is attached. (Peters, Tracey) (Entered: 01/02/2025) |
| 01/03/2025 | 13 | Consent MOTION for extension of time to file answer re 1 Complaint, filed by Richard N Bien on behalf of Exxon Mobil Corporation. Suggestions in opposition/response due by 1/17/2025 unless otherwise directed by the court. (Related document(s) 1 ) (Bien, Richard) (Entered: 01/03/2025) |
| 01/06/2025 | 14 | Before the Court is Defendant Exxon Mobil Corporation's ("ExxonMobil") Consent Motion for Extension of Time. (Doc. # 13 .) For good cause shown, the motion is GRANTED. ExxonMobil may answer, respond, or otherwise plead to Plaintiffs' Complaint on or before February 10, 2025. Signed on 1/6/2025 by District Judge Stephen R. Bough. This is a TEXT ONLY ENTRY. No document is attached. (Peters, Tracey) (Entered: 01/06/2025) |
| 01/09/2025 | 15 | NOTICE of appearance by Robert J Hoffman on behalf of Dow, Inc., Dow Chemical Company (Attorney Robert J Hoffman added to party Dow, Inc.(pty:dft), Attorney Robert J Hoffman added to party Dow Chemical Company(pty:dft))(Hoffman, Robert) (Entered: 01/09/2025) |
| 01/09/2025 | 16 | NOTICE of appearance by Robert M. Thompson on behalf of Dow, Inc., Dow Chemical Company (Attorney Robert M. Thompson added to party Dow, Inc.(pty:dft), Attorney Robert M. Thompson added to party Dow Chemical Company(pty:dft))(Thompson, Robert) (Entered: 01/09/2025) |
| 01/09/2025 | 17 | NOTICE of appearance by Grace E. Martinez on behalf of Dow, Inc., Dow Chemical Company (Attorney Grace E. Martinez added to party Dow, Inc.(pty:dft), Attorney Grace E. Martinez added to party Dow Chemical Company(pty:dft))(Martinez, Grace) (Entered: 01/09/2025) |
| 01/09/2025 | 18 | Consent MOTION for extension of time to file answer re 1 Complaint, filed by Robert J Hoffman on behalf of Dow, Inc., Dow Chemical Company. Suggestions in opposition/response due by 1/23/2025 unless otherwise directed by the court. (Related document(s) 1 ) (Hoffman, Robert) (Entered: 01/09/2025) |
| 01/09/2025 | 19 | NOTICE of appearance by Karrie J. Clinkinbeard on behalf of Eastman Chemical Company (Attorney Karrie J. Clinkinbeard added to party Eastman Chemical Company(pty:dft))(Clinkinbeard, Karrie) (Entered: 01/09/2025) |
| 01/09/2025 | 20 | NOTICE of appearance by Brian Nye on behalf of Eastman Chemical Company (Attorney Brian Nye added to party Eastman Chemical Company(pty:dft))(Nye, Brian) (Entered: 01/09/2025) |

**App. 166**

| | | |
|---|---|---|
| 01/09/2025 | 21 | Consent MOTION for extension of time *TO EXTEND SPECIALLY APPEARING DEFENDANT EASTMAN CHEMICAL COMPANY'S TIME TO RESPOND TO PLAINTIFFS' COMPLAINT AND SUGGESTIONS IN SUPPORT* filed by Karrie J. Clinkinbeard on behalf of Eastman Chemical Company. Suggestions in opposition/response due by 1/23/2025 unless otherwise directed by the court. (Clinkinbeard, Karrie) (Entered: 01/09/2025) |
| 01/09/2025 | 22 | NOTICE of appearance by Booker T Shaw on behalf of Celanese Corporation (Attorney Booker T Shaw added to party Celanese Corporation(pty:dft))(Shaw, Booker) (Entered: 01/09/2025) |
| 01/09/2025 | 23 | DISCLOSURE OF CORPORATE INTERESTS filed by Booker T Shaw on behalf of Defendant Celanese Corporation.(Shaw, Booker) (Entered: 01/09/2025) |
| 01/09/2025 | 24 | Consent MOTION for extension of time *(Consent Motion to Extend Defendant Celanese Corporation's Time to Answer, Respond or Otherwise Plead to Plaintiff's' Complaint and Suggestions in Support)* filed by Booker T Shaw on behalf of Celanese Corporation. Suggestions in opposition/response due by 1/23/2025 unless otherwise directed by the court. (Shaw, Booker) (Entered: 01/09/2025) |
| 01/09/2025 | 25 | NOTICE of appearance by Kara Trouslot Stubbs on behalf of Dupont de Nemours, Inc. (Attorney Kara Trouslot Stubbs added to party Dupont de Nemours, Inc.(pty:dft))(Stubbs, Kara) (Entered: 01/09/2025) |
| 01/09/2025 | 26 | MOTION for extension of time to file answer filed by Kara Trouslot Stubbs on behalf of Dupont de Nemours, Inc.. Suggestions in opposition/response due by 1/23/2025 unless otherwise directed by the court. (Stubbs, Kara) (Entered: 01/09/2025) |
| 01/09/2025 | 27 | DISCLOSURE OF CORPORATE INTERESTS filed by Kara Trouslot Stubbs on behalf of Defendant Dupont de Nemours, Inc..(Stubbs, Kara) (Entered: 01/09/2025) |
| 01/10/2025 | 28 | Before the Court is Defendants Dow Inc. and Dow Chemical Company's (collectively "Dow") Consent Motion for Extension of Time. (Doc. # 18 .) For good cause shown, the motion is GRANTED. Dow may answer, move, or otherwise respond to Plaintiffs' Complaint on or before February 10, 2025. Signed on 1/10/2025 by District Judge Stephen R. Bough. <span style="color:red">This is a TEXT ONLY ENTRY. No document is attached.</span> (Peters, Tracey) (Entered: 01/10/2025) |
| 01/10/2025 | 29 | Before the Court is Defendant Eastman Chemical Company's ("Eastman") Consent Motion for Extension of Time. (Doc. # 21 .) For good cause shown, the motion is GRANTED. Eastman may respond to Plaintiffs' Complaint on or before February 10, 2025. Signed on 1/10/2025 by District Judge Stephen R. Bough. <span style="color:red">This is a TEXT ONLY ENTRY. No document is attached.</span> (Peters, Tracey) (Entered: 01/10/2025) |
| 01/10/2025 | 30 | Before the Court is Defendant Celanese Corporation's ("Celanese") Consent Motion for Extension of Time. (Doc. # 24 .) For good cause shown, the motion is GRANTED. Celanese may respond to Plaintiffs' Complaint on or before February 10, 2025. Signed on 1/10/2025 by District Judge Stephen R. Bough. <span style="color:red">This is a TEXT ONLY ENTRY. No document is attached.</span> (Peters, Tracey) (Entered: 01/10/2025) |
| 01/10/2025 | 31 | DISCLOSURE OF CORPORATE INTERESTS filed by Robert J Hoffman on behalf of Defendant Dow Chemical Company.(Hoffman, Robert) (Entered: 01/10/2025) |
| 01/10/2025 | 32 | DISCLOSURE OF CORPORATE INTERESTS filed by Robert J Hoffman on behalf of Defendant Dow, Inc..(Hoffman, Robert) (Entered: 01/10/2025) |
| 01/13/2025 | 33 | Before the Court is Defendant Dupont de Nemours, Inc.'s ("Dupont") Consent Motion for Extension of Time. (Doc. # 26 .) For good cause shown, the motion is GRANTED. |

**App. 167**

| | | Dupont may respond to Plaintiffs' Complaint on or before February 10, 2025. Signed on 1/13/2025 by District Judge Stephen R. Bough. This is a TEXT ONLY ENTRY. No document is attached. (Peters, Tracey) (Entered: 01/13/2025) |
|---|---|---|
| 01/14/2025 | 34 | DISCLOSURE OF CORPORATE INTERESTS *Defendant's Rule 7.1 Disclosure Statement* filed by Karrie J. Clinkinbeard on behalf of Defendant Eastman Chemical Company.(Clinkinbeard, Karrie) (Entered: 01/14/2025) |
| 01/14/2025 | 35 | Motion to allow David L. Schrader to appear pro hac vice (Pro Hac fee $100 receipt number AMOWDC-9382812) filed by Kara Trouslot Stubbs on behalf of Dupont de Nemours, Inc.. (Stubbs, Kara) (Entered: 01/14/2025) |
| 01/14/2025 | 36 | Motion to allow Rachel P. Raphael to appear pro hac vice (Pro Hac fee $100 receipt number AMOWDC-9382837) filed by Kara Trouslot Stubbs on behalf of Dupont de Nemours, Inc.. (Stubbs, Kara) (Entered: 01/14/2025) |
| 01/14/2025 | 37 | Motion to allow William T. McEnroe to appear pro hac vice (Pro Hac fee $100 receipt number AMOWDC-9382833) filed by Kara Trouslot Stubbs on behalf of Dupont de Nemours, Inc.. (Stubbs, Kara) (Entered: 01/14/2025) |
| 01/15/2025 | 38 | ORDER granting 35 , 36 , and 37 motion to appear pro hac vice entered by Clerk of Court. Attorney David L. Schrader, Rachel P. Raphael, and Willam T. McEnroe for Dupont de Nemours, Inc. allowed to appear pro hac vice. This entry will serve as authorization for the pro hac participation by the attorney. <br><br> Western District of Missouri Local Rule 5.1 requires documents to be filed electronically. If pro hac vice counsel has not already done so, counsel is directed to immediately register for a WDMO e-filing account for NextGen CM/ECF. This will enable counsel to electronically file documents and receive electronic notification of filings. Register for a WDMO e-filing account at PACER. This is a TEXT ONLY ENTRY. No document is attached. (Warren, Melissa) (Entered: 01/15/2025) |
| 01/15/2025 | 39 | Motion to allow David J. Lender to appear pro hac vice (Pro Hac fee $100 receipt number AMOWDC-9384990) filed by Richard N Bien on behalf of Exxon Mobil Corporation. (Bien, Richard) (Entered: 01/15/2025) |
| 01/16/2025 | 40 | ORDER granting 39 motion to appear pro hac vice entered by Clerk of Court. Attorney David J Lender for Exxon Mobil Corporation allowed to appear pro hac vice. This entry will serve as authorization for the pro hac participation by the attorney. <br><br> Western District of Missouri Local Rule 5.1 requires documents to be filed electronically. If pro hac vice counsel has not already done so, counsel is directed to immediately register for a WDMO e-filing account for NextGen CM/ECF. This will enable counsel to electronically file documents and receive electronic notification of filings. Register for a WDMO e-filing account at PACER. This is a TEXT ONLY ENTRY. No document is attached. (Warren, Melissa) (Entered: 01/16/2025) |
| 01/16/2025 | 41 | NOTICE of appearance by Thomas P. Schult on behalf of Chevron U.S.A., Inc., (Attorney Thomas P. Schult added to party Chevron U.S.A., Inc.,(pty:dft))(Schult, Thomas) (Entered: 01/16/2025) |
| 01/16/2025 | 42 | NOTICE of appearance by Lauren Tallent on behalf of Chevron U.S.A., Inc., (Attorney Lauren Tallent added to party Chevron U.S.A., Inc.,(pty:dft))(Tallent, Lauren) (Entered: 01/16/2025) |
| 01/16/2025 | 43 | NOTICE of appearance by Courtney Kroeger on behalf of Chevron U.S.A., Inc., (Attorney Courtney Kroeger added to party Chevron U.S.A., Inc.,(pty:dft))(Kroeger, Courtney) (Entered: 01/16/2025) |

**App. 168**

| 01/16/2025 | 44 | DISCLOSURE OF CORPORATE INTERESTS filed by Thomas P. Schult on behalf of Defendant Chevron U.S.A., Inc.,.(Schult, Thomas) (Entered: 01/16/2025) |
|---|---|---|
| 01/16/2025 | 45 | Consent MOTION for extension of time to file answer re 1 Complaint, - *Consent Motion to Extend Defendant Chevron U.S.A. Inc.'s Time to Answer, Respond or Otherwise Plead to Plaintiffs' Complaint and Suggestions in Support* filed by Thomas P. Schult on behalf of Chevron U.S.A., Inc.,. Suggestions in opposition/response due by 1/30/2025 unless otherwise directed by the court. (Related document(s) 1 ) (Schult, Thomas) (Entered: 01/16/2025) |
| 01/17/2025 | 46 | Before the Court is a Defendant Chevron U.S.A. Inc.'s ("Chevron") Consent Motion to Extend Defendant Chevron U.S.A. Inc.'s Time to Answer, Respond, or Otherwise Plead to Plaintiffs' Complaint (Doc. # 45 .) For good cause shown, the motion is GRANTED. Chevron may answer, respond, or otherwise plead to Plaintiffs' Complaint on or before February 10, 2025. Signed on 1/17/2025 by District Judge Stephen R. Bough. This is a TEXT ONLY ENTRY. No document is attached. (Peters, Tracey) (Entered: 01/17/2025) |
| 01/17/2025 | 47 | SUGGESTIONS in opposition re 3 MOTION to reassign/transfer case */Motion to Transfer Venue*, 5 MOTION to stay */Motion to Stay Proceedings and Suggestions in Support* filed by Rex A Sharp on behalf of Plaintiffs Billie Rodriguez, Daniel Erwin, Michael Ackerman, Kyle Foreman. Reply suggestions due by 1/31/2025 unless otherwise directed by the court. (Attachments: # 1 Exhibit 1)(Related document(s) 3 , 5 ) (Sharp, Rex) (Entered: 01/17/2025) |
| 01/17/2025 | 48 | AMENDED COMPLAINT *(First)* against All Defendants All Plaintiffs.(Sharp, Rex) (Entered: 01/17/2025) |
| 01/21/2025 | 49 | Before the Court is Defendant Exxon Mobil Corporation's Motion to Transfer Venue (Doc. # 3 ) and Motion to Stay Proceedings (Doc. # 5 ). Upon review, as Plaintiff has voluntarily dismissed his parallel lawsuit in the District of Kansas, the motions are DENIED AS MOOT. Signed on 1/21/2025 by District Judge Stephen R. Bough. This is a TEXT ONLY ENTRY. No document is attached. (Peters, Tracey) (Entered: 01/21/2025) |
| 01/22/2025 | | SUMMONS ISSUED as to Lyondellbasell Industries, N.V.. (Woods, Gloria) (Entered: 01/22/2025) |
| 01/22/2025 | 50 | NOTICE of appearance by Zachary Joseph Parker on behalf of American Chemistry Council (Attorney Zachary Joseph Parker added to party American Chemistry Council(pty:dft))(Parker, Zachary) (Entered: 01/22/2025) |
| 01/22/2025 | 51 | Motion to allow David L. Anderson to appear pro hac vice (Pro Hac fee $100 receipt number AMOWDC-9399287) filed by Zachary Joseph Parker on behalf of American Chemistry Council. (Parker, Zachary) (Entered: 01/22/2025) |
| 01/22/2025 | 52 | Motion to allow Sheila A.G. Armbrust to appear pro hac vice (Pro Hac fee $100 receipt number AMOWDC-9399334) filed by Zachary Joseph Parker on behalf of American Chemistry Council. (Parker, Zachary) (Entered: 01/22/2025) |
| 01/22/2025 | 53 | Motion to allow David A. Goldenberg to appear pro hac vice (Pro Hac fee $100 receipt number AMOWDC-9399342) filed by Zachary Joseph Parker on behalf of American Chemistry Council. (Parker, Zachary) (Entered: 01/22/2025) |
| 01/22/2025 | 54 | DISCLOSURE OF CORPORATE INTERESTS filed by Zachary Joseph Parker on behalf of Defendant American Chemistry Council.(Parker, Zachary) (Entered: 01/22/2025) |
| 01/22/2025 | 55 | MOTION for reconsideration re 49 Order on Motion to Reassign/Transfer Case,, Order on Motion to Stay, filed by Richard N Bien on behalf of Exxon Mobil Corporation. |

**App. 169**

| | | |
|---|---|---|
| | | Suggestions in opposition/response due by 2/5/2025 unless otherwise directed by the court. (Related document(s) 49 ) (Bien, Richard) (Entered: 01/22/2025) |
| 01/22/2025 | 56 | Joint MOTION for extension of time to file answer re 48 Amended Complaint *Joint Motion and [Proposed] Consent Order Regarding Motions, Briefing Schedules and Page Limits* filed by Tristan L. Duncan on behalf of All Parties. Suggestions in opposition/response due by 2/5/2025 unless otherwise directed by the court. (Related document(s) 48 ) (Attorney Tristan L. Duncan added to party Chevron Phillips Chemical Corporation(pty:dft))(Duncan, Tristan) (Entered: 01/22/2025) |
| 01/23/2025 | 57 | ORDER granting 51 , 52 & 53 motion to appear pro hac vice entered by Clerk of Court. Attorney David L. Anderson, Sheila Armbrust and David A. Goldenberg for American Chemistry Council allowed to appear pro hac vice. This entry will serve as authorization for the pro hac participation by the attorney.<br><br>Western District of Missouri Local Rule 5.1 requires documents to be filed electronically. If pro hac vice counsel has not already done so, counsel is directed to immediately register for a WDMO e-filing account for NextGen CM/ECF. This will enable counsel to electronically file documents and receive electronic notification of filings. Register for a WDMO e-filing account at PACER. This is a TEXT ONLY ENTRY. No document is attached. (Berner, Crystal) (Entered: 01/23/2025) |
| 01/23/2025 | 58 | Before the Court is a Joint Motion for Extension of Time. (Doc. # 56 .) Upon review, the motion is GRANTED. Defendants shall file any Motions to Dismiss on or before March 10, 2025. Plaintiffs shall file their Oppositions to any Motions to Dismiss on or before April 18, 2025. Defendants shall file any Replies to Plaintiffs' Oppositions to Defendants' Motions to Dismiss on or before May 28, 2025. The parties shall comply with the page limitations for all Personal Jurisdiction Motions, Joint Motions to Dismiss, and Individual Rule 12 Motions agreed to in the Joint Motion for Extension of Time. Signed on 1/23/2025 by District Judge Stephen R. Bough. This is a TEXT ONLY ENTRY. No document is attached. (Peters, Tracey) (Entered: 01/23/2025) |
| 01/23/2025 | 59 | Motion to allow Bradley J. Hamburger to appear pro hac vice (Pro Hac fee $100 receipt number AMOWDC-9401898) filed by Thomas P. Schult on behalf of Chevron U.S.A., Inc.,. (Schult, Thomas) (Entered: 01/23/2025) |
| 01/23/2025 | 60 | Motion to allow Christopher D. Dusseault to appear pro hac vice (Pro Hac fee $100 receipt number AMOWDC-9401929) filed by Thomas P. Schult on behalf of Chevron U.S.A., Inc.,. (Schult, Thomas) (Entered: 01/23/2025) |
| 01/23/2025 | 61 | Motion to allow Perlette Michele Jura to appear pro hac vice (Pro Hac fee $100 receipt number AMOWDC-9401944) filed by Thomas P. Schult on behalf of Chevron U.S.A., Inc.,. (Schult, Thomas) (Entered: 01/23/2025) |
| 01/23/2025 | 62 | Motion to allow Theodore J. Boutrous, Jr. to appear pro hac vice (Pro Hac fee $100 receipt number AMOWDC-9401966) filed by Thomas P. Schult on behalf of Chevron U.S.A., Inc.,. (Schult, Thomas) (Entered: 01/23/2025) |
| 01/23/2025 | 63 | Motion to allow Joshua D. Dick to appear pro hac vice (Pro Hac fee $100 receipt number AMOWDC-9401977) filed by Thomas P. Schult on behalf of Chevron U.S.A., Inc.,. (Schult, Thomas) (Entered: 01/23/2025) |
| 01/24/2025 | 64 | Motion to allow Gregory J. DuBoff to appear pro hac vice (Pro Hac fee $100 receipt number AMOWDC-9402239) filed by Karrie J. Clinkinbeard on behalf of Eastman Chemical Company. (Clinkinbeard, Karrie) (Entered: 01/24/2025) |
| 01/24/2025 | 65 | ORDER granting 59 , 60 , 61 , 62 , 63 motion to appear pro hac vice entered by Clerk of Court. Attorney Bradley J. Hamburger, Christopher D. Dusseault, Perlette M. Jura, |

| | | |
|---|---|---|
| | | Theodore Joseph Boutrous, Jr. and Joshua D. Dick for Chevron U.S.A., Inc. allowed to appear pro hac vice. This entry will serve as authorization for the pro hac participation by the attorney.<br><br>Western District of Missouri Local Rule 5.1 requires documents to be filed electronically. If pro hac vice counsel has not already done so, counsel is directed to immediately register for a WDMO e-filing account for NextGen CM/ECF. This will enable counsel to electronically file documents and receive electronic notification of filings. Register for a WDMO e-filing account at PACER. This is a TEXT ONLY ENTRY. No document is attached. (Berner, Crystal) (Entered: 01/24/2025) |
| 01/24/2025 | 66 | ORDER granting 64 motion to appear pro hac vice entered by Clerk of Court. Attorney Gregory J. DuBoff for Eastman Chemical Company allowed to appear pro hac vice. This entry will serve as authorization for the pro hac participation by the attorney.<br><br>Western District of Missouri Local Rule 5.1 requires documents to be filed electronically. If pro hac vice counsel has not already done so, counsel is directed to immediately register for a WDMO e-filing account for NextGen CM/ECF. This will enable counsel to electronically file documents and receive electronic notification of filings. Register for a WDMO e-filing account at PACER. This is a TEXT ONLY ENTRY. No document is attached. (Berner, Crystal) (Entered: 01/24/2025) |
| 01/24/2025 | 67 | NOTICE of appearance by Tristan L. Duncan on behalf of Chevron Phillips Chemical Corporation (Duncan, Tristan) (Entered: 01/24/2025) |
| 01/24/2025 | 68 | DISCLOSURE OF CORPORATE INTERESTS of Chevron Phillips Chemical Company LP filed by Tristan L. Duncan on behalf of Defendant Chevron Phillips Chemical Corporation.(Duncan, Tristan) (Entered: 01/24/2025) |
| 01/24/2025 | 69 | Motion to allow Daniel B. Rogers to appear pro hac vice (Pro Hac fee $100 receipt number AMOWDC-9402962) filed by Tristan L. Duncan on behalf of Chevron Phillips Chemical Corporation. (Duncan, Tristan) (Entered: 01/24/2025) |
| 01/24/2025 | 70 | ORDER granting 69 motion to appear pro hac vice entered by Clerk of Court. Attorney Daniel B. Rogers for Chevron Phillips Chemical Corporation allowed to appear pro hac vice. This entry will serve as authorization for the pro hac participation by the attorney.<br><br>Western District of Missouri Local Rule 5.1 requires documents to be filed electronically. If pro hac vice counsel has not already done so, counsel is directed to immediately register for a WDMO e-filing account for NextGen CM/ECF. This will enable counsel to electronically file documents and receive electronic notification of filings. Register for a WDMO e-filing account at PACER. This is a TEXT ONLY ENTRY. No document is attached. (Berner, Crystal) (Entered: 01/24/2025) |
| 01/24/2025 | 71 | Motion to allow Jonathan N. Adair to appear pro hac vice (Pro Hac fee $100 receipt number AMOWDC-9404314) filed by Grace E. Martinez on behalf of Dow, Inc., Dow Chemical Company. (Martinez, Grace) (Entered: 01/24/2025) |
| 01/24/2025 | 72 | Motion to allow Nader R. Boulos to appear pro hac vice (Pro Hac fee $100 receipt number AMOWDC-9404366) filed by Grace E. Martinez on behalf of Dow, Inc., Dow Chemical Company. (Martinez, Grace) (Entered: 01/24/2025) |
| 01/24/2025 | 73 | Motion to allow Daniel E. Laytin to appear pro hac vice (Pro Hac fee $100 receipt number AMOWDC-9404406) filed by Grace E. Martinez on behalf of Dow, Inc., Dow Chemical Company. (Martinez, Grace) (Entered: 01/24/2025) |
| 01/27/2025 | 74 | ORDER granting 71 , 72 & 73 motion to appear pro hac vice entered by Clerk of Court. Attorney Jonathan N. Adair, Nader R. Boulos & Daniel E. Laytin for Dow Chemical |

| | | |
|---|---|---|
| | | Company & Dow, Inc. allowed to appear pro hac vice. This entry will serve as authorization for the pro hac participation by the attorney.<br><br>Western District of Missouri Local Rule 5.1 requires documents to be filed electronically. If pro hac vice counsel has not already done so, counsel is directed to immediately register for a WDMO e-filing account for NextGen CM/ECF. This will enable counsel to electronically file documents and receive electronic notification of filings. Register for a WDMO e-filing account at PACER. This is a TEXT ONLY ENTRY. No document is attached. (Berner, Crystal) (Entered: 01/27/2025) |
| 01/27/2025 | 75 | RULE 16 NOTICE. Proposed scheduling order due by 4/8/2025.<br><br>Scheduling Conference set for 4/22/2025 at 2:30 PM in Courtroom 7B, Kansas City (SRB) before District Judge Stephen R. Bough.<br><br>Signed on 1/27/2025 by District Judge Stephen R. Bough. (Peters, Tracey) (Entered: 01/27/2025) |
| 01/27/2025 | 76 | Motion to allow Richard C. Godfrey to appear pro hac vice (Pro Hac fee $100 receipt number AMOWDC-9407575) filed by Booker T Shaw on behalf of Celanese Corporation. (Shaw, Booker) (Entered: 01/27/2025) |
| 01/28/2025 | 77 | ORDER granting 76 motion to appear pro hac vice entered by Clerk of Court. Attorney Richard C. Godfrey for Celanese Corporation allowed to appear pro hac vice. This entry will serve as authorization for the pro hac participation by the attorney.<br><br>Western District of Missouri Local Rule 5.1 requires documents to be filed electronically. If pro hac vice counsel has not already done so, counsel is directed to immediately register for a WDMO e-filing account for NextGen CM/ECF. This will enable counsel to electronically file documents and receive electronic notification of filings. Register for a WDMO e-filing account at PACER. This is a TEXT ONLY ENTRY. No document is attached. (Berner, Crystal) (Entered: 01/28/2025) |
| 01/30/2025 | 78 | Motion to allow R. Allan Pixton to appear pro hac vice (Pro Hac fee $100 receipt number AMOWDC-9414558) filed by Booker T Shaw on behalf of Celanese Corporation. (Shaw, Booker) (Entered: 01/30/2025) |
| 01/30/2025 | 79 | ORDER granting 78 motion to appear pro hac vice entered by Clerk of Court. Attorney R. Allan Pixton for Celanese Corporation allowed to appear pro hac vice. This entry will serve as authorization for the pro hac participation by the attorney.<br><br>Western District of Missouri Local Rule 5.1 requires documents to be filed electronically. If pro hac vice counsel has not already done so, counsel is directed to immediately register for a WDMO e-filing account for NextGen CM/ECF. This will enable counsel to electronically file documents and receive electronic notification of filings. Register for a WDMO e-filing account at PACER. This is a TEXT ONLY ENTRY. No document is attached. (Lock, Tania) (Entered: 01/30/2025) |
| 01/31/2025 | | NOTICE of filing: Mediation and Assessment Program Reminder: Your Designation of Mediator is due soon (filed as an ADR event in CM/ECF). See Notice of Inclusion and MAP General Order for specifics. (ADI, MAP) (Entered: 01/31/2025) |
| 02/04/2025 | 80 | MOTION to intervene filed by Nicholas C Smith on behalf of State of Kansas Attorney General. Suggestions in opposition/response due by 2/18/2025 unless otherwise directed by the court. (Attachments: # 1 Supplement Suggestions in Support of Kansas's Motion for Limited Intervention, # 2 Exhibit Exhibit A to Motion for Limited Intervention, # 3 Exhibit Exhibit B to Motion for Limited Intervention)(Attorney Nicholas C Smith added |

**App. 172**

| | | to party State of Kansas Attorney General(pty:dft))(Smith, Nicholas) **Modified on 2/4/2025 at the request of counsel, documents removed from the formal to correct filing oversight.NEF regenerated to all parties.** (Kern, Kendra) (Entered: 02/04/2025) |
|---|---|---|
| 02/04/2025 | 81 | MOTION to intervene filed by Nicholas C Smith on behalf of State of Kansas Attorney General. Suggestions in opposition/response due by 2/18/2025 unless otherwise directed by the court. (Attachments: # 1 Supplement Suggestions in Support of Kansas's Motion for Limited Intervention, # 2 Exhibit Exhibit A to Kansas's Motion for Limited Intervention (Proposed Motion to Dismiss and Supporting Suggestions), # 3 Exhibit Exhibit B to Kansas's Motion for Limited Intervention (Proposed Motion to Exceed Page Limits for Motion to Dismiss Supporting Suggestions))(Smith, Nicholas) (Entered: 02/04/2025) |
| 02/05/2025 | 82 | SUGGESTIONS in opposition re 55 MOTION for reconsideration re 49 Order on Motion to Reassign/Transfer Case,, Order on Motion to Stay, filed by Isaac Diel on behalf of Plaintiffs Emily Thorpe, The Board of Commissioners of The County of Ford, Jennifer Tritt, Drew Scruggs, Mary Jane McQueeny, Billie Rodriguez, Daniel Erwin, Michael Ackerman, Kyle Foreman. Reply suggestions due by 2/19/2025 unless otherwise directed by the court. (Related document(s) 55 ) (Attorney Isaac Diel added to party Emily Thorpe(pty:pla), Attorney Isaac Diel added to party The Board of Commissioners of The County of Ford(pty:pla), Attorney Isaac Diel added to party Jennifer Tritt(pty:pla), Attorney Isaac Diel added to party Drew Scruggs(pty:pla), Attorney Isaac Diel added to party Mary Jane McQueeny(pty:pla), Attorney Isaac Diel added to party Billie Rodriguez(pty:pla), Attorney Isaac Diel added to party Daniel Erwin(pty:pla), Attorney Isaac Diel added to party Michael Ackerman(pty:pla), Attorney Isaac Diel added to party Kyle Foreman(pty:pla))(Diel, Isaac) (Entered: 02/05/2025) |
| 02/06/2025 | 83 | NOTICE of appearance by Adam Thomas Steinhilber on behalf of State of Kansas Attorney General (Attorney Adam Thomas Steinhilber added to party State of Kansas Attorney General(pty:dft))(Steinhilber, Adam) (Entered: 02/06/2025) |
| 02/06/2025 | 84 | NOTICE of appearance by Melanie Sue Jack on behalf of State of Kansas Attorney General (Attorney Melanie Sue Jack added to party State of Kansas Attorney General(pty:dft))(Jack, Melanie) (Entered: 02/06/2025) |
| 02/07/2025 | 85 | Before the Court is Intervenor State of Kansas, ex rel. Kris W. Kobach, Attorney General's ("Kansas AG") Motion to for Limited Intervention. (Doc. # 81 .) Upon review, the motion is GRANTED. Kansas AG may intervene under Federal Rule of Civil Procedure 24(a)(2) and is ORDERED to file its proposed motions separately to be considered by the Court. Signed on 2/7/2025 by District Judge Stephen R. Bough. This is a TEXT ONLY ENTRY. No document is attached. (Peters, Tracey) (Entered: 02/07/2025) |
| 02/07/2025 | 86 | MOTION to clarify filed by Rex A Sharp on behalf of All Plaintiffs. Suggestions in opposition/response due by 2/21/2025 unless otherwise directed by the court. (Sharp, Rex) (Entered: 02/07/2025) |
| 02/07/2025 | 87 | RETURN OF SERVICE of complaint executed by All Plaintiffs. Lyondellbasell Industries, N.V. served on 2/4/2025, answer due 3/10/2025. (Sharp, Rex) (Entered: 02/07/2025) |
| 02/07/2025 | 88 | MOTION for leave to file excess pages filed by Nicholas C Smith on behalf of State of Kansas Attorney General. Suggestions in opposition/response due by 2/21/2025 unless otherwise directed by the court. (Smith, Nicholas) (Entered: 02/07/2025) |

| 02/07/2025 | 89 | SUGGESTIONS in opposition re 86 MOTION to clarify *Defendants' Opposition to Plaintiffs' Motion to Clarify* filed by Thomas P. Schult on behalf of Defendant Chevron U.S.A., Inc.,. Reply suggestions due by 2/21/2025 unless otherwise directed by the court. (Related document(s) 86 ) (Schult, Thomas) (Entered: 02/07/2025) |
|---|---|---|
| 02/10/2025 | 90 | REPLY SUGGESTIONS to motion re 55 MOTION for reconsideration re 49 Order on Motion to Reassign/Transfer Case,, Order on Motion to Stay, filed by Richard N Bien on behalf of Defendant Exxon Mobil Corporation. (Related document(s) 55 ) (Bien, Richard) (Entered: 02/10/2025) |
| 02/10/2025 | 91 | NOTICE of appearance by Jeffrey Daniel Morris on behalf of Chevron U.S.A., Inc., (Attorney Jeffrey Daniel Morris added to party Chevron U.S.A., Inc.,(pty:dft))(Morris, Jeffrey) (Entered: 02/10/2025) |
| 02/10/2025 | 92 | Before the Court is Defendant Exxon Mobil Corporation's Motion for Reconsideration. (Doc. # 55 .) To support a motion for reconsideration for an interlocutory order, a moving party must demonstrate "(1) that it did not have a fair opportunity to argue the matter previously, and (2) that granting the motion is necessary to correct a significant error." *Provisur Techs., Inc. v. Weber, Inc.*, No. 19-CV-06021-SRB, 2022 WL 22883433, at *1 (W.D. Mo. Aug. 18, 2022) (internal citations omitted). However, the Court "has an interest in judicial economy and ensuring respect for the finality of its decisions, values that would be undermined if it were to routinely reconsider its interlocutory orders." *Disc. Tobacco Warehouse, Inc. v. Briggs Tobacco & Specialty Co.*, No. 3:09-CV-05078-DGK, 2010 WL 3522476, at *1 (W.D. Mo. Sept. 2, 2010). Therefore, a "district court has wide discretion over whether to grant a motion for reconsideration of a prior order[.]" *SPV-LS, LLC v. Transamerica Life Ins. Co.*, 912 F.3d 1106, 1111 (8th Cir. 2019). Upon review, the motion has been duly considered and is DENIED. Signed on 2/10/2025 by District Judge Stephen R. Bough. This is a TEXT ONLY ENTRY. No document is attached. (Peters, Tracey) (Entered: 02/10/2025) |
| 02/11/2025 | 93 | Motion to allow Drew Cleary Jordan to appear pro hac vice (Pro Hac fee $100 receipt number AMOWDC-9433624) filed by Kara Trouslot Stubbs on behalf of Dupont de Nemours, Inc.. (Stubbs, Kara) (Entered: 02/11/2025) |
| 02/11/2025 | 94 | ORDER granting 93 motion to appear pro hac vice entered by Clerk of Court. Attorney Drew C. Jordan for Dupont de Nemours, Inc. allowed to appear pro hac vice. This entry will serve as authorization for the pro hac participation by the attorney.<br><br>Western District of Missouri Local Rule 5.1 requires documents to be filed electronically. If pro hac vice counsel has not already done so, counsel is directed to immediately register for a WDMO e-filing account for NextGen CM/ECF. This will enable counsel to electronically file documents and receive electronic notification of filings. Register for a WDMO e-filing account at PACER. This is a TEXT ONLY ENTRY. No document is attached. (Berner, Crystal) (Entered: 02/11/2025) |
| 02/12/2025 | 95 | Before the Court is Plaintiff's Motion to Clarify. (Doc. # 86 .) Upon review, the motion is DENIED. The Court's grant of intervention to Kansas AG does not disturb or change the Court's previous January 23, 2025, Order on briefing schedules and page limitations to the remaining Defendants. However, Defendant the State of Kansas Attorney General ("Kansas AG") may file its Motion to Dismiss separately due to its unique interests. Kansas AG shall file its separate Motion to Dismiss by March 10, 2025. Additionally, Kansas AG's Motion to Exceed Page Limitations for Kansas AG's Supporting Suggestions for Motion to Dismiss (Doc. # 88 ) is DENIED. Kansas AG shall abide by Local Rule 7.0(d)(1)(A) and limit its supporting suggestions to fifteen (15) pages. Signed on 2/12/2025 by District Judge Stephen R. Bough. This is a TEXT ONLY ENTRY. No document is attached. (Peters, Tracey) (Entered: 02/12/2025) |

**App. 174**

| 02/21/2025 | 96 | NOTICE of appearance by G. Edgar James on behalf of Lyondellbasell Industries, N.V. (Attorney G. Edgar James added to party Lyondellbasell Industries, N.V.(pty:dft))(James, G.) (Entered: 02/21/2025) |
| 02/21/2025 | 97 | NOTICE of appearance by James M. Humphrey on behalf of Lyondellbasell Industries, N.V. (Attorney James M. Humphrey added to party Lyondellbasell Industries, N.V. (pty:dft))(Humphrey, James) (Entered: 02/21/2025) |
| 02/21/2025 | 98 | RESPONSE to motion *Joinder to Consent Motion* filed by G. Edgar James on behalf of Defendant Lyondellbasell Industries, N.V.. Reply suggestions due by 3/7/2025 unless otherwise directed by the court. (James, G.) (Entered: 02/21/2025) |
| 02/21/2025 | 99 | DISCLOSURE OF CORPORATE INTERESTS filed by G. Edgar James on behalf of Defendant Lyondellbasell Industries, N.V..(James, G.) (Entered: 02/21/2025) |
| 02/21/2025 | 100 | Motion to allow David C. Kiernan to appear pro hac vice (Pro Hac fee $100 receipt number AMOWDC-9449129) filed by G. Edgar James on behalf of Lyondellbasell Industries, N.V.. (James, G.) (Entered: 02/21/2025) |
| 02/21/2025 | 101 | Motion to allow Emily F. Knox to appear pro hac vice (Pro Hac fee $100 receipt number AMOWDC-9449141) filed by G. Edgar James on behalf of Lyondellbasell Industries, N.V.. (James, G.) (Entered: 02/21/2025) |
| 02/21/2025 | 102 | Motion to allow J. Bruce McDonald to appear pro hac vice (Pro Hac fee $100 receipt number AMOWDC-9449145) filed by G. Edgar James on behalf of Lyondellbasell Industries, N.V.. (James, G.) (Entered: 02/21/2025) |
| 02/21/2025 | 103 | Motion to allow Nicole M. Perry to appear pro hac vice (Pro Hac fee $100 receipt number AMOWDC-9449148) filed by G. Edgar James on behalf of Lyondellbasell Industries, N.V.. (James, G.) (Entered: 02/21/2025) |
| 02/21/2025 | 104 | Motion to allow Andrew M. Ryngaert to appear pro hac vice (Pro Hac fee $100 receipt number AMOWDC-9449151) filed by G. Edgar James on behalf of Lyondellbasell Industries, N.V.. (James, G.) (Entered: 02/21/2025) |
| 02/21/2025 | 105 | Motion to allow Craig E. Stewart to appear pro hac vice (Pro Hac fee $100 receipt number AMOWDC-9449164) filed by G. Edgar James on behalf of Lyondellbasell Industries, N.V.. (James, G.) (Entered: 02/21/2025) |

| **PACER Service Center** | | |
|---|---|---|
| **Transaction Receipt** | | |
| 02/22/2025 09:39:36 | | |
| **PACER Login:** | biratusi | **Client Code:** | 44297.0114-7716 |
| **Description:** | Docket Report | **Search Criteria:** | 4:24-cv-00803-SRB |
| **Billable Pages:** | 20 | **Cost:** | 2.00 |

**App. 175**

# Exhibit 7

BILLIE RODRIGUEZ, DANIEL ERWIN,
MICHAEL B. ACKERMAN, and KYLE
FOREMAN, individually and on behalf of all
others similarly situated,

          Plaintiffs,

     v.

EXXON MOBIL CORPORATION, CHEVRON
USA INC., CHEVRON PHILLIPS CHEMICAL
CORPORATION, DUPONT de NEMOURS,
INC., DUPONT CORPORATION, CELANESE
CORPORATION, DOW INC., DOW
CHEMICAL COMPANY, EASTMAN
CHEMICAL COMPANY, LYONDELLBASELL
INDUSTRIES N.V., and AMERICAN
CHEMISTRY COUNCIL,

          Defendants.

Case No. 4:24-cv-00803-SRB

## SUGGESTIONS IN SUPPORT OF SPECIALLY APPEARING DEFENDANT[1] EXXON MOBIL CORPORATION'S MOTION TO TRANSFER VENUE

This case (*Rodriguez*) is the second of two putative class action lawsuits filed against identical defendants concerning defendants' plastic production and the recyclability of plastics. Nineteen days before filing *Rodriguez*, Plaintiffs' counsel filed *Ford County*[2], in the District of Kansas, an action on behalf of a smaller putative class of

---

[1] Exxon Mobil Corporation specially appears only to contest venue via the first-filed rule. By filing this motion, ExxonMobil does not concede jurisdiction is proper in the District of Kansas or the Western District of Missouri, and the instant motion does not prevent ExxonMobil from subsequently filing 12(b) motions in either forum, including but not limited to motions challenging personal jurisdiction under 12(b)(2). ExxonMobil explicitly preserves all defenses under Rule 12(b) and intends to file such motions after the appropriate forum is determined. *See* Fed. R. Civ. P. 12(h)(1). *Lewis & Clark Reg. Water Sys., Inc. v. Carstensen Contracting, Inc.,* 355 F. Supp. 3d 880 (D.S.D. Dec. 31, 2018); *Dekalb Genetics Corp. v. Syngenta Seeds, Inc.,* No. 4:06CV01191-ERW, 2007 WL 1223510, at *5 (E.D. Mo. Apr. 24, 2007).

[2] The *Ford County* lawsuit is *Ford County, Kansas v. Exxon Mobil Corp., et al.,* Case No. 2:24-cv-02547, filed November 27, 2024 in the District of Kansas. The complaint in that case is attached as Exhibit 1 and the class allegations are contained in paragraphs 152-161.

plaintiffs all included in the proposed *Rodriguez* classes. The *Rodriguez* and *Ford County* lawsuits are based on virtually identical averments of fact.[3] For the reasons set forth below, Defendant Exxon Mobil Corporation ("ExxonMobil") specially appears (see footnote 1) to move this Court to transfer *Rodriguez* to the District of Kansas where the first-filed *Ford County* is pending.

## I. Relevant Facts

### A. *Ford County* litigation

Plaintiffs' counsel, Sharp Law, LLP, filed the *Ford County* lawsuit on November 27, 2024, in the United States District Court for the District of Kansas[4] on behalf of a putative class of all Kansas counties. (Ex. 1, ¶ 146). *Ford County* asserts a Kansas state law claim for public nuisance. (*Id.*, ¶¶ 154–65). Specifically, *Ford County* asserts that Defendants have "deceptively advertis[ed] and market[ed] that plastics were recyclable when in reality less than 10% of Plastics are recycled." (*Id.,* ¶ 157).

Plaintiff in *Ford County* seeks "an injunction to enjoin Defendants from engaging in the deceptive, unfair, unconscionable, and unlawful business practices alleged," court-ordered abatement of the "nuisance," and compensatory, treble, and punitive damages. (*Id.* at p. 45).

### B. *Rodriguez*

Nineteen days after filing *Ford County*, Plaintiffs' counsel, in this Court, filed *Rodriguez,* a second putative class action. The defendants in *Rodriguez* include the *Ford County* defendants; *Rodriguez* seeks to certify both "nationwide" and "state law" classes,

---

[3] *Compare* Plaintiffs' Class Action Complaint [Doc. 1] *with* Exhibit 1.
[4] The *Ford County* plaintiff has designated Kansas City, Kansas as the place of trial. Notice of Designation of Place of Trial, *Ford County, Kansas*, Case No. 2:24-cv-02547 (D. Kan. Nov. 27, 2024).

2

both of which would, by their proposed definitions, include "entities" such as the Kansas counties that constitute the putative *Ford County* class. (*See* Doc. 1, ¶¶ 153–61).

*Rodriguez* seeks "an injunction to enjoin Defendants from engaging in the deceptive, unfair, unconscionable, and unlawful business practices alleged," and compensatory and treble damages. (Doc. 1, p. 91).

### C.    Near-identical complaints

The respective complaints in the instant matter and *Ford County* demonstrate that these two lawsuits are based on identical or nearly identical facts in competing forums. *Rodriguez* asserts additional legal theories, but the suit is based on the same fact averments alleged in *Ford County*. For example, the text of the complaints' opening paragraphs are nearly identical:[5]



**CLASS ACTION COMPLAINT**

~~Plaintiff Ford County, Kansas files~~Plaintiffs Billie Rodriguez, Daniel Erwin, Michael B. Ackerman, and Kyle Foreman file this Class Action Complaint, individually and on behalf of all others similarly situated, against the named Defendants, seeking relief to remedy the harms caused by Defendants' coordinated negligent and/or ~~intentional~~fraudulent representations regarding the recyclability of plastics, which led to the production and purchase of more plastics than otherwise would have occurred. These ~~representations~~joint misrepresentations have led to higher plastic prices than otherwise would have occurred in a competitive market and massive sanitation problems for county and city governments and their landfills. Plaintiffs' allegations are based on personal knowledge as to Plaintiffs' own conduct and investigation of counsel based on publicly available information ~~as to all other allegations~~.

---

[5]The paragraph inserted is a comparison of the *Ford County* Complaint opening paragraph compared to

3

Both matters assert factual allegations concerning:

- Types of plastics and their uses;
- Recycling challenges associated with plastics, including recycling rates, and technological and economical limitations;
- A historical analysis of the plastics industry, including specific discussion of the 1950s-1970s, the 1980s, and the 1990s to present;
- Environmental Impacts of plastics, including plastic pollution and microplastics; and
- Efforts by plastic industry participants, trade associations, and alleged misinformation campaigns.

Even a cursory review of the two complaints shows that they are nearly identical with many paragraphs repeated nearly verbatim. Further, use of a Compare Write tool shows the two complaint fact averments are largely identical. The distinctions between the factual averments are minor: the order of some averments was changed though the content remains the same and some adjectives and modifiers were changed though the content remains the same. Finally, the respective complaints are estimated to be approximately 95% identical based on an analysis of the factual averments (paragraphs 26–147 of the *Rodriguez* complaint and paragraphs 23–139 of the *Ford County* complaint).[6]

Despite asserting different causes of action, all the *Rodriguez* and *Ford County* legal claims stem from the same theory of alleged liability—that:

Defendants' false representations regarding the recyclability of plastics led to increased production of plastic products, increased demand for plastics products, increased prices for plastic products and corresponding issues

---

the *Rodriguez* Complaint opening paragraph.

[6] This analysis was conducted using Microsoft CoPilot, an artificial intelligence tool, to compare against each other the fact averment paragraphs of the respective complaints. In a recent study, this tool "exhibited the highest accuracy rate compared to ChatGPT-3.5 and Gemini" in interpreting biochemical laboratory data. Ahmed Naseer Kaftan et al., *Response accuracy of ChatGPT 3.5 Copilot and Gemini in interpreting biochemical laboratory data a pilot study*, *Sci. Rep.* 14, 8233 (2024), *available at* https://doi.org/10.1038/s41598-024-58964-1 (last accessed Dec. 20, 2024).

4

**App. 180**

with the remediation of plastic waste, all of which have harmed [Plaintiffs].

(*See* Doc. 1, ¶ 2; Ex. 1, ¶ 2).

## II.    Argument

### A.    The "first-filed" rule requires transfer of this case to Kansas.

#### i.    The "first-filed" rule applies here because *Rodriguez* and *Ford County* substantially overlap.

"[T]he doctrine of federal comity permits a court to decline jurisdiction over an action when a complaint involving the same parties and issues has already been filed in another district." *Orthmann v. Apple River Campground, Inc.*, 765 F.2d 119, 121 (8th Cir. 1985) (citing *Pacesetter Systems, Inc. v. Medtronic, Inc.*, 678 F.2d 93, 94–95 (9th Cir.1982)). This doctrine is known as the "first-filed" rule. "The purpose of this rule is to promote efficient use of judicial resources. The rule is not intended to be rigid, mechanical, or inflexible, but should be applied in a manner serving sound judicial administration." *Id.* It is the date a suit is filed, not the date a suit is served, that determines chronological precedence for the first-filed rule. *Gray Mfg. Co., Inc v. Vehicle Serv. Grp.*, LLC, No. 18-06001-CV-SJ-GAF, 2018 WL 11411258, at *2 n.3 (W.D. Mo. June 5, 2018).

Application of the first-filed rule does not require that the parties, putative classes, or claims in both cases be identical. They only "must be so related that there is substantial overlap between the cases regarding the issues raised." *Id.* at *2. As Chief Judge Phillips noted, "'[i]n the putative class context, requiring an exact identity among the parties and claims would make it so the first-filed rule would never apply, undercutting its purpose of judicial efficiency.'" *Evans v. J.P. Morgan Chase Bank, N.A*., No. 13-00686-CV-W-BP, 2014 WL 12600285, at *1 (W.D. Mo. Feb. 12, 2014) (quoting *Worthington v. Bayer Healthcare*, *LLC*, 2012 WL 1079716, *4 n.3 (D.N.J. Mar. 30, 2012)).

5

Here, "substantial overlap between the cases" supports transfer. The facts alleged in *Ford County* and *Rodriguez* are virtually identical. (*See supra*, Section I.C). Both cases assert that the same defendants engaged in the same deceptive advertising and business practices concerning the recyclability of plastics, which resulted in alleged damages to coterminous groups of Plaintiffs.[7] Given the similarity of the facts, same defendants, overlapping classes, and identical theory of liability supporting both petitions, transfer under the first-filed doctrine is appropriate despite the differing legal claims in both complaints. When, as here, there is substantial overlap between the cases, transfer of the second-filed case (*Rodriguez*) to the district where the first-filed case (*Ford County*) is pending is legally correct. *Painter v. L'Oreal USA, Inc.*, No. 6:24-CV-03077-MDH, 2024 WL 4774904, at *3 (W.D. Mo. Nov. 13, 2024).

In *Painter*, which was decided last month, this District Court applied the first-filed rule to transfer a second-filed putative class action to the district of a first-filed putative class action. In *Painter*, Judge Harpool applied the first-filed rule to transfer to the District of Hawaii a putative class action asserting Missouri state law claims, where a parallel class action was previously filed. *Id*. at *3. This District has also applied the rule to transfer non-class litigation to the district where an earlier-filed parallel class action was underway. *See Evans v. J.P. Morgan Chase Bank, N.A*., No. 13-00686-CV-W-BP, 2014 WL 12600285, at *1 (W.D. Mo. Feb. 12, 2014) (transferring case asserting Missouri citizens' ERISA claims to the Southern District of New York, where a putative class action that could include Plaintiffs was underway).

---

[7] The *Rodriguez* putative classes by definition contain all the members of the *Ford County* putative class. *See supra*, Section I.B.

6

### ii. The first-filed rule requires the District of Kansas to resolve any questions of jurisdiction.

The first-filed rule determines which of two federal courts will resolve the issues in parallel cases, "including, if necessary, whether personal jurisdiction exists." *Advanced Physical Therapy, LLC v. Apex Physical Therapy*, LLC, No. 17-3149-CV-S-BP, 2017 WL 9717215, at *2 (W.D. Mo. July 6, 2017). "The first-filed rule dictates not only which forum is appropriate, but also which forum should decide which forum is appropriate." *Painter,* 2024 WL 4774904, at *3.

The *Ford County* Plaintiff has asserted that the District of Kansas has jurisdiction over ExxonMobil. ExxonMobil does not concede that the District of Kansas has jurisdiction over ExxonMobil, and specifically reserves the right to challenge jurisdiction in the District of Kansas, just as it reserves the right to challenge personal jurisdiction in the Western District of Missouri.[8] Regardless, under the first-filed rule, it is the District of Kansas, not the Western District of Missouri, that must decide the jurisdictional issues. See *Cadle Co. v. Whataburger of Alice, Inc.*, 174 F.3d 599, 604 (5th Cir. 1999) ("Because the second-filed court is not binding the litigants before it to a ruling of the first, there is no reason to examine the jurisdiction of the first-filed court."); *Advanced Physical Therapy*, 2017 WL 9717215, at *2; *Johnson v. Pfizer, Inc.*, No. 04–1178, 2004 WL 2898076, at *2 (D.Kan.2004) (explaining that "any jurisdictional defects, or objections to venue would be decided by" the first-filed court.).

### iii. No exceptions to the first-filed rule apply.

Missouri federal courts recognize two exceptions to the first-filed rule: "(1) [the]

---

[8] *Dekalb Genetics*, 2007 WL 1223510, at *4–5 (under Rule 12(h), motion to transfer does not waive a defendant's ability to raise subsequent 12(b) defenses).

balance of convenience; and (2) compelling circumstances." *Painter*, 2024 WL 4774904, at *2; *see also Monsanto Tech. LLC v. Syngenta Crop Prot., Inc.*, 212 F. Supp. 2d 1101, 1102 (E.D. Mo. 2002). Other considerations include "inequitable conduct, bad faith, or forum shopping." *Baatz v. Columbia Gas Transmission, LLC*, 814 F.3d 785, 792 (6th Cir. 2016 (quoting *E.E.O.C. v. Univ. of Pennsylvania*, 850 F.2d 969, 972 (3d Cir. 1988)).). "[D]eviations from the rule should be the exception, rather than the norm." *Id.* No exceptional circumstances warrant departure from the first-filed rule in this case.

### a. The Western District of Missouri is less, not more, convenient.

First, the balance of convenience does not prevent application of the first-filed rule; the proposed transfer is simply across the river from Missouri to Kansas. The Western District has no significant ties to the parties, evidence, or alleged events that would render it more convenient than the District of Kansas. Thus, the inefficiencies of litigating parallel cases in separate jurisdictions make the Western District of Missouri less convenient than the District of Kansas.

The Western District has no superior ties to the parties. Plaintiffs in the *Rodriguez* matter include residents of Missouri, Kansas, California, and Florida. (Doc. 1, ¶¶ 12–15). The Western District of Missouri may be a nominally more convenient forum for Plaintiff Billie Rodriguez, who is alleged to be a resident of Missouri, but the Complaint also names Daniel Erwin, who is alleged to be a resident of Kansas, as a Plaintiff. (*Id.*) On information and belief, none of the remaining Plaintiffs nor the Defendants are domiciled in Kansas or Missouri, and thus they would all likely have to travel to the Kansas City Metropolitan Area in either forum.

Further, Missouri law is not uniquely dispositive or applicable as to the vast majority

8

of the *Rodriguez* causes of action. In fact, only Count 7 (of 45) is specifically based on Missouri substantive law. The District of Kansas, which already has the same factual allegations pending in *Ford County*, is as equipped to evaluate a Missouri cause of action among thirty-five other state claims as the Western District of Missouri is to evaluate a Kansas cause of action among those same thirty-five state claims. (*Id*. ¶¶ 176–292).

Finally, Plaintiffs allege "a national crisis affecting citizens (and children) in all 50 states," (*Id*., ¶ 7), with Plaintiffs having purchased plastic products in Missouri, Kansas, California, New York, and Florida. (*Id.*, ¶¶ 12-15.) The putative nationwide and state classes include "[a]ll persons or entities in the United States and its territories who indirectly purchased plastics for end use . . . ," (*id.*, ¶ 153), as well as "[a]ll persons or entities in the Indirect Purchaser states who indirectly purchased plastics for end use . . . ." (*Id.*, ¶ 154 (footnote omitted)). As a result, there is no significant difference between the Westen District of Missouri and the District of Kansas with respect to the factual averments at issue.

In contrast, there are clear efficiencies to be had from dealing with a single court, but Defendants will be deprived of these efficiencies if forced to duplicate their efforts across multiple courts. *See Battenfeld Techs., Inc. v. Birchwood Lab'ys, Inc.*, No. 2:10-CV-04224-NKL, 2011 WL 1131101, at *3 (W.D. Mo. Mar. 28, 2011) (the "inefficiencies of litigating overlapping disputes in two different venues at the same time" would "lead to unnecessary expenses to the parties, the witnesses, and the taxpayer-funded federal courts."); *Larsen v. Pioneer Hi-Bred Int'l, Inc.*, No. 4:06-CV-0077-JAJ, 2007 WL 3341698, at *11 (S.D. Iowa Nov. 9, 2007) (granting motion to transfer in part because defendant would "be forced to proceed in two districts and incur duplicative litigation costs.").

Accordingly, the balance of convenience weighs in favor of transfer to the District of Kansas.

> **b.    The compelling circumstances here weigh in favor of, rather than against, transfer.**

Courts sometimes invoke "compelling circumstances" to decline to transfer a second-filed case. "Compelling circumstances" involve, for example, race-to-the-courthouse situations where a defendant races to a friendlier jurisdiction to file a declaratory judgment suit to head off anticipated litigation by a plaintiff. *Painter*, 2024 WL 4774904, at *2. Such is not the case here—the first-filed suit was filed by the same Plaintiffs' counsel on behalf of putative class members of both the first and second-filed suits. This is no race to the courthouse. Instead, parity between the actions, alleged fact averments, and classes may actually suggest judge- or forum-shopping. *Miles v. Ill. Cent. R. Co.*, 315 U.S. 698, 706–07 (1942) (Jackson, J., concurring) (noting that plaintiffs should not be entitled to go shopping for a judge or jury); *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1088 n.22 (6th Cir. 1996) (noting the Sixth Circuit was "troubled by the appearance of the same counsel in the several pending class actions, which raises an obvious concern that counsel may be forum-shopping.").

Accordingly, in keeping with the first-filed rule and "the doctrine of federal comity", *Orthmann,* 765 F.3d at 121, the Court should transfer this matter to the District of Kansas, where Plaintiffs' counsel chose to first file *Ford County*.

## III.    Conclusion

Federal courts maintain strong policies in favor of judicial efficiency and opposed to forum shopping. Transfer of this second putative class action to the district where the first putative class action remains pending satisfies both these policies and complies with

**App. 186**

the first-filed rule. Specially appearing Defendant ExxonMobil therefore respectfully requests that this Court transfer this matter to the District of Kansas.

Dated: December 22, 2024                    Respectfully submitted,


                                            **LATHROP GPM LLP**

                                            By:  */s/ Richard N. Bien*
                                                Richard N. Bien    (MO #31398)
                                                William F. Ford    (MO #35116)
                                                Emma C. Halling    (MO #75986)
                                                Grant A. Harse    (KS #001043)
                                                Brody Sabor    (MO #73421)
                                                2345 Grand Boulevard, Suite 2200
                                                Kansas City, Missouri 64108
                                                Telephone: (816) 292-2000
                                                Telecopier: (816) 292-2001
                                                richard.bien@lathropgpm.com
                                                bill.ford@lathropgpm.com
                                                emma.halling@lathropgpm.com
                                                grant.harse@lathropgpm.com
                                                brody.sabor@lathropgpm.com

                                                -AND-

                                                David J. Lender
                                                (Pro Hac Vice to be filed)
                                                WEIL, GOTSHAL & MANGES LLP
                                                767 Fifth Avenue
                                                New York, New York 10153
                                                Telephone: (212) 310-8000
                                                Telecopier: (212) 310-8007
                                                david.lender@weil.com

11

David R. Singh
(Pro Hac Vice to be filed)
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, California 94065
Telephone: (650) 802-3000
Telecopier: (650) 802-3100
david.singh@weil.com

*Attorneys for Exxon Mobil Corporation*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on December 22, 2024, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to counsel of record.

*/s/ Richard N. Bien*
Richard N. Bien
*An Attorney for Exxon Mobil Corporation*

12

# Exhibit 8

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MISSOURI

BILLIE RODRIQUEZ, et al

      Plaintiffs,

v.

EXXON MOBIL CORPORATION, et al

      Defendants.

Case No. 4:24-cv-00803-SRB

## PLAINTIFFS' NOTICE IN RESPONSE TO EXXON MOBIL'S MOTION TO TRANSFER AND MOTION TO STAY PROCEEDINGS

Plaintiffs come now to address Exxon Mobil Corporation's Motion to Transfer Venue and Motion to Stay Proceedings. Both Motions are now moot, and in support of this, Plaintiffs state:

1. On December 22, 2024, Defendant Exxon Mobil Corporation[1] filed both a Motion to Transfer Venue [ECF 3] and Suggestions in Support [ECF 4], and a Motion to Stay Proceedings with accompanying Suggestions in Support [ECF 5]. Through stipulation, the deadline for Plaintiffs' Response to these Motions is January 17, 2025. ECF 11, 12.

2. The basis for these Motions was the filing of a similar putative class action, against the same Defendants, with the same allegations, on behalf of Plaintiff Ford County in the District of Kansas, *Ford County, Kansas v. Exxon Mobil Corp., et al*., Case No. 2:24-cv-02547. Defendant Exxon alleges "virtually identical averments of fact" between the instant case and *Ford County*. ECF 4 at 3.

---

[1] Defendant ExxonMobil's attempt to "specially appear" while preserving Rule 12(b) defenses is inconsistent with well-established principles of federal civil procedure. Filing any motion, including a motion to stay or transfer venue, constitutes consent to the Court's jurisdiction and effectively waives any objections based on personal jurisdiction or improper venue. See *Insurance Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 704 (1982) (holding that personal jurisdiction objections can be waived through conduct indicating consent to the court's authority). ExxonMobil's filing of motions in this case, including its Motion to Transfer and Motion to Stay Proceedings, constitutes an invocation of the Court's authority and renders its purported "special appearance" meaningless.

3.      Upon consideration of Defendant Exxon Mobil's arguments regarding the overlap of allegations and parties to the two cases, and for purposes of judicial efficiency and economies, Plaintiffs, as masters of their own Complaint, voluntarily dismissed *Ford County* in the District of Kansas. *See* 24-cv-2547, ECF 4 (attached as **Exhibit 1**).

4.      Because the instant case is now brought on behalf of several Missouri residents—including additional plaintiffs added as part of the forthcoming First Amended Complaint—the lawsuit is best situated in the Western District of Missouri to be litigated in a single case, together, by the Consumer Plaintiffs and the governmental entity Plaintiff, Ford County. This will allow all parties to save time and judicial resources and streamline discovery in the appropriate jurisdiction.

5.      As such, an Amended Complaint on behalf of the Consumer Plaintiffs and Ford County is forthcoming on the docket, and Defendant Exxon Mobil Corporation's Motions to Transfer and Stay are now moot and require no further response.

Dated: January 17, 2025.

Respectfully submitted,

/s/ Rex A. Sharp
Rex A. Sharp, MO #51205
Isaac L. Diel, MO #39503
W. Greg Wright, MO #49545
Sarah T. Bradshaw, MO #66276
Hammons P. Hepner, MO #77258
SHARP LAW, LLP
4820 W. 75th Street
Prairie Village, KS 66208
(913) 901-0505
(913) 261-7564 Fax
rsharp@midwest-law.com
idiel@midwest-law.com
gwright@midwest-law.com
sbradshaw@midwest-law.com
hhepner@midwest-law.com

--and--
Dave Rebein, KS #10476
REBEIN BROTHERS, PA
1715 Central Ave.
Dodge City, KS 67801
Tel: (620) 227-08126

--and--

Glenn I. Kerbs, KS #09754
Samantha F. Sweley, KS #26833
KERBS LAW OFFICE, LLC
1715 Central Ave.
Dodge City, KS 67801
Tel: (620) 255-0238
gkerbs@kerbslaw.com
ssweley@kerbslaw.com

*Attorneys for Plaintiffs*
*and the Proposed Class*

3

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on January 17, 2025, I caused to be electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

*/s/ Rex A. Sharp*
Rex A. Sharp

# Exhibit 9

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF MISSOURI**

| | |
|---|---|
| BILLIE RODRIGUEZ, DANIEL ERWIN, MICHAEL B. ACKERMAN, KYLE FOREMAN, DREW SCRUGGS, MARY JANE MCQUEENY, EMILY THORPE, JENNIFER TRITT and THE BOARD OF COUNTY COMMISSIONERS OF THE COUNTY OF FORD, individually and on behalf of all others similarly situated, | |
| Plaintiffs, | Case No. 4:24-cv-00803-SRB |
| v. | |
| EXXON MOBIL CORPORATION, CHEVRON USA INC., CHEVRON PHILLIPS CHEMICAL CORPORATION, DUPONT de NEMOURS, INC., DUPONT CORPORATION, CELANESE CORPORATION, DOW INC., DOW CHEMICAL COMPANY, EASTMAN CHEMICAL COMPANY, LYONDELLBASELL INDUSTRIES N.V., and AMERICAN CHEMISTRY COUNCIL, | CLASS ACTION JURY TRIAL DEMANDED |
| Defendants. | |

## FIRST AMENDED CLASS ACTION COMPLAINT

App. 195

**TABLE OF CONTENTS**

I.     INTRODUCTION ................................................................................................1

II.    JURISDICTION AND VENUE ..........................................................................3

III.   PARTIES ............................................................................................................4

IV.   FACTUAL ALLEGATIONS ..............................................................................8

      A.     Background of the Plastic Product Industry ...........................................8

      B.     Most plastics cannot be recycled, causing the plastic waste and pollution crisis. ...9

      C.     Defendants knew that their promotion and production of plastic products for a throw-away lifestyle created a solid-waste crisis without a solution....................13

            i.     1950s: The plastics industry touted plastics' supposed disposability.........13

            ii.    Late 1960s into 1970s: Landfills and burning were the plastic industry's "solution" to the growing pollution problem. ............................................15

            iii.   1980s: After receiving backlash for their earlier "solutions," the plastics industry encouraged recycling of plastics....................................................18

            iv.   Late 1980s to Mid-1990s: The plastics industry continued its recyclability campaign using trade groups to spread the message. ................................22

            v.    Mid-1990s to 2010s: The plastics industry successfully curbed pressure to create more recyclable plastics, yet recycling continued to prove to be an ineffective method to combat plastic pollution and waste.........................36

            vi.   Today: The plastics industry's aggressive misinformation campaign continues to deceive consumers..............................................................41

V.     TOLLING OF THE STATUTE OF LIMITATIONS.........................................43

      A.     Discovery-Rule Tolling ........................................................................43

      B.     Fraudulent-Concealment Tolling ..........................................................44

VI.   CLASS ACTION ALLEGATIONS ..................................................................44

VII.  ANTITRUST INJURY .....................................................................................48

VIII.   RELEVANT MARKET.................................................................................................49

IX.     CLAIMS FOR RELIEF ..............................................................................................49

A.      VIOLATIONS OF THE SHERMAN ACT...................................................................49

B.      VIOLATIONS OF PUBLIC NUISANCE LAWS ...........................................................50

C.      VIOLATIONS OF STATE CONSUMER PROTECTION LAWS .................................52

D.      VIOLATIONS OF STATE ANTITRUST LAWS ............................................................68

DEMAND FOR JURY TRIAL ...............................................................................................92

PRAYER FOR RELIEF ...........................................................................................................92

Case 4:24-cv-00803-SRB    Document 48    Filed 01/17/25    Page 3 of 98

App. 197

Plaintiffs individually and on behalf of all others similarly situated, file this First Amended Class Action Complaint against the named Defendants, seeking relief to remedy the harms caused by Defendants' coordinated negligent and/or fraudulent representations regarding the recyclability of plastics which led to the production and purchase of more plastics than otherwise would have occurred. These joint misrepresentations have led to higher plastic prices than otherwise would have occurred in a competitive market and massive sanitation problems for county and city governments and their landfills. Plaintiffs' allegations are based on personal knowledge as to Plaintiffs' own conduct and investigation of counsel based on publicly available information.

## I.     **INTRODUCTION**

1.      This case is about Defendants' profit-driven decision to promote the idea to the American consumer that plastics are recyclable and better for the environment, when in reality only a tiny fraction of plastics are ever recycled.

2.      Defendants' false representations regarding the recyclability of plastics led to increased production of plastic products, increased demand for plastics products, increased prices for plastic products and corresponding issues with the remediation of plastic waste, all of which have harmed the citizens of Missouri and other states.

3.      Through this Class Action Complaint, Plaintiffs, individually and on behalf of the Classes (defined below), seek an injunction to prohibit Defendants from advertising their plastic products as recyclable and damages for the increased cost of plastic products purchased by Plaintiffs during the class period. Plaintiffs also seek damages under state laws to remedy the high prices they paid because of Defendants' conduct and under common law Public Nuisance to remedy the high sanitation costs for plastic waste clean-up and disposal

4.      Plastic pollution is one of the most serious environmental crises facing the world today. Between 1950 and 2015, over 90% of plastics were landfilled, incinerated, or leaked into

the environment.[1] Plastic waste is ubiquitous—from our rivers, lakes, and oceans to roadways and coastlines. It is in "the air we breathe, the food we eat, and the water we drink."[2] One study estimates that humans ingest up to five grams or the equivalent of one credit card worth of plastic per week.[3] Some of the largest plastics and gas companies are among the 20 petrochemical companies responsible for more than half of all single-use plastics generated globally.[4] ExxonMobil, for example, is the world's top producer of single-use plastic polymers.[5]

5.     Underpinning this plastic waste crisis is a decades-long coordinated campaign of fraud and deception about the recyclability of plastics.

6.     Despite their longstanding knowledge that recycling plastic is neither technically nor economically viable, petrochemical companies—independently and through their industry trade associations and front groups—have engaged in fraudulent marketing and deceptive public education campaigns designed to mislead the public about the viability of plastic recycling as a solution to plastic waste. These calculated efforts have effectively protected and expanded plastic markets, while stalling legislative or regulatory action that would meaningfully address plastic waste and pollution. Fossil fuel and other petrochemical companies have used the false promise of plastic recycling to exponentially increase virgin plastic production over the last six decades,

---

[1] Roland Guyer, et al., Production, *Use, and Fate of All plastics Ever Made*, 3 SCIENCE ADVANCES 2-3 (2017), https://www.science.org/doi/10.1126/sciadv.1700782.
[2] WWF, NO PLASTIC IN NATURE: ASSESSING PLASTIC INGESTION FROM NATURE TO PEOPLE 6-7 (2019), https://wwfint.awassets.panda.org/downloads/plastic_ingest_web_spreads_1.pdf.
[3] Kala Senathirajah, et al., *Estimation of the Mass Microplastics Ingested – A Pivotal First Step Towards Human Health Risk Assessment,* 404 JOURNAL OF HAZARDOUS MATERIALS 11 (2021), https://www.sciencedirect.com/science/article/abs/pii/S0304389420319944.
[4] *See* Minderoo Foundation, THE PLASTIC WASTE MAKERS INDEX: REVEALING THE SOURCE OF THE SINGLE-USE PLASTICS CRISIS 12, 14 (2021), https://cdn.minderoo.org/content/uploads/2021/05/27094234/20211105-Plastic-Waste-Makers-Index.pdf; Minderoo Foundation, THE PLASTIC WASTE MAKERS INDEX 2023 18, 57 (2023), https://cdn.minderoo.org/content/uploads/2023/02/04205527/Plastic-Waste-Makers-Index-2023.pdf.
[5] Minderoo Foundation, THE PLASTIC WASTE MAKERS INDEX 2023, *supra* note 4, at *57*.

creating and perpetuating the global plastic waste crisis and imposing significant costs on communities that are left to pay for the consequences.

7.      The Plastic problems described throughout this Complaint amount to a national crisis affecting citizens, children, cities, and counties in all 50 states, including right here in Missouri. In turn, it requires a national, 50-state solution, to stamp out their nationwide scheme.

8.      This case seeks to hold these plastic producers and manufacturers accountable where government enforcement has not (at least not yet). Defendants should be required to repay the consumers, cities, counties, and others that they lied to and defrauded.

9.      The plastics industry—which includes petrochemical companies, their trade associations, and the front groups that represent their interests—should be held accountable for their campaign of deception much like the producers of tobacco, opioids, and toxic chemicals, who engaged in similar schemes.

## II.      JURISDICTION AND VENUE

10.      This action arises under Section 1 of the Sherman Act (15 U.S.C. § 1), and Section 16 of the Clayton Act (15 U.S.C. § 26), as well as the antitrust, fair competition, consumer protection, and public nuisance laws of various states. This action is for compensatory damages, treble damages, costs of suit, injunctive relief, and reasonable attorneys' fees.

11.      This Court has proper jurisdiction over this matter in that Defendants have transacted and conducted business within the state of Missouri and in this judicial district. Specifically, each Defendant transacted business throughout the United States, including this District. Each Defendant manufactured, sold, shipped, and/or delivered substantial quantities of plastics throughout the United States, including this District. Each Defendant has substantial contacts with the United States, including this District. And each Defendant engaged in an antitrust conspiracy that was directed at and had a direct, foreseeable, and intended effect of

3

causing injury to the business or property of persons residing in, located in, or doing business throughout the United States, including in this District.

12.     This Court has diversity jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action where the amount in controversy exceeds the sum or value of $5 million, exclusive of interest and costs, there are more than 100 members in the proposed class, and Plaintiffs are located in a state different from Defendants. This Court has supplemental jurisdiction over Plaintiffs' pendent state-law claims pursuant to 28 U.S.C. § 1367. Subject matter jurisdiction over this action further exists under 15 U.S.C. § 4, 15 U.S.C. § 26, and 28 U.S.C. §§ 1331, 1337. This Court also has subject matter jurisdiction as a result of the Class Action Fairness Act.

13.     Defendants' activities were within the flow of, and were intended to and did have a substantial effect on, interstate commerce of the United States. Defendants' products and services are sold in the flow of interstate commerce.

14.     Venue is proper in this Court under 15 U.S.C. § 22 and 28 U.S.C. § 1391(b), (c), and (d) because a substantial part of the events or omissions giving rise to the claims at issue occurred in this District, one Plaintiff resides in this District and the Defendants' property at issue (plastics) are located in this District, and each Defendant transacted business, was found, had agents, or resided in this District.

### III.    **PARTIES**

15.     Plaintiff Billie Rodriguez is a resident of the State of Missouri and purchased plastic products in the states of Missouri and Kansas.

16.     Plaintiff Daniel Erwin is a resident of the State of Kansas and purchased plastic products in the states of Missouri and Kansas.

17. Plaintiff Michael Ackerman is a resident of the State of California and purchased plastic products in the states of California and New York.

18. Plaintiff Kyle Foreman is a resident of the State of Florida and purchased plastic products in the state of Florida.

19. Plaintiff Drew Scruggs is a resident of the State of Missouri and purchased plastic products in the state of Missouri.

20. Plaintiff Mary Jane McQueeny is a resident of the State of Missouri and purchased plastic products in the state of Missouri.

21. Plaintiff Emily Thorpe is a resident of the State of Missouri and purchased plastic products in the state of Missouri.

22. Plaintiff Jennifer Tritt is a resident of the State of Missouri and purchased plastic products in the state of Missouri.

23. Plaintiff The Board of County Commissioners of the County of Ford is a duly organized county located in Kansas, which purchased plastic products in the State of Kansas, and operated a landfill in the State of Kansas.

24. Defendant Exxon Mobil Corporation ("Exxon Mobil") is the world's largest plastic producing company in revenue and market capitalization. It is headquartered in Spring, Texas. Exxon Mobil is the successor company to John D. Rockefeller's Standard Plastics Company and was created by merging two plastics giants (Exxon and Mobil). It dominates the American plastics and gas industry and also is the world's largest producer of polyolefins, additives, raw materials, compounds and related polymers and resins. Exxon Mobil Corporation can be served at 22777 Springwoods Village Parkway, Spring, TX 77389-1425. It is registered in the state of Missouri

with its registered agent of Corporation Service Company located at 221 Bolivar Street, Jefferson City, Missouri 65101.

25.     Defendant Chevron USA, Inc. is another plastics and gas company created by the breakup of Standard Plastics Company. It is headquartered in San Ramon, California. It can be served at 6001 Bollinger Canyon Road, San Ramos, CA 94583. It is registered in the state of Missouri with its registered agent of The Prentice-Hall Corporation System, Inc. located at 221 Bolivar Street, Jefferson City, MO 65101.

26.     Defendant Chevron Phillips Chemical Corporation is a joint venture between Chevron USA Inc. and Phillips 66 Company. It is headquartered in The Woodlands, Texas, and is one of the top suppliers of polyethylene in the world today. It can be served at 10001 Six Pines Dr., The Woodlands, TX 77380. It is registered in the state of Missouri with its registered agent of CT Corporation System located at 5661 Telegraph Road, Suite B, Saint Louis, Missouri 63120.

27.     Defendant DuPont de Nemours, Inc.[6] is an American multinational company headquartered in Wilmington, Delaware. It is a leading plastics manufacturer with revenue of over $12 billion dollars in 2023. It can be served at 974 Centre Rd. Bldg. 730, Wilmington, DE 19805.

28.     Defendant Celanese Corporation focuses mainly on specialty chemicals and is a leading producer of acetic acid. It is also one of the world's largest vinyl acetate monomers (VAM) producer. It is headquartered in Irving, Texas. It can be served at 222 W. Los Colinas Blvd., Suite 900N, Irving, TX 75039.

29.     Defendant Dow Inc. is one of the world's leading material science companies. The company conducts its worldwide business through six business units. It was incorporated in Delaware in 2018 to serve as a holding company for the Dow Chemical Company. It is

---

[6] DuPont Corporation is used interchangeably when referencing to Defendant DuPont de Nemours, Inc.

headquartered in Midland, Michigan, and can be served at 2211 H.H. Dow Way, Midland, MI 48674.

30.     Defendant The Dow Chemical Company is headquartered at 2211 H. H. Dow Way Midland, Michigan. As of 2021, Dow Chemical was among the three largest chemical producers in the world. Dow Chemical produces commodity chemicals like polyethylene. Basic plastics make up 26% of Dow Chemical sales. It is an operating subsidiary of Dow Inc. It can be served at 2211 H.H. Dow Way Midland, MI 48674. It is registered in the state of Missouri with its registered agent of The Corporation Company located at 5661 Telegraph Road, Suite 4B, Saint Louis, Missouri 63129-4275.

31.     Defendant Eastman Chemical Company is a global specialty chemicals company that produces a wide range of fibers, chemicals and advanced materials. It is a significant supplier of coatings, adhesives, specialty plastic products and a major supplier of cellulose acetate fibers and copolyesters. It is headquartered in Kingsport, Tennessee. It may be served at 200 S. Wilcox Dr., Kingsport, TN 37660. It is registered in the state of Missouri with its registered agent of United Agent Group Inc. located at 12747 Olive Boulevard, Suite 300, St. Louis, MO 63141.

32.     Defendant LyondellBasell Industries N.V. is a multinational company. It is the largest licensor of polyethylene and polypropylene in the world. Its United States headquarters is located in Houston, Texas. It can be served at 1221 McKinney St., Suite 300, Houston, TX 77010. Defendant Lyondell Chemical Company is a Delaware Corporation and is registered in the state of Missouri with its registered agent of CT Corporation System located at 5661 Telegraph Road, Suite 4B, Saint Louis, MO 63129-4275.

33.     Defendant The American Chemistry Council, known as the Manufacturing Chemists' Association at its founding in 1872, then as the Chemical Manufacturers Association

from 1978 to 2000, is an industry trade association for American chemical companies. It is based in Washington, D.C. The mission of the American Chemistry Council is to promote the interests of the chemical industry. The trade group represents U.S. chemical companies as well as the plastics and chlorine industries, formerly known as the American Plastics Council. It can be served at 700 Second St. NE Washington D.C. 20002. During its operations, the Council has included the following Defendant members: Exxon Mobil, Chevron Phillips, Dow, Dupont, Eastman Chemical Company, Celanese Corporation, and LyondellBasell.

## IV. FACTUAL ALLEGATIONS

### A. Background of the Plastic Product Industry

34.     The plastic products at issue in this case can be separated into certain categories based on their chemical composition and end use.

35.     Polyethylene Terephthalate (PET) is used most commonly in water and soft drink bottles, fruit juice containers, domes or covers for prepared meals, cookie/biscuit trays, condiment bottles, cream/nut butter containers, and cooking plastics bottles.

36.     Polyethylene (PE) is used in milk and water jugs.

37.     Polypropylene (PP) is used in hard containers such as pill bottles as well as microwave dishes, yogurt and ice cream containers, and chip bags.

38.     Polystyrene (PS) is used for water station cups and plastic cutlery.

39.     Polycarbonate (PC) is used in longer lasting reusable containers including refillable water bottles, nursing bottles or lab bottles.

40.     High Density Polyethylene (HDPE) is used in milk bottles, freezer bags, ice cream containers, pouches and sachets.

41.     Low Density Polyethylene (LDPE) is used in squeeze bottles, cling wrap, shrink wrap pouches and sachets.

42. Plastics are part of a sector known as "petrochemicals," or products made from fossil fuels such as plastics and gas. More than 99% of plastics are produced from fossil fuels.[7]

**B. Most plastics cannot be recycled, causing the plastic waste and pollution crisis.**

43. There are "thousands of different types of plastic, each with its own chemical composition and characteristics."[8] Almost all of these plastics cannot be "recycled"—meaning they cannot be collected, processed, and remanufactured into new products.[9]

44. As of 2021, the U.S. recycling rate for plastic is estimated to be only 5-6%.[10] Despite decades of industry promises, plastic recycling has failed to become a reality due to long-known technical and economic limitations.[11]

45. Certain types of plastics have no end markets (i.e., businesses that buy and use recyclable materials to make new products), and therefore are *impossible* to recycle. To date, viable markets only exist for polyethylene terephthalate (PET) and high density polyethylene (HDPE) plastic bottles and jugs.[12] These are known as plastics #1 and #2, respectively, under the industry's Resin Identification Codes (RICs):[13]

---

[7] Center for International Environmental Law (CIEL), FUELING PLASTICS: FOSSILS, PLASTICS, AND PETROCHEMICAL, FEEDSTOCKS 1 (2017), https://www.ciel.org/wp-content/uploads/2017/09/Fueling-plastics-Fossils-plastics-Petrochemical-Feedstocks.pdf.

[8] Professor plastics, *Types of Plastic: How Many Kinds of plastics are There?*, plastics Make it Possible (Jan. 18, 2012), *available at* https://web.archive.org/web/20220611222514/https://www.plasticsmakeitpossible.com/about-plastics/types-of-plastics/professorplastics-how-many-types-of-plastics-are-there/ (archived June 11, 2022).

[9] U.S. EPA, The U.S. Recycling System, https://www.epa.gov/circulareconomy/us-recycling-system ("In the United States, recycling is the process of collecting and processing materials (that would otherwise be thrown away as trash) and remanufacturing them into new products.").

[10] Beyond plastics & The Last Beach Cleanup, The Real Truth About the U.S. plastics Recycling Rate 3 (2022), https://static1.squarespace.com/static/5eda91260bbb7e7a4bf528d8/t/62b2238152acae761414d698/1655841666913/The-Real-Truth-about-the-USPlastic-Recycling-Rate-2021-Facts-and-Figures-_5-4-22.pdf.

[11] The plastic recycling rate in the U.S. has never exceeded the 2014 peak of 9.5%, and even that figure includes a significant amount of exported plastic waste that was dumped or burned rather than recycled. Id.; John Hocevar, Circular Claims Fall Flat: Comprehensive U.S. Survey of plastics Recyclability 7 (2020), https://www.greenpeace.org/usa/wp-content/uploads/2020/02/Greenpeace-Report-Circular-Claims-Fall-Flat.pdf.

[12] John Hocevar, supra note 11, at 7.

[13] Brad Kelechava, Resin Identification Codes (RICs), as Specified by ASTM D7611, American National Standards Institute (Feb. 21, 2019), https://blog.ansi.org/2019/02/resin-identification-codes-rics-astm-d7611/.

| Resin Identification Number | Resin | Resin Identification Code – Option A | Resin Identification Code – Option B |
|---|---|---|---|
| 1 | Poly(ethylene terephthalate) | 1 PETE | 01 PET |
| 2 | High density polyethylene | 2 HDPE | 02 PE-HD |
| 3 | Poly(vinyl chloride) | 3 V | 03 PVC |
| 4 | Low density polyethylene | 4 LDPE | 04 PE-LD |
| 5 | Polypropylene | 5 PP | 05 PP |
| 6 | Polystyrene | 6 PS | 06 PS |
| 7 | Other resins | 7 OTHER | 07 O |

[14]

46.     After conducting a 10-year review on plastic recycling, in 1991, the U.S. Environmental Protection Agency (EPA) concluded that "it appears that at the present only two types could be considered for making into high quality objects, PET and HDPE," specifically those sourced from bottles.[15]

[14] https://web.archive.org/web/20160126213345/http://www.plasticsindustry.org/Aboutplastics/content.cfm?Item-Number=823&navItemNumber=1125.
[15] U.S. EPA, Ten Year Review of plastics Recycling 22 (1991), https://semspub.epa.gov/work/03/17184.pdf.

47.     This remains true more than 30 years later.[16] While a minority of municipal recycling programs across the country may collect plastics with RICs #3-7, they do not actually recycle them.[17] Instead, such plastics are incinerated or sent to landfills.

48.     The thousands of different plastics and the variation among them further limit recyclability. When recycling plastic waste, a facility must sort and separate thousands of pieces of plastic by type to maintain a high degree of purity in the recycled material.[18]

49.     For this reason, some types of plastic that are technically "recyclable" are not recycled in practice. For example, many single-use plastics are made of different types of plastic polymers as well as other materials, such as paper, metals, or adhesives.[19] It is impractical—if not impossible—to separate these different components for recycling.[20]

50.     Even products made of a single type of plastic often cannot be recycled together because they include different chemical additives or colorants.[21] For example, PET is widely accepted by municipal recycling programs, yet PET bottles cannot be recycled with PET clamshells and other thermoforms, which are made from a PET material with different chemical properties.[22] Similarly, green PET bottles cannot be recycled with clear PET bottles.[23]

---

[16] John Hocevar, *supra* note 10, at 4 ("Only some PET #1 and HDPE #2 plastic bottles and jugs can be legitimately labeled as recyclable in the U.S. today"); see also Greenpeace, Circular Claims Fall Flat Again: 2022 Update 27-29 (2022), https://www.greenpeace.org/usa/wp-content/uploads/2022/10/GPUS_FinalReport_2022.pdf (estimating that the existing domestic capacity for recycling/reprocessing PET waste is 20.9% and HDPE is 10.3%, while the capacity to recycle other plastics ranges from "negligible" to less than 5%).

[17] John Hocevar, supra note 10 at 4, 7-9; Greenpeace, supra note 15, at 3-4. For example, the City of Knoxville, Tennessee, states on its website that its recycling facility will collect plastics #3-7, but it does not recycle them because "there is no 'end-market' buyer." City of Knoxville, Recycling, https://www.knoxvilletn.gov/cms/One.aspx?portalId=109562&pageId=200229 (last visited Oct. 26, 2023).

[18] Judith Enck & Jan Dell, Plastic Recycling Doesn't Work and Will Never Work, The Atlantic (May 30, 2022), https://www.theatlantic.com/ideas/archive/2022/05/single-use-plastic-chemical-recycling-disposal/661141/.

[19] See Jefferson Hopewell et al., plastics Recycling: Challenges and Opportunities, 364 Philos. Trans. R. Soc. Lond. B Biol. Sci. 2115, 2118 (2009), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2873020/.

[20] *Id.*

[21] Judith Enck & Jan Dell, *supra* note 16.

[22] *Id.*

[23] *Id.*; *see also* Becky Sullivan, *Sprite Ditches its Iconic green bottle—but Environmentalists Say it's Not Enough*, NPR ( July 28, 2022), https://www.npr.org/2022/07/28/1114242535/sprite-green-bottles-recycle.

51.     The quality of plastic degrades as it is recycled, limiting both the use of recycled plastic and its continued recyclability. The fossil fuel-derived chemicals that form the basis of plastic are vulnerable to heat and other processes used in recycling.[24] As the chemicals degrade, they lose their quality and integrity, making recycled resins unsuitable for many manufacturers.[25]

52.     But plastics can only be recycled – or more accurately "downcycled" – once, rarely twice.[26]

53.     Recycling most plastics is technologically infeasible, as the plastics industry has long known, and subsequent scientific research would confirm. "When recycled, some of the plastic can be remade into similar products; however, most is typically downcycled into a product of lower quality and is unable to displace products made from virgin plastics [citation omitted]."[27] Even PET, the most easily recycled type of plastic, quickly degrades through the recycling process.

54.     The *toxicity* of plastic and its chemical additives limits the recyclability of plastic. Many plastics commonly contain toxic additives such as stabilizers, plasticizers, coatings, catalysts, and flame retardants.[28]

55.     Managed plastic waste contributes to plastic pollution of the environment. As plastic waste degrades in landfills, microplastics are released into the surrounding environment, including contamination of groundwater and surface water by air and by leachate.[29]

---

[24] *See* Huiying Jin et al., *The effect of extensive mechanical recycling on the properties of low density polyethylene*, 97 POLYMER DEGRADATION AND STABILITY 2263 (2012), https://www.sciencedirect.com/science/article/abs/pii/S0141391012003114 ("[P]roperties of mechanically recycled polymers do not remain the same because of degradation from heat, mechanical stress, oxidation and ultraviolet radiation during reprocessing and lifetime").

[25] *See* Sarah DeWeerdt, *Why It's So Hard to Recycle Plastic*, SCIENTIFIC AMERICAN (Dec. 13, 2022), https://www.scientificamerican.com/article/why-its-so-hard-to-recycle-plastic/.

[26] *See* Roland Geyer et al., *supra* note 1, at 2-3.

[27] Moran et al., San Francisco Estuary Institute, A Synthesis of Microplastic Sources and Pathways to Urban Runoff (Oct. 2021) page 76.

[28] *See* John N. Hahladakis et al., *An overview of chemical additives present in plastics: Migration, release, fate and environmental impact during their use, disposal and recycling*, 344 J. of Hazardous Materials 179, 184-168 (Feb. 15, 2018), https://www.sciencedirect.com/science/article/pii/S030438941730763X.

[29] Leachate is a solution or product obtained by leaching, especially from landfills or other sources.

56.     Plastic waste may be further contaminated through curbside collection of containers for pesticides, cleaning solvents, and other household items.[30]

57.     As plastics degrade through use and the recycling process, they begin to leach these toxic substances.[31] For this reason, a vast majority of plastic products cannot be recycled into food-grade packaging, food-contact surfaces, or other high-contact products.[32]

### C.    Defendants knew that their promotion and production of plastic products for a throw-away lifestyle created a solid-waste crisis without a solution.

#### i.    1950s: The plastics industry touted plastics' supposed disposability.

58.     Beginning in the 1950s, the petrochemical companies that produced plastic resins identified a way to ensure a steady, growing demand for plastic: disposability. If plastic products were used only once, then they would need to be purchased—and thus produced—again and again.

59.     At the Society of the Plastics Industry's ("SPI") 1956 national conference, participants were told that "developments should be aimed at low cost, big volume, practicability, and *expendability*."[33] In short, the producers' aim should be for their products to end up "in the garbage wagon."[34]

60.     The shift to disposables began almost immediately—even for products that had previously been sold to customers because they could be repurposed.[35] Plastic dry cleaning bags

---

[30] Greenpeace, Forever Toxic: The Science on Health Threats from Plastic Recycling 4 (2023), https://www.greenpeace.org/usa/wp-content/uploads/2023/05/GreenpeaceUSA_ForeverToxic_ENG.pdf.
[31] *Id.*
[32] *See* Environment & Climate Change Canada, ASSESSING THE STATE OF FOOD GRADE RECYCLED RESIN IN CANADA AND THE UNITED STATES, 4, 34 (2021), https://www.plasticsmarkets.org/jsfcontent/ECCC_Food_Grade_Report_Oct_2021_jsf_1.pdf.
[33] *plastics in Disposables and Expendables*, 34 MODERN PLASTICS 93 (Apr. 1957) (emphasis in original).
[34] *Id.*
[35] Jeffrey L. Meikle, AMERICAN PLASTIC: A CULTURAL HISTORY 266-67 (Rutgers University Press 1995), https://www.google.com/books/edition/American_Plastic/u_1ePU4GEGAC?hl=en&gbpv=0 (chronicling the shift to disposables). The industry's earlier campaigns promoting plastic as durable have also been chronicled. *See id.* at 186-88; Susan Freinkel, Plastic: A TOXIC LOVE STORY 145 (2011).

were advertised as durable and reusable throughout the 1950s,[36] but the industry quickly changed

tack in 1959 after around 80 children suffocated on plastic dry cleaner bags, leading to immense

public backlash against the industry and some of the earliest calls for plastic bans.[37]

61. SPI launched a nationwide public relations campaign, claiming that the bags were

meant to be disposable, essentially shifting the blame to the children's parents—and it worked.[38]

62. This campaign served as a mechanism to insulate the industry from public and

regulatory backlash while simultaneously introducing consumers to the idea of disposable plastics.

An SPI pamphlet from 1959 **(Figure 1)** explained that customers should "never keep a plastic bag

after it has served its intended usefulness. Destroy it: Tear it up … or tie it in a knot … and throw

it away."[39] To do otherwise "is the worst mistake a mother could make."[40]



## Figure 1

The Society of the Plastics Industry encouraged consumers
to dispose of plastic dry-cleaning bags. SPI, 1959.

---

[36] *See This Bag Spells Business*, 50 DuPont Magazine 24, 25 (Feb/Mar. 1956),
https://digital.hagley.org/1956_50_01 (quoting the general manager of a Providence, Rhode Island dry cleaning company who explained that the film bags combined "maximum transparency as well as the necessary durability." That durability, the article went on to say, allowed consumers to find additional uses for the bags even after they had received their laundered clothes, stating, "Bags of 'Alathon' are reusable, too, as housewives have discovered").
[37] Susan Freinkel, *supra* note 38, at 142-43.
[38] Jeffrey L. Meikle, *supra* note 38, at 249-58; *see also* Hiram McCann, *Hazards in Film Misuse Must Be Taught Parents*, 36 Modern Plastics 262 (June 1959) (on file with CCI #1356.264) (explaining that the bags were "made and costed to be disposable" and lamenting that items ranging from cars to cleaning fluids "kill children every day," but in those cases "[a]dults are blamed–mainly parents. And rightly so").
[39] Society of the plastics Industry (SPI), Plastic Film: Correct Use and Mis-Use 2 (1959).
[40] *Id.* At 3.

63.     The plastics industry's successful navigation of this crisis—and the corresponding threat of plastic bans—provided a model for the future, both in the way the industry would respond to backlash and the way it would insist on disposability by offering customers no alternative.[41] Even as consumers resisted the shift to single-use plastics, which they found jarring after being told since the 1930s that plastics were too valuable to be thrown away, the plastics industry successfully expanded into new markets—especially single-use packaging—at an unprecedented pace.

64.     In 1960, packaging represented just 10% of total plastic production, but amounted to 25% by the end of the decade.[42] By that point, disposable plastics had become the norm for everything from detergent bottles to plastic milk jugs, and plastic rings for canned beverage six-packs.[43]

65.     In 1963, Lloyd Stouffer, editor of the trade journal *Modern Plastics,* congratulated the industry on "filling the trash cans, the rubbish dumps and the incinerators" with single-use plastics.[44] "The happy day has arrived," Stouffer opined, "when nobody any longer considers the plastics package too good to throw away."[45]

   ii.     **Late 1960s into 1970s: Landfills and burning were the plastic industry's "solution" to the growing pollution problem.**

66.     The industry's success in "selling" disposability and introducing single-use plastics had predictable consequences. By the end of the decade and into the early 1970s, plastics were identified as a key part of the developing solid waste crisis.

---

[41] Jeffrey L. Meikle, *supra* note 39, at 249-58.
[42] *Id.* At 266.
[43] *Id.* At 265-66.
[44] See Rebecca Altman, *American Beauties: How Plastic Bags Came to Rule Our Lives, And Why We Can't Quit them*, Topic (2018), *available at* https://web.archive.org/web/20191113102708/https://www.topic.com/american-beauties (archived Nov. 13, 2019) (quoting Lloyd Stouffer, *plastics Packaging: Today and Tomorrow,* SPI Annual plastics Conference (Nov. 19-21, 1963)).
[45] *Id.*

67.    *Modern Plastics* warned companies that the industry needed to figure out a solution to the pushback they were experiencing before "well-meaning but misinformed authorities step in with homemade remedies and regulations."[46]

68.    Again, facing immense public backlash and a genuine threat of regulation,[47] the plastics industry responded with two "solutions." The first, in response to concerns about litter, was landfilling. As the American Chemical Society explained in 1969, "it is always possible that scientists and engineers will learn to recycle or dispose of wastes at a profit, but that does not seem likely to happen soon on a broad basis."[48]

69.    Different types of plastic cannot be recycled together, even when separating out those that cannot be recycled at all (including thermoset polymers like polyurethanes and vulcanized rubber). For example, a PET bottle cannot be recycled with an HDPE bottle, however similar they appear. Further complicating matters, many plastic products are made by incorporating various additives, as well as mixing different polymers to take advantage of their distinct qualities.

---

[46] Jeffrey L. Meikle, *supra* note 39, at 265 (quoting Joel Frados, *There's Something in the Air*, 4 MODERN PLASTICS 89 (Oct. 1966)).

[47] See Jerome Heckman, General Counsel, SPI, Presentation at the Meeting of the SPI plastics Waste Management Committee: Solid Waste and Litter: Legislative Status and Outlook—1972 (Mar. 1, 1972), *available at* https://cdn.toxicdocs.org/8R/8Rq8Namx-13mzoge1jEG7N0pzm/8Rq8Namx13mzoge1jEG7N0pzm.pdf (claiming that, at the time of the presentation in 1972, there were over "a thousand regulatory proposals . . . at various governmental levels which could adversely affect the interests of the plastics industry"); Lester E. Blaschke, *Analysis of the Resource Recovery Act of 1970 and Its Effect on Implementation of Solid Waste Management Programs*, 34 J. ENVTL. HEALTH 89, 89 (1971), https://www.jstor.org/stable/44545882 (describing the passage of the Resource Recovery Act in 1970, as an EPA official, represented "a significant shift in emphasis from 'disposal' to 'recycling and recovery of materials and energy'").

[48] ACS Committee on Chemistry & Public Affairs, *Cleaning Our Environment–The Chemical Basis for Action*, in C&E NEWS, at 58, 60 (Sept. 8, 1969), available at https://cdn.toxicdocs.org/6b/6bLOmw81KLQJwzb0RQ9mEadx6/6bLOmw81KLQJwzb0RQ9mEadx6.pdf.

70. As explained by researchers in 1969, "[t]he very success of package makers in marrying dissimilar materials has made packaging materials virtually unrecoverable after use."[49] As a result, the economics of plastic recycling were—and still are— "virtually hopeless," as one industry insider put it in 1969.[50]

71. Still, the greatest obstacle to plastic recycling was that no market existed for the final product. Recycled plastic was more expensive and of lower quality than virgin resins. This was, in part, intrinsic to the material. Even under ideal conditions, plastics experienced "a degradation of resin properties and performance . . . during the initial fabrication, through aging, and in any reclamation process," as explained in a 1973 report commissioned by SPI.[51]

72. As a direct result of these limitations, few manufacturers had any interest in purchasing recycled resins.[52]

73. According to the SPI report, "[r]ecycling of plastics from [municipal sources of plastic waste] poses the greatest challenge," because "there are no effective marketing mechanisms for trade in contaminated, mixed plastics."[53] The report was definitive: "When plastics leave fabrication points, they are almost never recovered. There is no recovery from obsolete products."[54]

---

[49] Arsen J. Darnay & William E. Franklin, *The Changing Dimensions of Packaging Wastes*, in FIRST NATIONAL CONFERENCE ON PACKAGING WASTES at 11, 16; https://nepis.epa.gov/Exe/ZyPURL.cgi?Dockey=2000Q54D.TXT; *see also* Thomas B. Becnel, *supra* note 54, at 85 (stating that "it is ironic that the very molecular structure that has made [plastic] so popular creates certain disposal problems").
[50] Eric B. Outwater, Packaging – U.S.A., in Proceedings: First National Conference on Packaging Wastes 1, 7 (1971).
[51] R.L. Glauz, et al., THE PLASTICS INDUSTRY IN THE YEAR 2000 41 (1973), Box 12, Jack Milgrom Papers, Special Collections Research Center, Syracuse University Libraries.
[52] *Id.*
[53] *Id.*
[54] *Id.*

74. Throughout the 1970s, SPI officials argued that plastics were an ideal material for landfilling since "they don't biodegrade," they "just sit there."[55] But the alternate "solution" proved to be the industry favored waste-to-energy (WtE) incineration. Support for WtE was reinforced by individual companies and trade associations representing the industry throughout the decade.[56]

75. And by the 1980s, while the industry pushed the false narrative of recyclability of these plastics products, the same impediments identified in the 1960s and 1970s for why they couldn't be effectively recycled remained.

   iii. **1980s: After receiving backlash for their earlier "solutions," the plastics industry encouraged recycling of plastics.**

76. By the 1980s, while the industry pushed the false narrative of recyclability of these plastics products, the same impediments identified in the 1960s and 1970s for why they couldn't be effectively recycled remained. Neither landfilling nor incineration sufficiently assuaged public concerns or regulatory pressure, and the industry again faced proposed bans on single-use plastics in the mid-1980s. This time, it adopted a solution that it knew was popular among consumers and policymakers alike: recycling.

77. SPI established the Plastics Recycling Foundation (PRF), bringing together petrochemical companies and bottlers **(Figure 2)**, and PRF immediately began a campaign to demonstrate the industry's supposed commitment to mechanical recycling.[57]

---

[55] Radio Interview with Ralph Harding, President of the Society of the plastics Industry, in Atlanta, Georgia (n.d.).
[56] Jeffrey L. Meikle, *supra* note 38, at 272; *see also*, *e.g.,* Internal Memorandum from Avron B. Magram, Hatco Chemical Division, W.R. Grace Company on PVC/Ecology (May 11, 1971), available at
https://cdn.toxicdocs.org/pe/peX25LzXyN4nbMM8dO6D1Za66/peX25LzXyN4nbMM8dO6D1Za66.pdf
(discussing relevant research and updates regarding PVC incineration from January 1970 to May 1971).
[57] *See* Leo H. Carney, *The Environment*, N.Y. TIMES (Sept. 15, 1985)
https://www.nytimes.com/1985/09/15/nyregion/the-environment.html; *see also* Judie Neilson, Oregon Dep't of Fish & Wildlife *The Oregon Experience, in* NOAA, PROCEEDINGS OF THE WORKSHOP ON THE FATE AND IMPACT OF MARINE DEBRIS 154, 158 (Richard S. Shomura & Howard O. Yoshida eds., 1985),

**Figure 2**

Exxon Chemical, a member of the Society of the Plastics Industry, acknowledged its support for organizations like the Plastics Recycling Foundation and the Council for Solid Waste Solutions in its Environmental Compendium. *Exxon, 1990 (emphasis added).*

78.     But industry support did little to change the basic problem: plastics were notoriously difficult to recycle, as the industry had known for years. Doubts about the viability of municipal solid waste recycling in general went back decades.

79.     Prior to 1980, the plastics industry consistently reached the same conclusion when it explored the possibility of recycling plastic from the municipal waste stream: mechanical recycling was technically and economically infeasible.

80.     In 1986, an industry trade association acknowledged that the situation was virtually the same as it had been decades earlier.

---

https://repository.library.noaa.gov/view/noaa/5680 (noting that "the Society for the plastics Industry has allocated $5 million to establish a Plastic Recycling Foundation and Institute to aggressively pursue methods to make it economically feasible to recycle plastic in large quantities").

81.     The Vinyl Institute (VI), a spin-off organization of SPI, explained in a report that "purity and quality demands set for many applications preclude the use of recycled material."[58] As the organization's founding director, Roy Gottesman, explained to attendees of an industry conference in 1989 **(Figure 3)**, "Recycling cannot go on indefinitely, and does not solve the solid waste problem."[59]



## Figure 3

The executive director of the Vinyl Institute shared "key considerations to be made when considering recycling" with other members of the plastics industry. *Gottesman, 1989 (emphasis added).*

82.     Ultimately, the VI report **(Figure 4)** concluded, "recycling cannot be considered a permanent solid waste solution, as it merely prolongs the time until an item is disposed of."[60]

---

[58] Vinyl Institute, SOLID WASTE FACT SHEET—DRAFT 5 (July 18, 1986), *available at* https://climateintegrity.org/uploads/deception/1989_Vinyl_Institute_-_Fact_Sheet.pdf.

[59] Dr. Roy T. Gottesman, Executive Director, Vinyl Institute, Presentation at the Institute for International Research Conference on Achieving Market Expansion Through plastics Recycling, *An Overview of Options for Disposal of Vinyl plastics in Municipal Solid Waste* 1 (Sept. 26, 1989), Box No. 5, Jack Milgrom Papers, Special Collections Research Center, Syracuse University Libraries.

[60] *Id.* at 2 (emphasis in original).

## Figure 4

A draft "Solid Waste Fact Sheet," created by the Vinyl Institute,
was stark in its assessment of the viability of recycling
to address plastic waste issues. *VI. 1986 (emphasis added)*.

83.     At the Vinyl Institute meeting that same year, members discussed a recent study on
the economics of recycling. "This study indicates that based on our economic system, on the cost
of fuel and transportation, on the economic benefit of downstream markets, on the low cost of
plastic feedstocks, and the even lower cost of off grade-off spec plastic feedstocks, recycling is not
and will never be commercially viable unless it is significantly subsidized by a government entity."

84.     What led the industry to change its position in the 1980s was not a massive
technological breakthrough or an answer to the economic roadblocks to plastic recycling. Rather,
the plastics industry began to lie about the viability of recycling as a direct result of the backlash
they faced from the public.

85.     As SPI officials discussed in a 1984 memo on the threat of a recycling bill **(Figure
5)**, although they were able to shape the bill "to reflect the . . . commitment of our industry to move
forward" on recycling, "there is no question that the State of New Jersey must see substantial short-
term progress in the recycling of plastic containers or else punitive legislation . . . will attack the
problem head-on."[61]

---

[61] Letter from Roger Bernstein, Letter from Roger Bernstein, Society of the plastics Industry, to the New Jersey
Task Force State Government Affairs Committee, New Jersey's Mandatory Recycling Bill 2 (Dec. 20, 1984),
available at https://www.toxicdocs.org/d/rpQVOR8obVNLbN5R69K0EJ5pJ?lightbox=1. As an SPI employee put it



**Figure 5**

The Society of the Plastics Industry articulating the industry's support for recycling in the face of potential "punitive legislation" that would attack the plastic waste problem "head-on." *Bernstein, 1991 (emphasis added).*

86.     The industry felt the threat of legislative action acutely throughout the 1980s and 1990s.

> **iv.     Late 1980s to Mid-1990s: The plastics industry continued its recyclability campaign using trade groups to spread the message.**

87.     Looking back at the early days of this regulatory uptick, a representative from Occidental Chemical testified to Congress in 1992 that there was a "rush to demonstrate environmental purity. . . . The call was to recycle or be banned."[62]

88.     Consumer demands that plastics be recycled or banned presented the plastics industry with a severe problem. The industry knew that mechanical recycling was not a viable solution—yet renewed concerns about plastic waste and its impact on the environment meant they

---

in a different memo, "the NJ Recycling office regards plastics as a problem not shared by competitive materials." Memorandum from John C. Malloy, Director of Packaging Services, SPI, to Plastic Bottle Institute (Oct. 12, 1984).

[62] Plastics Recycling: Problems and Possibilities: Hearing Before the Subcomm. on Env't & Emp. of the H. Comm. on Small Bus., 102nd Cong. 121 (1992) (testimony of William F. Carroll, Jr., Ph.D., Director of Commercial Development, Occidental Chemical Corp.). The Occidental representative went on to explain the challenge of the situation given the poor state of plastic recycling infrastructure and development: "The plastics industry was made to feel the pressure acutely. Programs for each plastic, and in many cases each grade of plastic, had to be devised and technically proven. Bottles had to be sorted, cleaned, purified and made into pellets for processors." *Id.*

needed the public to *believe* recycling could address their concerns, and the industry was invested in its success.

89.    The industry took a familiar approach, leaning on its trade associations just as it had in the face of previous crises.[63] SPI's Public Affairs Council ("PAC"), created after SPI successfully defeated a recycling bill in New York City in 1971,[64] served as a model in particular. Initially established as the Plastics Waste Management Fund, PAC brought together 12 petrochemical companies "to fight off restrictive legislation everywhere," in the words of SPI President Ralph Harding, Jr.[65]

90.    Similar trade associations and front groups proliferated during the 1980s and early 1990s. Along with the Plastics Recycling Foundation and Vinyl Institute, the petrochemical companies, with support from SPI, created a variety of organizations in this brief span,[66] including: the Plastic Bottle Institute (PBI) in the early 1980s; the Center for Plastics Recycling Research (CPRR) at Rutgers University in 1985; the Council on Packaging in the Environment (COPE) in 1986; and the Council for Solid Waste Solutions (CSWS) in 1988 **(Figure 6)**, which became known as the Partnership for Plastics Progress (P3) in 1992 before quickly being reorganized as the American plastics Council (APC).[67]

---

[63] *See, e.g.*, Jerome Heckman, *supra* note 50 (addressing the plastics industry as SPI's general counsel amid fighting proposed taxes on plastic containers and other regulation on plastics in 1972).
[64] *Id.*
[65] Jeffrey L. Meikle, *supra* note 38, at 272-73 (quoting a talk given by Ralph Harding, Jr. entitled "Challenges Facing the plastics Industry" on December 8, 1971).
[66] These organizations were not necessarily contained within a single umbrella organization. For example, SPI and the Chemical Manufacturers Association both had official roles in the Partnership for plastics Progress. The board of directors, "made up of the highest level of industry executives," and "function[ed] as a business council under the auspices of the" CMA, while SPI was responsible for "staffing and implementing Partnership programs." Partnership for plastics Progress, *Introducing the Partnership for plastics Progress* (Jan. 1992).
[67] Internal notes at APC indicate that the name was changed after it was poorly received by consumers: "The connect betw[ee]n P3 & SPI was clutter—no good[.] Consumers don't like." Bailey Condrey, APC, *Staff Mtg 8/24/92*, *in* STAFF MEETINGS 53 (1992). These issues had been anticipated a year prior, when internal discussions about organization names concluded: "P3 great internally, but bad externally," and the group would "[n]eed consumer-friendly name." Bailey Condrey, APC, *Outreach TF 8/23/91*, *in* NOTES 6 (1991). The Task Force praised another unused acronym because it was "[m]ore publically [sic] focused" and "[n]o conspiracy implied." *Id.* at 7.



**Figure 6**

The executive board members of the Council for Solid Waste Solutions, including many of the world's largest fossil fuel and petrochemical companies, were listed on the cover of the organization's industry newsletter, *Handlers News. CSWS, 1991 (emphasis added).*

91.     The Council for Solid Waste Solutions (the Council) formed in 1988 in furtherance of their campaign to convince the public that recycling was the answer to the plastics waste and pollution crisis.[68]

92.     After Exxon, Mobil, and other major players in the industry formed the Council, they pushed the plastics recycling message with increased coordination and seriousness.

93.     The Council spent millions of dollars on advertisements to herald recycling as the solution to plastic waste in hopes to change public perception. For example, the Council took out a 12-page advertisement in the July 17, 1989 edition of *Time* magazine exclaiming, "The URGENT NEED to RECYCLE." Issued by the official-sounding organization, the "Council for Solid Waste Solutions," this advertisement pushed the Council's agenda and advertised for the Council and its members.

---

[68] Council for Solid Waste Solutions, *The Urgent Need to Recycle* (July 17, 1989) *Time.*

94.     In 1989, Mobil misleadingly promised the public that it was "venturing into recycling mainly out of a sense of environmental concern. 'We are responsible for that segment of the waste stream, so we're going to see that it's disposed of consistent with' the federal [EPA's] recommendations."

95.     At the time that Mobil made these statements, the national plastics recycling rate was between just one and two percent. *See* **Figure 7**: National Recycling and Composting Rates from 1960 to 2018.[69]

**Figure 7**



Recycling Tonnages, 1960–2018

---

[69] U.S. Environmental Protection Agency, *National Overview: Facts and Figures on Materials, Wastes, and Recycling* https://www.epa.gov/facts-and-figures-about-materials-waste-and-recycling/national-overview-facts-and-figures-materials#Trends1960-Today.

**Recycling and composting as a percentage of generation**

| | 1960 | 1970 | 1980 | 1990 | 2000 | 2005 | 2010 | 2015 | 2017 | 2018 |
|---|---|---|---|---|---|---|---|---|---|---|
| **Paper and Paperboard** | 17% | 15% | 21% | 28% | 43% | 50% | 63% | 67% | 66% | 68% |
| **Glass** | 2% | 1% | 5% | 20% | 23% | 21% | 27% | 28% | 25% | 25% |
| **Plastics** | Neg. | Neg. | <1% | 2% | 6% | 6% | 8% | 9% | 9% | 9% |
| **Yard Trimmings** | Neg. | Neg. | Neg. | 12% | 52% | 62% | 58% | 61% | 69% | 63% |
| **Lead-acid Batteries** | Neg. | 76% | 70% | 97% | 93% | 96% | 99% | 99% | 99% | 99% |

"Neg." means less than 5,000 tons or 0.05 percent.

96.     Other trade associations, such as the National Association for PET Container Resources (NAPCOR) and the Flexible Packaging Association (FPA), were established or took on new importance over the same time period.

97.     All of these groups had the same directive: defend the plastics industry from restrictive legislation; and worked in concert to push the same narrative: selling recycling as a viable solution to plastic waste. **(Figure 8)**.



## Figure 8

Meeting notes from January 2, 1994 indicate that the American Plastics Council intended to take an aggressive approach in responding to public outcry about plastic waste. *Condrey, 1994 (emphasis added)*.

98.     The largest resin producers, including Exxon, Mobil, DuPont, and Dow, invested tens of millions of dollars into various aspects of plastic recycling, including public relations efforts to shape consumer perception of recycling.[70]

99.     One of the first and most important steps in this campaign to make consumers believe in plastic recycling was the industry-wide implementation of a labeling system known as Resin Identification Codes, or RICs. First introduced in 1988 by SPI, in an attempt to stave off regulation, the "Voluntary Plastic Container Coding System," as it was originally known, grouped plastics by resin type and labeled them with a number surrounded by a triangle of "chasing arrows," the widely recognized symbol for recycling.[71] The "chasing arrows" symbol, a logo showing three arrows each folded in the middle and arranged in a triangle was invented in 1970 by a student who won a contest held by a box manufacturer to promote recycling of paper.[72]

100.    SPI modified and adopted the chasing arrow symbol for plastic containers, including a number in the middle of the three arrows ranging from 1 to 7, that would correspond to the type of resin the item was made from.

101.    The chasing arrows symbol is now strongly associated with recycling, and consumers usually assume that the symbol identifies items that can be recycled.[73] Even though it is universally understood as the recycling symbol the symbol is unnecessary and misleading.

102.    Indeed, in practice, the symbol led consumers to believe that all labeled plastic items were recyclable. And in turn, drove the demand for plastics by consumers. In truth, however, the plastic resin identification codes confused consumers, who believed that any item containing

---

[70] Susan Freinkel, *supra* note 39, at 162-63.
[71] *Id*. at 177-78.
[72] Che, *His Recycling Symbol Is Everywhere. The E.P.A. Says It Shouldn't Be.*, N.Y. Times (Aug. 3, 2023) https://www.nytimes.com/2023/08/07/climate/chasing-arrows-recycling-symbol-epa.html.
[73] *Id*.

the chasing arrows symbol was recyclable. When in fact, most plastic resins could not be recycled because there were no recycling facilities that were capable of recycling most resin numbers. Two surveys in different states showed that between 53 and 74 percent of consumers believed the presence of the symbol on a product meant it could be recycled where they live. In fact, recyclers themselves were clear that they did not need, and in some cases actively opposed, SPI's RIC system. **(Figure 9)**.



## Figure 9

*The Connecticut Department of Environmental Conservation discouraged the state governement from adopting Society of the Plastics Industry's resin identification code system because it was uncessesary and likely to confuse consumers. DEC, 1990 (emphasis added).*

103.     Despite these concerns, the plastics industry continued to push for the adoption of the codes, with other trade associations like APC joining SPI in the fight to codify the system through state legislation with a clear purpose: "to prevent bans."[74] The industry encouraged the adoption of the codes not despite the confusion the RIC system would cause, but because of it. As APC officials noted in a 1992 meeting, the chasing arrows were a "consumer tested mark" and

---

[74] Bailey Condrey, *Staff Mtg 8/24/92, in* STAFF MEETINGS, *supra* note 70, at 54.

"most identified."[75] The RIC system conveyed that plastics are recyclable and, by the mid-1990s, 39 states had adopted legislation requiring the symbols.[76]

104.    Industry trade associations also sought to influence consumer views on plastic recycling through other means. The industry heavily publicized repeated "commitments" to recycling, only to quietly ignore them when they were not achieved.[77]

105.    The plastics industry set these goals knowing they were unlikely to meet them, according to a representative of DuPont. "It is no secret that the quantitative goals industry originally set for itself for economically recycling plastic containers extracted from municipal waste streams were extremely ambitious," James Lohr told attendees at a 1992 recycling conference.[78]

106.    Unfortunately for the industry, Lohr explained, "[t]he goals have proven to be an even greater 'stretch' than originally anticipated."[79]

107.    APC internally acknowledged that their publicized goal to recycle 25% of post-consumer plastic bottles and containers by 1995 would be difficult to reach years before.

108.    In 1992, staffers at APC noted that "[a]dvocacy doomed to failure unless signif[icant] resources allocated to recy[cling],"[80] and acknowledged that the goal "will be difficult to reach" since the "value of the product is lower than cost to prod[uce]."[81]

---

[75] Bailey Condrey, *Monday Mar 23 Staff Mtg., in* STAFF MEETINGS, *supra* note 70, at 11.

[76] *See* Richard Lindsay Stover, et al., Ecology Center, Report of the Berkeley plastics Task Force 9 (Apr. 8, 1996), https://ecologycenter.org/plastics/ptf/; Steve Toloken, *FTC Cracks Down on Resin Code Placement*, PLASTICS NEWS (May 4, 1998), https://www.plasticsnews.com/article/19980504/NEWS/305049986/ftc-cracks-down-on-resin-code-placement.

[77] *See, e.g.,* Tom Ford & Roger King, *APC Retreats from Goal To Recycle 25%*, PLASTICS NEWS (Mar. 25, 1996), https://www.plasticsnews.com/article/19960325/NEWS/303259995/apc-retreats-from-goal-to-recycle-25 (SPI and the Council for Solid Waste Solutions announced in 1991 a goal to recycled 25% of post-consumer bottles and containers by 1995, but abandoned the goal in 1995).

[78] James E. Lohr, *supra* note 77, at 4.

[79] *Id*.

[80] Bailey Condrey, *Staff Mtg 4/13/92, in* STAFF MEETINGS, *supra* note 70, at 13.

[81] Bailey Condrey, *Staff Mtg 8/24/92, in* STAFF MEETINGS, *supra* note 70, at 53.

109.    By January 1994, APC staff again acknowledged that they were unlikely to meet the goal and began discussing how they hoped the failure would be viewed.[82] Still, they were careful to avoid emphasizing this in public. An Exxon employee warned APC staff **(Figure 10)** that they did not "want paper floating around saying we won't meet goal" since the issue was "HIGHLY SENSITIVE POLITICALLY."[83]



### Figure 10

Irwin Levowitz of Exxon Chemical discouraged American Plastics Council staffers from being "too open" in their communications about the trade organization's recycling goal in a January 1994 meeting. *Condrey, 1994 (emphasis added).*

110.    In light of these failures, the industry developed new ways of measuring and presenting recycling rates.

111.    Internal APC meeting notes from May 1995, for example, indicate that the organization was "moving from reporting plas[tic] pkg #s [*sic*] to bottles only,"[84] making it appear that rates had increased more than they actually had. This "roll out of new recy[cling] rates" was appealing because it "helps us justify the new methodology."[85]

---

[82] Bailey Condrey, *ART Meeting – Houston 1/26/94, in* NOTES, at 24 (1994).
[83] *Id*. at 25 (emphasis in original).
[84] Bailey Condrey, *Staff Mtg 5/8/95, in* STAFF & COMMUNICATIONS MTGS. 111 (1994-1996).
[85] Bailey Condrey, *May 5, 1995 Red Mtg., Tech Review Prog., in* STAFF & COMMUNICATIONS MTGS., *supra* note 70, at 107. An alternative system of measurement and a new phrase, "Recovered for Recycling," had been developed by NAPCOR in partnership with the accounting firm Ernst & Young. *See generally* R.W. Beck, 1995 NATIONAL POST-

112.    Industry advertisements, whether sponsored by individual petrochemical companies or front groups, normalized the idea that plastics could be recycled among consumers and policymakers. But most advertisements simply repeated the same lies about the viability of plastic recycling. According to a NAPCOR ad placed in *Ladies' Home Journal* in 1991 **(Figure 11)**, "a bottle can come back as a bottle, over and over again."[86]



**Figure 11**

113.    CSWS advertised its materials demonstrating how people could set up plastic recycling programs in their communities and left little room for doubt: "The proven systems are in place. The talk is over. Plastics recycling is here."[87] And COPE (then known as the Council on

---

CONSUMER PLASTICS RECYCLING RATE STUDY (Sept. 1996), Box No. 12, Jack Milgrom Papers, Special Collections Research Center, Syracuse University Libraries.
[86] National Association for Plastic Container Recovery, *A Bottle That Can Come Back for New Year's Eve is a Cause for Thanksgiving*, LADIES HOME JOURNAL 92 (Dec. 1991).
[87] Council for Solid Waste Solutions, *plastics Recycling Has Taken Off*, STATE LEGISLATURES 35 (Apr. 1991); *see also* Council for Solid Waste Solutions, *Innovations in Recycling: plastics Industry Offers Step by Step Recycling Program Set Up*, STATE LEGISLATURES a2, special insert at 13 (June 1991).

Plastic and Packaging in the Environment) told *Chicago Tribune* readers that they should "Recycle Plastic to Save Landfill Space" to celebrate Earth Day in 1992.[88]

114. Perhaps most egregiously, plastics industry trade associations representing the petrochemical companies developed "sponsored educational materials" for use in schools.[89]

115. For example, a 1994 educational guide distributed by the California Department of Conservation Division of Recycling promoted materials created by trade associations and petrochemical companies, including free curriculum materials on plastic recycling from Dow,[90] an APC guide to setting up a school recycling program,[91] and a Foodservice Packaging Institute (FPI) video entitled "Foodservice Disposables: Should I Feel Guilty?" discussing "the growing controversy over reusable versus disposables."[92] Another video, "Working Together for a Healthier Planet," was produced by APC in 1992—it featured a narrator making blatantly false statements, including the claim that "most plastics can be melted and reused over and over again."[93]

116. When public backlash prompted threats of legislative and regulatory action, the plastics industry recognized that the appearance of action was its best defense. The industry

---

[88] Council for Solid Waste Solutions & National Association for Plastic Container Recovery, *Together, We're Working to Improve Products for Our Environment*, CHICAGO TRIBUNE Z21 (Apr. 5, 1992).

[89] *Molding Young Minds: Firms Spend Big to Get Views into Public Schools*, PLASTICS NEWS (Oct. 30, 1995), https://www.plasticsnews.com/article/19951030/NEWS/310309999/molding-young-minds-firms-spend-big-to-get-views-into-public-schools.

[90] Cal. Dep't of Conservation, Div. of Recycling, EDUCATION & RECYCLING: EDUCATOR'S WASTE MANAGEMENT RESOURCE & ACTIVITY GUIDE 1994 124, 127 (1994).

[91] *Id.* at 131; *see also* National Energy Information Center (NEIC), ENERGY EDUCATION RESOURCES 8 (Mar. 1997) (describing another APC education campaign as "a unique hands-on kit, designed to help middle level science classes explore the world of plastics").

[92] Cal. Dep't of Conservation, *supra* note 93, at 133; *IAMFES Audio Visual Library*, DAIRY, FOOD, & ENVIRONMENTAL SANITATION 195 (Mar. 1993) (describing the educational material as a video that "examines such issues as litter, solid waste, recycling, composting and protection of the earth's ozone layer" and "makes for an excellent discussion opener on . . . the environmental trade-offs (convenience, sanitation and family health) that source reduction necessarily entails").

[93] Working Together for a Healthier Planet, at 8:31 (American plastics Council 1992).

**App. 229**

announced direct investments in recycling initiatives, taking the form of research efforts, pilot programs, and company-owned recycling facilities.

117.    Whatever form they took, they shared a common purpose: to prevent bans on single-use plastics. Although heavily publicized in their initial phases, investments in these "recycling" projects rarely lasted. The projects either never came to fruition, or the facilities were never built or shut down quietly when the threat of regulation passed.

118.    Short-term industry investment could not overcome the economic obstacles to plastic recycling. "The basic issue is economics," the director of environmental solutions at B.F. Goodrich explained to an industry panel in 1992. "[F]or commodity plastics, including PVC, the costs of recycling or recovery either overlap or are greater than the selling price for these materials. This is the essence of the problem and the basic reason why recycling is not growing at faster rates."[94]

119.    Ideally, a representative of Eastman Chemical told attendees of an industry conference in 1994 that consumers could put their plastic containers into recycling bins and "be assured that they would be separated into pure streams and would all be sold for viable reuse applications."[95] But "[w]hile someday this may be a reality," he explained, "it is more likely that we will wake up and realize that we are not going to recycle our way out of the solid waste issue."[96]

120.    The petrochemical companies continued to be primarily invested in expanding production, and that meant more virgin resins. Between 1990 and 1996, for every pound of plastic packaging that was recycled, an average of four pounds of virgin plastic was produced.

---

[94] F.E. Krause, Director Environmental Solutions, Geon Vinyl Division, BF Goodrich Co., Presentation to The Vinyl Industry Tripartite Meeting, *PVC Recycling—An Overview* 1 (Sept. 3-4, 1992), *available at* https://www.toxicdocs.org/d/91wxG1YnjQ8KjOnZ3jE9wLxg7?lightbox=1.
[95] Noel Malone, Manager plastics Solid Waste Management, Eastman Chemical Company, Presentation at Bev-Pak America's '94 Program, *Automated Sortation of Plastic Containers* 1-2 (1994), Box No. 5, Jack Milgrom Papers, Special Collections Research Center, Syracuse University Libraries.
[96] *Id*. At 2.

121.     Another employee at Occidental, James R. Clark, explained at a 1992 conference, "the economics of virgin production"— meaning the widespread availability of cheap, virgin resins—"have put downward pressure on recycled resin value in the marketplace."[97] He told attendees that while "[v]irgin resin meets" the criteria of converters—including characteristics like consistent color, low contamination, and processability—"current recycled materials fail in many of these categories."[98]

122.     In 1995, even as APC officials continued their campaign to convince the public that recycling was viable, staffer Bailey Condrey noted internally **(Figure 12)** that "virgin supplies will go up sharply in near future [and] kick the shit out of PCR (Post-Consumer Recycled material) prices."[99]



**Figure 12**

Notes from a November 1995 American Plastics Council staff meeting reveal clear knowledge that recycled plastic was not economically competitive with virgin material. *Condrey, 1994-1996 (emphasis added).*

123.     "Recycling is not always the best option as it does not always effect [*sic*] greatest environmental gain," explained the European Vinyls Corporation in 1993. "In many instances where mechanical recycling is possible, the energy and other resources consumed outweigh the

[97] James R. Clark, Product Manager Recycling, Occidental Chemical Company, Presenting at ETEX '92: Turn Waste into Profits, *plastics Recycling Strategy* 1 (Apr. 6-7, 1992), Box No. OS2, Jack Milgrom Papers, Special Collections Research Center, Syracuse University Libraries.
[98] *Id*. at 3.
[99] Bailey Condrey, *Staff Mtg 11/6/95*, *in* STAFF & COMMUNICATIONS MTGS. 111, 182 (1994-1996).

environmental gain."[100] Additional research highlighted these concerns. In 1996, the Association

of Plastics Manufacturers in Europe discussed a study that found "there is a limit . . . to the amount

of household plastics waste which can be mechanically recycled with environmental gains."

(**Figure 13**).[101]



## Figure 13

A report from the Association of Plastics Manufacturers in Europe acknowledged that recycling could not adequately address plastic waste. *APME, 1996 (emphasis added).*

124.    The plastics industry's failure to overcome the technical and economic obstacles to

mechanical recycling may have suggested the need for additional research and investment, either

a doubling-down on the mission of the "strike force" or exploration of other options in the fight

against plastic waste. But, in reality, the opposite happened.

125.    The Center for plastics Recycling Research shuttered its doors in 1996, as did

several of the plastic recycling facilities owned by various petrochemical corporations, including

Union Carbide.[102]

---

[100] Rolf Buhl, European Vinyls Corp., UPDATE OF THE PVC RELATED ENVIRONMENTAL DEVELOPMENTS IN EUROPE AS PER JANUARY 1993 25 (Jan. 25, 1993), *available at* https://www.toxicdocs.org/d/O19KKZqrv3EGM5451dXYGmbr1?lightbox=1.
[101] Ass'n of Plastic Mfrs. in Europe (APME), *Summary Report: Separated Mixed Plastics Waste as a Fuel Source* 2 (1996).
[102] *See* Dianne Dumanoski, *Key Events of 1996*, PLASTICS NEWS (Apr 26, 2004), https://www.plasticsnews.com/article/20040423/NEWS/304239998/key-events-of-1996.

126. NPRC fell well short of its 25% recycling commitment – it recycled under 2% as of 1995,[103] and was sold in 1999.[104]

127. Recycling-oriented industry front groups also shifted to the background or, in the case of groups like COPE, ceased operations.[105]

128. All of these changes reflected a broader shift away from the highly visible campaign for recycling that defined the period between 1985 and 1995.

>    **v.    Mid-1990s to 2010s: The plastics industry successfully curbed pressure to create more recyclable plastics, yet recycling continued to prove to be an ineffective method to combat plastic pollution and waste.**

129. Recycling research and advocacy were no longer the priorities they once had been because, as far as the industry was concerned, the real problem had been addressed. The public had been successfully convinced that plastics could be recycled, and the actual viability of recycling mattered far less to the industry than perception.

130. By the mid-1990s, public outrage on plastic waste had begun to subside, and plastics fervor waned in state legislatures and city councils across the country.[106]

131. With that decline in public pressure came a sense of security that the industry had not felt for some time. APC President Red Cavaney explained that "in the early 1990s the public

---

[103] Clare Goldsberry, *supra* note 133.

[104] Steve Toloken, *Thermoformer Elm Packaging Buys NPRC,* PLASTICS NEWS ( July 5, 1999), https://www.plasticsnews.com/article/19990705/NEWS/307059998/thermoformer-elm-packaging-buys-nprc.

[105] *See Recycling Structure is Worth Salvaging*, PLASTICS NEWS, (Dec. 9, 1996), https://www.plasticsnews.com/article/19961209/NEWS/312099976/recycling-structure-is-worth-salvaging.  Further confirmation to industry insiders of the declining importance of recycling came in 1996 when Tom Rattray, the recycling expert who explained that petrochemical companies viewed recycling as competition, retired from his position as Procter & Gamble's associate director for environmental quality. The company decided not to fill his position. *Requiem for a Heavyweight*, PLASTICS NEWS (Sept. 16, 1996).

[106] *S See* Roger King, *Big Reforms Not Likely by State Legislatures,* PLASTICS NEWS (Jan. 16, 1995). Internal documents indicate that by this time, industry fears of increased regulation and recycling mandates had largely shifted abroad. In a December 1995 meeting, APC staffers discussed the "European vs. American model" of packaging regulation, noting "more [and] more countries moving toward mandated recycling goals." Bailey Condrey, *Staff Mtg. 12/4/95, in* STAFF & COMMUNICATIONS MTGS., *supra* note 108, at 194.

focus was very much on targets, and they seemed the most easily explained way of showing that something was being done."[107]

132.    But while an APC spokesperson assured the public that the organization remained "very much committed to increased recycling," the situation was different in 1996 than it had been when they set recycled content goals that had not been reached.[108] "The idea of rates, dates, mandates … numerical goals, is all very artificial."[109] The plastics industry had "progressed beyond" these sorts of "targets," Cavaney explained.[110]

133.    This shift reflected the fact that the implementation of a sustainable plastic recycling infrastructure had never been as important to the industry as relieving public and regulatory pressure.

134.    As Exxon Chemical Vice President Irwin Levowitz succinctly explained in a January 1994 meeting with APC staff **(Figure 14)**, "We are committed to the activities, but not committed to the results."[111]



**Figure 14**
Notes from an American Plastics Council meeting in January 1994 quoted Irwin Levowitz of Exxon Chemical. *Condrey, 1994 (emphasis added).*

---

[107] Tom Ford & Roger King, *supra* note 99.
[108] *Id.*
[109] *Id.*
[110] *Id.*
[111] Bailey Condrey, *Gov/Tech Mtg 1/21/94*, *in* NOTES, *supra* note 86, at 7-8.

135.     In essence, the plastics industry had won, and they knew it. As a *Plastics News* columnist told readers in March 1995, "[t]he plastics recycling war is over. We should declare victory and put the money into cancer research. . . . [T]he level of plastics recycling is about 22 percent and won't increase greatly for each new dollar spent."[112]

136.     The results of the plastic recycling research and development sprint had been limited, but the public relations campaign accompanying it had been remarkably effective.

137.     Working in concert, petrochemical companies and their trade associations successfully convinced consumers that recycling presented a viable solution to the plastic waste crisis, and that was enough.

138.     Polling conducted for APC in 1997 showed that, while respondents who worked in the waste management field were rapidly losing confidence in recycling and shifting their priorities toward source reduction,[113] "recycling continues to be seen as the best use of a community's time and money for resource management by the media, government, and customers."[114]

139.     Members of the media in particular embraced the industry's narrative on recycling, with a majority favoring plastic recycling over alternatives like reuse or source reduction.[115] Media respondents were also more likely to believe that plastic recycling was economically self-sufficient compared to other groups.[116]

140.     In 2000, the plastics recycling rate sat at only six percent and only increased three percentage points, to nine percent, by 2018.[117] According to plastic waste export data, the

---

[112] Roger King, *Don't Throw More Money at Recycling*, PLASTICS NEWS (Mar. 13, 1995), https://www.plasticsnews.com/article/19950313/OPINION02/303139979/don-t-throw-more-money-at-recycling.
[113] *See* Cambridge Reports, Research Int'l, RESOURCE MANAGEMENT OPTIONS, PLASTICS, AND THE PLASTICS INDUSTRY: VIEWS OF APC'S TARGET AUDIENCES 1 (May 1997).
[114] *Id*.
[115] *Id*.
[116] *Id*. at 2.
[117] U.S. Environmental Protection Agency, *National Overview: Facts& Figures on Materials, Wastes, and Recycling, supra*.

ostensible increase to nine percent was largely due to millions of pounds of plastic waste being exported each year to China and developing countries, supposedly for recycling but often for incineration or landfilling.[118] Today, the plastic waste exports have declined and the U.S. plastics recycling rate is a dismal five percent.[119]

141. The steep increase in plastic production over the past 60 years, as depicted in **Figure 15**, created a dramatic increase in plastic waste: in the United States, plastic increased as a percent of municipal solid waste (by mass) from 0.4 percent in 1960 to 12.2 percent in 2018.[120] An estimated 44 million tons of plastic waste were generated in the United States in 2019.

**Figure 15 plastics Production Chart and Prediction to 2060**[121]



[118] Beyond plastics and the Last Beach Cleanup, The Real Truth about the U.S. plastics Recycling Rate, *supra* note 9, at page 2.
[119] Nat. Renewable Energy Laboratory, *NREL Calculates Lost Value of Landfilled Plastic in the U.S.* (April 28, 2022) https://www.nrel.gov/news/press/2022/nrel-calculates-lost-value-of-landfilled-plastic-in-us.html; *see also* Beyond plastics and the Last Beach Cleanup, *supra* note 9.
[120] Com. on the U.S. Contributions to Global Ocean Plastic Waste, Nat. Academy Sciences, Engineering, and Medicine, Reckoning with the U.S. Role in Global Ocean Plastic Waste (2022) page 3. (Additionally, the generation of municipal solid waste in the United States has increased significantly over the past 60 years).
[121] *Global Plastic Production and Projections, 1950 to 2060,* Our World in Data https://ourworldindata.org/grapher/global-plastic-production-projections.

142.    The excessive amount of plastic waste and pollution is one of the most serious environmental crises confronting Missouri and the planet today. According to the U.S. Environmental Protection Agency's (EPA) latest estimates, approximately 23 percent of global plastic waste was improperly disposed of, burned (creating harmful and toxic emissions), or leaked into the environment in 2019.

143.    Widespread production and promotion of single-use plastic has led to persistent plastic leakage into the environment[122] Around the world each year, an estimated 11 million tons of plastic waste become aquatic pollution, and 18 million tons of plastic waste pollute land. Together, that is the equivalent of four garbage trucks of new plastic waste polluting water or land *every minute.*[123]

144.    Single-use plastics – plastic packaging, bags, straws, and disposable plasticware and utensils – represent the largest plastics application, and account for one-third of all plastics consumed globally.[124] Single-use plastics comprise most of the plastic waste that escapes and/or is discharged into the environment.[125]

145.    Once plastic waste enters the environment as pollution, it is long-lived, cumulative, friable, and mobile, and can have substantial negative effects on a wide range of freshwater, marine, and terrestrial species. Removing plastics from the environment becomes difficult and costly as plastics fragment into smaller and smaller pieces.

146.    Defendants produce the primary chemicals and polymers used to produce plastic and styrofoam products such as bottles, cups, plastics, utensils, take-out containers, and packaging

---

[122] Organization for Economic Cooperation and Development (OECD), *Plastic Pollution is Growing Relentlessly as Waste Management and Recycling Fall Short, Says OECD* (Feb. 22, 2022) https://www.oecd.org/en/about/news/press-releases/2022/02/plastic-pollution-is-growing-relentlessly-as-waste-management-and-recycling-fall-short.html.
[123] Lau et al., *Evaluating Scenarios Toward Zero Plastic Pollution* (2020) 269 Science 1455.
[124] Minderoo 2023, *supra* note 4, page 17.
[125] *Id.*

designed for single-use that are sold throughout United States, and Defendants consider the production of these polymers as the "core" of their chemicals and products portfolio and see 80 percent of its growth potential as "dependent on single-use plastics applications."

147.    Over the years, Exxon Mobil and the other Defendants expanded their U.S. plastic production to 7.7 million tons per year in 2023. Plastic waste has also grown, for instance, from 8.9 percent of all managed trash in California in 1999 to almost 14 percent of all managed trash in California in 2021. Even when millions of tons of waste plastic were still being exported to China each year, plastics recycling never managed to reach 10%. Despite the stark failure of plastics recycling, the plastics, packaging, and products industries have waged a decades-long misinformation campaign to perpetuate the myth that plastic is recyclable.[126]

148.    "Plastic waste is not just an environmental issue. It's a waste management issue. It's also a land use issue because landfills are closing in many areas," Anelia Milbrandt, a senior research analyst at National Renewable Energy Laboratory (NREL) said. "What do we do with all that waste?"[127]

149.    Tellingly, all polled groups—consumers, media members, government officials, and even waste management industry representatives—believed that plastic could be economically recycled at a much higher rate than it could be.[128]

vi.    **Today: The plastics industry's aggressive misinformation campaign continues to deceive consumers.**

150.    In 2019, NAPCOR and its membership of companies that manufacture and distribute PET containers conceived a scheme to attempt to combat a rising "tide of anti-plastic

---

[126] Beyond plastics, The Real Truth about the U.S. plastics Recycling Rate, *supra* note 9, at page 2. *See also* PBS Frontline, "Plastic Wars," March 31, 2020 https://www.pbs.org/wgbh/frontline/documentary/plastic-wars/
[127] Nat. Renewable Energy Laboratory, *NREL Calculates Lost Value of Landfilled Plastic in the U.S.* (April 28, 2022), https://www.nrel.gov/news/press/2022/nrel-calculates-lost-value-of-landfilled-plastic-in-us.html.
[128] *See id.*

sentiment." To address this issue, NAPCOR hired a public relations firm to address these concerns and the "voices calling for safe, environmentally conscious packaging alternatives." The public relations firm then created the "Positively PET" slogan for its campaign. NAPCOR's public relations firm hired specifically to address this rising tide advised NAPCOR that it should "not be the overall handle for the account" to ensure that "consumers don't feel like they are being preached to."

151.    Instead of NAPCOR promoting the Positively PET campaign, internal documents reveal that NAPCOR hired social media influencers to promote "PET plastics messaging." These social media influencers were paid to post Positively PET posts containing the claim that a PET bottle is 100% recyclable and can be made with 100% recyclable content. But that claim doesn't match NAPCOR's own recycling data for PET Bottle Collection Rates, 2001 – 2022 (**Figure 16**).[129]

**Figure 16: PET Bottle Collection Rates, 2001-2022**



---

[129] *NAPCOR's 2022 PET Recycling Report Demonstrates Bottle-to-Bottle Circulatrity Continues on the Rise* (Dec. 13, 2023), available at: https://napcor.com/news/2022-pet-recycling-report/.

152.     The fraudulent campaign continued into 2024, when NAPCOR entered the debate on the 2024 Paris Olympics ban on single-use water bottles and cups. NAPCOR communications director, Lindsay Nichols, described this strategy on inserting industry-favoring messaging into trending conversations as the opportunity to "newsjack." And to ensure a successful hijack of news and trending topics with NAPCOR's misleading recycling messaging, NAPCOR encouraged all posts to include common hashtags such as #Olympics, #Paris2024, and #TeamUSA.

153.     Similarly, Defendants and associated plastics industry trade group continue their mislead advertising campaign. For example, the previously-discussed Society of Plastics Industry (SPI) changed its name in 2016 to the Plastics Industry Association. Even as recently as 2023, Exxon Mobil played an active role in the Plastics Industry Association's governance, where an Exxon Mobil Senior Sustainability Advisor was Vice Chair of the Plastics Industry Association's Recycling Committee.

154.     The Plastics Industry Association, with Exxon Mobil at the helm, seemingly continues to play an integral role in pushing the messaging that plastics are recyclable, as indicated by its website[130] and companion site, recyclingisreal.com.

155.     Defendants, working in conjunction with these trade groups, have successfully worked for over 60 years to drive the demand for single-use plastics by misleading and defrauding the American public with the unfounded notion that plastics are recyclable.

## V.     TOLLING OF THE STATUTE OF LIMITATIONS

### A.     Discovery-Rule Tolling

156.     Within the period of any applicable statute of limitations, Plaintiffs could not have discovered through the exercise of reasonable diligence that most plastics are not recyclable.

---

[130] https://www.plasticsindustry.org/sustainability

157.    Plaintiffs did not discover, and did not know of, facts that would have caused a reasonable person to suspect that most plastics were not recyclable.

### B.    Fraudulent-Concealment Tolling

158.    All applicable statutes of limitations have also been tolled by Defendants' fraudulent concealment throughout the period relevant to this action that most plastics were not recyclable.

159.    Rather than disclosing to consumers the fact that only 15% of all plastics can be recycled, Defendants continued to manufacture, market, distribute, and sell plastics as recyclable and a better alternative to aluminum and glass.

## VI.    CLASS ACTION ALLEGATIONS

160.    Plaintiffs repeat and re-allege every allegation above as set forth above.

161.    **Nationwide Class:** Pursuant to Federal Rule 23(b)(1) and (b)(2), Plaintiffs Billie Rodriguez, Daniel Erwin, Michael Ackerman, Kyle Foreman, Drew Scruggs, Mary Jane McQueeny, Emily Thorpe, Jennifer Tritt and the Board of County Commissioners of the County of Ford bring this suit on their own behalf and on behalf of a proposed class of all other similarly situated persons ("Nationwide Class") consisting of:

> All persons, governmental, and non-governmental entities in the United States and its territories who indirectly purchased plastics for end use from January 1, 1990 until Defendants' conduct ceases or class notice is given, whichever occurs first.

Excluded from the Class are:

> a.    The Defendants and their officers, directors, management, employees, subsidiaries or affiliates;
>
> a.    The judges in this case and any members of their immediate families;
>
> b.    All persons who are presently in bankruptcy proceedings or who obtained a bankruptcy discharge in the last three years;

> c.    All persons who are currently incarcerated; and
>
> d.    The State of California and all cities, counties, and municipalities within.

162. **State Law Class:** Pursuant to Federal Rule 23(b)(3), Plaintiffs Billie Rodriguez, Daniel Erwin, Michael Ackerman, Kyle Foreman, Drew Scruggs, Mary Jane McQueeny, Emily Thorpe, Jennifer Tritt and the Board of County Commissioners of the County of Ford bring this suit on their own behalf and on behalf of a proposed class of all other similarly situated persons ("State Law Class") consisting of:

> All persons, governmental, and non-governmental entities in the Indirect Purchaser states[131] who indirectly purchased plastics for end use from January 1, 1990 until Defendants' conduct ceases or class notice is given, whichever occurs first.

Excluded from the Class are:

> a.    The Defendants and their officers, directors, management, employees, subsidiaries or affiliates;
>
> b.    The judges in this case and any members of their immediate families;
>
> c.    All persons who are presently in bankruptcy proceedings or who obtained a bankruptcy discharge in the last three years;
>
> d.    All persons who are currently incarcerated;
>
> e.    The State of California and all cities, counties, and municipalities within.

163. **Public Nuisance Class**: Pursuant to Federal Rule 23(b)(2) and (3), Plaintiff The Board of County Commissioners of the County of Ford brings this suit on its own behalf and on behalf of a proposed class of all other similarly situated persons ("Public Nuisance Class") consisting of:

---

[131] The Indirect Purchaser States include Arizona, Arkansas, California, Colorado, Connecticut, District of Columbia, Florida, Hawaii, Illinois, Iowa, Kansas, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin.

All counties, cities, and municipalities located within the United States and its territories which have incurred and will continue to incur sanitation costs for plastic waste clean-up and disposal from January 1, 1990 until Defendants' conduct ceases or until class notice is given, whichever occurs first (the "Class").

Excluded from the Class are:

    a.    The Defendants and their officers, directors, management, employees, subsidiaries or affiliates;

    b.    The judges in this case and any members of their immediate families; and

    c.    The State of California and all cities, counties, and municipalities within.

164. Upon information and belief, the Classes consists of millions of persons, governmental, and non-governmental entities residing throughout the United States. Numerosity is therefore satisfied, and it would be impracticable to join all Class Members before the Court.

165. Under Rule 23(b)(3), there are numerous and substantial questions of law or fact common to all of the Class Members and which predominate over any individual issues. Included within the common question of law or fact are:

    a.    Whether Defendants' combined deceptive advertising regarding the recyclable nature of plastics, has substantially affected interstate and intrastate commerce;

    b.    Whether Defendants engaged in an agreement, combination or conspiracy to artificially increase the demand for plastics to protect their profits;

    c.    The duration of this conspiracy or combination;

    d.    Whether the alleged conspiracy violated state antitrust and consumer protection laws;

    e.    Whether Defendants' deceptive advertising regarding the recyclable nature of plastics, has substantially affected interstate and intrastate commerce;

    f.    Whether Defendants' deceptive advertising regarding the recyclability of plastics has increased the cost of waste disposal;

    g.    Whether Defendants negligently mispresented its product or pricing;

h.  Whether the Defendants' conduct was an unreasonable interference with the counties' health and welfare;

i.  Whether the conduct of Defendants caused injury to the Class;

j.  The quantum of overcharges paid by the Class in the aggregate;

k.  Whether Defendants negligently mispresented its product or pricing;

l.  Whether Defendants were unjustly enriched by selling plastics at an inflated price.

166.  The claims of Plaintiffs are typical of the claims of Class Members, in that they share the facts above and legal claims or questions with Class Members, there is a sufficient relationship between the damage to Plaintiffs and Defendants' conduct affecting Class Members, and Plaintiffs have no interests adverse to the interests other Class Members.

167.  Plaintiffs will fairly and adequately protect the interests of Class Members and have retained counsel experienced and competent in the prosecution of complex class actions including complex questions that arise in consumer protection litigation.

168.  A class action is superior to other methods for the fair and efficient adjudication of this controversy, since individual joinder of all Class Members is impracticable and no other group method of adjudication of all claims asserted is more efficient and manageable for at least the following reasons:

a.  The liability claims presented in this case predominates over any questions of law or fact, if any exists at all, affecting any individual member of the Class;

b.  Absent a Class, the Class Members will continue to suffer damage and Defendants' unlawful conduct will continue without remedy while Defendants profit from and enjoy their ill-gotten gains;

c.  Given the size of individual Class Members' claims, few, if any, Class Members could afford to or would seek legal redress individually for the wrongs Defendants committed against them, and absent Class Members have no substantial interest in individually controlling the prosecution of individual actions;

d. When the liability of Defendants has been adjudicated, claims of all Class Members can be administered efficiently and/or determined uniformly by the Court; and

e. This action presents no difficulty that would impede its management by the Court as a class action, which is the best available means by which Plaintiff and Class Members can seek redress for the harm caused to them by Defendant.

169. Because Plaintiffs seek relief for the Classes as described above, the prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual member of the Classes, which would establish incompatible standards of conduct for Defendant.

170. Further, bringing individual claims would overburden the Courts and be an inefficient method of resolving the dispute, which is the center of this litigation. Adjudications with respect to individual Class Members would, as a practical matter, be dispositive of the interest of other Class Members who are not parties to the adjudication and may impair or impede their ability to protect their interests. As a consequence, class treatment is a superior method for adjudication of the issues in this case.

## VII. ANTITRUST INJURY

171. Plaintiffs repeat and re-allege every allegation above as set forth above.

172. Defendants' anticompetitive conduct had the following effects, among others:

a. the demand for plastics was artificially increased;

b. price competition has been restrained or eliminated with respect to plastic;

c. purchasers of plastics have been deprived of free and open competition; and

d. purchasers of plastics, including Plaintiffs, paid artificially inflated prices.

48

173.    The purpose of Defendants' conduct was to artificially increase the demand for plastics to protect their profits. As a direct and foreseeable result, Plaintiffs and the Classes paid supracompetitive prices for plastics during the Class Periods.

174.    Through the alleged violations of antitrust laws, Plaintiffs and the Classes have sustained injury to their business or property, purchasing more plastics than if they had known of the true recyclability rates of plastics and paying higher prices for plastics than they would have paid in the absence of Defendants' illegal conduct, and have suffered damages as a result.

175.    Plaintiffs paid higher prices for plastics that would have in the absence of Defendants' conduct.

176.    This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

## VIII.    RELEVANT MARKET

177.    The relevant product market for this action is plastics products for end use consumption and the relevant geographic market is the United States and its territories.

## IX.    CLAIMS FOR RELIEF

## A.    VIOLATIONS OF THE SHERMAN ACT

### COUNT 1
### VIOLATION OF 15 U.S.C. § 1
### (On Behalf of the Nationwide Class for Injunctive Relief)

178.    Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

179.    From at least January 1, 1990, and continuing through the present, the exact dates being unknown to Plaintiffs, Defendants and their co-conspirators entered into a continuing agreement, understanding, and conspiracy in restraint of trade artificially to artificially increase the demand for plastics in the United States, including by restraining their respective production volumes, in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

49

180. In formulating and carrying out the alleged agreement, understanding, and conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including, but not limited to, the acts, practices, and course of conduct set forth above, and to artificially increase the demand for plastics to protect their profits.

181. The combination and conspiracy alleged has had at least the following effects:

    a.    The demand for plastics was artificially increased;

    b.    Price competition in the sale of plastics has been restrained, suppressed, and/or eliminated in the United States; and

    c.    Those who purchased plastics indirectly from Defendants and their co-conspirators for their personal use have been deprived of the benefits of free and open competition and paid artificially high prices for plastics.

182. Plaintiffs and Class Members have been injured and will continue to be injured in their businesses and property by paying more for plastics purchased indirectly from Defendants and their co-conspirators for their personal use than they would have paid and will pay in the absence of the combination and conspiracy.

183. Plaintiffs and Class Members are entitled to an injunction against Defendants, preventing and restraining the violations alleged.

184. Plaintiffs and the Nationwide Class, pursuant to Fed. R. Civ. P. 57 and 28 U.S.C. § 2201(a), seek a declaratory judgment that Defendants' conduct in seeking to prevent competition as described violates § 1 of the Sherman Act (15 U.S.C. § 1).

**B.**    <u>**VIOLATIONS OF PUBLIC NUISANCE LAWS**</u>

<u>**COUNT 2**</u>
<u>**PUBLIC NUISANCE**</u>
**(On Behalf of the Public Nuisance Class)**

205. Plaintiffs repeat and re-allege each and every allegation set forth above.

206. Defendants created, exacerbated, and maintained a public nuisance by increasing

plastic waste which proximately caused injury to Plaintiffs.

207.    A public nuisance is an unreasonable interference with a right common to the general public. Defendants conduct has created, contributed to, and maintained an ongoing, significant, unlawful, and unreasonable interference with rights common to the general public, including the public health, welfare, safety, peace, comfort, and convenience of Plaintiffs' communities. *See* Restatement (Second) of Torts § 821B.

208.    Defendants have created, contributed to, and maintained a public nuisance by deceptively advertising and marketing that plastics were recyclable when in reality less than 10% of Plastics are recycled. This deceptive advertising caused various agencies not to ban Plastics, artificially increased the demand for Plastics and increased the amount of Plastics waste that counties have had to dispose of. This conduct has unreasonably interfered with the public health, welfare, and safety in Plaintiffs' communities. Plaintiffs have a common right to be free from such conduct and to be free from conduct that creates a disturbance and reasonable apprehension of danger to person and property.

209.    The interference is unreasonable because Defendants nuisance-creating conduct:

a.    Involves a significant interference with the public health, the public safety, the public peace, the public comfort, and/or the public convenience;

b.    Was and is proscribed by state laws and regulations at all relevant times; and/or

c.    Is of a continuing nature and, as Defendants know, has had and continues to have a significant effect upon rights common to the general public, including the public health, the public safety, the public peace, the public comfort, and/or the public convenience.

210.    The significant interference with rights common to the general public is described in detail throughout this Complaint.

211.    Defendants are liable for creating, contributing to, and maintaining the public

nuisance because their intentional, knowing, reckless, and unreasonable and/or unlawful conduct was a substantial factor in producing the public nuisance and harm to Plaintiffs.

212. Defendants had control over its conduct in Plaintiffs' communities and that conduct has had an adverse effect on rights common to the general public. Defendants have controlled the dissemination of information regarding the recyclability of Plastics to consumers for years.

213. It was reasonably foreseeable that Defendant's actions and omissions would result in the public nuisance and harm to Plaintiffs described here.

214. The externalized risks associated with Defendants nuisance-creating conduct as described here greatly exceed the internalized benefits.

215. The nuisance created by Defendants conduct is abatable.

216. As a direct and proximate result of Defendants' tortious conduct and the public nuisance created by Defendant, Plaintiffs have been damaged.

## C.  <u>VIOLATIONS OF STATE CONSUMER PROTECTION LAWS</u>

217. Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

218. As alleged throughout this Class Action Complaint, Exxon Mobil Corporation, Chevron USA, Inc., Chevron Philips Chemical Corporation, Celanese Corporation, Dow Inc., Dow Chemical Company, Dupont de Nemours, Inc., Dupont Corporation, Eastman Chemical Company, LyondellBasell Industries N.V., and American Chemical Counsel engaged in unfair methods of competition; unfair or deceptive acts or practices; and/or unconscionable acts or practices in violation of the following state consumer protection laws by taking the following actions, including but not limited to:

    a.   making fraudulent, deceptive, and material misrepresentations about the recyclability of plastics sold in the United States;

    b.   not disclosing that less than 10% of plastic products are recycled;

   c.  exploiting the perceived recyclability of plastics to artificially increased demand and therefore prices of plastic.

219. As a result of Defendants' practices, Plaintiffs and the class members have suffered damages and are entitled to recover those damages and costs, including reasonable attorneys' fees.

220. Plaintiffs and the Class are also entitled to an injunction to stop Defendants continued deceptive and unconscionable practices of advertising and selling plastics as recyclable.

221. By engaging in the conduct set forth throughout this Class Action Complaint, Defendants have engaged in unfair competition and unfair or deceptive acts or practices or unconscionable practices in violation of the following state consumer protection statutes:

**COUNT 3**
**VIOLATIONS OF THE ARKANSAS DECEPTIVE TRADE PRACTICES ACT**
**(Ark. Code Ann. § 4-88-101, *et seq.*)**
**(On Behalf of the State Law Class)**

222. Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

223. Through the conduct alleged, Defendants have violated Ark. Code § 4-88-101 *et seq.*

224. Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of trade or commerce in the plastics market, a substantial part of which occurred within Arkansas.

225. Defendants' unlawful conduct substantially affected Arkansas' trade and commerce.

226. Defendants concealed, suppressed, and omitted to disclose material facts to members of the Arkansas Class concerning Defendants' unlawful activities and artificially inflated prices for plastics. They concealed, suppressed, and omitted facts would have been important to members of the Arkansas Class as they related to the cost of products they purchased.

227. Defendants misrepresented the real cause of price increases and/or the absence of price reductions in plastics by making public statements that were not in accord with the facts.

228. Defendants' statements and conduct related to the price of their products were deceptive as they had the tendency or capacity to mislead members of State Law Class to believe that they were purchasing at prices established by a free and fair market.

229. The aforementioned conduct by Defendants constituted "unconscionable" and "deceptive" acts or practices in violation of ARK. CODE § 4-88-107(a)(10).

230. As a direct and proximate result of Defendants' unlawful conduct, members of the State Law Class have been injured in their business or property and are threatened with further injury in that they paid and will pay supra-competitive prices for plastics due to Defendants' unlawful conduct.

231. Accordingly, members of the State Law Class seek all relief available under the Arkansas Deceptive Trade Practices Act.

## COUNT 4
## VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION LAW
### (Cal. Bus. & Prof. Code § 17200, *et seq.*)
### (On Behalf of the State Law Class)

232. Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

233. Plaintiffs bring this Count on behalf of all Class Members who are or have been residents of California at any relevant time ("California Class Members") against Exxon Mobil Corporation, Chevron USA, Inc., Chevron Philips Chemical Corporation, Celanese Corporation, Dow Inc., Dow Chemical Company, Dupont de Nemours, Inc., Dupont Corporation, Eastman Chemical Company, LyondellBasell Industries N.V., and American Chemical Council.

234. CAL. BUS. & PROF. CODE § 17200 prohibits any "unlawful, unfair, or fraudulent business act or practices."

54

235. As alleged throughout this Class Action Complaint, Defendants engaged in unfair, deceptive, and/or unlawful practices in violation of California's Unfair Competition law by, at a minimum: (a) making material misrepresentations about the recyclability of plastics; and (b) causing confusion or misunderstanding regarding the recyclability of plastics.

236. As indicated by the below statements of California and federal policy, Defendants' grossly excessive and unfair plastics pricing violates public policy and is, as such, unlawful under CAL. BUS. & PROF. CODE § 17200.

237. Defendants' unfair, unlawful and/or deceptive activity alleged caused Plaintiffs and the California Class Members to purchase plastics at inflated prices. Accordingly, Plaintiffs and the California Class Members have suffered injury in fact including lost money or property as a result of Defendants' misrepresentations and omissions.

238. Plaintiffs request that this Court enter such orders or judgments as may be necessary to enjoin Defendants from continuing their unfair, unlawful, and/or deceptive practices and to restore to Plaintiffs and Class Members any money Defendants acquired by unfair competition, including restitution and/or restitutionary disgorgement, as provided in CAL. BUS. & PROF. CODE § 17203 and CAL. BUS. & PROF. CODE § 3345; and for such other relief set forth below.

## COUNT 5
## VIOLATION OF THE DISTRICT OF COLUMBIA CONSUMER PROTECTION PROCEDURES (6 Del. Code § 2513, *et seq.*)
### (On Behalf of the State Law Class)

239. Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

240. Plaintiffs and Class Members purchased plastics for personal, family, or household purposes.

241. Through the conduct alleged, Defendants have violated D.C. CODE § 28-3901, *et seq.*

242. Defendants are "merchants" within the meaning of D.C. Code § 28- 3901(a)(3).

243. Defendants' conduct was an unfair method of competition, and an unfair or deceptive act or practice within the conduct of commerce within the District of Columbia. Defendants' unlawful conduct substantially affected the District of Columbia's trade and commerce.

244. As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and Class Members have been injured in their business or property and are threatened with further injury.

245. Because of the foregoing, Plaintiffs and Class Members are entitled to seek all forms of relief, including treble damages or $1,500 per violation (whichever is greater) plus punitive damages, reasonable attorney's fees and costs under D.C. Code § 28-3901, *et seq.*

## COUNT 6
## VIOLATIONS OF FLORIDA'S UNFAIR & DECEPTIVE TRADE PRACTICES ACT
### (Fla. Stat. § 501.201, *et seq.*)
### (On Behalf of the State Law Class)

246. Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

247. The Florida Deceptive & Unfair Trade Practices Act, Fla. Stat. § 501.201, et seq. (the "FDUTPA"), generally prohibits "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce," including practices in restraint of trade. Fla. Stat. § 501.204(1).

248. The primary policy of the FDUTPA is "[t]o protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.202(2).

249. A claim for damages under the FDUTPA has three elements: (1) a prohibited practice; (2) causation; and (3) actual damages.

250. Under Florida law, indirect purchasers have standing to maintain an action under the FDUTPA based on the facts alleged in this complaint. See FLA. STAT. § 501.211(1) ("anyone aggrieved by a violation of this [statute] may bring an action . . .").

251. Plaintiffs and Class Members purchased plastics within the State of Florida during the Class Period. But for Defendants' conduct set forth, the price of plastics would have been lower, in an amount to be determined at trial.

252. Defendants' unlawful conduct substantially affected Florida's trade and commerce.

253. As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and the Class Members have been injured in their business or property because of overcharges for plastics and are threatened with further injury.

254. Because of the foregoing, Plaintiffs and the Class Members are entitled to seek all forms of relief, including injunctive relief pursuant to FLA. STAT. § 501.208 and declaratory judgment, actual damages, reasonable attorneys' fees and costs pursuant to FLA. STAT. § 501.211.

**COUNT 7**
**VIOLATION OF THE MASSACHUSETTS CONSUMER PROTECTION ACT,**
**(Mass. Gen. Laws Ch. 93a, § 1, *et seq.*)**
**(On Behalf of the State Law Class)**

255. Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

256. Through the conduct alleged, including the violation of federal antitrust laws, Defendants have violated the Massachusetts Consumer Protection Act, MASS. GEN. LAWS ch. 93A § 2, et seq.

257.    Plaintiffs and Class Members purchased plastics within the Commonwealth of Massachusetts during the Class Period. But for Defendants' conduct set forth, the price paid would have been lower, in an amount to be determined at trial.

258.    Defendants' conduct was an unfair method of competition, and an unfair or deceptive act or practice within the conduct of commerce within the Commonwealth of Massachusetts.

259.    Defendants' unlawful conduct substantially affected Massachusetts' trade and commerce.

260.    Plaintiffs and Class Members purchased plastics, primarily for personal, family, or household purposes.

261.    As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and Class Members have been injured in their business or property and are threatened with further injury.

262.    Because of the foregoing, Plaintiffs and Class Members are entitled to seek all forms of relief, including up to treble damages and reasonable attorney's fees and costs under MASS. GEN. LAWS ch. 93A § 9.

## COUNT 8
## VIOLATION OF THE MISSOURI MERCHANDISING PRACTICES
### (ACT, MO. ANN. STAT. § 407-010, *ET SEQ.*)
### (On Behalf of the State Law Class)

263.    Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

264.    Chapter 407 of the Missouri Merchandising Practices Act (the "MMPA") governs unlawful business practices, including antitrust violations such as restraints of trade and monopolization. MO. REV. STAT. § 407.020 prohibits "the act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the

58

concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce…," as further interpreted by the Missouri Code of State Regulations, 15 CSR 60-7.010, *et seq.*, 15 CSR 60-8.010, *et seq.*, and 15 CSR 60-9.010, *et seq.*, and MO. REV. STAT. § 407.025, which provides for the relief sought in this count.

265.     The Defendants concealed, suppressed, and omitted to disclose material facts to Plaintiffs and members of the Damages Class concerning its unlawful activities and artificially inflated prices for plastics. It concealed, suppressed, and omitted facts that would have been important to Plaintiffs and members of the State Law Class as they related to the cost of plastics they purchased.

266.     The Defendants misrepresented the real cause of price increases and/or the absence of price reductions in plastics by making public statements that were not in accord with the facts.

267.     The Defendants' statements and conduct related to the price of plastics were deceptive as they had the tendency or capacity to mislead Plaintiffs and members of the State Law Class to believe that they were purchasing plastics at prices established by a free and fair market.

268.     Plaintiffs and Class Members purchased plastics for end use within the State of Missouri during the Class Period. But for Defendants' conduct set forth, the price of plastics would have been lower, in an amount to be determined at trial.

269.     Under Missouri law, indirect purchasers have standing to maintain an action under the MMPA based on the facts alleged in this Complaint. *Gibbons v. J. Nuckolls, Inc.*, 216 S.W.3d 667, 669 (Mo. 2007).

270.     Plaintiffs and Class Members were injured with respect to purchases of plastics in Missouri and are entitled to all forms of relief, including actual damages or liquidated damages in

an amount which bears a reasonable relation to the actual damages which have been sustained, as well as reasonable attorneys' fees, costs, and injunctive relief.

**COUNT 9**
**VIOLATION OF THE MONTANA UNFAIR TRADE PRACTICES AND CONSUMER PROTECT ION ACT OF 1970,**
**(Mont. Code § 30-14-103, *et seq.* and § 30-14-201, *et seq.*)**
**(On Behalf of the State Law Class)**

271.    Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

272.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Montana Unfair Trade Practices and Consumer Protection Act of 1970, MONT. CODE, §§ 30-14-103, *et seq.*, and 30-14-201, *et seq.*

273.    Defendants' unlawful conduct had the following effects: (1) the demand for plastics was artificially increased throughout Montana; (2) Plaintiffs and Class Members were deprived of free and open competition; and (3) Plaintiffs and Class Members paid supracompetitive, artificially inflated prices for plastics.

274.    Plaintiffs and Class Members purchased plastics, primarily for personal, family, or household purposes.

275.    During the Class Period, Defendants' illegal conduct substantially affected Montana commerce and consumers.

276.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and Class Members have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of MONT. CODE, §§ 30 14-103, *et seq.*, and 30-14-201, *et seq.*, and, accordingly, Plaintiffs and Class Members seek all relief available under that statute.

## COUNT 10
## VIOLATION OF THE NEBRASKA CONSUMER PROTECTION ACT
### (Neb. Rev. Stat. § 59-1602, *et seq.*)
### (On Behalf of the State Law Class)

277.    Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

278.    Through the conduct alleged, Defendants have violated NEB. REV. STAT. § 59-1602, *et seq*.

279.    Under Nebraska law, indirect purchasers have standing to maintain an action under the Nebraska Consumer Protection Act based on the facts alleged in this Complaint. *See* NEB. REV. STAT. § 59-1609. Defendants' conduct had a direct or indirect impact upon Plaintiffs' and Class Members's ability to protect themselves.

280.    Defendants' unlawful conduct substantially affected Nebraska's trade and commerce.

281.    As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and the Class Members have been injured in their business or property and are threatened with further injury.

282.    Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of Nebraska.

283.    Because of the foregoing, Plaintiffs and Class Members seek all relief available under the statute, NEB. REV. STAT. § 59-1601, *et seq*.

## COUNT 11
## VIOLATIONS OF THE NEVADA DECEPTIVE TRADE PRACTICES ACT
### (Nev. Rev. Stat. § 598.0903, *et seq.*)
### (On Behalf of the State Law Class)

284.    Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

285.    Through the conduct alleged, Defendants have violated NEV. REV. STAT. § 598.0903, *et seq*.

286. Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of Nevada.

287. Defendants' conduct amounted to a fraudulent act or practice committed by a supplier in connection with a consumer transaction.

288. Defendants' unlawful conduct substantially affected Nevada's trade and commerce.

289. Defendants' conduct was willful.

290. As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and Class Members have been injured in their business or property and are threatened with further injury.

291. Because of the foregoing, Plaintiffs and Class Members is entitled to seek all forms of relief, including damages, reasonable attorneys' fees and costs, and a civil penalty of up to $5,000 per violation under NEV. REV. STAT. § 598.0993.

## COUNT 12
## VIOLATIONS OF NEW HAMPSHIRE CONSUMER PROTECTION ACT
### (N.H. Rev. Stat. Ann. § 358-a:1, *et seq.*)
### (On Behalf of the State Law Class)

292. Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

293. Through the conduct alleged, Defendants have violated N.H. REV. STAT. tit. XXXI, § 358-A:1, *et seq*.

294. Under New Hampshire law, indirect purchasers have standing to maintain an action under the New Hampshire Consumer Protection Act based on the facts alleged in this Complaint. *See LaChance v. U.S. Smokeless Tobacco Co.*, 156 N.H. 88, 92-100 (2007).

295. Defendants' conduct was unfair or deceptive within the conduct of commerce within the State of New Hampshire.

296. Defendants' conduct was willful and knowing.

297. Defendants' conduct had a direct or indirect impact upon Plaintiffs' and Class Members's ability to protect themselves.

298. Defendants' unlawful conduct substantially affected New Hampshire's trade and commerce.

299. As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and the Class Members have been injured in their business or property and are threatened with further injury.

300. Because of the foregoing, Plaintiffs and the Class Members are entitled to seek all forms of relief available under N.H. REV. STAT §§ 358-A:10 and 358-A:10-a.

## COUNT 13
## VIOLATIONS OF THE NEW MEXICO UNFAIR TRADE PRACTICES ACT
### (N.M. Stat. Ann. §§ 57-12-1, *et seq.*)
### (On Behalf of the State Law Class)

301. Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

302. Through the conduct alleged, Defendants have violated N.M. STAT. § 57-12-3, *et seq*.

303. Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of New Mexico.

304. Defendants' unlawful conduct substantially affected New Mexico's trade and commerce.

305. Defendants' conduct constituted "unconscionable trade practices" in that such conduct, inter alia, resulted in a gross disparity between the value received by Plaintiffs and Class Members and the price paid by them for Defendants' oil as set forth in N.M. STAT. § 57-12-2E.

306. Defendants' conduct was willful.

307. As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and the Class Members have been injured in their business or property and are threatened with further injury.

308. Because of the foregoing, Plaintiffs and Class Members are entitled to seek all forms of relief, including actual damages or up to $300 per violation, whichever is greater, plus reasonable attorney's fees under N.M. STAT. § 57-12-10.

## COUNT 14
## VIOLATIONS OF THE NORTH CAROLINA UNFAIR AND DECEPTIVE TRADE PRACTICES ACT
### (N.C. Gen. Stat. §§ 75-1.1, *et seq.*)
### (On Behalf of the State Law Class)

309. Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

310. Through the conduct alleged, Defendants have violated N.C. GEN. STAT. § 75-1.1, *et seq*. Under North Carolina law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. *See Hyde v. Abbott Labs., Inc.*, 123 N.C. App. 572, 584 (1996).

311. Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of North Carolina.

312. Defendants' trade practices are and have been immoral, unethical, unscrupulous, and substantially injurious to consumers.

313. Defendants' unlawful conduct substantially affected North Carolina's trade and commerce.

314. Defendants' conduct constitutes consumer-oriented deceptive acts or practices within the meaning of North Carolina law, which resulted in consumer injury and broad adverse impact on the public at large and harmed the public interest of North Carolina consumers in an honest marketplace in which economic activity is conducted in a competitive manner.

64

315.     As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and Class Members have been injured in their business or property and are threatened with further injury.

316.     Because of the foregoing, Plaintiffs and the Class Members are entitled to seek all forms of relief, including treble damages under N.C. GEN. STAT. § 75-16.

## COUNT 15
## VIOLATIONS OF THE RHODE ISLAND DECEPTIVE TRADE PRACTICES ACT
### (R. I. Gen. Laws § 6-13-1.1, *et seq.*)
### (On Behalf of the State Law Class)

317.     Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

318.     Through the conduct alleged, Defendants have violated R.I. GEN. LAWS § 6-13.1-1, *et seq.*

319.     Defendants engaged in an unfair or deceptive act or practice with the intent to injure competitors and consumers through supra-competitive profits.

320.     Defendants' conduct was unfair or deceptive within the conduct of commerce within the State of Rhode Island.

321.     Defendants' conduct amounted to an unfair or deceptive act or practice committed by a supplier in connection with a consumer transaction.

322.     Defendants' unlawful conduct substantially affected Rhode Island's trade and commerce.

323.     Defendants' conduct was willful.

324.     Plaintiffs and Class Members purchased goods plastics, primarily for personal, family, or household purposes.

325. As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and Class Members have been injured in their business or property and are threatened with further injury.

326. Because of the foregoing, Plaintiffs and Class Members are entitled to seek all forms of relief, including actual damages or $200 per violation, whichever is greater, and injunctive relief and punitive damages under R.I. GEN. LAWS § 6-13.1-5.2.

## COUNT 16
## VIOLATIONS OF THE SOUTH CAROLINA UNFAIR TRADE PRACTICES ACT
### (S.C. Code Ann. § 39-5-10, *et seq.*)
### (On Behalf of the State Law Class)

327. Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

328. Through the conduct alleged, Defendants have violated S.C. CODE ANN. § 39-5-10, *et seq.*

329. Defendants' conduct was unfair or deceptive within the conduct of commerce within the State of South Carolina. Defendants' conduct had a direct or indirect impact upon Plaintiffs' and Class Members's ability to protect themselves.

330. Defendants' unlawful conduct substantially affected South Carolina trade and commerce.

331. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

332. The Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. CODE ANN. §§ 39-5-10, *et seq.*, and, accordingly, Plaintiffs and the members of the State Law Class seek all relief available under that statute.

## VIOLATIONS OF VERMONT CONSUMER PROTECTION ACT
### (Vt. Stat. Ann. Tit. 9, § 2451 *et seq.*)
#### (On Behalf of the State Law Class)

333.     Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

334.     Through the conduct alleged, Defendants have violated VT. STAT. ANN. tit. 9, § 2451, *et seq*.

335.     Title 9 of the Vermont Statutes generally governs commerce and trade in Vermont. Chapter 63 thereof governs consumer protection and prohibits, among other things, unfair methods competition, unfair and deceptive acts and practices, and antitrust violations such as restraints of trade and monopolization. *See* VT. STAT. ANN. tit. 9, § 2453(a).

336.     Plaintiffs and Class Members purchased plastics within the State of Vermont during the Class Period. But for Defendants' conduct set forth, the price of plastics would have been lower, in an amount to be determined at trial.

337.     Under Vermont law, indirect purchasers have standing under the antitrust provisions of the Vermont Statutes to maintain an action based on the facts alleged in this complaint. VT. STAT. ANN. TIT. 9, § 2465(b); *see* also *Elkins v. Microsoft Corp.*, 174 Vt. 328, 341 (2002).

338.     Defendants competed unfairly by restraining trade as set forth, in violation of VT. STAT. tit. 9, § 2453, *et seq*.

339.     Defendants' violations of Vermont law were flagrant.

340.     Defendants' conduct caused or was intended to cause unfair methods of competition within the State of Vermont.

341.     Defendants' unlawful conduct substantially affected Vermont's trade and commerce.

342.     As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and the Class Members have been injured in their business or property and are threatened with further injury.

343.     Plaintiffs and Class Members were injured with respect to purchases of plastics in Vermont and are entitled to all forms of relief, including actual damages, treble damages, and reasonable attorneys' fees.

**D.     <u>VIOLATIONS OF STATE ANTITRUST LAWS</u>**

344.     Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

345.     During the Class Period, Defendants and their co-conspirators entered and engaged in a contract, combination, or conspiracy to artificially increase the demand for plastics to protect their profits, the production of plastics in various states to unreasonably restrain trade and commerce and harm consumers in violation of the various state antitrust and consumer protection laws set forth below.

346.     In formulating and effectuating this conspiracy, Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including: agreeing to artificially increase the demand for plastics, which injured Plaintiffs and Class Members; exchange of competitively sensitive information between and among Defendants; and participating in meetings conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

347.     Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to artificially increase the demand for plastics to protect their profits. As a direct and proximate result of Defendants' conduct, Plaintiffs and Class Members were deprived of free and open competition and paid more to purchase plastics than they otherwise would have absent Defendants' unlawful conduct. This injury is of the type

that the antitrust and consumer protection laws of the below states were designed to prevent and flows from what makes Defendants' conduct unlawful.

348. Defendants have also profited significantly from the conspiracy. Defendants' profits derived from their anticompetitive conduct and come at the expense of and to the detriment of Plaintiffs and Class Members.

349. Accordingly, Plaintiffs and the members of the State Law Class in each of the following jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by each jurisdiction's law, injunction (where applicable), and costs of suit, including reasonable attorneys' fees, as allowed by the following state laws.

350. Defendants' anticompetitive acts described above were knowing and willful and constitute violations of the following state antitrust and consumer protection statutes.

351. In the Counts that follow, a reference to the "Class" is a reference to the State Law Class unless otherwise specified.

### COUNT 18
### VIOLATION OF ARIZONA'S UNIFORM STATE ANTITRUST ACT,
### (ARIZ. REV. STAT. § 44-401, *ET SEQ.*)
### (On Behalf of the State Law Class)

352. Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

353. Through the conduct alleged, Defendants have violated ARIZ. REV. STAT. § 44-1401, *et seq*.

354. Under Arizona law, indirect purchasers have standing to maintain an action under the Antitrust Act based on the facts alleged in this Complaint. *Bunker's Glass Co. v. Pilkington PLC*, 206 Ariz. 9, 11-20 (2003).

355. Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of the plastics market, a substantial part occurred within Arizona.

69

356. Defendants' violations of Arizona law were flagrant.

357. Defendants' unlawful conduct substantially affected Arizona's trade and commerce (plastics).

358. As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and Class Members have been injured in their business or property and are threatened with further injury.

359. Because of the foregoing, Plaintiffs and Class Members are entitled to seek all forms of relief available under ARIZ. REV. STAT § 44-1401, *et seq*.

## COUNT 19
## VIOLATION OF CALIFORNIA'S CARTWRIGHT ACT,
### (CAL. BUS. & PROF. CODE § 16700 *ET SEQ.*)
### (On Behalf of the State Law Class)

360. Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

361. The California Business & Professions Code generally governs conduct of corporate entities. The Cartwright Act, CAL. BUS. & PROF. CODE §§ 16700-16770, governs antitrust violations in California.

362. Under the Cartwright Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. CAL. BUS. & PROF. CODE § 16750(a).

363. A trust in California is any combination of capital, skills or acts by two or more persons intended for various purposes, including, but not limited to, creating or carrying out restrictions in trade or commerce, limiting or reducing the production or increasing the price of any commodity, or preventing competition in the market for a commodity. CAL. BUS. & PROF. CODE § 16720. Every trust in California is unlawful except as provided by the Code. *Id*. § 16726.

70

364. Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of the plastics market, a substantial part of which occurred within California.

365. Defendants enacted a combination of capital, skill or acts for the purpose of creating and carrying out restrictions in trade or commerce, in violation of CAL. BUS. & PROF. CODE § 16700, *et seq*.

366. Plaintiffs and Class Members purchased plastics within the State of California during the Class Period. But for Defendant's conduct set forth, the price of plastics would have been lower, in an amount to be determined at trial.

367. Plaintiffs and Class Members were with respect to purchases of plastics in California and are entitled to all forms of relief, including recovery of treble damages, interest, and injunctive relief, plus reasonable attorneys' fees and costs.

**COUNT 20**
**VIOLATION OF THE COLORADO ANTITRUST ACT,**
**(COLO. REV. STAT. ANN. § 6-4-101, *ET SEQ.*)**
**(On Behalf of the State Law Class)**

368. Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

369. Plaintiffs and Class Members purchased Defendants' plastics within Colorado during the Class Period. But for Defendants' conduct set forth, the price of Defendants' plastic would have been lower, in an amount to be determined at trial.

370. The Colorado State Antitrust Act of 2023 specifically allows a private act of recovery for "[a]ny person injured, either directly or indirectly" from violations Colorado antitrust law for actual damages. *See* C.R.S. § 6-4-115 (emphasis added).

371. Defendants contracted, combined or conspired to act in restraint of trade within Colorado in violation of C.R.S. § 6-4-101, *et seq*.

71

App. 268

372.    Plaintiffs and Class Members were injured with respect to purchases of plastics in Colorado and are entitled to all forms of relief, including actual damages, treble damages, as well as interest and reasonable attorneys' fees and costs. C.R.S. § 6-4-115.

### COUNT 21
### VIOLATION OF THE CONNECTICUT ANTITRUST ACT,
### (CONN. GEN. STAT. ANN § 35-24, *ET SEQ.*)
### (On Behalf of the State Law Class)

373.    Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

374.    Plaintiffs and Class Members purchased Defendants' plastics within Connecticut during the Class Period. But for Defendants' conduct set forth, the price of Defendants' plastics would have been lower, in an amount to be determined at trial.

375.    The Connecticut Antitrust specifically allows a private act of recovery for indirect purchasers by prohibiting a defendant from "assert[ing] a defense that the defendant did not deal directly with the person on whose behalf the action is brought." *See* C.G.S.A. § 35-46a.

376.    Defendants contracted, combined, or conspired to act in restraint of trade within Connecticut in violation C.G.S.A. § 35-24, *et seq*. Defendants' conducts and conspiracies restrained, suppressed, and eliminated the price competitive for plastics; artificially increased the demand for plastics, while depriving Plaintiffs and Class Members of free and open competition. These acts resulted in Plaintiffs and Class Members paying supracompetitive, artificially inflated prices for plastics.

377.    Plaintiffs and Class Members were injured with respect to purchases of plastics in Connecticut and are entitled to all forms of relief, including actual damages, treble damages, as well as interest and reasonable attorneys' fees and costs.

**COUNT 22**
**VIOLATION OF DISTRICT OF COLUMBIA ANTITRUST ACT,**
**(D.C. CODE § 28-4501, *ET SEQ.*)**
**(On Behalf of the State Law Class)**

378. Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

379. Plaintiffs and Class Members purchased Defendants' plastics within the District of Columbia during the Class Period. But for Defendants' conduct set forth, the price of Defendants' plastics would have been lower, in an amount to be determined at trial.

380. Under District of Columbia law, indirect purchasers have standing to maintain an action under the antitrust provisions of the D.C. Code because "[a]ny indirect purchaser in the chain of manufacture, production or distribution of goods or services . . . shall be deemed to be injured within the meaning of this chapter." D.C. CODE § 28-4509(a).

381. Defendants contracted, combined or conspired to act in restraint of trade within the District of Columbia in violation of D.C. CODE § 28-4501, *et seq*.

382. Plaintiffs and Class Members were injured with respect to purchases of plastics in the District of Columbia and are entitled to all forms of relief, including actual damages, treble damages, as well as interest and reasonable attorneys' fees and costs.

**COUNT 23**
**VIOLATION OF HAWAII ANTITRUST ACT,**
**(HAW. REV. STAT. ANN § 480-1, *ET SEQ.*)**
**(On Behalf of the State Law Class)**

383. Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

384. Plaintiffs and Class Members purchased plastics within Hawaii during the Class Period. But for Defendants' conduct set forth, the price of plastics would have been lower, in an amount to be determined at trial.

385. The Hawaii Antitrust Act specifically allows a private act of recovery for indirect purchasers. *See* HRS § 480-13.3.

73

386.     Defendants contracted, combined, or conspired to act in restraint of trade within Connecticut in violation of H.S.R. § 480-1, *et seq*.

387.     Plaintiffs and Class Members were injured with respect to purchases of plastics in Hawaii and are entitled to all forms of relief, including actual damages, as well as interest and reasonable attorneys' fees and costs.

### COUNT 24
### VIOLATION OF ILLINOIS ANTITRUST ACT,
### (740 Ill. Comp. Stat. Ann. 10/3(1), *et seq.*)
### (On Behalf of the State Law Class)

388.     Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

389.     Plaintiffs and Class Members purchased Defendants' plastics within the State of Illinois during the Class Period. But for Defendants' conduct set forth, the price of Defendants' plastics would have been lower, in an amount to be determined at trial.

390.     Under the Illinois Antitrust Act, indirect purchasers have standing to maintain an action for damages based on the facts alleged in this complaint. 740 Ill. Comp. Stat. Ann.10/7(2).

391.     Defendants entered into contracts or engaged in a combination or conspiracy to artificially increase the demand for plastics sold within the State of Illinois.

392.     Plaintiffs and Class Members were injured with respect to purchases of plastics in Illinois and are entitled to all forms of relief, including actual damages, treble damages, and reasonable attorneys' fees and costs.

### COUNT 25
### VIOLATION OF IOWA COMPETITION LAW,
### (Iowa Code § 553.1, *et seq.*)
### (On Behalf of the State Law Class)

393.     Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

394. Under Iowa law, indirect purchasers have standing to maintain an action under the Iowa Competition Law based on the facts alleged in this Complaint. *Comes v. Microsoft Corp.*, 646 N.W.2d 440, 449-51 (Iowa 2002).

395. Plaintiffs and Class Members purchased Defendants' plastics within the State of Iowa during the Class Period. But for Defendants' conduct set forth, the price of Defendants' plastics would have been lower, in an amount to be determined at trial.

396. Defendants contracted, combined or conspired to restrain trade in the plastics market, in violation of IOWA CODE § 553.1, *et seq*.

397. Plaintiffs and Class Members were injured with respect to purchases of plastics in Iowa, and are entitled to all forms of relief, including actual damages, exemplary damages for willful conduct, reasonable attorneys' fees and costs, and injunctive relief.

## COUNT 26
## VIOLATION OF KANSAS RESTRAINT OF TRADE ACT,
### (KAN. STAT. ANN. § 50-101, *ET SEQ.*)
### (On Behalf of the State Law Class)

398. Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

399. The Kansas Restraint of Trade Act aims to prohibit practices which, among other things, "tend to prevent full and free competition in the importation, transportation or sale of articles imported into this state . . . ." KAN. STAT. ANN. § 50-112.

400. Plaintiffs and Class Members purchased plastics within the State of Kansas during the Class Period.

401. But for Defendants' conduct set forth, the price of plastics would have been lower, in an amount to be determined at trial.

402. Under the Kansas Restraint of Trade Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. KAN. STAT. ANN. § 50-161(b).

403.     Plaintiffs and Class Members were injured with respect to purchases of plastics in Kansas and are entitled to all forms of relief, including actual damages, reasonable attorneys' fees and costs, and injunctive relief.

### COUNT 27
### VIOLATION OF MAINE'S ANTITRUST STATUTE,
#### (ME. REV. STAT. ANN. TIT. 10 § 1101, *ET SEQ.*)
#### (On Behalf of the State Law Class)

404.     Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

405.     Plaintiffs and Class Members purchased plastics within the State of Maine during the Class Period. But for Defendants' conduct set forth, the price of plastics would have been lower, in an amount to be determined at trial.

406.     Under Maine law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. ME. REV. STAT. ANN. tit. 10, § 1104(1).

407.     Plaintiffs and Class Members were injured with respect to purchases of plastics in Maine and are entitled to all forms of relief, including actual damages, treble damages, and reasonable attorneys' and experts' fees and costs.

### COUNT 28
### VIOLATION OF MARYLAND'S ANTITRUST STATUTE,
#### (MD. CODE ANN. § 11-201, *ET SEQ.*)
#### (On Behalf of the State Law Class)

408.     Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

409.     The purpose of Maryland's antitrust statute is "to complement the body of federal law governing restraints of trade, unfair competition, and unfair, deceptive, and fraudulent acts or practices." MD. CODE ANN. § 11-202(a)(1).

410.     Under Maryland law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. MD. CODE ANN. § 11-209(b)(2)(i).

411.     Under Maryland's antitrust statute, a plaintiff who establishes a violation is entitled to recover three times the amount of actual damages resulting from the violation, along with costs and reasonably attorneys' fees. MD. CODE ANN. § 209(b)(4).

412.     Plaintiffs and Class Members were injured with respect to purchases of plastics in Maryland and are entitled to all forms of relief, including actual damages, treble damages, and reasonable attorneys' and experts' fees and costs.

### COUNT 29
### <u>VIOLATION OF THE MICHIGAN ANTITRUST REFORM ACT,</u>
### (MICH. COMP. LAWS § 445.771, *ET SEQ.*)
### (On Behalf of the State Law Class)

413.     Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

414.     The Michigan Antitrust Reform Act aims "to prohibit contracts, combinations, and conspiracies in restraint of trade or commerce . . . [and] to provide remedies, fines, and penalties for violations of this act." Mich. Act 274 of 1984 (MICH. COMP. LAWS § 445.771, *et seq.*).

415.     Plaintiffs and Class Members purchased Defendants' plastics within the State of Michigan during the Class Period. But for Defendants' conduct set forth, the price of plastics would have been lower, in an amount to be determined at trial.

416.     Under the Michigan Antitrust Reform Act, indirect purchasers have standing to maintain an action based on the facts alleged in this complaint. MICH. COMP. LAWS § 445.778(2).

417.     Plaintiffs and Class Members were injured with respect to purchases of plastics in Michigan and are entitled to all forms of relief, including actual damages, treble damages for flagrant violations, interest, costs, reasonable attorneys' fees, and injunctive or other appropriate equitable relief.

## COUNT 30
## VIOLATION OF THE MINNESOTA ANTITRUST LAW,
### (Minn. Stat. §§ 325D.49 *et seq.* & 325D.57 *et seq.*)
### (On Behalf of the State Law Class)

418.     Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

419.     The Minnesota Antitrust Law of 1971 prohibits "any contract, combination or conspiracy when any part thereof was created, formed, or entered into in [Minnesota]; and any contract, combination or conspiracy, wherever created, formed or entered into . . . whenever any of the forgoing affects the trade or commerce of [Minnesota]." Minn. Stat. § 325D.54.

420.     Plaintiffs and Class Members purchased Defendants' plastics the State of Minnesota during the Class Period. But for Defendants' conduct set forth, the price of plastics would have been lower, in an amount to be determined at trial.

421.     Under the Minnesota Antitrust Act of 1971, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. Minn. Stat. § 325D.57.

422.     Plaintiffs and Class Members were injured with respect to purchases of plastics in Minnesota and are entitled to all forms of relief, including actual damages, treble damages, costs and disbursements, reasonable attorneys' fees, and injunctive relief necessary to prevent and restrain violations hereof.

## COUNT 31
## VIOLATION OF THE MISSISSIPPI ANTITRUST STATUTE,
### Miss. Code Ann. § 75-21-1, *et seq.*
### (On Behalf of the State Law Class)

423.     Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

424.     Title 75 of the Mississippi Code regulates trade, commerce, and investments. Chapter 21 thereof generally prohibits trusts and combines in restraint or hindrance of trade, with the aim that "trusts and combines may be suppressed, and the benefits arising from competition in business [are] preserved" to Mississippians. Miss. Code Ann. § 75-21-39.

78

425.     "A trust or combine is a combination, contract, understanding or agreement, express or implied . . . when inimical to the public welfare" and with the effect of, among other things, restraining trade, increasing the price or output of a commodity, or hindering competition in the production or sale of a commodity. MISS. CODE ANN. § 75-21-1.

426.     Plaintiffs and Class Members purchased plastics within the State of Mississippi during the Class Period. But for Defendants' conduct set forth, the price of plastics would have been lower, in an amount to be determined at trial.

427.     Under Mississippi law, indirect purchasers have standing to maintain an action under the antitrust provisions of the Mississippi Code based on the facts alleged in this Complaint. MISS. CODE ANN. § 75-21-9.

428.     Plaintiffs and Class Members were injured with respect to purchases of plastics in Mississippi and are entitled to all forms of relief, including actual damages and a penalty of $500 per instance of injury.

### COUNT 32
### VIOLATION OF THE NEBRASKA JUNKIN ACT,
### (NEB. REV. STAT. § 59-801, *ET SEQ.*)
### (On Behalf of the State Law Class)

429.     Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

430.     Chapter 59 of the Nebraska Revised Statutes generally governs business and trade practices. Sections 801 through 831 thereof, known as the Junkin Act, prohibit antitrust violations such as restraints of trade and monopolization.

431.     Plaintiffs and Class Members purchased plastics within the State of Nebraska during the Class Period. But for Defendants' conduct set forth, the price of plastics would have been lower, in an amount to be determined at trial.

432.     Under Nebraska law, indirect purchasers have standing to maintain an action under the Junkin Act based on the facts alleged in this Complaint. NEB. REV. STAT. § 59-821.

433.     Plaintiffs and Class Members were injured with respect to purchases of plastics in Nebraska and are entitled to all forms of relief, including actual damages or liquidated damages in an amount which bears a reasonable relation to the actual damages which have been sustained, as well as reasonable attorneys' fees, costs, and injunctive relief.

**COUNT 33**
**VIOLATION OF THE NEVADA UNFAIR TRADE PRACTICES ACT,**
**(NEV. REV. STAT. § 598A.010, *ET SEQ.*)**
**(On Behalf of the State Law Class)**

434.     Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

435.     The Nevada Unfair Trade Practices Act ("NUTPA") states that "free, open and competitive production and sale of commodities and services is necessary to the economic well-being of the citizens of the State of Nevada." NEV. REV. STAT. ANN. § 598A.030(1).

436.     The policy of NUTPA is to "[p]rohibit acts in restraint of trade or commerce," "[p]reserve and protect the free, open and competitive market," and "[p]enalize all persons engaged in [] anticompetitive practices." Nev. Rev. Stat. Ann. § 598A.030(2). Such acts include, among other things, price fixing, division of markets, allocation of customers, and monopolization of trade. *See* NEV. REV. STAT. ANN. § 598A.060.

437.     Plaintiffs and Class Members purchased plastics within the State of Nevada during the Class Period. But for Defendants' conduct set forth, the price of plastics would have been lower, in an amount to be determined at trial.

438.     Under Nevada law, indirect purchasers have standing to maintain an action under NUTPA based on the facts alleged in this Complaint. NEV. REV. STAT. ANN. § 598A.210(2).

439. Plaintiffs and Class Members were injured with respect to purchases of plastics in Nevada in that at least thousands of sales of plastics took place in Nevada, purchased by Nevada consumers at supra-competitive prices caused by Defendants' conduct.

440. Accordingly, Plaintiffs and Class Members are entitled to all forms of relief, including actual damages, treble damages, reasonable attorneys' fees, costs, and injunctive relief.

**COUNT 34**
**VIOLATION OF NEW HAMPSHIRE'S ANTITRUST STATUTE,**
**(N.H. REV. STAT. ANN. TIT. XXXI, § 356:1, *ET SEQ.*)**
**(On Behalf of the State Law Class)**

441. Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

442. Title XXXI of the New Hampshire Statutes generally governs trade and commerce.

443. Chapter 356 thereof governs combinations and monopolies and prohibits restraints of trade. *See* N.H. REV. STAT. ANN. tit. XXXI, §§ 356:2, 3.

444. Plaintiffs and Class Members purchased Defendants' plastics within the State of New Hampshire during the Class Period. But for Defendants' conduct set forth, the price of Defendants' plastics would have been lower, in an amount to be determined at trial.

445. Under New Hampshire law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. N.H. REV. STAT. ANN. § 356:11(II). Defendants established, maintained or attempted to, constituting a contract, combination or conspiracy in restraint of trade in violation of in violation of N.H. REV. STAT. ANN. § 356:1, *et seq*.

446. Plaintiffs and Class Members were injured with respect to purchases of Defendants' plastics in New Hampshire and are entitled to all forms of relief, including actual damages sustained, treble damages for willful or flagrant violations, reasonable attorneys' fees, costs, and injunctive relief.

## COUNT 35
## VIOLATION OF THE NEW MEXICO ANTITRUST ACT,
### (N.M. STAT. ANN. § 57-1-1, *ET SEQ.*)
### (On Behalf of the State Law Class)

447.    Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

448.    The New Mexico Antitrust Act aims to "prohibit[] restraints of trade and monopolistic practices." N.M. STAT. ANN. § 57-1-15.

449.    Plaintiffs and Class Members purchased plastics within the State of New Mexico during the Class Period. But for Defendants' conduct set forth, the price of plastics would have been lower, in an amount to be determined at trial.

450.    Under New Mexico law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. *See* N.M. STAT. ANN. § 57-1-3(A).

451.    Plaintiffs and Class Members were injured with respect to purchases of plastics in New Mexico and are entitled to all forms of relief, including actual damages, treble damages, reasonable attorneys' fees, costs, and injunctive relief.

## COUNT 36
## VIOLATION OF SECTION 340 OF THE NEW YORK GENERAL BUSINESS LAW,
### (N.Y. GEN. BUS. LAW § 340, *ET SEQ.*)
### (On Behalf of the State Law Class)

452.    Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

453.    Section 340 of Article 22 of the New York General Business Law prohibits monopolies and contracts or agreements in restraint of trade, with the policy of encouraging competition or the free exercise of any activity in the conduct of any business, trade or commerce in New York. *See* N.Y. GEN. BUS. LAW § 340(1).

454.    Plaintiffs and Class Members purchased plastics within the State of New York during the Class Period. But for Defendants' conduct set forth, the price of plastics would have been lower, in an amount to be determined at trial.

455.     Under New York law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. *See* N.Y. GEN. BUS. LAW § 340(6).

456.     Plaintiffs and Class Members were injured with respect to purchases of plastics in New York and are entitled to all forms of relief, including actual damages, treble damages, costs not exceeding $10,000, and reasonable attorneys' fees and all relief available under N.Y. GEN. BUS. LAW §349, *et seq*.

**COUNT 37**
**VIOLATION OF THE NORTH CAROLINA GENERAL**
**STATUTES, (N.C. GEN. STAT. § 75-1, *ET SEQ*.)**
**(On Behalf of the State Law Class)**

457.     Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

458.     Chapter 75 of the North Carolina Statutes generally governs unlawful business practices, including antitrust violations such as restraints of trade and monopolization.

459.     Under North Carolina law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. *See Hyde v. Abbott Labs., Inc.*, 123 N.C. App. 572, 584 (1996).

460.     Defendants' unlawful conduct substantially affected North Carolina's trade and commerce.

461.     As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and the Class Members have been injured in their business or property and are threatened with further injury.

462.     Because of the foregoing, Plaintiffs and Class Members are entitled to seek all forms of relief available, including treble damages, under N.C. GEN. STAT. § 75-1, *et seq*.

## COUNT 38
## VIOLATION OF THE NORTH DAKOTA UNIFORM STATE ANTITRUST ACT, N.D.
### (CENT. CODE § 51-08.1-01, *ET SEQ.*)
### (On Behalf of the State Law Class)

463. Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

464. The North Dakota Uniform State Antitrust Act generally prohibits restraints on or monopolization of trade. *See* N.D. CENT. CODE § 51-08.1-01, *et seq*.

465. Plaintiffs and Class Members purchased plastics within the State of North Dakota during the Class Period. But for Defendants' conduct set forth, the price of plastics would have been lower, in an amount to be determined at trial.

466. Under the North Dakota Uniform State Antitrust Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. N.D. CENT. CODE § 51-08.1-08.

467. Defendants' violations of North Dakota law were flagrant.

468. Defendants' unlawful conduct substantially affected North Dakota's trade and commerce.

469. As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and Class Members were injured with respect to purchases in North Dakota and are threatened with further injury, and are entitled to all forms of relief, including actual damages, treble damages for flagrant violations, costs, reasonable attorneys' fees, and injunctive or other equitable relief available under N.D. CENT. CODE § 51-08.1-01, *et seq*.

## COUNT 39
## VIOLATION OF THE OREGON ANTITRUST LAW,
### (OR. REV. STAT. § 646.705, *ET SEQ.*)
### (On Behalf of the State Law Class)

470. Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

471.    Chapter 646 of the Oregon Revised Statutes generally governs business and trade practices within Oregon. Sections 705 through 880 thereof govern antitrust violations, with the policy to "encourage free and open competition in the interest of the general welfare and economy of the state." OR. REV. STAT. § 646.715(1).

472.    Plaintiffs and Class Members purchased plastics within the State of Oregon during the Class Period. But for Defendants' conduct set forth, the price of plastics would have been lower, in an amount to be determined at trial.

473.    Under Oregon law, indirect purchasers have standing under the antitrust provisions of the Oregon Revised Statutes to maintain an action based on the facts alleged in this Complaint. OR. REV. STAT. § 646.780(1)(a).

474.    Plaintiffs and Class Members were injured with respect to purchases of plastics within the intrastate commerce of Oregon, or alternatively to interstate commerce involving actual or threatened injury to persons located in Oregon, and are entitled to all forms of relief, including actual damages, treble damages, reasonable attorneys' fees, expert witness fees and investigative costs, and injunctive relief.

### COUNT 40
### VIOLATION OF THE RHODE ISLAND ANTITRUST ACT,
### (6 R.I. GEN. LAWS § 6-36-1, *ET SEQ.*)
### (On Behalf of the State Law Class)

475.    Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

476.    The Rhode Island Antitrust Act aims "[t]o promote the unhampered growth of commerce and industry throughout [Rhode Island] by prohibiting unreasonable restraints of trade and monopolistic practices" that hamper, prevent or decrease competition. 6 R.I. GEN. LAWS § 6-36-2(a)(2).

477. Plaintiffs and Class Members purchased plastics within the State of Rhode Island during the Class Period. But for Defendants' conduct set forth, the price of plastics would have been lower, in an amount to be determined at trial.

478. Under the Rhode Island Antitrust Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. R.I. GEN. LAWS § 6-36-11(a).

479. Plaintiffs and Class Members were injured with respect to purchases of plastics in Rhode Island and are entitled to all forms of relief, including actual damages, treble damages, reasonable costs, reasonable attorneys' fees, and injunctive relief.

## COUNT 41
## VIOLATION OF THE SOUTH DAKOTA ANTITRUST STATUTE,
### (S.D. CODIFIED LAWS § 37-1-3.1, *ET SEQ.*)
### (On Behalf of the State Law Class)

480. Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

481. Chapter 37-1 of the South Dakota Codified Laws prohibits restraint of trade, monopolies, and discriminatory trade practices. S.D. CODIFIED LAWS §§ 37-1-3.1, 3.2.

482. Plaintiffs and Class Members purchased plastics within the State of South Dakota during the Class Period. But for Defendants' conduct set forth, the price of plastics would have been lower, in an amount to be determined at trial.

483. Under South Dakota law, indirect purchasers have standing under the antitrust provisions of the South Dakota Codified Laws to maintain an action based on the facts alleged in this Complaint. *See* S.D. CODIFIED LAWS § 37-1-33.

484. Plaintiffs and Class Members were injured with respect to purchases of plastics in South Dakota and are entitled to all forms of relief, including actual damages, treble damages, taxable costs, reasonable attorneys' fees, and injunctive or other equitable relief.

## COUNT 42
## VIOLATION OF THE TENNESSEE TRADE PRACTICES ACT,
### (TENN. CODE § 47-25-101, *ET SEQ.*)
### (On Behalf of the State Law Class)

485.     Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

486.     The Tennessee Trade Practices Act generally governs commerce and trade in Tennessee, and it prohibits, among other things, all arrangements, contracts, agreements, or combinations between persons or corporations made with a view to lessen, or which tend to lessen, full and free competition in goods in Tennessee. All such arrangements, contracts, agreements, or combinations between persons or corporations designed, or which tend, to increase the prices of any such goods, are against public policy, unlawful, and void. *See* TENN. CODE ANN. § 47-25-101.

487.     Under Tennessee law, indirect purchasers have standing under the Tennessee Trade Practice Acts to maintain an action based on the facts alleged in this Complaint. *See Freeman Indus., LLC v. Eastman Chem. Co.*, 172 S.W.3d 512, 520 (Tenn. 2005).

488.     Defendants competed unfairly and colluded by meeting to restrain output, artificially increase demand, divide markets, and otherwise restrain trade as set forth, in violation of TENN. CODE ANN. § 47-25-101, *et seq*.

489.     Defendants' conduct violated the Tennessee Trade Practice Act because it was an arrangement, contract, agreement, or combination to lessen full and free competition in goods in Tennessee, and because it tended to increase the prices of goods in Tennessee. Specifically, Defendant's combination or conspiracy had the following effects: (1) price competition for plastics was restrained, suppressed, and eliminated throughout Tennessee; (2) artificially increase the demand for plastics throughout Tennessee; (3) Plaintiffs and Class Members were deprived of free and open competition; and (4) Plaintiffs and Class Members paid supracompetitive, artificially inflated prices for plastics.

490.    During the Class Period, Defendants' illegal conduct had a substantial effect on Tennessee commerce as plastics refined from Defendants plastics was sold in Tennessee.

491.    Plaintiffs and Class Members purchased plastics within the State of Tennessee during the Class Period. But for Defendants' conduct set forth, the price of plastics would have been lower, in an amount to be determined at trial.

492.    Plaintiffs and Class Members were injured with respect to purchases of plastics in Tennessee and are entitled to all forms of relief available under the law, including return of the unlawful overcharges that they paid on their purchases, damages, equitable relief, and reasonable attorneys' fees.

## COUNT 43
## VIOLATION OF THE UTAH ANTITRUST ACT,
### (UTAH CODE ANN. § 76-10-3101, *ET SEQ.*)
### (On Behalf of the State Law Class)

493.    Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

494.    The Utah Antitrust Act aims to "encourage free and open competition in the interest of the general welfare and economy of this state by prohibiting monopolistic and unfair trade practices, combinations and conspiracies in restraint of trade or commerce." UTAH CODE ANN. § 76-10-3102.

495.    Plaintiffs and Class Members purchased plastics within the State of Utah during the Class Period. But for Defendants' conduct set forth, the price of plastics would have been lower, in an amount to be determined at trial.

496.    Under the Utah Antitrust Act, indirect purchasers who are either Utah residents or Utah citizens have standing to maintain an action based on the facts alleged in this Complaint. UTAH CODE ANN. § 76-10-3109(1)(a).

497.    Plaintiffs and Class Members were injured with respect to purchases of plastics in Utah and are entitled to all forms of relief, including actual damages, treble damages, costs of suit, reasonable attorneys' fees, and injunctive relief.

## COUNT 44
## VIOLATION OF THE WEST VIRGINIA ANTITRUST ACT,
### (W. VA. CODE § 47-18-1, *ET SEQ.*)
### (On Behalf of the State Law Class)

498.    Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

499.    The violations of law set forth above also constitute violations of Section 47-18-1 of the West Virginia Code.

500.    During the Class Period, Defendants engaged in anticompetitive conduct alleged above, including a continuing contract, combination or conspiracy in unreasonable restraint of trade and commerce within the intrastate commerce of West Virginia, in violation of W. VA. CODE §§ 47-18-3; 47-18-4.

501.    Plaintiffs and Class Members purchased Defendants' plastics within the State of West Virginia during the Class Period. But for Defendant's conduct set forth, the price of Defendants' plastics would have been lower, in an amount to be determined at trial.

502.    Under West Virginia law, indirect purchasers have standing to maintain an action under the West Virginia Antitrust Act based on the facts alleged in this Complaint. W. VA. CODE St. R. 142-9-2 ("Any person who is injured directly or indirectly by reason of a violation of the West Virginia Antitrust Act, W. Va. Code § 47-18-1, *et seq*., may bring an action for damages under W. Va. Code § 47-18-9.").

503.    Defendants' anticompetitive acts described above were knowing, willful and constitute violations or flagrant violations of the West Virginia Antitrust Act.

504.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and Class Members have been injured in their business and property in that they paid more for plastics than they otherwise would have paid absent Defendants' unlawful conduct.

505.     As a result of Defendants' violation of Section 47-18-3 of the West Virginia Antitrust Act, Plaintiffs and Class Members seek treble damages and their cost of suit, including reasonable attorneys' fees, pursuant to Section 47-18-9 of the West Virginia Code.

### COUNT 45
### VIOLATION OF THE WISCONSIN ANTITRUST ACT,
### (WIS. STAT. § 133.01, *ET SEQ.*)
### (On Behalf of the State Law Class)

506.     Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

507.     Chapter 133 of the Wisconsin Statutes governs trust and monopolies, with the intent "to safeguard the public against the creation or perpetuation of monopolies and to foster and encourage competition by prohibiting unfair and discriminatory business practices which destroy or hamper competition." WIS. STAT. § 133.01.

508.     Plaintiffs and Class Members purchased plastics within the State of Wisconsin during the Class Period. But for Defendants' conduct set forth, the price of plastics would have been lower, in an amount to be determined at trial.

509.     Under Wisconsin law, indirect purchasers have standing under the antitrust provisions of the Wisconsin Statutes to maintain an action based on the facts alleged in this Complaint. *See* WIS. STAT. § 133.18(1)(a).

510.     Defendants contracted, combined or conspired in restraint of trade or commerce of plastics, with the intention of injuring or destroying competition, in violation of WIS. STAT. § 133.01, *et seq.*

511. Plaintiffs and Class Members were injured with respect to purchases of Defendants' plastics in Wisconsin in that the actions alleged substantially affected the people of Wisconsin, with at least thousands of consumers in Wisconsin paying substantially higher prices for plastics in Wisconsin.

512. Accordingly, Plaintiffs and Class Members are entitled to all forms of relief, including actual damages, treble damages, costs and reasonable attorneys' fees, and injunctive relief.

## COUNT 46
## UNJUST ENRICHMENT

513. Plaintiffs incorporate each allegation in the preceding paragraphs of this Complaint.

514. Through their conduct, Defendants caused damages to Plaintiffs and to Class Members.

515. By misleading the American public into thinking that plastics are completely, or near completely recyclable, Defendants artificially increased the demand for their plastics. This deception not only allowed Defendants to avoid plastic bans, but the artificially inflated demand allowed them to increase the prices of their plastics. By purchasing plastics at an inflated price in the United States, which Defendants forced them to do, Plaintiffs and the Class Members conferred a benefit on Defendants in the form of the inflated and unconscionable price of the product.

516. Defendants appreciated the benefit because, were consumers not to purchase plastics, Defendants would have no sales and make no money off Plastic sales in the aforementioned states.

517. Defendants were directly involved in, the deceptive advertising of plastics, setting the price for plastics, making material misstatements, and directing the sale and distribution of plastics nationwide in the United States.

518.    Plaintiffs and Class Members have conferred upon Defendants an economic benefit, in the nature of profits resulting from unlawful overcharges and the artificial increase in the demand of plastics to the economic detriment of Plaintiffs and the Class. Defendants' acceptance and retention of the benefit is inequitable and unjust because the benefit was obtained by Defendants unconscionable sales, and unlawful acts.

519.    Equity cannot in good conscience permit Defendants to be economically enriched for its unjust actions at Plaintiffs and Class Members' expense and in violation of state law, and therefore restitution or disgorgement or both of such economic enrichment is required. It would be futile for Plaintiffs and the Class to seek a remedy from any party with whom they had privity of contract. Defendants have paid no consideration to anyone for any benefits received indirectly from Plaintiffs and the Class.

520.    Plaintiffs and the members of the Damages Class are entitled to the amount of the Defendants' ill-gotten gains resulting from its unlawful, unjust, and inequitable conduct. Plaintiffs and the members of the Damages Class are entitled to the establishment of a constructive trust consisting of all ill-gotten gains from which Plaintiffs and the members of the Damages Class may make claims on a pro rata basis.

## DEMAND FOR JURY TRIAL

Plaintiffs respectfully demand a jury trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request the following relief:

a.      Determine that this action may be maintained as a class action pursuant to Fed. R. Civ. P. 23 for each of the Classes; direct that reasonable notice of this action, as provided by Fed. R. Civ. P.  23(c)(2) be given to the Classes; and declare that Plaintiffs are the representatives of the Classes;

b.      Require Defendants to pay for sending notice to the certified Classes as required by relevant states' law;

c.   Appoint Plaintiffs as Class Representatives and Plaintiffs' counsel as Class Counsel;

d.   Issue an injunction under 15 U.S.C. § 26 to enjoin Defendants from engaging in the deceptive, unfair, unconscionable, and unlawful business practices alleged in this First Amended Class Action Complaint;

e.   Issue an injunction under 15 U.S.C. § 26 to enjoin Defendants from engaging in anticompetitive conduct in the plastics market;

f.   Find that Defendants have caused a public nuisance by their conduct which has injured the Plaintiffs;

g.   Provide abatement, remediation, and cleanup of this public nuisance at the Court's direction;

h.   Award compensatory damages to Plaintiffs and the proposed Classes in an amount to be established at trial;

i.   Award treble damages as permitted by law;

j.   Award pre- and post-judgment interest;

k.   Award punitive damages based on Defendants' reprehensible and deliberate conduct;

l.   Award reasonable attorneys' fees and costs; and

m.   For all such other and further relief as may be just and proper.

Dated: January 17, 2025.

Respectfully submitted,

*/s/ Rex A. Sharp*
Rex A. Sharp, MO #51205
Isaac L. Diel, MO #39503
W. Greg Wright, MO #49545
Sarah T. Bradshaw, MO #66276
Hammons P. Hepner, MO #77258
SHARP LAW, LLP
4820 W. 75th Street
Prairie Village, KS 66208
(913) 901-0505
(913) 261-7564 Fax
rsharp@midwest-law.com
idiel@midwest-law.com
gwright@midwest-law.com
sbradshaw@midwest-law.com
hhepner@midwest-law.com

--and--

Dave Rebein, KS #10476
REBEIN BROTHERS, PA
1715 Central Ave.
Dodge City, KS 67801
Tel: (620) 227-08126

--and--

Glenn I. Kerbs, KS #09754
Samantha F. Sweley, KS #26833
KERBS LAW OFFICE, LLC
1715 Central Ave.
Dodge City, KS 67801
Tel: (620) 255-0238
gkerbs@kerbslaw.com
ssweley@kerbslaw.com

*Attorneys for Plaintiffs*
*and the Proposed Class*

## CERTIFICATE OF SERVICE

I hereby certify that, on January 17, 2025, I caused to be electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

*/s/ Rex A. Sharp*
Rex A. Sharp

# Exhibit 10

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MISSOURI
### AT KANSAS CITY

|  |  |
|---|---|
| BILLIE RODRIGUEZ, DANIEL ERWIN, MICHAEL B. ACKERMAN, and KYLE FOREMAN, individually and on behalf of all others similarly situated,<br><br>     Plaintiffs,<br>   v.<br><br>EXXON MOBIL CORPORATION, CHEVRON USA INC., CHEVRON PHILLIPS CHEMICAL CORPORATION, DUPONT de NEMOURS, INC., DUPONT CORPORATION, CELANESE CORPORATION, DOW INC., DOW CHEMICAL COMPANY, EASTMAN CHEMICAL COMPANY, LYONDELLBASELL INDUSTRIES N.V., and AMERICAN CHEMISTRY COUNCIL,<br><br>     Defendants. | Case No. 4:24-cv-00803-SRB |

## SPECIALLY APPEARING DEFENDANT EXXON MOBIL CORPORATION'S MOTION TO RECONSIDER

COMES NOW specially appearing defendant Exxon Mobil Corporation ("ExxonMobil"), by and through its undersigned counsel, and moves the Court to reconsider its order denying ExxonMobil's motion to transfer venue (Doc. 3) and motion to stay proceedings (Doc. 5) as moot ("Order") (Doc. 49). On January 17, 2025, Plaintiffs filed a consolidated response to ExxonMobil's motions (Doc. 47), making ExxonMobil's reply suggestions due January 31, 2025 under Western District of Missouri Local Rule 7(c)(3). Based on Plaintiffs' misstatement of the law, the Court issued its Order on January 21, 2025, before ExxonMobil had an opportunity to reply.

As discussed in greater detail below, Plaintiffs dismissal of *Ford County, Kansas v. Exxon Mobil Corp., et al.*, D. Kan. Case No. 2:24-cv-02547 ("*Ford County*") does not

65332405v1

moot ExxonMobil's motions, the "first-filed" doctrine still applies, Plaintiffs' forum shopping should not be condoned, and transfer is still appropriate. ExxonMobil respectfully requests the Court reconsider its January 21 Order denying ExxonMobil's transfer motion as moot and reach the merits of ExxonMobil's motions to transfer this case to the District of Kansas and stay this case pending the decision on the motion to transfer.

## I.  Background

ExxonMobil's motion to transfer venue seeks an order from this Court transferring this case to the District of Kansas. (Doc. 3). In its suggestions in support, ExxonMobil explained that nineteen days before this action was filed, Plaintiffs' counsel filed *Ford County*, naming the same defendants named in this case. (Doc. 4 at 1-2). Plaintiffs now admit that the Ford County factual averments and the injunctive relief sought are nearly identical. (Doc. 47). Thus, the "first-filed" rule compels transfer of this case to the District of Kansas. In its motion to stay proceedings, ExxonMobil also requested that the Court stay this case pending its decision on the motion to transfer venue. (Doc. 5).

Plaintiffs' consolidated response to ExxonMobil's motions admits the underlying rationale for transfer and stay and offers no analysis of the pending issues, instead declaring that its dismissal of the first-filed Kansas action allegedly moots ExxonMobil's motions. (Doc. 47). Specifically, Plaintiffs informed the Court that "[u]pon consideration of Defendant Exxon Mobil's arguments regarding the overlap of allegations and parties to the two cases, and for purposes of judicial efficiency and economies, Plaintiffs, as masters of their own Complaint, voluntarily dismissed *Ford County* in the District of Kansas." (Doc. 47 at 2). Plaintiffs attached that notice of dismissal (Doc. 47-1) and incorrectly represented to the Court that ExxonMobil's transfer and stay motions are moot

as a result, requiring "no further response." (Doc. 47 at 2). After ExxonMobil had drawn attention to the indicia of forum shopping in its suggestions in support of its motion to transfer, Plaintiffs confirmed those motivations by dismissing *Ford County* and amending the complaint in this case to add the *Ford County* public nuisance claim. (Doc. 48).[1]

On January 21, 2025, before ExxonMobil had an opportunity to file a reply correcting Plaintiffs' assertion that the transfer motion is moot, the Court accepted Plaintiffs' response rationale and denied both motions, stating, "as Plaintiff has voluntarily dismissed his parallel lawsuit in the District of Kansas, the motions are DENIED AS MOOT" (Doc. 49) (emphasis in original).

## II.  Standards Governing Reconsideration

A Court may reconsider a prior interlocutory order "if the moving party demonstrates (1) that it did not have a fair opportunity to argue the matter previously, and (2) that granting the motion is necessary to correct a significant error." *Provisur Techs., Inc. v. Weber, Inc.*, No. 21-cv-06113-SRB, 2024 WL 4919540, at *1 (W.D.Mo. Oct. 24, 2024) (slip copy) (quoting *Disc. Tobacco Warehouse, Inc. v. Briggs Tobacco & Specialty Co.*, No. 3:09-CV-05078-DGK, 2010 WL 3522476, at *2 (W.D. Mo. Sept. 2, 2010).

## III.  The Court should reconsider its order denying ExxonMobil's motions to transfer venue and to stay proceedings as moot because ExxonMobil did not have a fair opportunity to reply to Plaintiffs' response and reconsideration is necessary to correct a significant error.

Under Western District Local Rule 7(c), any moving party may file reply suggestions "[w]ithin 14 days after the opposing suggestions" to the party's motion are filed. Here, Plaintiffs filed their response to ExxonMobil's motions to transfer venue and

---

[1] It should be noted that putative plaintiffs in the Amended Complaint include "[a]ll counties, cities, and municipalities located within the United States and its territories…." (Doc. 48, at 163). This presumably encompasses the City of Kansas City, Missouri as a plaintiff in this litigation.

to stay proceedings on January 17, 2025, so ExxonMobil had until January 31 to file its reply. Notwithstanding, based on the Plaintiffs' incorrect assertion that the dismissal of the District of Kansas action mooted the transfer motion, the Court denied ExxonMobil's motions as moot on January 21, ten days before ExxonMobil's reply suggestions were due. This denied ExxonMobil "a fair opportunity to argue the matter[s]" contained in the reply it planned to file. *Provisur*, 2024 WL 4919540, at *1.

The assertion that ExxonMobil's transfer motion is moot is a "significant error" warranting reconsideration and because the Court ruled before ExxonMobil had an opportunity to file its reply brief, ExxonMobil did not have an opportunity to respond to Plaintiffs' error. In fact, dismissal of a "first filed" action does not moot a motion to transfer a later-filed action to the initial case's venue. Accordingly, the Court should reconsider its order denying ExxonMobil's motions to transfer venue as moot and should consider the merits of ExxonMobil's motion to transfer and stay proceedings.

## IV. Plaintiffs' voluntary dismissal of *Ford County* does not bar transfer under the "first-filed" doctrine.

Transfer is still appropriate pursuant to the first-filed rule even, and sometimes more so, when the first-filed case has been dismissed. In situations like the one at hand, where Plaintiffs' counsel "has taken calculated steps in filing, serving, and dismissing cases -- all seemingly with the intent to choose what it views as the best jurisdiction in which to proceed," such "indicia of forum shopping" weighs in favor of, not against, transfer. *Abreu v. Pfizer, Inc.*, No. 21-62122-CIV, 2022 WL 2355541, at *13 (S.D. Fla. June 22, 2022), *report and recommendation adopted*, 2022 WL 3370932 (S.D. Fla. Aug. 16, 2022).

4

**A.** ***Transfer remains appropriate under the first-filed rule when the first-filed action has been dismissed.***

Voluntary dismissal of the *Ford County* action did not moot ExxonMobil's transfer motion, as courts frequently transfer cases to jurisdictions where no pending case exists, and courts have regularly transferred second-filed actions to first-filed venues where the earlier filed action has already been dismissed. The lack of a pending case in the transferee jurisdiction does not moot a motion to transfer or to stay. Moreover, the District of Kansas retains a degree of jurisdiction over *Ford County* notwithstanding that case's dismissal. *See, e.g., Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 395-99 (1990) (recognizing that "[i]t is well established that a federal court may consider collateral issues after an action is no longer pending").

The above general principals regarding transfer to a district with no active case are exemplified in cases applying the first-filed doctrine post dismissal in the transferee court. For example, in *Young v. L'Oreal USA, Inc.*, 526 F. Supp. 3d 700, 706 (N.D. Cal. 2021), the Northern District of California considered whether the "first-filed" doctrine warrants transfer "even though the first-filed action is no longer pending in either the district or appellate courts[.]" There, a putative class of plaintiffs filed suit alleging the defendant's cosmetic products suffered from labeling and packaging defects. *Id.* at 702. Two years before that action commenced, the same attorneys representing the plaintiffs in the California case filed a nearly identical action against the same defendant in the Southern District of New York. *Id.* at 703. The New York court dismissed the plaintiffs' complaint, which the Second Circuit affirmed. *Id.* at 703–04. While the Second Circuit appeal was pending, plaintiffs' counsel filed the nearly identical suit in California. *Id.*

65332405v1

Upon defendant's motion, the Northern District of California transferred the case to the Southern District of New York even though the court in the first-filed case had dismissed, in its entirety, the first case in a decision affirmed on appeal. *Id.* at 706-08. The Northern District explained that "a court is not stripped of its discretion to apply the first-to-file rule even though the first-filed action is no longer pending." *Id.* at 706 (citing *Alul v. Am. Honda Motor Co., Inc.*, No. No. 16-cv-04384-JST, 2016 WL 7116934, at *1, 6 (N.D. Cal. Dec. 7, 2016); *Exec. Law Grp., Inc. v. Exec. Law Grp. PL*, No. SACV 13-01823 MMM, 2014 WL 12577090, at *3 (C.D. Cal. Mar. 24, 2014)).

A more recent decision reached the same result. In *Johnson v. Siemens Indus., Inc.*, No. 23-cv-01562-RS, 2023 WL 4686015 (N.D. Cal. July 21, 2023), the plaintiffs' attorney previously filed two class action suits against the same defendant: one in the Central District of California and the second in California state court, which was then removed to the Northern District of California. *Id.* at *1. In *Johnson* the Northern District found that the first-filed doctrine warranted transfer despite dismissal of the earlier cases. *Id.* at *4. It explained, "[a]lthough the named plaintiff is different, the same counsel is endeavoring to bring the same claims on behalf of the same class," which the Court called an "inescapable" example of "intentional shopping for a different result[.]" *Id.* at *3. So, while "dismissal of an earlier-filed case may render some of the considerations behind the rule moot in certain circumstances, *the forum shopping concern remains*." *Id.* at *4 (emphasis added). The "forum shopping concern" is also at issue here and weighs strongly in favor of transfer under the first-filed rule. For this reason, the Court should reconsider its Order.

**B.** *Evidence of forum shopping weighs in favor of, rather than mooting, transfer under the first-filed rule.*

Plaintiffs' counsel here – the same attorneys who filed *Ford County* – filed this action against an identical set of defendants and based on the same factual allegations seeking identical injunctive relief. When ExxonMobil drew attention to the indicia of forum shopping in its suggestions in support of its motion to transfer, Plaintiffs confirmed those motivations by dismissing *Ford County* and amending the complaint in this case to add the *Ford County* public nuisance claim. (Doc. 48).

Plaintiffs' actions in filing, never seeking service in, and then dismissing *Ford County* evinces the "calculated steps" Plaintiffs have undertaken in "filing, serving, and dismissing cases" with "the intent to choose what it views as the best jurisdiction in which to proceed" – this Court. *Abreu*, 2022 WL 2355541, at *13 (applying first-filed rule to recommend transfer of a case despite both a voluntary dismissal and a dismissal on the merits of cases in the first district, noting that Plaintiff's counsel's earlier voluntary dismissal of a first-filed case weighed in favor of, not against, transfer).

These considerations apply equally in this Circuit. The Eighth Circuit has stated explicitly that "it is inappropriate for a plaintiff to use voluntary dismissal as an avenue for seeking a more favorable forum." *Thatcher v. Hanover Ins. Grp., Inc.*, 659 F.3d 1212, 1214 (8th Cir. 2011). Plaintiffs should not be permitted to run afoul of this Eighth Circuit policy by voluntarily dismissing the first-filed *Ford County* and joining the public nuisance claim to the second-filed *Rodriguez* in an effort to moot ExxonMobil's motion to transfer and choose what Plaintiffs apparently perceive as a more favorable forum.

Instead of repudiating the law and analysis offered by ExxonMobil in support of its motion for transfer, Plaintiffs' actions and response to the motion admit the overlap in the

cases and demonstrates Plaintiffs' motivations. This conduct underscores the merits of ExxonMobil's motion.

## V. The Court should stay these proceedings until it decides ExxonMobil's motion to transfer.

Plaintiffs similarly did not respond to ExxonMobil's motion to stay proceedings other than to claim that motion was moot due to the *Ford County* voluntary dismissal. As explained above, ExxonMobil's transfer motion is not moot because the Court may still apply the first-filed rule and transfer this case. For the same reason, ExxonMobil's request to stay these proceedings pending adjudication of the motion to transfer is not moot.

If anything, a stay is more warranted now than before given Plaintiffs' recent amended complaint[2] incorporating Ford County, Kansas as a plaintiff and raising the public nuisance claim in this suit. (*Compare* Doc. 48, ¶¶ 205-16 *with* Doc. 4-1, ¶¶ 154-165). It would betray all sense of judicial economy to require Defendants to prepare responsive pleadings or Rule 12(b) motions (in turn requiring Plaintiffs to prepare their own responses) while this Court weighs ExxonMobil's transfer motion. As ExxonMobil explained in its motion to stay, "once a party files a transfer motion, disposing of that motion *should unquestionably take top priority*." *In re Apple Inc.*, 979 F.3d 1332, 1337 (Fed. Cir. 2020) (emphasis added). ExxonMobil's request to stay this case comports with the principle of judicial economy, and Plaintiffs did not provide any analysis or argument to the contrary.[3]

---

[2] Plaintiffs' addition of the public nuisance cause of action to the *Rodriguez* complaint precipitated no substantive changes to the factual allegations. (*Compare* Doc. 1, ¶¶ 26–147 *with* Doc. 48, ¶¶ 34–155).

[3] In their response to the motions to transfer and stay, Plaintiffs assert a non-germane jurisdictional waiver argument, suggesting ExxonMobil's limited appearance is somehow unsupported by law. For support, Plaintiff's' cite to *Insurance Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 704 (1982) (Doc. 47 n.1.). The holding in *Insurance Corp of Ireland* is not applicable here. There, the Supreme Court discussed instances where personal jurisdiction may be waived, by contract, stipulation or arbitration

## Conclusion

ExxonMobil respectfully requests that this Court reconsider its Order denying ExxonMobil's motion to transfer based on the first filed rule as moot and consider the merits of ExxonMobil's motion and grant ExxonMobil's motions to transfer this case to the District of Kansas and stay this case pending the decision on the motion to transfer venue.

Dated: January 22, 2025

Respectfully submitted,

**LATHROP GPM LLP**

By: */s/ Richard N. Bien*

Richard N. Bien      (MO #31398)
William F. Ford      (MO #35116)
Emma C. Halling      (MO #75986)
Grant A. Harse      (KS #001043)
Brody Sabor      (MO #73421)
2345 Grand Boulevard, Suite 2200
Kansas City, Missouri 64108
Telephone: (816) 292-2000
Telecopier: (816) 292-2001
richard.bien@lathropgpm.com
bill.ford@lathropgpm.com
emma.halling@lathropgpm.com
grant.harse@lathropgpm.com
brody.sabor@lathropgpm.com

-AND-

---

agreements, "voluntary use of certain state procedures," including filing a cross-action, *id.* at 704, or "filing a plea in abatement, or taking the question to a higher court." *Chicago Life Ins. Co. v. Cherry*, 244 U.S. 25, 30 (1917) (cited in *Insurance Corp. of Ireland*, 456 U.S. at 704). ExxonMobil has not waived personal jurisdiction by these acts or otherwise. There is no contract, stipulation or arbitration agreement, and ExxonMobil has not filed an "answer or a responsive pleading" to the complaint nor has it yet filed a 12(b) motion. *See* Fed. R. Civ. P. 7(a) and *McDowell v. Tankinetics, Inc., infra.* ExxonMobil has not waived, but instead has specifically preserved a challenge to personal jurisdiction. ExxonMobil has provided Plaintiffs with explicit, unambiguous notice that it does not concede personal jurisdiction and will challenge "personal jurisdiction under 12(b)(2)," and assert other defenses, once the proper forum has been established. (Doc. 4 n.1.) See *McDowell v. Tankinetics, Inc.*, No. 11–3306–CV–S–RED, 2012 WL 828509, at *4 (W.D.Mo. Mar. 8, 2012), aff'd 507 Fed.Appx. 624, *per curiam* (May 31, 2013) ("Under Rule 12, a defense is only waived if it is not included in a responsive pleading or set forth in a motion to dismiss. Rule 12(h)(1)(B)(i)-(ii). . . . Defendants covered all bases by specifically indicating in their Notice of Removal (Doc. 1) that they did not intend to waive personal jurisdiction by removing this case to federal court.").

9

David J. Lender (*pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Telecopier: (212) 310-8007
david.lender@weil.com

David R. Singh
(pro hac vice to be filed)
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, California 94065
Telephone: (650) 802-3000
Telecopier: (650) 802-3100
david.singh@weil.com

*Attorneys for Exxon Mobil Corporation*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on January 22, 2025, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to counsel of record.

*/s/ Richard N. Bien*
Richard N. Bien
*An Attorney for Exxon Mobil Corporation*

10

# Exhibit 11

BILLIE RODRIGUEZ, et al
     Plaintiffs,

v.

EXXON MOBIL CORPORATION, et al
     Defendants.

Case No. 4:24-cv-00803-SRB

## PLAINTIFFS' SUGGESTIONS IN OPPOSITION TO DEFENDANT EXXON MOBIL CORPORATION'S MOTION FOR RECONSIDERATION

What Defendant Exxon Mobil Corporation (Exxon) asks this Court to do—to re-open a *terminated* case in a different judicial district—is not relief that can be granted.[1] Plaintiffs respond accordingly because the Motion for Reconsideration lacks merit and moves the Court for something that is not procedurally possible. Exxon's motion to transfer Plaintiffs' case is an attempt at forum shopping that was correctly mooted and its Motion for Reconsideration falls flat.

## BACKGROUND

On November 27, 2024, Plaintiff The Board of County Commissioners of the County of Ford, Kansas (Ford County) filed a class action in the District of Kansas on behalf of a class of all Kansas counties seeking to remedy the harms caused by Defendants' negligent and/or intentional misrepresentations about the recyclability of plastics. *See Ford County, Kansas v. Exxon Mobil Corp. et al.*, 24-cv-02547 (D. Kan.). Nineteen days later, on December 16, the original Plaintiffs in this case filed a similar case on behalf of a class of consumers. Exxon did not appreciate that

---

[1] Not only does Exxon contest this Court's jurisdiction over it in this case, it also contests the District of Kansas's jurisdiction—the jurisdiction it seeks to have this case transferred to. *See* Doc. #4 at 1 n.1.

**App. 305**

Plaintiffs had filed two cases in separate judicial districts, and it wished to have both litigated in the District of Kansas. So, six days later, before any party had been served or notified of the filing—and on a Sunday evening—Exxon filed a Motion to Transfer and Motion to Stay in this case, based on its belief that the then Ford County case in the District of Kansas and the Consumer case here significantly overlapped and the "first to file" rule mandated consolidation in the District of Kansas. Docs. #3, 4. Subsequently, Ford County voluntarily dismissed its case in the District of Kansas, before any defendant in that action had been served or appeared, and joined the current case here: the venue where more Plaintiffs reside and that has closer ties to the events alleged. Doc. #48. Plaintiffs then notified the Court that Exxon's requests for transfer and stay were moot because only one case now exists. Doc. #47. The Court then entered a minute entry to that effect. Doc. #49. Even though the Kansas case is now a nullity, Exxon still wants the Court to reconsider its arguments for moving the action to its forum of choice and staying this case in the interim. But all tenets of law and equity require that this case be left undisturbed in this District.

## LEGAL STANDARD

A motion for reconsideration is not rooted in the Federal Rules of Civil Procedure, and is typically treated as a Rule 59(e) motion to alter or amend the judgment, or a Rule 60(b) motion for relief from a final judgment, order, or proceeding. *Provisur Techs., Inc. v. Weber, Inc.*, No. 19-CV-06021-SRB, 2022 WL 22883433, at *1 (W.D. Mo. Aug. 18, 2022) (internal citations and quotation marks omitted). There is a high bar for reconsideration of interlocutory orders because of the Court's inherent "'interest in judicial economy and ensuring respect for the finality of its decisions, values that would be undermined if it were to routinely reconsider[.]'" *Id.* (quoting *Disc. Tobacco Warehouse, Inc. v. Briggs Tobacco & Specialty Co.*, No. 09-CV-05078-DGK, 2010 WL 3522476, at *1 (W.D. Mo. Sept. 2, 2010)). Because Exxon fails to identify whether its Motion seeks relief under Fed. R. Civ. P 59(e) or Fed. R. Civ. P 60(b), the Court shall discern the basis.

*Robinson v. Midwest Div.-RMC, LLC*, No. 4:19-CV-0934-SRB, 2020 WL 3317614, at *1 (W.D. Mo. June 18, 2020) (citing *Sanders v. Clemco Indus.*, 862 F.2d 161, 168 (8th Cir. 1988) (observing that a "danger[] of filing a self-styled 'motion for reconsideration' . . . not described by any particular rule of federal civil procedure" is that a "party leaves the characterization of the motion to the court's somewhat unenlightened guess")). But under either Rule, Exxon's motion fails.

## ARGUMENT

### I. The Motion to Transfer was mooted when Ford County dismissed the action in the District of Kansas.

#### A. No exceptional circumstances justify reconsideration.

Exxon decries the Court's Minute Entry Order, Doc. #49, deeming the Motion to Transfer Venue, Doc. #3, and Motion to Stay Proceedings, Doc. #5, as moot, in light of Ford County's dismissal of its case in the District of Kansas and joining the Amended Complaint here. Exxon argues that it didn't get an opportunity to be heard on the merits because, even though Plaintiffs did what Exxon wanted by consolidating the cases for efficiency, Doc. #4 at 9, it wasn't done in the jurisdiction Exxon wanted. *See* Doc. #55 at 2-3. Exxon now seeks the Court's reconsideration and for another bite at the apple to argue why it thinks the District of Kansas is the more appropriate judicial forum. But reconsideration motions are rarely granted, and typically *only* granted to correct unfounded and objectively incorrect rulings. *E.g., Provisur Techs., Inc. v. Weber, Inc.*, No 21-cv-06113-SRB, 2024 WL 4919540, at *1 (W.D. Mo. Oct. 24, 2024).

Exxon did not specify whether they were seeking relief under Rule 59(e) or Rule 60(b), but under either Rule, its argument does not warrant reconsideration. Rule 59(e) gives the Court power to rectify its own mistakes in the period immediately after judgment is entered. *Williamson v. Stange*, No. 1:22-CV-117 JAR, 2022 WL 13818675, at *2 (E.D. Mo. Oct. 24, 2022) (citing *White v. N.H. Dep't of Emp't Sec.*, 455 U.S. 445, 450 (1982)). Rule 59(e) motions are limited,

however, to correcting "manifest errors of law or fact or to present newly discovered evidence." *Id*. (citing *U.S. v. Metro. St. Louis Sewer Dist.*, 440 F.3d 930, 933 (8th Cir. 2006)). The Minute Entry Order at issue here did not make any findings as to law or fact but simply ratified the status of the cases. Plaintiffs told the Court that one case was terminated and Exxon's Motions to Transfer and Stay were no longer at issue because there was no longer a pending case in the District of Kansas. Doc. #47. There is no manifest error to cure.

Similarly, a Rule 60(b) motion for reconsideration should be reserved for "extraordinary relief which may be granted only upon an adequate showing of exceptional circumstances." *Williamson,* 2022 WL 13818675, at *3 (citing *U.S. Xpress Enters., Inc. v. J.B. Hunt Transp., Inc.*, 320 F.3d 809, 815 (8th Cir. 2003)). Rule 60(b) provides relief for:

> (1) mistake, inadvertence, surprise, or excusable neglect;

> (2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b);

> (3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party;

> (4) the judgment is void;

> (5) the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or

> (6) any other reason that justifies relief.

Fed. R. Civ. P. 60. None of these circumstances are present here, nor are there any circumstances that "justify extraordinary relief." *Williamson*, 2022 WL 13818675, at *3.

In pressing its Motion for Reconsideration, Exxon improperly asks the Court to revisit its argument about the relatedness of the two actions, which was already resolved by Ford County dismissing its District of Kansas case and joining this action. Not once in its reconsideration request does Exxon cite either rule to suggest why reconsideration is warranted. Nor could Exxon

cite any such support because there is no basis under either Rule 59(e) or Rule 60(b) to reconsider the Court's Order mooting Exxon's two motions.

**B. If the Court does consider the substantive arguments of Exxon's request for reconsideration, it will find that the law is in Plaintiffs' favor.**

**1. Plaintiffs get deference for their choice of forum.**

Plaintiffs, most of whom are Missouri residents, chose to bring litigation in their home forum, and that decision should be left undisturbed. Exxon makes no viable argument for disturbing Plaintiffs' choice, other than that the now-nonexistent case in the District of Kansas was filed three weeks before this one. Generally, a court is to give Plaintiffs' choice of forum considerable deference. *Harrison v. Gen. Motors Co*., No. 17-3128-CV-S-SRB, 2017 WL 11341317, at *1 (W.D. Mo. Sept. 25, 2017) (citing *In re Apple, Inc.*, 602 F.3d 909, 913 (8th Cir. 2010) and denying a motion to transfer under Rule 1404)). That choice should only be disturbed upon a clear showing that the balance of interests weighs in favor of the movant's choice of venue. *Painter v. L'Oreal USA, Inc*., No. 6:24-CV-03077-MDH, 2024 WL 4774904, at *3 (W.D. Mo. Nov. 13, 2024) (citing *Gen. Comm. of Adjustment v. Burlington N. R.R.*, 895 F. Supp. 249, 252 (E.D. Mo. 1995)). Even if the Court were to consider Exxon's substantive arguments and weigh the factors under the first-to-file rule, Exxon's arguments are unavailing, because the purpose of transferring to the first-filed case is to "promote efficient use of judicial resources." *Haworth v. New Prime, Inc*., 448 F. Supp. 3d 1060, 1064 (W.D. Mo. 2020) (citing *Orthmann v. Apple River Campground, Inc.*, 765 F.2d 119, 121 (8th Cir. 1985)). There is no concern over misuse of judicial resources in multiple courts, since this case is only being litigated in a single court. Because the law flies in the face of Exxon's position, it does not provide any law to the contrary. Plaintiffs' choice of forum should not be disturbed by Exxon's unproductive arguments.

5

### 2. Exxon's authority on cases being transferred to dormant dockets is unavailing.

The relief that Exxon seeks—for this Court to "consider the merits" of its moot request and somehow transfer/reopen a terminated case in the District of Kansas, to move the parties across the state line—is not relief that a party can ask the Court to make. Doc. #55 at 9. The cases cited by Exxon for the proposition that this is logistically feasible and possible are not remotely akin to the facts here.

In *Young v. L'Oreal USA, Inc.*, two similar cases were filed in different jurisdictions, and while the first one was pending on appeal to the Second Circuit, ***after dismissal on the merits*** based primarily on the defendant's preemption arguments, the plaintiffs' counsel filed the second case on the other side of the country. 526 F. Supp. 3d 700, 703 (N.D. Cal. 2021). In its ruling on the motion to transfer by the defendant, the Court appropriately rooted its decision in "sound judicial administration" and "the three pillars supporting the first-to-file rule—economy, consistency, and comity." *Id.* at 708. And most notably, the Court sought to "to avoid the embarrassment of conflicting judgments." *Id.* (quoting *Church of Scientology v. United States Dep't of the Army*, 611 F.2d 738, 750 (9th Cir. 1979)). Here, Ford County's previous District of Kansas case is not pending anywhere, certainly not on appeal in the Tenth Circuit. There is no potential for conflicting judgments because there is only one case. *Young* does not support Exxon's contention to transfer this current case back to a terminated docket.

Exxon's other caselaw in support is also misleading. In a case involving two class actions against the same defendant, the Northern District of California granted the defendant's motion to transfer to the location of the first-filed case ***after briefing and a court order granting dismissal of the federal claims.*** *Johnson v. Siemens Indus., Inc.*, No. 23-CV-01562-RS, 2023 WL 4686015, at *1 (N.D. Cal. July 21, 2023). Rather than amending that complaint to add Johnson, with

additional plausible allegations and/or refiling with the state law claims, Johnson filed a new, although "essentially the same," case in a different federal judicial district. *Id.* at *3. The court, quoting *Young,* ordered transfer on the basis of the plaintiffs' counsel trying to avoid the prior adverse ruling. *Id.* at *4. Here, Plaintiffs' counsel is not trying to avoid a prior adverse ruling—indeed, there were no rulings in the District of Kansas case, let alone *any* motion practice or briefing that would suggest an efficiency in keeping the case in the District of Kansas.

Despite Exxon's best attempts at analogizing these cases with the instant case, there is no colorable argument that these cases are instructive. And given the weight of authority—and no Eighth Circuit law in support to invoke—Exxon's argument is unavailing. Both cases dealt with new complaints being filed following substantial and time-consuming dispositive briefing and rulings, and both paid special mind to the potential for inconsistent rulings, given the overlap of legal and factual claims. In contrast, the docket in Ford County's District of Kansas case consisted of a single entry outside the case initiation documents—Ford County's Fed. R. Civ. P. 41(a)(1)(A)(i) dismissal notice. There were no rulings or orders, dispositive or otherwise, that created the law of the case and risked creation of conflicting outcomes between this case and that one. And Exxon does not even attempt to argue the pillars supporting a transfer because economy, consistency, and comity are all met by leaving the case exactly where Plaintiffs, the masters of their own complaint, sought to litigate it.

### 3. The relief sought by Exxon is unattainable.

As discussed above, Exxon cites none and Plaintiffs have located no authority in which a transferor-court ordered the re-opening of an already terminated docket in the potential transferee-court, a docket which had no actual filings after case initiation, simply because a similar complaint in another jurisdiction was originally filed there. Exxon postures that, based on the merits of its motion to transfer, this Court has authority to re-open the District of Kansas docket and require it

to accept transfer of this case for it to be litigated in that jurisdiction. Doc. #55 at 4-6. Exxon further argues that a stay is warranted while the Court consider it's transfer request, so that Exxon and its co-defendants are not required to prepare their Rule 12(b) motions. *Id.* at 8. But most perplexing, Exxon argues, without support, that "the lack of a pending case in the transferee jurisdiction does not moot a motion to transfer to stay." *Id*. at 5. Indeed, that's exactly what it does. The caselaw authorizes the Court to transfer a latter filed case back to a case that's pending on appeal, after deciding that retaining jurisdiction in the forum of the latter case could risk conflicting rulings. But there is nothing in the Federal Rules of Civil Procedure or binding (or persuasive) caselaw that permits the Court to transfer a case back to a case that was already subject to a Rule 41 voluntary dismissal before an answer was filed.

There is no Eighth Circuit authority that would allow the Court to grant Exxon's requested relief, because a Rule 41(a)(1)(A) dismissal without prejudice operates as a complete bar of future litigation of that docket and case number. In fact, a notable quote from *Young* (a case in which Exxon relied, but the quote was conspicuously absent from its brief) is instructive: "'[A] suit dismissed without prejudice,'. . . leaves the situation the same as if the suit had never been brought in the first place." *Young*, 526 F. Supp. 3d at 707 (citations omitted). That sentiment resonates in the Eighth Circuit, as it has repeatedly held the result of a voluntary dismissal under Rule 41(a) renders the case null and leaves the parties in the same position as if the case had never been filed. *Tri-Nat'l, Inc. v. Yelder*, 781 F.3d 408, 414 (8th Cir. 2015) (quoting *In re Piper Aircraft Distrib. Sys. Antitrust Litig.*, 551 F.2d 213, 219 (8th Cir. 1977)). Indeed, because the case becomes a nullity, "[t]he jurisdictional effect of such a voluntary dismissal deprives the court of any power to adjudicate the withdrawn claim." *Vanover v. Bohnert*, 11 F. App'x 679, 681 (8th Cir. 2001) (citing *Smith v. Dowden,* 47 F.3d 940, 943 (8th Cir. 1995); *see Safeguard Bus. Sys., Inc. v. Hoeffel,* 907

8

**App. 312**

F.2d 861, 864 (8th Cir.1990) (holding district court orders filed after a voluntary dismissal are void for want of jurisdiction)). So Ford County's District of Kansas lawsuit is now exactly that: a nullity.

And Exxon's quote from Thatcher regarding the Eighth Circuit's "policy" on forum-shopping is again misleading and without context. Doc. #55 at 7. The *Thatcher* plaintiff voluntarily dismissed his case without prejudice after the defendants answered—apparently wanting to refile in state court to avoid federal jurisdiction—so the Eighth Circuit found the district court abused its discretion by granting the dismissal. *Thatcher v. Hanover Ins. Grp., Inc.*, 659 F.3d 1212 (8th Cir. 2011) To reiterate, nothing had been done in Ford County's District of Kansas case prior to its dismissal and Ford County joining this action. Even Exxon points out that the defendants in Ford County's Kansas case had not even been served. *See* Doc. #55 at 7. So, considering the closure of the docket and termination of the cause, the District of Kansas action is no longer pending, active, or able to accept new filings, and Exxon must answer to a Western District of Missouri court. Even if the Court were to reconsider its minute entry and contemplate Exxon's sought-after transfer to the District of Kansas, it is without the ability to move this case to a terminated docket that operates under the law as though it never existed.

## CONCLUSION

The irony is not lost that the very relief sought by Exxon is what it accuses Plaintiffs of doing: trying to get the case heard in a venue of their choice. And consider the implications of what Exxon asks this Court to do: it would mean that anytime a case was nonsuited before service or responsive pleadings, it would still anchor and serve as "first-filed" for all future cases and would require every other court to transfer similar cases brought in other forums, in perpetuity. This would flout logic and law. Exxon cannot ignore Rule 41(a)(1)(A)(i). Plaintiffs' case rests soundly in this Court, with more Plaintiffs at home here than in the District of Kansas. Accordingly, Plaintiffs request that the Court deny Exxon's Motion for Reconsideration.

9

Dated: February 5, 2025.

Respectfully submitted,

<u>/s/ Isaac L. Diel</u>
Rex A. Sharp, MO #51205
Isaac L. Diel, MO #39503
W. Greg Wright, MO #49545
Sarah T. Bradshaw, MO #66276
Hammons P. Hepner, MO #77258
SHARP LAW, LLP
4820 W. 75th Street
Prairie Village, KS 66208
(913) 901-0505
(913) 261-7564 Fax
rsharp@midwest-law.com
idiel@midwest-law.com
gwright@midwest-law.com
sbradshaw@midwest-law.com
hhepner@midwest-law.com

--and--

Dave Rebein, KS #10476
REBEIN BROTHERS, PA
1715 Central Ave.
Dodge City, KS 67801
Tel: (620) 227-08126

--and--

Glenn I. Kerbs, KS #09754
Samantha F. Sweley, KS #26833
KERBS LAW OFFICE, LLC
1715 Central Ave.
Dodge City, KS 67801
Tel: (620) 255-0238
gkerbs@kerbslaw.com
ssweley@kerbslaw.com

*Attorneys for Plaintiffs*
*and the Proposed Class*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that, on February 5, 2025, I caused to be electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

*/s/ Isaac L. Diel*
Rex A. Sharp

# Exhibit 12

BILLIE RODRIGUEZ, DANIEL ERWIN, MICHAEL B. ACKERMAN, and KYLE FOREMAN, individually and on behalf of all others similarly situated,

        Plaintiffs,

    v.

EXXON MOBIL CORPORATION, CHEVRON USA INC., CHEVRON PHILLIPS CHEMICAL CORPORATION, DUPONT de NEMOURS, INC., DUPONT CORPORATION, CELANESE CORPORATION, DOW INC., DOW CHEMICAL COMPANY, EASTMAN CHEMICAL COMPANY, LYONDELLBASELL INDUSTRIES N.V., and AMERICAN CHEMISTRY COUNCIL,

        Defendants.

Case No. 4:24-cv-00803-SRB

**ORAL ARGUMENT REQUESTED**

## SPECIALLY APPEARING DEFENDANT EXXON MOBIL CORPORATION'S REPLY SUGGESTIONS IN SUPPORT OF ITS MOTION TO RECONSIDER

Specially appearing defendant Exxon Mobil Corporation ("ExxonMobil"),[1] by and through its undersigned counsel, submits the following Reply Suggestions in Support of its Motion to Reconsider. (Doc. 55). Plaintiffs' Suggestions in Opposition (Doc. 82) contain multiple misstatements of law and mischaracterization of authorities relied on. Plaintiffs proffer an incorrect legal standard, claiming that transfer is unavailable pursuant to the

---

[1] Exxon Mobil Corporation specially appears only to contest venue via the first-filed rule. By filing its motion, motion for reconsideration, and reply in support, ExxonMobil does not concede jurisdiction is proper in the District of Kansas or the Western District of Missouri, and the instant motion does not prevent ExxonMobil from subsequently filing 12(b) motions in either forum, including but not limited to motions challenging personal jurisdiction under 12(b)(2). ExxonMobil explicitly preserves all defenses under Rule 12(b) and intends to file such motions after the appropriate forum is determined. *See* Fed. R. Civ. P. 12(h)(1). *Lewis & Clark Reg. Water Sys., Inc. v. Carstensen Contracting, Inc.*, 355 F. Supp. 3d 880 (D.S.D. Dec. 31, 2018); *Dekalb Genetics Corp. v. Syngenta Seeds, Inc.*, No. 4:06CV01191-ERW, 2007 WL 1223510, at *5 (E.D. Mo. Apr. 24, 2007).

first-filed rule where prior actions were voluntarily dismissed, and based on that falsity, Plaintiffs incorrectly claim that transfer is impossible. To the contrary, transfer pursuant to the first-filed rule is available and appropriate here, particularly in light of Plaintiffs' forum shopping.

## I.    ExxonMobil met its burden for reconsideration of an interlocutory order.

Plaintiffs incorrectly assert that Rule 59(e) or Rule 60(b) apply to ExxonMobil's motion for reconsideration. Rather than supporting its argument, Plaintiffs' claimed authority demonstrates that the opposite is true – where an order is interlocutory reconsideration is appropriate when the moving party demonstrates "(1) that it did not have a fair opportunity to argue the matter previously, and (2) that granting the motion is necessary to correct a significant error." *Provisur Techs., Inc. v. Weber, Inc*., No. 19-CV-06021-SRB, 2022 WL 22883433, at *1 (W.D. Mo. Aug. 18, 2022) (quoting *Disc. Tobacco Warehouse, Inc. v. Briggs Tobacco & Specialty Co.*, No. 09-CV-05078-DGK, 2010 WL 3522476, at *1 (W.D. Mo. Sept. 2, 2010)); (*See, also*, Doc. 55 at 3.).[2]

The foregoing is the proper standard for reconsideration of an interlocutory order, such as the order here. Conversely, Rule 59(e) and Rule 60(b) apply when the order being reconsidered is a *final* judgment or order.[3] *Disc. Tobacco Warehouse,* 2010 WL 3522476, at *1. This motion for reconsideration addresses an interlocutory order not a final judgment. *See* Fed. R. Civ. P. 54(b) (stating "any order or other decision, however

---

[2] Indeed, *Provisur* recognized that this Court has "greater discretion" to reconsider an interlocutory order, like the one here, than it would have "to reconsider a motion brought pursuant to Rules 59(e) and 60(b)." *Id*.

[3] Rule 59(e) is wholly inapplicable as it applies only to "final judgments." *See Broadway v. Norris*, 193 F.3d 987, 989 (8th Cir. 1999). And even if this Court applies Rule 60(b), ExxonMobil's motion nevertheless satisfied the rule's requirement for exceptional circumstances in cases, like the one here, where a ruling is based on mistake. Fed. R. Civ. P. 60(b)(1). ExxonMobil clearly pleaded the denial of its ability to correct Plaintiff's misrepresentations concerning mootness despite the ten remaining days in ExxonMobil's reply period. L.R. 7(c)(3). (Doc. 55, pp. 3-4).

**App. 318**

designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities."). Treatment of a motion to reconsider as a Rule 60(b) motion "fail[s] to recognize a district court's inherent authority to reconsider interlocutory orders, authority which as a practical matter a district court needs in order to modify orders in response to the changing circumstances of a lawsuit before it." *Disc. Tobacco Warehouse, Inc.*, 2010 WL 3522476, at *1 (citations omitted).

ExxonMobil's motion for reconsideration satisfies both elements of the applicable standard. First, the motion shows that ExxonMobil did not have a fair opportunity to argue the matter previously—the Court ruled on January 21, the first business day after Plaintiffs' response and ten days before ExxonMobil's reply was due under L.R. 7(c)(3). (Doc. 55, pp. 3-4). Because the Order was entered prior to the reply deadline, the Court did not have the opportunity to consider ExxonMobil's argument that the first-filed rule applies when the prior action has been voluntarily dismissed. Second, the Motion to Reconsider affords the Court the opportunity to correct the error occasioned by Plaintiff's incorrect mootness argument. (Doc. 55, pp. 4-7); *see infra* Section II.

## II. Transfer is appropriate despite Plaintiffs' voluntary dismissal of *Ford County*.

Plaintiffs' response incorrectly contends that the first-filed rule is restricted to circumstances where the first-filed case remains pending or circumstances where the first-filed case was dismissed after an adverse ruling. (Doc. 82, pp. 6-7). This is not the law. As explained in ExxonMobil's motion, the longstanding federal policy against forum shopping requires application of the first-filed rule even (or perhaps more so) when

Plaintiffs' counsel voluntarily dismissed the first-filed action. (Doc. 55, pp. 4, 7) (citing *Abreu v. Pfizer, Inc.*, No. 21-62122-CIV, 2022 WL 2355541, at *13 (S.D. Fla. June 22, 2022), report and recommendation adopted, 2022 WL 3370932 (S.D. Fla. Aug. 16, 2022)).

Plaintiffs' opposition does not address Plaintiffs' obvious forum shopping or the *Abreu* decision. This is unsurprising given the parallels between Plaintiffs' counsel's conduct here and Plaintiffs' counsel's conduct in *Abreu*. In *Abreu*, Plaintiffs' counsel first-filed two class actions in the Southern District of New York, then filed a subsequent class action in the Southern District of Florida. 2022 WL 2355541, at *22. One Southern District of New York case was dismissed on the merits—but one remained pending. *Id*. When the Defendant in the Southern District of Florida filed a motion to transfer that later-filed class action to the Southern District of New York, Plaintiffs' counsel—like Plaintiffs' counsel here—voluntarily dismissed the still-pending Southern District of New York suit, then argued that transfer was no longer appropriate because "the circumstances [have] changed drastically." *Id*. Despite this claim, the Southern District of Florida granted Defendant's motion to transfer because Plaintiffs' counsel's voluntarily dismissal of the earlier filed suit "confirm[ed] the theory that Plaintiff's counsel was, and is, forum shopping." *Id*.

Other U.S. District Courts have also transferred cases to jurisdictions where a Plaintiff earlier voluntarily dismissed a suit in circumstances evincing forum shopping. In *Emerson v. Toyota Motor N. Am., Inc.*, No. 14-CV-02842-JST, 2014 WL 6985183 (N.D. Cal. Dec. 9, 2014), the Plaintiff filed suit in the Central District of California, then voluntarily dismissed the suit after the District Judge was assigned. Plaintiff then re-filed her action

in the Northern District of California. 2014 WL 6985183, at *1-3. The Northern District granted Defendant's motion to transfer the suit back to the Central District, concluding that "Plaintiff's conduct suggests that Plaintiff may have filed in this District believing they would receive a more favorable judicial assignment than the one they had just received in the Central District." *Id.* at *3.

Likewise, here, Plaintiffs' counsel filed the Ford County matter on November 27, 2024. (Ex. 1, *Ford County* Docket, p. 2). That same day, Judge Vratil was assigned the case. (*Id.*). Plaintiffs' counsel was obviously aware that Judge Vratil had previously dismissed a different putative class action filed by the same Plaintiffs' counsel upon defendant ExxonMobil's motion in that case. See *Wheeler v. Exxon Mobil Corp.*, No. CV 19-4025-KHV, 2019 WL 5188738, at *8 (D. Kan. Oct. 15, 2019). Therefore, after assignment of the case to Judge Vratil, Plaintiffs' counsel never sought service or issuance of a summons in *Ford County*. (Ex. 1, p. 2). Instead, nineteen days after drawing Judge Vratil in *Ford County*, Plaintiffs' counsel filed the instant *Rodriguez* complaint based on near-identical factual averments and seeking identical injunctive relief in this district. (Doc. 1). Upon assignment to this Court, Plaintiffs' counsel immediately set out obtaining and serving summons in the Western District of Missouri. (Ex. 2, *Rodriguez* Docket, p. 8) (noting summons issued December 18, 2024). As in *Emerson*, here, Plaintiffs' counsel's conduct of duplicate filing and withholding service dependent on designation of the judge evinces forum shopping that merits transfer to the District of Kansas.

### III. Plaintiffs' choice of forum argument is unavailing.

Plaintiffs' "master of the forum" argument is inapplicable to this litigation and the Court need not defer to that argument. (Doc. 82, p. 5). Initially, as is apparent from this motion, Plaintiffs' first choice of forum was actually Kansas, in the *Ford County* suit.

5

In addition, Plaintiffs' original complaint in this matter had only a single Missouri Plaintiff. (Doc. 1, ¶¶ 12-15). As originally filed, the majority of Plaintiffs' alleged class representatives were citizens of other states and foreign to the Missouri forum. (Doc. 1, ¶¶ 12-15). The Eighth Circuit recognizes that "a foreign plaintiff's choice of forum 'is entitled to substantially less deference.'" *In re Apple, Inc.*, 602 F.3d 909, 913 (8th Cir. 2010) (citation omitted). It was not until <u>after</u> ExxonMobil moved to transfer this case that Plaintiffs amended their Complaint to add as Plaintiffs four additional Missouri residents as well as Ford County, Kansas. (Doc. 48, ¶¶ 15-23).

Moreover, in the context of putative nationwide class actions like the one here, "many courts give a plaintiff's choice of forum less deference." *Silverberg v. H&R Block, Inc.*, No. 4:06CV00519 ERW, 2006 WL 1314005, at *2 (E.D. Mo. May 12, 2006); *see also Koster v. Lumbermen's Mut. Cas. Co.*, 330 U.S. 518, 524 (1947) ("where there are hundreds of potential plaintiffs, all equally entitled voluntarily to invest themselves with the corporation's cause of action and all of whom could with equal show of right go into their many home courts, the claim of any one plaintiff that a forum is appropriate merely because it is his home forum is considerably weakened."). For example, in *Arnold v. LME, Inc.*, No. 19-CV-00555-FJG, 2020 WL 13470567, at *6 (W.D. Mo. Sept. 22, 2020) the Western District of Missouri applied these principles and transferred a putative class action to the District of Minnesota because even though "twenty [named] plaintiffs reside[d] in the Western District of Missouri [and] worked at the Kansas City Terminal . . . . the putative class comprises over a thousand [former employees] who allegedly worked at approximately thirty [terminals] across the country. Thus . . . the named plaintiffs comprise[d] less than 2% of the putative class" and their choice of forum was entitled to

6

"little deference." Here, the five named Missouri Plaintiffs from the First Amended Complaint constitute a miniscule fraction of the proposed nationwide class of "all persons, governmental, and non-governmental entities in the United States and its territories who indirectly purchased plastics for end use [since] January 1, 1990." (Doc. 48, ¶ 161).

Further, "any remaining deference is negated by evidence that Plaintiff's choice of forum was admittedly based on impermissible forum shopping." *Merrick Bank Corp. v. Savvis, Inc.*, No. 4:08CV00674 ERW, 2008 WL 5146660, at *5 (E.D. Mo. Dec. 8, 2008). So, too, here, Plaintiffs' "choices of forum" are entitled to little weight, given the national scope of this putative class action, the circumstances of Plaintiffs' inclusion of additional Plaintiffs, and Plaintiffs' counsel's conduct of "filing, serving, and dismissing cases" with "the intent to choose what it views as the best jurisdiction in which to proceed." *Abreu*, 2022 WL 2355541, at *13.

## IV. This court can transfer a case to the District of Kansas.

Finally, Plaintiffs insist that transfer is "unattainable" because this Court would be "order[ing] the re-opening of an already terminated docket in the potential transferee-court." (Doc. 82, p. 7). This is nonsense. This Court would not be forcing the District of Kansas to re-open *Ford County* after it was voluntarily dismissed. It would be transferring this case—*Rodriguez*—to the District of Kansas, a routine exercise for district courts. See e.g. *Est. of Logan by & Through Logan v. Busch*, No. 4:21-CV-00416-RK, 2022 WL 551256, at *5 (W.D. Mo. Feb. 23, 2022) (*sua sponte* transferring suit on behalf of Missouri estate to District of Kansas); *Auld v. Great Plains Tech. Servs., Inc.*, No. 20-CV-00120-FJG, 2020 WL 8415077, at *4 (W.D. Mo. July 1, 2020) (transferring case to District of Kansas even though venue was also proper in Western District of Missouri); *Simpkins v.*

*Univ. of Kansas Hosp. Auth.*, No. 2:16-CV-04009-NKL, 2016 WL 738229, at *3 (W.D. Mo. Feb. 23, 2016) (transferring putative class action to the District of Kansas).

Transferring a case to a different district does not require the transferee district to re-open a closed case, and Plaintiffs have provided no authority in support of this argument. Rather, transfer provides the transferee district the opportunity to preside over the transferred case. In addition, as noted above, multiple courts have transferred actions to the first-filed jurisdiction after Plaintiffs voluntarily dismissed their suits in the first-filed jurisdiction. *See supra* Section II.

Plaintiffs' theory that transfer to the District of Kansas would impermissibly force open a terminated case is without any support and contrary to established law and practice.

## V.     Conclusion.

Plaintiffs' opposition consists largely of misinterpretations of case law and unsupported statements. Plaintiffs' counsel's conduct of filing, holding service, re-filing in a different jurisdiction upon designation of the judge, and then voluntarily dismissing the first filed suit is strong evidence of forum shopping that warrants transfer under the first-filed rule. Transfer to the District of Kansas is proper under the first-filed rule.

65448655v2

Dated: February 10, 2025                      Respectfully submitted,

/s/ *Richard N. Bien*         AND      David J. Lender (Pro Hac Vice)
Richard N. Bien (MO #31398)           **WEIL, GOTSHAL & MANGES LLP**
William F. Ford (MO #35116)           767 Fifth Avenue
Emma C. Halling (MO #75986)         New York, New York 10153
Grant A. Harse (MO #68948)           Telephone: (212) 310-8000
Brody Sabor (MO #73421)              Telecopier: (212) 310-8007
**LATHROP GPM LLP**                   david.lender@weil.com
2345 Grand Boulevard, Suite 2200
Kansas City, Missouri 64108         David R. Singh
Telephone: (816) 292-2000           (Pro Hac Vice to be filed)
Telecopier: (816) 292-2000           **WEIL, GOTSHAL & MANGES LLP**
richard.bien@lathropgpm.com         201 Redwood Shores Parkway
bill.ford@lathropgpm.com              Redwood Shores, California 94065
emma.halling@lathropgpm.com        Telephone: (650) 802-3000
grant.harse@lathropgpm.com          Telecopier: (650) 802-3100
brody.sabor@lathropgpm.com          david.singh@weil.com

*Attorneys for Defendant ExxonMobil Corporation*

## <u>CERTIFICATE OF SERVICE</u>

      The undersigned hereby certifies that on February 10, 2025, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to counsel of record.

                       /s/ *Richard N. Bien*
                       Richard N. Bien
                       *An Attorney for ExxonMobil Corporation*

# Exhibit 13

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI**

BILLIE RODRIGUEZ, DANIEL ERWIN,
MICHAEL B. ACKERMAN, KYLE FOREMAN,
DREW SCRUGGS, MARY JANE MCQUEENY,
EMILY THORPE, JENNIFER TRITT and THE
BOARD OF COUNTY COMMISSIONERS OF
THE COUNTY OF FORD, individually and on
behalf of all others similarly situated,

       Plaintiffs,

vs.

EXXON MOBIL CORPORATION, CHEVRON
USA INC., CHEVRON PHILLIPS CHEMICAL
CORPORATION, DUPONT de NEMOURS, INC.,
CELANESE CORPORATION, DOW INC.,
DOW CHEMICAL COMPANY, DUPONT
CORPORATION, EASTMAN CHEMICAL
COMPANY, LYONDELLBASELL INDUSTRIES,
N.V., and AMERICAN CHEMISTRY COUNCIL,

       Defendants,

and

STATE OF KANSAS, *ex rel.*
KRIS W. KOBACH, Attorney General,

       Proposed Defendant-Intervenor.

Case No. 4:24-cv-00803-SRB

**ORAL ARGUMENT REQUESTED**

**SUGGESTIONS IN SUPPORT OF
KANSAS'S MOTION FOR LIMITED INTERVENTION**

# TABLE OF CONTENTS

**BACKGROUND** ........................................................................................................... **1**

**ARGUMENT** ............................................................................................................... **2**

    I.   Kansas's intervention is timely. ............................................................................ 3

    II.  Kansas has a right to intervene under Rule 24(a)(2). .......................................... 4

        a.     Kansas has recognized sovereign, property, and economic interests in the subject matter of the litigation. ............................................................................................ 5

        b.     Kansas's sovereign, economic, and property interests may be impaired by the disposition of the case. ........................................................................................... 7

        c.     The existing parties do not—and *cannot*—adequately represent Kansas's interests in this litigation. .................................................................................................... 8

    III. Alternatively, the Court should permit Kansas, through its attorney general, to intervene under Rule 24(b). ............................................................................................................. 10

        a.     Kansas's intervention is warranted under Rules 24(b)(1)(B) and (b)(3). ............. 10

        b.     Kansas's intervention is warranted under Rules 24(b)(2)(A) and (b)(3). ............. 11

    IV. Kansas has standing for intervention under Rule 24. ....................................... 12

    **CONCLUSION** ....................................................................................................... **13**

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*ACLU of Minn. v. Tarek ibn Ziyad Acad.*, 643 F.3d 1088 (8th Cir. 2011) .................................. 3

*Akiachak Native Cmty. v. U.S. Dep't of Interior*, 584 F. Supp. 2d 1 (D.D.C. 2008) ..................... 3

*Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592 (1982) ...... 5, 8, 9, 11, 12

*Aziz v. Trump*, 231 F. Supp. 3d 23 (E.D. Va. 2017) ....................................................... 12

*Coal. of Ariz./N.M. Cntys. for Stable Econ. Growth v. Dep't of Interior*, 100 F.3d 837 (10th Cir. 1996) ....................................................................................................................... 8

*Coffey v. Comm'r*, 663 F.3d 947 (8th Cir. 2011) .................................................... 11, 12

*Elliott Indus. Ltd. P'ship v. BP Am. Prod. Co.*, 407 F.3d 1091 (10th Cir. 2005) .......................... 2

*Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367 (2024) .................................. 13

*In re Baycol Prods. Litig.*, 214 F.R.D. 542 (D. Minn. 2003) ............................................... 3

*Lynch v. Nat'l Prescription Adm'rs, Inc.*, 787 F.3d 868 (8th Cir. 2015) .............................. 8, 12

*Massachusetts v. E.P.A.*, 549 U.S. 497 (2007) ........................................................... 12

*Mille Lacs Band of Chippewa Indians v. Minnesota*, 989 F.2d 994 (8th Cir. 1993) ..................... 4

*Mo. Coal. for Env't Found. v. Wheeler*, No. 2:19-CV-4215-NKL, 2020 WL 2331201 (W.D. Mo. May 11, 2020) ................................................................................................. 5

*Nash Cnty. Bd. of Educ. v. Biltmore Co.*, 640 F.2d 484 (4th Cir. 1981) ................................. 6

*Nat'l Parks Conservation Ass'n v. U.S. E.P.A.*, 759 F.3d 969 (8th Cir. 2014) ........................... 6

*New Jersey v. New York*, 345 U.S. 369 (1953) ............................................................. 5

*Planned Parenthood of Minn., Inc. v. Citizens for Cmty. Action*, 558 F.2d 861 (8th Cir. 1977) ... 8

*Reynolds v. Sims*, 377 U.S. 533 (1964) ................................................................... 5, 9

*S.E.C. v. Flight Transp. Corp.*, 699 F.2d 943 (8th Cir. 1983) ............................................. 8

*Smith v. Fed. Hous. Fin. Agency*, No. 4:12-CV-54, 2013 WL 12121334 (E.D. Tenn. Jan. 22, 2013) ...................................................................................................... 11

*South Dakota ex rel. Barnett v. U.S. Dep't of Interior*, 317 F.3d 783 (8th Cir. 2003) .............. 3, 8

*Thiebaut v. Colo. Springs Utils.*, 455 F. App'x 795 (10th Cir. 2011) ..................................... 6

*United States v. Hooker Chemicals & Plastics Corp.*, 749 F.2d 968 (2d Cir. 1984) ..................... 9

*United States v. Metro. St. Louis Sewer Dist.*, 569 F.3d 829 (8th Cir. 2009) ............................ 2

*United States v. Ritchie Special Credit Invs., Ltd.*, 620 F.3d 824 (8th Cir. 2010) ........................ 4

*United States v. Union Elec. Co.*, 64 F.3d 1152 (8th Cir. 1995) .......................................... 7

*WaterLegacy v. U.S. E.P.A.*, 300 F.R.D. 332 (D. Minn. 2014) ............................................. 2

*Wilson v. CFMOTO Powersports, Inc.*, No. CV 15–3192 (JRT/JJK), 2016 WL 912182 (D. Minn. Mar. 7, 2016) ................................................................................................ 11

*Wyandotte Nation v. City of Kansas City*, 200 F. Supp. 2d 1279 (D. Kan. 2002) ................. 3, 8, 9

**Statutes**

15 U.S.C. § 15c ................................................................................................ 6, 12

K.S.A. 50-160 ................................................................................................... 7

K.S.A. 50-162 ................................................................................................ 6, 12

K.S.A. 50-628 ................................................................................................... 12

K.S.A. 60-908 ................................................................................................ 6, 12

K.S.A. 65-3401 *et seq.* ......................................................................................... 6

K.S.A. 65-3408 ................................................................................................... 7

K.S.A. 65-3415 ............................................................................................... 7, 9

K.S.A. 65-3415a .............................................................................................. 7, 9

K.S.A. 65-3415b .............................................................................................. 7, 9

K.S.A. 75-702 ............................................................................................... 6, 12

K.S.A. 75-702(a) ................................................................................................ 11

**Rules**

Fed. R. Civ. P. 24(a) ......................................................................................... 3, 4

Fed. R. Civ. P. 24(b)(1) ........................................................................................ 3

Fed. R. Civ. P. 24(b)(2) ..................................................................................... 3, 11

Defendant State of Kansas, *ex rel*. Kris W. Kobach, Attorney General ("Kansas"), respectfully submits these suggestions in support of its Motion for Limited Intervention as to Plaintiff The Board of County Commissioners of the County of Ford ("Ford County") in this class action suit against the eleven Plastics Defendants. *See* (Doc. 48.) Federal Rule of Civil Procedure 24 allows Kansas to move for limited intervention as of right, or alternatively, by permission, to challenge Ford County's lack of legal authority to bring its class allegations, challenge the suit's standing, jurisdiction, and venue, and defend Kansas's constitutional, statutory, and common law authority and interests, including its *parens patriae* authority.

## BACKGROUND

On January 17, 2025, Ford County, along with its individual consumer co-plaintiffs, filed its First Amended Class Action Complaint against eleven Plastics Defendants.[1] Ford County alleges the Plastics Defendants misrepresented the recyclability of plastics materials, which caused a nonspecific injury that increased its costs of acquiring plastics and waste management operations costs and interfered with its public health, safety, and welfare. (Doc. 48, ¶ 161-65.) As its remedy, Ford County seeks "a national, 50-state solution" through a statewide and nationwide injunction, abatement of a public nuisance, and monetary and punitive damages. (Doc. 48, ¶¶ 3, 7.) Ford County's "solution" is a class action making claims on behalf of itself *and* the general public and all political subdivisions.[2] (Doc. 48, ¶¶ 23, 161-63.) However, Ford County fundamentally lacks the legal authority to assert Kansas's exclusive *parens patriae* authority and statutory authorities, or attempt to represent the State and its political subdivisions.

---

[1] Ford County joined this matter with the amended complaint. Previously, Ford County brought its own class action in the District of Kansas. *See* Class Action Complaint, *Ford County v. Exxon Mobil Corp., et. al.*, No. 2:24-cv-02547-KHV-GEB (D. Kan. Nov. 27, 2024). However, Ford County voluntarily dismissed that suit after Defendant Exxon Mobil Corp. moved to transfer venue. *See* (Docs. 3-4, 47, 55.)

[2] *See* (Doc. 48, at ¶23, ¶ 161 ("All persons, governmental, and non-governmental entities in the United States and its territories"), at ¶ 162 ("All persons, governmental, and non-governmental entities in the Indirect Purchaser states"), at ¶ 163 ("All counties, cities, and municipalities located within the United States and its territories").)

Kansas's intervention as a party-defendant is imperative to defend its State sovereignty and *parens patriae* interests and challenge Ford County's standing, jurisdiction, venue, and class certification. Ford County—an entity created by Kansas with limited authority—is fundamentally undermining Kansas's sovereignty in this action. Kansas does not currently possess enough credible information to assess Ford County's underlying claims and determine whether a (legitimate) statewide suit is needed, *but* Kansas seeks intervention to protect its ability to make similar factual allegations and claims against the Plastics Defendants, if Kansas determines that any such claims exist. Ford County undermines Kansas's goal by attempting to usurp Kansas's authority and commandeer Kansas's possible claims.

Given its strong, legally protectable interest in this matter, Kansas has a right—or *at least* should be permitted—to intervene to protect its exclusive, sovereign authority.

## <u>ARGUMENT</u>

Federal Rule of Civil Procedure 24 empowers a prospective party to intervene in litigation because of its stake in the outcome. Because of Kansas's significant interest in the outcome of this suit, intervention is warranted.

Rule 24(a) articulates a non-party's right to intervention, and Rule 24(b) provides the circumstances where the Court may permit a non-party's intervention. Intervention fosters judicial efficiency and protects non-parties from having their interests adversely impacted without their participation. *United States v. Metro. St. Louis Sewer Dist.*, 569 F.3d 829, 840 (8th Cir. 2009). And courts often grant limited-purpose intervention, especially because Rule 24 requires flexibility. *See, e.g.*, *Elliott Indus. Ltd. P'ship v. BP Am. Prod. Co.*, 407 F.3d 1091, 1104 (10th Cir. 2005) (permitting intervention to challenge jurisdiction); *WaterLegacy v. U.S. E.P.A.*, 300 F.R.D. 332, 339 (D. Minn. 2014) (collecting cases discussing limited-purpose interventions);

*In re Baycol Prods. Litig.*, 214 F.R.D. 542, 543-44 (D. Minn. 2003) (permitting intervention for limited purpose of modifying a protective order, reasoning the intervenors do not ask the court to exercise jurisdiction over *additional* claims on the merits). Courts have previously recognized that a state has a right to intervene for the limited purpose of protecting its sovereignty. *See, e.g.*, *Wyandotte Nation v. City of Kansas City*, 200 F. Supp. 2d 1279, 1287-89 (D. Kan. 2002) (allowing Kansas to intervene for the purpose of filing a motion to dismiss); *Akiachak Native Cmty. v. U.S. Dep't of Interior*, 584 F. Supp. 2d 1, 6-7 (D.D.C. 2008) (holding Alaska was entitled to intervene as of right as party-defendant to defend its sovereignty).

Kansas has a right to intervene in this matter because it has an interest that could be impaired or impeded by this action, and the parties do not adequately represent its interests. *See* Fed. R. Civ. P. 24(a)(2); *see also South Dakota ex rel. Barnett v. U.S. Dep't of Interior*, 317 F.3d 783, 785 (8th Cir. 2003) ("Rule 24 should be liberally construed with all doubts resolved in favor of the proposed intervenor"); *Wyandotte Nation*, 200 F. Supp. 2d at 1287-89. Kansas also meets the standard for permissive intervention under Rule 24(b) because Kansas has a claim or defense in common with the underling suit, *see* Fed. R. Civ. P. 24(b)(1)(B), and the Attorney General is the only official authorized to bring a statewide suit, *see* Fed. R. Civ. P. 24(b)(2)(A)

## I. Kansas's intervention is timely.

As a precondition, Rule 24 requires that a motion to intervene be timely. *See* Fed. R. Civ. P. 24(a)(2), (b)(1)-(2) Timeliness is generally "based on all of the circumstances," including the litigation's progress, the intervenor's awareness of the litigation, any reasons for delayed intervention, and whether intervention prejudices existing parties. *ACLU of Minn. v. Tarek ibn Ziyad Acad.*, 643 F.3d 1088, 1094 (8th Cir. 2011). Intervention in the early phases of litigation is considered timely. *See Mille Lacs Band of Chippewa Indians v. Minnesota*, 989 F.2d 994, 999

(8th Cir. 1993) (finding the district court abused its discretion by denying a motion to intervene when "the legal proceedings were still at a preliminary stage," and no discovery requests have been exchanged).

Kansas seeks to intervene nineteen calendar days after the amended complaint was filed in this action. This litigation has progressed very little since the first amended complaint (Doc. 48) was filed. No party has filed a dispositive motion, and no defendant has filed an answer. In fact, the parties have agreed to *extend* the opportunity for dispositive motions to March 10, 2025. *See* (Doc. 56, at 2.) Kansas's effort to intervene in this matter is at an early and preliminary stage, which is important in light of the Kansas's proposed motion to dismiss. To the extent Kansas has delayed its intervention (though it has not), any delay was caused by Ford County's choice to join this suit. *See* (Docs. 47 and 48.) Finally, Kansas's intervention will not delay litigation or prejudice an existing party, especially at this preliminary stage. On the contrary, *Kansas* would be significantly prejudiced if denied intervention because *this action* is where Kansas's sovereignty is threatened, so it is the appropriate venue for Kansas to protect its sovereign interest. *Cf. United States v. Ritchie Special Credit Invs., Ltd.*, 620 F.3d 824, 834 (8th Cir. 2010) (finding intervention prejudicial, in part, when a party has other venues to contest and protect its interests). This motion is timely.

## II.    Kansas has a right to intervene under Rule 24(a)(2).

Kansas is entitled to intervene as of right under Rule 24(a)(2). That rule provides a non-party the right to intervene if: "(1) it has a recognized interest in the subject matter of the litigation; (2) the interest might be impaired by the disposition of the case; and (3) the interest will not be adequately protected by the existing parties." *South Dakota*, 317 F.3d at 785 (citing *Chiglo v. City of Preston*, 104 F.3d 185, 187 (8th Cir. 1997)); Fed. R. Civ. P. 24(a)(2). A non-

party has "only a "minimal burden of showing that its interests are not adequately represented by the parties." *South Dakota*, 317 F.3d at 785 (quoting *Mausolf v. Babbitt*, 85 F.3d 1295, 1303 (8th Cir.1996)). Because Kansas's motion is timely and it meets Rule 24(a)(2)'s other requirements, Kansas is entitled to intervene as of right.

**a. Kansas has recognized sovereign, property, and economic interests in the subject matter of the litigation.**

Kansas has a recognized interest in defending its sovereign *parens patriae* authority from usurpation by a political subdivision. The *parens patriae* authority is derived from Kansas's unique "quasi-sovereign interest." *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 607 (1982). "[P]*arens patriae* is inherent in the supreme power of every State[.]" *Id.* at 600. Although the Supreme Court has declined to provide "an exhaustive formal definition [or] a definitive list of qualifying interests[,]" it articulated two general categories. *Id.* at 607. First, a State has a sovereign interest in creating and enforcing a legal code, which includes a State's interest in the physical and economic well-being and health of its residents in general. *Id.* at 601, 607. Second, a State has an interest in demanding recognition of its sovereignty within the federal system. *Id.* at 601, 607. A State is uniquely positioned to sue on behalf of all citizens of the State by virtue of its *parens patriae* interests. *New Jersey v. New York*, 345 U.S. 369, 372 (1953) (quoting *Kentucky v. Indiana*, 281 U.S. 163, 173-74 (1930)). This is in *stark* contrast to the comparably narrow authority held by counties. *See Reynolds v. Sims*, 377 U.S. 533, 575 (1964) (recognizing that counties "never were and never have been considered as sovereign entities" and instead are "subordinate governmental instrumentalities created by the State"); *Mo. Coal. for Env't Found. v. Wheeler*, No. 2:19-CV-4215-NKL, 2020 WL 2331201, at *9 (W.D. Mo. May 11, 2020) (recognizing political subdivisions are not sovereigns and cannot invoke *parens patriae*); *see also Nash Cnty. Bd. of Educ. v. Biltmore Co.*, 640 F.2d 484, 496 (4th Cir.

1981) ("[C]ommon sense dictates that when an alleged wrong affects governmental units on a state-wide basis, the state should seek redress on their behalf as well as on its own rather than parcelling out the actions among local agencies.").

Here, Kansas has the recognized sovereign interest to ensure the *proper party* (*i.e.*, the State of Kansas) is bringing an action on behalf of the State, its political subdivisions, and the general public, in compliance with Kansas and federal law. *See, e.g.*, 15 U.S.C. § 15c (attorney general's sole authority to bring federal antitrust claims for the State); K.S.A. 50-162 (attorney general's exclusive authority to bring Kansas Restraint of Trade Act claims for the State and its political subdivisions); K.S.A. 75-702 (attorney general's sole authority to prosecute civil matters for the State); K.S.A. 60-908 (attorney general's *exclusive* authority to abate statewide nuisances); *see also Thiebaut v. Colo. Springs Utils.*, 455 F. App'x 795, 800 (10th Cir. 2011) (recognizing "that in deciding whether a plaintiff qualifies for *parens patriae* standing, it is appropriate to look to state law" (citing *Hous. Auth. of Kaw Tribe of Indians of Okla. v. City of Ponca City*, 952 F.2d 1183 (10th Cir. 1991)). Further, Kansas has a recognized sovereign interest in enforcing its public nuisance laws, state and federal antitrust laws, and state consumer protection laws, if violations have occurred.

Kansas also has property and economic interests in the subject matter of the litigation. The Eighth Circuit has consistently held that when a potential judgment implicates an intervenor's property or economic interests, the intervenor has a "recognized interest" warranting intervention. *Nat'l Parks Conservation Ass'n v. U.S. E.P.A.*, 759 F.3d 969, 976 (8th Cir. 2014) (collecting cases). Through its sovereign authority, Kansas developed comprehensive safety and sanitation laws. *See generally*, K.S.A. 65-3401 *et seq.* (Kansas's solid and hazardous waste statutes). Even Kansas itself must comply with its sanitation laws and obtain permits for

6

applicable state land use. K.S.A. 65-3408. Assuming the Plaintiffs were to succeed on the merits, Kansas would have economic and property interests the potential judgment implicate, such as: (1) the likely loss of solid waste tonnage fees, (2) Kansas's increased costs to investigate public nuisances caused by solid and hazardous waste, (3) Kansas's increased costs of waste management grants to counties and cities, (4) civil penalties, (5) and Kansas's foreseeable operational costs of coordinating and administering a statewide nuisance abatement. *See* K.S.A. 65-3415 (solid waste grants); K.S.A. 65-3415a (solid waste management fund); K.S.A. 65-3415b (solid waste tonnage fees); K.S.A. 50-160 (civil penalties to the State for violating Kansas Restraint of Trade Act).

Kansas has thus demonstrated that its stake in this litigation is sufficient to satisfy the recognized interest requirement and warrants its intervention as of right.

**b. Kansas's sovereign, economic, and property interests may be impaired by the disposition of the case.**

Kansas's interests in this litigation are precipitated by the significant possibility that Ford County's statewide (and nationwide) class allegations may foreclose Kansas's ability to (legitimately) "hold these plastic producers and manufacturers accountable" in the future *if* unlawful conduct is discovered. (Doc. 48, ¶ 8.) In other words, Kansas's interests may be impaired by the disposition of the case by operation of *res judicata*, collateral estoppel, or *stare decisis*. *See United States v. Union Elec. Co.*, 64 F.3d 1152, 1161 (8th Cir. 1995) (intervenor need not show "would be," but only "may be" impaired). Ford County's broad class allegations seek to illegitimately invoke and represent each sovereign State's *parens patriae* authority. In doing so, and assuming Ford County prevails, Kansas faces a tremendously high risk of being foreclosed from bringing the same or similar claims against the same or similar manufacturers. If nothing less, the *stare decisis* effect of this litigation will speak volumes on future (legitimate)

actions brought by the States. *See Coal. of Ariz./N.M. Cntys. for Stable Econ. Growth v. Dep't of Interior*, 100 F.3d 837, 844 (10th Cir. 1996) ("[T]he *stare decisis* effect of the district court's judgment is sufficient impairment for intervention under Rule 24(a)(2)."). Thus, disposition of Ford County's claims may (most likely *will*) impair Kansas's sovereign, economic, and property interests.

### c. The existing parties do not—and *cannot*—adequately represent Kansas's interests in this litigation.

The current parties are neither equipped, nor motivated, to represent Kansas's sovereign interests. *See Wyandotte Nation*, 200 F. Supp. 2d at 1288-89 (recognizing that private parties and a municipality could not represent the State's interests). And, Kansas has "only a minimal burden of showing that its interests are not adequately represented by the parties." *South Dakota*, 317 F.3d at 785 (quoting *Mausolf*, 85 F.3d at 1303). Even when certain interests are "not adverse," the interests are not adequately represented if the interests are "disparate." *Planned Parenthood of Minn., Inc. v. Citizens for Cmty. Action*, 558 F.2d 861, 870 (8th Cir. 1977); *South Dakota*, 317 F.3d at 786 (recognizing that sovereign governments, acting *parens patriae*, represent interests of all its citizens and subdivisions). "[I]ntervention as of right may be based upon an interest which is contingent upon the outcome of the litigation." *S.E.C. v. Flight Transp. Corp.*, 699 F.2d 943, 948 (8th Cir. 1983) (interests were disparate where intervenor had additional and concrete interests different from existing government party).

Because Kansas seeks to intervene to challenge Ford County's usurpation of Kansas's *parens patriae* and statutory authority, the existing defendants cannot adequately represent Kansas's interests. Ford County *cannot* exercise Kansas's *parens patriae* authority in this action. *See Snapp*, 458 U.S. at 607; *see also Lynch v. Nat'l Prescription Adm'rs, Inc.*, 787 F.3d 868, 872 (8th Cir. 2015) (Attorneys General can invoke *parens patriae* doctrine); *Reynolds*, 377 U.S. at

575 ("[p]olitical subdivisions of States—counties, cities, whatever—never were and never have been considered as sovereign entities[,]" cannot invoke *parens patriae* authority, and can only exercise the "powers conferred upon them" by the State (cleaned up)). Ford County cannot represent Kansas's interests and prospective legal claims against the Plastics Defendants because Ford County cannot exercise any authority on behalf of all the State, its political subdivisions, and its citizens. And, assuming plaintiffs prevail on the merits, Kansas *will* (*at minimum*) face a *direct* impact to its solid waste management fund and ability to investigate the precise conduct plaintiffs allege. *See* K.S.A. 65-3415; K.S.A. 65-3415a; K.S.A. 65-3415b.

Separately, the Plastics Defendants may seek a similar outcome as Kansas (*i.e.*, dismissal), but they do not share the "unique," sovereign interests of the State in defending its *parens patriae* and statutory authority. *See Wyandotte Nation*, 200 F. Supp. 2d at 1288-89. And the Plastics Defendants will likely seek to dismiss the claims as a whole *with prejudice*. But, Kansas is seeking dismissal of Ford County's class allegations *without prejudice* because Kansas may choose to bring or participate in a legitimate "national, 50-state solution" "to hold [the] plastics producers and manufacturers accountable[,]" if or when concrete facts show violations of Kansas or federal law. (Doc. 48, ¶¶ 7-8.)

Because the "State is no ordinary litigant," no existing party can adequately represent its interests, especially when acting to protect its sovereign authority. *Snapp*, 458 U.S. at 612 (Brennan, J., concurring); *cf. United States v. Hooker Chemicals & Plastics Corp.*, 749 F.2d 968, 984 (2d Cir. 1984) ("[A] government asserting its status as *parens patriae* deserves special consideration when the issue is adequacy of representation."). Kansas's interests are not adequately represented by the existing parties.

*    *    *

Because Kansas has many recognized interests that this litigation may (or *will*) impair, and no existing party can represent these interests, the Court should find that Kansas is entitled to intervene under Rule 24(a)(2).

**III.    Alternatively, the Court should permit Kansas, through its attorney general, to intervene under Rule 24(b).**

If this Court determines that Kansas is not entitled to intervene as of right, then it should allow Kansas, through its attorney general, to intervene under Rule 24(b). As previously noted, the motion is timely. And Kansas otherwise meets the necessary requirements for intervention.

**a.    Kansas's intervention is warranted under Rules 24(b)(1)(B) and (b)(3).**

Rules 24(b)(1)(B) and (b)(3) allow Kansas to timely intervene if (1) Kansas has a claim or defense that shares a common question of law or fact, and (2) intervention would not unduly delay or prejudice the right of the original parties. Kansas meets this standard.

*First*, Kansas has a claim or defense that shares a common question of law with the underlying suit. Specifically, whether Ford County is attempting to improperly usurp Kansas's *parens patriae* and statutory authority by bringing an action on behalf of all persons, States, counties, and municipalities. (Doc. 48, ¶¶ 161-165.) By bringing this action on behalf of Kansas, its political subdivisions, and its citizens, Ford County *directly* challenges Kansas's sovereignty (without naming Kansas as a defendant). And, by Ford County's own account, Ford County shares a common question of law with Kansas. *See* (Doc. 48, ¶¶ 165-66 ("there are numerous and substantial questions of law or fact common to all of the Class Members").) The Plastics Defendants will also likely raise the common question of whether Ford County has the authority to bring this suit as it has. Kansas seeks to defend its sovereignty through this limited intervention and proposed motion to dismiss.

*Second*, Kansas's intervention would not unduly delay or prejudice the rights of the original parties because the State's intervention is timely and at a preliminary stage of litigation. If Kansas is unable to intervene, Kansas's sovereignty "inherent in [its] supreme power" would be fatally prejudiced. *Snapp*, 458 U.S. at 607. Because of Kansas's significant interests in the underlying suit and the common legal question, this Court should allow the State to intervene under Rules 24(b)(1)(B) and (b)(3).

### b. Kansas's intervention is warranted under Rules 24(b)(2)(A) and (b)(3).

Alternatively, the Court should allow Kansas to intervene under Rule 24(b)(2)(A), which permits timely intervention by a state governmental officer who administers a statute or regulation at issue without unduly delaying or prejudicing the existing parties. *Coffey v. Comm'r*, 663 F.3d 947, 951 (8th Cir. 2011); Fed. R. Civ. P. 24(b)(2)(A); *see also Wilson v. CFMOTO Powersports, Inc.*, No. CV 15–3192 (JRT/JJK), 2016 WL 912182, at *8 (D. Minn. Mar. 7, 2016) (permitting a state agency head intervention three months after amended complaint, but before start of discovery, when state agency administered and enforced the statute at issue); *Smith v. Fed. Hous. Fin. Agency*, No. 4:12-CV-54, 2013 WL 12121334, at *1-2 (E.D. Tenn. Jan. 22, 2013) (allowing state official to intervene in a class action suit based on a statute that state law authorized only the official to administer and the suit was "based on a matter of significant concern" to the official). Represented by the attorney general and as previously shown, Kansas's motion is timely and will not cause undue delay or prejudice to the existing parties.

As the chief law enforcement officer of Kansas, the attorney general is the exclusive authority to "appear for the state, and prosecute and defend any an all actions and proceedings" in all federal courts. K.S.A. 75-702(a). And, Kansas (through the attorney general) is the sole authority to enforce antitrust, consumer protection, and public nuisance claims on behalf of the

State, its subdivisions, and its citizens. *See* 15 U.S.C. § 15c (attorney general's sole authority to bring federal antitrust claims for the State); K.S.A. 50-162 (attorney general's exclusive authority to bring Kansas Restraint of Trade Act claims for the State and its political subdivisions); K.S.A. 75-702 (attorney general's sole authority to prosecute civil matters for the State); K.S.A. 60-908 (attorney general's exclusive authority to abate statewide nuisances); *see also* K.S.A. 50-628 (attorney general's exclusive authority to enforce state consumer protection law "throughout the state"). Kansas (through its attorney general) meets all prerequisites for permissive intervention under Rule 24(b)(2)(A) and (b)(3).

## IV. Kansas has standing for intervention under Rule 24.

Prospective intervenors in the Eighth Circuit must also establish standing for intervention under Rule 24. *Coffey*, 663 F.3d at 950. Kansas, as a sovereign entity, satisfies its *parens patriae* standing burden under Article III because its intervention relates to Kansas's quasi-sovereign interests. *Snapp*, 458 U.S. at 600 (1982); *Massachusetts v. E.P.A.*, 549 U.S. 497, 519 (2007) ("[w]hen a State enters the Union, it surrenders certain sovereign prerogatives[,]" which entitles the State to "special solicitude in our standing analysis."); *see, e.g.*, *Aziz v. Trump*, 231 F. Supp. 3d 23, 29 (E.D. Va. 2017) (recognizing Virginia had a right to intervene because of its *parens patriae* interest in the litigation). To show its quasi-sovereign interests, a state must show it is "commenc[ing] an action to protect a public interest," such as the safety, health, or welfare of its citizens, enforcement of its legal code, or demanding recognition of its sovereignty in the federal system. *Lynch*, 787 F.3d at 872 (cleaned up); *Snapp*, 458 U.S. at 601-07. Kansas intervenes here, as *parens patriae*, to defend its sovereignty from Ford County's usurpation, enforce its legal code, and protect the interests of the State, its political subdivisions, and all its citizens by preventing possible foreclosure on statewide abatement, antitrust, and consumer protection

claims by Ford County's impermissible lawsuit. No other prospective intervenor can protect Kansas's interests in this way. Kansas has *parens patriae* standing for intervention under Rule 24.[3]

*    *    *

If the Court does not allow Kansas to intervene as of right, then it should allow Kansas, through the attorney general, to intervene for the limited purpose of defending its *parens patriae* and statutory authority and its ability to bring a similar suit against the defendants.

**<u>CONCLUSION</u>**

For the foregoing reasons, this Court should grant Kansas's Motion for Limited Intervention.

---

[3] If the Court finds Kansas is not acting *parens patriae* and must establish traditional standing: (1) Ford County's litigation will likely cause Kansas an injury of a partial loss of its sovereignty, loss of funding for statewide solid waste management, and a loss of possible legal claims; (2) such likely injury is caused by Ford County's litigation attacking Kansas's sovereignty; and (3) dismissal of Ford County's class allegations will protect against Kansas's sovereignty, future funding, and possible legal claims. *See Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 380 (2024). Accordingly, Kansas also has traditional standing.

13

**Dated:** February 4, 2025              Respectfully submitted,

                                   **KRIS W. KOBACH**
                                   **Attorney General of Kansas**

                                   */s/ Nicholas C. Smith*
                                   Melanie S. Jack, W.D. Mo. No. KS-001292
                                     *First Assistant Attorney General*
                                   Nicholas C. Smith, W.D. Mo. No. KS-001290
                                     *Assistant Attorney General*
                                   Adam T. Steinhilber, Mo. Bar No. 73959
                                     *Assistant Solicitor General*
                                   **OFFICE OF ATTORNEY GENERAL**
                                   120 SW 10th Avenue, 2nd Floor
                                   Topeka, Kansas 66612
                                   Phone: (785) 296-3751
                                   Fax: (785) 291-3699
                                   Email: Melanie.Jack@ag.ks.gov
                                          Nicholas.Smith@ag.ks.gov
                                          Adam.Steinhilber@ag.ks.gov

                                   *Attorneys for State of Kansas*

## CERTIFICATE OF SERVICE

      I hereby certify that on this <u>4th</u> day of <u>February</u> 2025, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send a notice of electronic filing to all counsel of record who have entered an appearance, and I otherwise caused all parties to be served with the foregoing document as required by Federal Rule of Civil Procedure 24(c).

                                   */s/ Nicholas C. Smith*
                                   Nicholas C. Smith